# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS; | |
| *Plaintiff,* | |
| *v.* | |
| UNITED STATES DEPARTMENT OF STATE; | Case No. 1:25-cv-465 |
| MARCO RUBIO, in his official capacity as Secretary of State, Department of State; | **MEMORANDUM IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF** |
| BUREAU OF POPULATION, REFUGEES, AND MIGRATION, Department of State; | |
| JENNIFER DAVIS, in her official capacity as Principal Deputy Assistant Secretary, Bureau of Population, Refugees, and Migration, Department of State; | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; | |
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, Department of Health and Human Services; | |
| *Defendants.* | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

    I.    USCCB Cared For Refugees In The United States For Decades Before It Partnered With The Government ........................................................................ 2

    II.   Congress Has Required Funding For Resettlement Of Admitted Refugees For Decades ........................................................................................................... 3

    III.  USCCB's Refugee Resettlement Program And Cooperative Agreements .................... 7

    IV.  The President And Secretary Of State Recently Issued Orders Suspending Foreign Aid And Refugee Admissions .......................................................... 9

    V.   The Government Abruptly Suspended Funding For Domestic Refugee Resettlement ................................................................................................. 10

    VI.  The Refugee Funding Suspension Has Inflicted Swift And Irreparable Harm ............. 12

ARGUMENT .......................................................................................................................... 13

    I.    USCCB Is Likely To Prevail On Its Claims Against The Government ...................... 14

        A.    The Refugee Funding Suspension Violates Appropriations-Related Statutes, Undermining The Separation Of Powers ................................. 14

        B.    The Refugee Funding Suspension Is Arbitrary And Capricious .......................... 19

        C.    The Refugee Funding Suspension Violates the APA's Notice-and-Comment Requirements ............................................................................. 25

    II.   USCCB Is Suffering And Will Continue To Suffer Irreparable Injury ...................... 26

    III.  The Balance Of The Equities And The Public Interest Favor Granting Relief ............ 29

    IV.  The Court Should Enjoin Enforcement Of The Refugee Funding Suspension And Compel Defendants To Resume Reimbursements ............................... 31

CONCLUSION ....................................................................................................................... 33

i

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdullah v. Obama*,
    753 F.3d 193 (D.C. Cir. 2014) ................................................................................13

\* *AIDS Vaccine Advoc. Coal. v. Dep't of State*,
    --- F. Supp. 3d ---, 2025 WL 485324 (D.D.C. Feb. 13, 2025) ......................22, 23, 26, 27, 28

*Allied Local & Reg'l Mfrs. Caucus v. Env't Prot. Agency*,
    215 F.3d 61 (D.C. Cir. 2000) ..................................................................................20

*Beattie v. Barnhart*,
    663 F. Supp. 2d 5 (D.D.C. 2009) ............................................................................26

*Caron Found. of Fla., Inc. v. City of Delray Beach*,
    879 F. Supp. 2d 1353 (S.D. Fla. 2012) ...................................................................28

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ...............................................................................26

*Chef Time 1520 LLC v. Small Bus. Admin.*,
    646 F. Supp. 3d 101 (D.D.C. 2022) ................................................................13, 14

*City of New Haven v. United States*,
    809 F.2d 900 (D.C. Cir. 1987) ...............................................................................18

\* *Clinton v. City of New York*,
    524 U.S. 417 (1998) .........................................................................................14, 15

\* *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ...........................................................................................20, 22

*Dickson v. Sec'y of Def.*,
    68 F.3d 1396 (D.C. Cir. 1995) ...............................................................................23

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ..............................................................................................21

*Hall v. Johnson*,
    599 F. Supp. 2d 1 (D.D.C. 2009) ...........................................................................13

*HIAS, Inc. v. Trump*
    985 F.3d 309 (4th Cir. 2021) ...................................................................................5

*Human Touch DC, Inc. v. Merriweather*,
    2015 WL 12564166 (D.D.C. May 26, 2015) ...................................................27, 30

\* *In re Aiken County*,
　　725 F.3d 255 (D.C. Cir. 2013) ...................................................................15, 18, 19

*INS v. Chadha*,
　　462 U.S. 919 (1983) ......................................................................................14

*Kirwa v. Dep't of Def.*,
　　285 F. Supp. 3d 21 (D.D.C. 2017) ..............................................................14

*Kooritzky v. Reich*,
　　17 F.3d 1509 (D.C. Cir. 1994) ......................................................................25

*League of Women Voters of the U.S. v. Newby*,
　　838 F.3d 1 (D.C. Cir. 2016) ..........................................................................27

*Lee v. Christian Coal. of Am., Inc.*,
　　160 F. Supp. 2d 14 (D.D.C. 2001) ...............................................................28

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
　　572 U.S. 118 (2014) ......................................................................................19

*Make The Rd. New York v. Wolf*,
　　962 F.3d 612 (D.C. Cir. 2020) ......................................................................19

*Marks v. Cent. Intel. Agency*,
　　590 F.2d 997 (D.C. Cir. 1978) ......................................................................23

\* *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
　　463 U.S. 29 (1983) ..........................................................................19, 20, 22

*Nat. Res. Def. Council v. Wheeler*,
　　955 F.3d 68 (D.C. Cir. 2020) ........................................................................25

*Nat'l Env't Dev. Ass'n's Clean Air Project v. Env't Prot. Agency*,
　　752 F.3d 999 (D.C. Cir. 2014) ......................................................................24

*Nat'l Mining Ass'n v. McCarthy*,
　　758 F.3d 243 (D.C. Cir. 2014) ......................................................................25

*New York v. Trump*,
　　2025 WL 357368 (D.R.I. Jan. 31, 2025) ................................................17, 19

*Off. of Pers. Mgmt. v. Richmond*,
　　496 U.S. 414 (1990) ......................................................................................14

*Ohio v. Env't Prot. Agency*,
　　603 U.S. 279 (2024) ......................................................................................19

*Open Cmtys. All. v. Carson*,
   286 F. Supp. 3d 148 (D.D.C. 2017) ...................................................29

*Otero Sav. & Loan Ass'n v. Fed. Rsrv. Bank of Kansas City*,
   665 F.2d 275 (10th Cir. 1981) ........................................................27

*Public Citizen v. Stockman*,
   528 F. Supp. 824 (D.D.C. 1981) .....................................................19

*Sec. & Exch. Comm'n v. Chenery Corp.*,
   318 U.S. 80 (1943).........................................................................24

*Train v. City of New York*,
   420 U.S. 35 (1975).........................................................................16

*Virginians Against Corrupt Congress v. Moran*,
   1992 WL 321508 (D.D.C. Oct. 21, 1992) ........................................31

*Whitman-Walker Clinic, Inc. v. Dep't of Health & Hum. Servs.*,
   485 F. Supp. 3d 1 (D.D.C. 2020) ....................................................28

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
   758 F.2d 669 (D.C. Cir. 1985).........................................................28

*Yakima Valley Cablevision, Inc. v. Fed. Commc'ns Comm'n*,
   794 F.2d 737 (D.C. Cir. 1986).........................................................22

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952).......................................................................15

**STATUTES**

2 U.S.C. § 681 ....................................................................................7

2 U.S.C. § 682 ..................................................................................17

2 U.S.C. § 684 .................................................................7, 17, 18, 19

2 U.S.C. § 687 ..................................................................................19

5 U.S.C. § 553 ..................................................................................25

5 U.S.C. § 705 ..................................................................................31

5 U.S.C. § 706 ..................................................................................31

8 U.S.C. § 1101 ...............................................................................4, 5

8 U.S.C. § 1157 ..................................................................................4

8 U.S.C. § 1181 ................................................................................................................4

8 U.S.C. § 1521 ................................................................................................................3

\* 8 U.S.C. § 1522 ...........................................................................4, 5, 6, 15, 16, 23

22 U.S.C. § 2394 ............................................................................................................23

22 U.S.C. § 2601 ..............................................................................................................3

28 U.S.C. § 1651 ............................................................................................................31

28 U.S.C. § 1657 ......................................................................................................31, 32

Pub. L. No. 87-510, 76 Stat. 121 (1962) .........................................................................3

Pub. L. No. 96-212, 94 Stat. 102 (1980) .........................................................................3

Pub. L. No. 99-93, 99 Stat. 405 (1985) ...........................................................................6

Pub. L. No. 103-236, 108 Stat. 382 (1994) .....................................................................6

Pub. L. No. 111-8, 123 Stat. 807 (2009) .........................................................................5

Pub. L. No. 113-235, 128 Stat. 2130 (2014) ...................................................................6

Pub. L. No. 117-43, 135 Stat. 344 (2021) ...............................................................6, 7, 16

Pub. L. No. 118-47, 138 Stat. 460 (2024) ...................................................................7, 16

## REGULATIONS

2 C.F.R. § 200.305 ...................................................................................................6, 24, 25

2 C.F.R. § 600.101 .......................................................................................................6, 24

## OTHER AUTHORITIES

Cardinal Blase J. Cupich, *Setting the record straight*, (Feb. 5, 2025),
   https://perma.cc/TZM6-VBZ4 ....................................................................................3

*Catholic Ministries Serving Migrants and Refugees*, USCCB (last visited Feb. 14,
   2025) https://perma.cc/ZSD8-879C ..........................................................................3

Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025) .........................................9

Exec. Order No. 14,163, 90 Fed. Reg. 8459 (Jan. 20, 2025) .........................................9

Joseph Story, 2 *Commentaries on the Constitution of the United States* § 1348 (3d ed. 1858) ...................................................................................................................14

KPMG, *United States Conference of Catholic Bishops and Affiliates: Consolidated Financial Statements with Supplemental Schedules, December 31, 2023 and 2022* (Aug. 16, 2024), https://perma.cc/59YQ-TH5L ...............................................8

*Letter of the Holy Father Francis to the Bishops of the United States of America*, (Feb. 10, 2025), https://perma.cc/38MM-RR4Z ........................................................2

*Matter of Henry M. Jackson, U.S. Senate*, B-200685, 1980 WL 14499 (Comp. Gen. Dec. 23, 1980) ..............................................................................................17

Memorandum from Secretary of State to All Diplomatic and Consular Posts, Dep't of State (Jan. 24, 2025), https://perma.cc/J26T-VCJR ...............................10

Off. of Assistant Sec'y for Plan. & Evaluation, U.S. Dep't of Health & Hum. Servs., *The Fiscal Impact of Refugees and Asylees at the Federal, State, and Local Levels from 2005 to 2019* (Feb. 2024), https://perma.cc/Y95E-QLWS..............................................................................30

Off. of Homeland Sec. Stat., Dep't of Homeland Sec., *Refugees: 2023* (Nov. 2024), https://perma.cc/8NAF-ST46 ...........................................................4

Pope Paul VI, *Populorum Progressio* (Mar. 26, 1967) ................................................2

*Refugee Processing and Security Screening*, USCIS (last visited Feb. 14, 2025), https://perma.cc/4A8C-EQRZ ..........................................................................4

*Refugee Timeline*, USCIS (last updated Jan. 24, 2025), https://perma.cc/F8PM-H27V...........................................................................3

*Report to Congress on Proposed Refugee Admissions for Fiscal Year 2024*, Dep't of State (Nov. 3, 2023), https://perma.cc/M4HL-HH2G .........................................5

*Resettlement Services*, USCCB (last visited Feb. 14, 2025), https://perma.cc/2DPN-M47N .............................................................................8

*United States Refugee Admissions Program Flowchart*, USCIS & Bureau of Population, Refugees, and Migration (Sept. 18, 2024), https://perma.cc/F5PJ-ZV3X ....................................................................4, 5

*U.S. Refugee Admissions Program and the Catholic Church*, USCCB Off. of Pol'y & Advoc. (Jan. 26, 2025), https://perma.cc/D7FC-WKKL ...........................................2

**INTRODUCTION**

This case involves the State Department's sudden and highly disruptive suspension of funding for the initial resettlement of refugees that the Department has been providing uninterrupted for decades. Carrying out a congressional directive, the State Department provides funding for lawfully admitted, government-vetted refugees for up to their first ninety days in the United States by entering into cooperative agreements with private resettlement agencies. For decades, the United States Conference of Catholic Bishops ("USCCB") has entered into such agreements annually. A federal statute and the cooperative agreements themselves require the government to provide prompt and adequate funding for any refugees that the government assigns to its resettlement partners, including USCCB.

Yet three weeks ago, without any notice, the government indefinitely suspended that funding. The government did not merely suspend future funding. It also suspended funding for the thousands of refugees that the government has *already* assigned to its resettlement partners. At the time of the funding suspension, USCCB had almost 7,000 refugees already assigned to it who urgently need money for food, shelter, emergency medical care, job training, and English-language education, among other things. It costs USCCB and its partners millions of dollars per week to care for those refugees. Because of that shortfall, USCCB has been forced to cut its staff and withhold payments from its partners. Unless the government's suspension is enjoined, further cuts will be needed, USCCB's reputation will be irreparably tarnished, and refugees will go without essential care.

The government's funding suspension is unlawful. It contravenes appropriations-related statutes, including the Impoundment Control Act, and flouts the Constitution's vesting of the power of the purse in Congress. It is also arbitrary and capricious because the government failed

1

to consider the predictably disastrous consequences of its suspension, the serious reliance interests of USCCB and other resettlement partners, and obvious alternatives—including suspending only future funding or waiting to take any action until the government completed a comprehensive review of the program.  To top it off, the government offered no reasonable explanation for its suspension and violated its own regulations.  And if this were not enough, the Refugee Funding Suspension constitutes a substantive rule that was not promulgated through notice and comment.

Because USCCB is likely to prevail on the merits of its claims, is suffering irreparable harm, and the equities and public interest favor relief, this Court should grant a temporary restraining order enjoining the government from taking any action to enforce or implement the funding suspension against USCCB, and requiring Defendants to reimburse USCCB for costs incurred pursuant to its cooperative agreements.  USCCB further requests that this Court issue a schedule for expedited briefing on a preliminary injunction.

## BACKGROUND

### I.    USCCB Cared For Refugees In The United States For Decades Before It Partnered With The Government

The Catholic Church has cared for refugees since the earliest days of Christianity.  *See The U.S. Refugee Admissions Program and the Catholic Church*, USCCB Off. of Pol'y & Advoc. (Jan. 26, 2025), https://perma.cc/D7FC-WKKL.  The "duty of giving foreigners a hospitable reception" is "imposed by human solidarity and by Christian charity."  Pope Paul VI, *Populorum Progressio* (Mar. 26, 1967).  "Jesus Christ, loving everyone with a universal love, educates us in the permanent recognition of the dignity of every human being, without exception."  *Letter of the Holy Father Francis to the Bishops of the United States of America* (Feb. 10, 2025), https://perma.cc/38MM-RR4Z.

In the United States specifically, the Church's refugee-resettlement efforts long predate its partnership with the federal government. The Church first coordinated efforts to receive and integrate those displaced by World War II in dioceses across the United States, and later welcomed hundreds of thousands of refugees fleeing communist persecution in the Soviet Union, Hungary, Vietnam, and Cuba. *Catholic Ministries Serving Migrants and Refugees*, USCCB (last visited Feb. 14, 2025), https://perma.cc/ZSD8-879C. Since 1965, USCCB and its predecessor organization, the U.S. Catholic Conference, have carried out this institutional mission in the United States. Decl. of William Canny ¶ 6 ("Decl."). USCCB does so not because all refugees are Catholic (many are not), "but because we are Catholic." Cardinal Blase J. Cupich, *Setting the record straight* (Feb. 5, 2025), https://perma.cc/TZM6-VBZ4; Decl. ¶ 6. In this way, USCCB discharges the mandate of the Gospel: "I was hungry and you gave me food, I was thirsty and you gave me drink, a stranger and you welcomed me." Cupich, *supra* (quoting Matthew 25:35).

## II. Congress Has Required Funding For Resettlement Of Admitted Refugees For Decades

For more than sixty years, Congress likewise has recognized that refugee assistance and resettlement is not just a moral imperative, but also is essential to this country's interests. In 1962, in response to the increase of refugees fleeing communist countries, Congress passed the Migration and Refugee Assistance Act, which authorized the appropriation of funds to address "urgent refugee and migration needs." Pub. L. No. 87-510, § 2(c), 76 Stat. 121, 122 (1962) (codified as amended at 22 U.S.C. § 2601(c)); *see also Refugee Timeline*, USCIS (last updated Jan. 24, 2025), https://perma.cc/F8PM-H27V. In 1980, Congress enacted the Refugee Act, Pub. L. No. 96-212, 94 Stat. 102 (1980) (codified at 8 U.S.C. § 1521 et seq.). That Act declared that "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands," including "efforts to promote opportunities for resettlement." § 101, 94 Stat. at 102.

Consistent with that purpose, the Refugee Act of 1980 created a statutory framework for the admission and resettlement of refugees known as the U.S. Refugee Admissions Program.

Under the U.S. Refugee Admissions Program, individuals outside the United States who have been persecuted or fear persecution on account of race, religion, nationality, or certain other grounds can seek legal admission into the United States. *See* 8 U.S.C. §§ 1101(a)(42), 1157(c). Refugees are screened abroad for eligibility and admissibility—a rigorous process that involves security and biometric checks, interviews, and medical screening, among other things. *Refugee Processing and Security Screening*, USCIS (last visited Feb. 14, 2025), https://perma.cc/4A8C-EQRZ; *United States Refugee Admissions Program Flowchart*, USCIS & Bureau of Population, Refugees, and Migration (Sept. 18, 2024), https://perma.cc/F5PJ-ZV3X. If approved as refugees, the individuals are admitted into the United States. 8 U.S.C. §§ 1157(c)(1), 1181(c). The President determines the maximum number of refugees to be admitted each fiscal year. *Id.* § 1157(a)(2), (3). Since 1990, an average of approximately 65,000 refugees have been admitted per year. Off. of Homeland Sec. Stat., Dep't of Homeland Sec., *Refugees: 2023*, at 4 (Nov. 2024), https://perma.cc/8NAF-ST46.

A core component of the U.S. Refugee Admissions Program is federal "domestic assistance" for the resettlement of newly arrived refugees, in partnership with private non-profit organizations. 8 U.S.C. § 1522. Rather than rely entirely on private charitable organizations to provide resettlement assistance, Congress made it the "policy of the United States" to commit federal funds in order to "promote opportunities for [refugee] resettlement." Refugee Act § 101, 94 Stat. at 102.

The resettlement program at issue here is the "[p]rogram of initial resettlement." 8 U.S.C. § 1522(b). Under that program, the Secretary of State has been designated by the President to "make grants to, and contracts with, public or private nonprofit agencies for initial resettlement

4

. . . of refugees in the United States." *Id.* § 1522(b)(1)(A), (B); *see also HIAS, Inc. v. Trump*, 985 F.3d 309, 319 n.5 (4th Cir. 2021) ("Since 1981, the Department of State has overseen the program."). Congress has made the same funding available for special immigrant visa (SIV) holders from Afghanistan—those who assisted the U.S. Mission in Afghanistan and fear reprisals as a result. *See* Afghan Allies Protection Act, Pub. L. No. 111-8, § 602(b)(8), 123 Stat. 807, 809 (2009) (codified in the notes of 8 U.S.C. § 1101). (For simplicity, this memorandum refers to special immigrant visa holders and refugees collectively as "refugees.")

The Secretary of State has charged the Bureau of Population, Refugees, and Migration ("PRM") with responsibility for administering the initial-resettlement program. PRM discharges that responsibility by entering into annual cooperative agreements with resettlement agencies. There are currently ten resettlement agencies, including USCCB. *See United States Refugee Admissions Program Flowchart*, *supra*; *Report to Congress on Proposed Refugee Admissions for Fiscal Year 2024*, Dep't of State (Nov. 3, 2023), https://perma.cc/M4HL-HH2G. Under the cooperative agreements, PRM awards specific sums to each resettlement agency to reimburse expenses the agency incurs supporting refugees for up to the first ninety days they are in the United States. *E.g.*, Ex. A at 22 (First 2025 Cooperative Agreement with USCCB); Ex. B at 23 (Second 2025 Cooperative Agreement with USCCB). This funding covers critical services, such as housing, food, and clothing, as well as social, medical, educational, and employment services. Ex. A at 5–6; Ex. B at 5–6.

Once PRM enters into these cooperative agreements, the agency has a statutory obligation to provide adequate initial-resettlement funding for admitted refugees "to the extent of available

appropriations." 8 U.S.C. § 1522(a)(1)(A).[1]  In particular, and among other things, the agency "*shall*, to the extent of available appropriations": (1) "make available sufficient resources for employment training and placement in order to achieve economic self-sufficiency among refugees as quickly as possible"; and (2) "provide refugees with the opportunity to acquire sufficient English language training to enable them to become effectively resettled as quickly as possible." 8 U.S.C. § 1522(a)(1)(A) (emphasis added).  Consistent with those statutory commands, State Department regulations require PRM to make "[p]ayments for allowable costs" incurred by resettlement agencies except in limited circumstances.  2 C.F.R. § 200.305(b)(6) (OMB regulations incorporated by reference into the State Department's federal award regulations at 2 C.F.R. § 600.101).

For decades, on a bipartisan basis, Congress has consistently appropriated funds for refugee resettlement.  In 1985, for example, Congress appropriated $344,730,000 annually to the State Department for "Migration and Refugee Assistance."  Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub. L. No. 99-93, § 101, 99 Stat. 405, 407 (1985).[2]  Congress's most recent appropriations have been no different.  In 2024, Congress appropriated $3,928,000,000 to implement, among other things, "the Migration and Refugee Assistance Act of 1962 . . . and other ac-

---

[1] Although Section 1522(a) names the Director of the Office of Refugee Resettlement at the Department of Health and Human Services, the Director's statutory obligations with respect to initial resettlement have been transferred by presidential designation to the Secretary of State under Section 1522(b)(1)(B) and delegated to PRM.  The Department of Health and Human Services and Secretary Kennedy are named as defendants out of an abundance of caution, and because HHS's Payment Management System is used to make payments to USCCB.  *See* Ex. A at 11.

[2] *See also* Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No. 103-236, § 104, 108 Stat. 382, 390 (1994) (appropriating about $590,000,000 for the same); Department of State, Foreign Operations, and Related Programs Appropriations Act, 2015, Pub. L. No. 113-235, 128 Stat. 2130, 2589 (2014) (appropriating $931,886,000 for the same); Additional Afghanistan Supplemental Appropriations Act, 2022, Pub. L. No. 117-43, 135 Stat. 344, 375 (2021) (appropriating $415,000,000 for fiscal year 2022 to "address humanitarian needs in, and to assist refugees from, Afghanistan").

tivities to meet refugee and migration needs." Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 744 (2024); 135 Stat. at 375 (appropriating an additional $976,100,000 for special immigrant visa holders from Afghanistan, among other things).

Independent of the statutory scheme requiring the government to adequately fund initial resettlement for admitted refugees, Congress also has enacted the Impoundment Control Act. 2 U.S.C. §§ 681–88. That Act regulates the Executive Branch's authority to "defer" the spending of appropriated funds by imposing substantive limitations and procedural requirements. *Id.* § 684. Before the Executive Branch can defer the use of appropriated funds, the Act requires the President to transmit a "special message" to both houses of Congress with specific details about the proposed deferral, including the amount to be deferred, the deferral's duration, "the reasons for the proposed deferral," and "the estimated fiscal, economic, and budgetary effect" it will have. *Id.* § 684(a). The Act also denies the Executive Branch any ability to defer spending except for three specified reasons; it forbids deferrals based on policy disagreements with Congress. *Id.* § 684(b).

### III.    USCCB's Refugee Resettlement Program And Cooperative Agreements

Each year since the enactment of the Refugee Act of 1980, USCCB has entered into agreements with the federal government to provide initial-resettlement services for refugees. USCCB receives and coordinates the distribution of PRM awards for initial resettlement through its Migration & Refugee Services. Decl. ¶ 5. USCCB partners with subrecipients, most of whom are local Catholic Charities, across the United States to accomplish this work. *Id.* ¶ 7. These partners are strategically chosen in concert with the State Department and state refugee coordinators to achieve goals such as partnering with subrecipients in locations that will facilitate family reunification efforts. *Id.*

Today, USCCB runs the largest non-governmental refugee-resettlement program in the United States. *Resettlement Services*, USCCB (last visited Feb. 14, 2025), https://perma.cc/2DPN-M47N. USCCB currently serves around 17% of refugees being resettled in the United States. Decl. ¶ 6. And since 1980, USCCB has provided initial-resettlement services to more than 930,000 refugees. *Id.* ¶ 7.

In providing this assistance, USCCB has consistently devoted more resources than it receives in related federal funding. In 2023, for example, USCCB paid $4 million more on its refugee-resettlement and related programs than it received from the federal government. *See* KPMG, *United States Conference of Catholic Bishops and Affiliates: Consolidated Financial Statements with Supplemental Schedules, December 31, 2023 and 2022* at 29 (Aug. 16, 2024), https://perma.cc/59YQ-TH5L (recording over $134,000,000 in expenses for migration and refugee services against only $130,000,000 in revenue). And those numbers do not account for the additional cash, in-kind contributions, or volunteer services provided by local Catholic Charities and other subrecipients. Decl. ¶ 18.

For Fiscal Year 2025, USCCB entered into two cooperative agreements with PRM awarding USCCB around $65 million for initial refugee resettlement. One of the agreements covers refugees; the other covers refugees and special immigrant visa holders from Afghanistan, who are treated like refugees for initial-resettlement purposes. In all other relevant respects, the terms of the cooperative agreements are substantially the same. *See* Ex. A at 4; Ex. B at 4. Both cooperative agreements run from October 1, 2024 to September 30, 2025.

Both cooperative agreements require USCCB to "[a]ssume responsibility for sponsorship of the refugees assigned to" it "under this agreement." *See* Ex. A at 38. On the day a refugee is admitted, USCCB must ensure that each refugee is met at the airport, transported to their home,

and provided a first meal as well as food and clothing for their immediate needs.  *Id.* at 39.
USCCB also must ensure that "refugees assigned to it" are provided the required home visits
within 72 hours of arrival, and that the housing provided to the refugees is safe, sanitary, and
adequately furnished.  *Id.* at 39–41.  USCCB must then assist refugees with, among other things,
applications for social security cards, health insurance and medical care, English-language pro-
grams, cultural orientation, and employment services during the first ninety days they are in the
United States.  *Id.* at 42–49.

## IV.   The President And Secretary Of State Recently Issued Orders Suspending Foreign Aid And Refugee Admissions

Starting on January 20, 2025, the President and the Secretary of State issued orders sus-
pending foreign aid and refugee admissions into the United States.  But none of those orders
expressly suspends funding for the domestic resettlement of admitted refugees.

On January 20, President Trump signed an executive order titled "Reevaluating and Rea-
ligning United States Foreign Aid."  Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025)
("Foreign Aid Executive Order").  The Foreign Aid Executive Order directs relevant Executive
Branch officials to institute a "90-day pause in United States foreign development assistance"
pending review for programmatic efficiency and policy alignment, subject to waivers authorized
by the Secretary of State for specific programs.  *Id.* § 3(a).  On the same day, President Trump
signed an executive order titled "Realigning the United States Refugee Admissions Program."
Exec. Order No. 14,163, 90 Fed. Reg. 8459 (Jan. 20, 2025) ("Refugee Executive Order").  The
Refugee Executive Order suspends the entry of new refugees into the United States with narrow
exceptions.

On January 24, Secretary of State Rubio issued an order to all State Department diplo-
matic and consular posts stating that "[c]onsistent with" the Foreign Aid Executive Order, "all

new obligations of funding . . . for foreign assistance programs funded by or through the Depart-ment and USAID" would be paused "pending a review." Memorandum from Secretary of State to All Diplomatic and Consular Posts, Dep't of State (Jan. 24, 2025), https://perma.cc/J26T-VCJR ("Rubio Memo"). The Rubio Memo instructed that for "existing foreign assistance awards, contracting officers and grant officers shall immediately issue stop-work orders, con-sistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review." *Id.* The Rubio Memo also provided for waivers for limited circumstances. *Id.*

## V.    The Government Abruptly Suspended Funding For Domestic Refugee Resettlement

Although none of the President's or Secretary of State's orders mentions (let alone pauses) funding for the resettlement of refugees already admitted into the United States, the State Depart-ment recently decided to suspend domestic refugee-resettlement funding as well (the "Refugee Funding Suspension").

On January 24, to implement the Refugee Funding Suspension, PRM sent materially iden-tical suspension letters to its resettlement agencies, including USCCB. *See, e.g.*, Complaint ¶¶ 196–97, *Pacito v. Trump*, No. 2:25-cv-255 (W.D. Wash. 2025). The two-page letter USCCB received stated that "consistent with" the Foreign Aid Executive Order, awards pursuant to USCCB's cooperative agreements with the State Department were "immediately suspended as of January 24, 2025" "pending a Department-wide review of foreign assistance programs." Ex. C (Suspension Letter). The suspension letter instructed that immediately upon receipt, USCCB "must stop all work under the award(s) and not incur any new costs after" January 24 and "cancel as many outstanding obligations as possible." *Id.*

The suspension letter provided only two perfunctory reasons for the sudden suspension. First, the letter stated that the suspension was "[c]onsistent with the President's Executive Order

on Reevaluating and Realigning United States Foreign Aid," without addressing how domestic refugee resettlement constitutes foreign aid.  *Id.*  Second, the letter stated that the award to USCCB "may no longer effectuate agency priorities," without addressing what the agency's priorities are or why the awards may no longer effectuate those priorities.  *Id.*  The letter did *not* explain why the government had elected to suspend funding pending its reevaluation of priorities rather than conduct that review before cutting off funding midstream.

The suspension letter also stated that USCCB could "submit payment requests for legitimate expenses incurred prior to the date of" the letter "or legitimate expenses associated with" the funding suspension.  *Id.*  But the government has to date refused to reimburse USCCB for more than $13 million in reimbursement funds for initial-resettlement services rendered before January 24—a refusal that constitutes an additional tacit component of the Refugee Funding Suspension.

On January 28, USCCB responded to PRM.  USCCB explained that its resettlement program services "includ[e] the provision of housing support, emergency food assistance, and emergency medical care to newly arrived refugees and Special Immigrant Visa (SIV) holders who have been processed and approved for resettlement in the United States by the federal government."  Ex. D (USCCB Letter to PRM).  USCCB urged that its programs were consistent with the "Administration's goals to make the United States safer and stronger, as it operates domestically to ensure that newly arrived refugees and SIV holders are able to integrate successfully into local communities."  *Id.*  USCCB also explained that it did not understand its awards to represent "new costs" and that the organization is entitled to reimbursement for all costs for serving "refugees and SIV holders in their initial 90-day . . . service periods."  *Id.*  USCCB also inquired about "legitimate expenses" it incurred before January 24, 2025.  *Id.*

On January 31, 2025, in providing an update about payment requests, PRM stated that the suspension was issued in order to "compl[y] with the [Foreign Aid] Executive Order" and directed USCCB to "abide by the notice of suspension issued to [the] organization." Ex. E (PRM Update on Payment Requests). PRM did not provide any further explanation for the Refugee Funding Suspension. "Although there has been some email traffic since then between USCCB and PRM, *e.g.*, Ex. F, PRM has not provided any further explanation for its funding suspension." Decl. ¶ 14 (citing email exchange on February 14, 2025).

## VI.    The Refugee Funding Suspension Has Inflicted Swift And Irreparable Harm

On January 25, 2025, the day after USCCB received the suspension letter, there were 6,758 refugees that had been assigned by the federal government to USCCB's care and who had been in the United States for ninety days or less. Decl. ¶ 15. In the ordinary course, USCCB receives subrecipient reimbursement requests for refugee-resettlement services rendered and submits reimbursements to PRM's grants office. *Id.* ¶ 8. Those funds are typically available to USCCB within 24 to 48 hours. *Id.* USCCB then pays its subrecipients for the refugee-resettlement services provided pursuant to the cooperative agreements and pays its own administrative costs, operating costs, and the salaries of resettlement staff provided for in the agreements. *Id.*

As a result of the Refugee Funding Suspension, however, USCCB has not been reimbursed for services provided to the thousands of refugees that have been assigned to it. USCCB has not been paid for services provided as far back as November 2024, or for services rendered after January 24 to the refugees already allocated to USCCB's care for their initial-resettlement period. Decl. ¶ 16. USCCB is currently awaiting approximately $13 million of unpaid reimbursements and currently owes an additional $11.6 million to its subrecipients that it is unable to reimburse. *Id.* Those numbers will rise by millions of dollars every week that the Refugee Funding Suspension remains in effect. *Id.*

The consequences of that funding shortfall have been predictably devastating. Because of that shortfall, on February 7, USCCB was forced to give four-weeks' notice of planned termination to 50 staff members in its Migration & Refugee Services office, more than half of its refugee-resettlement staff. Decl. ¶ 17. And USCCB will need to lay off additional staff if the funding suspension continues. *Id.* USCCB also has been unable to process reimbursements to subrecipients, who likewise have been forced to make layoffs. And although USCCB and its subrecipients so far have been able to maintain resettlement services for the refugees in their care, they soon will be unable to do so. *Id.* ¶ 22. If that happens, refugees may lose access to shelter, food, urgent medical care, English-language learning, job-training, and other services during their first days in the country.

## ARGUMENT

To obtain a temporary restraining order, "a movant 'must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 109 (D.D.C. 2022) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)); *see also Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) (standards for temporary restraining orders and preliminary injunctions are the same). It is the movant's burden "'to show that all four factors, taken together, weigh in favor of the injunction.'" *Chef Time*, 646 F. Supp. 3d at 109 (quoting *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014)). Because all four factors favor relief, this Court should enter a temporary restraining order and preliminary injunction enjoining enforcement of the Refugee Funding Suspension and requiring Defendants to reimburse USCCB for costs incurred pursuant to its cooperative agreements.

# I.    USCCB Is Likely To Prevail On Its Claims Against The Government

To be entitled to injunctive relief, a plaintiff "need only show likelihood of success on one claim." *Kirwa v. Dep't of Def.*, 285 F. Supp. 3d 21, 35 (D.D.C. 2017).  Here, the Refugee Funding Suspension is unlawful for multiple, independent reasons:  It contravenes appropriations-related statutes, including the Impoundment Control Act; undermines the Constitution's separation of powers; is arbitrary and capricious under the APA; and violates the APA's notice-and-comment rulemaking requirements.  USCCB therefore is highly likely to succeed on the merits.  *Chef Time*, 646 F. Supp. 3d at 109.

## A.  The Refugee Funding Suspension Violates Appropriations-Related Statutes, Undermining The Separation Of Powers

The Constitution vests the power of the purse in Congress.  The Appropriations Clause and Article I ensure "that public funds will be spent according to the letter of the difficult judgments reached *by Congress* as to the common good and not according to the individual favor of Government agents."  *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990) (emphasis added). "If it were otherwise, the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure."  *Id.* at 427 (quoting Joseph Story, 2 Commentaries on the Constitution of the United States § 1348 (3d ed. 1858)).

Those principles apply with equal force when the Executive Branch *refuses* to spend money that Congress has appropriated for specific purposes.  The "practical effect" of Executive impoundments is to unilaterally negate appropriations statutes, contravening the "'finely wrought' procedure that the Framers designed" for the enactment or repeal of a law.  *Clinton v. City of New York*, 524 U.S. 417, 438, 440 (1998) (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)).  That is why "where previously appropriated money is available for an agency to perform a statutorily

14

mandated activity," there is "no basis for a court to excuse the agency from that statutory mandate." *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013).

When the Executive Branch ignores Congress's instructions with respect to appropriations, it arrogates to itself Congress's power of the purse. That threatens to concentrate "power in the hands of a single branch" at grave risk to individual liberty, which is "always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton*, 524 U.S. at 450 (Kennedy, J., concurring). The Executive's power therefore is at its "lowest ebb" when it defies Congress's appropriations laws. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

Here, Congress has imposed (with the President's assent) two independent restrictions on the Executive Branch's ability to suspend funding for refugee resettlement: First, it has enacted a statute mandating that the government spend available appropriations on certain forms of assistance for refugees that it has admitted into the United States; and, second, it has enacted the Impoundment Control Act, which permits the Executive Branch to defer spending appropriated funds only after complying with specific procedures and only for particular reasons. The government has defied both of those congressional commands.

***The Immigration and Nationality Act***. The Refugee Funding Suspension contravenes Congress's command that in administering the initial-resettlement program, the government must promptly provide certain services to admitted refugees. The Immigration and Nationality Act, as amended by the Refugee Act of 1980, provides that once the Secretary has begun "providing assistance" to refugees by resettling them in the United States and placing them in the care of a nongovernmental entity like USCCB, the Secretary must provide funding to those refugees "to the extent of available appropriations." 8 U.S.C. § 1522(a)(1)(A). Among other things, the Secretary

"*shall*" make available "as quickly as possible" "sufficient resources for employment training" and for "sufficient English language training." *Id.* (emphasis added).

Here, the government has chosen to enter into cooperative agreements and thus to "provid[e] assistance" to admitted refugees. 8 U.S.C. § 1522(a)(1)(A). At the time of the Refugee Funding Suspension, it had assigned almost 7,000 refugees to USCCB who had been in the United States for ninety days or less. The government therefore has an obligation to make available funding for resettling those refugees "as quickly as possible" and "to the extent of available appropriations." *Id.*

The government has made no suggestion that the funds Congress appropriated to support this program have been exhausted. Last year alone, Congress appropriated $3.9 billion to the State Department for, among other things, "migration and refugee assistance." Department of State, Foreign Operations, and Related Programs Appropriations Act, 138 Stat. at 744; *see also* Additional Afghanistan Supplemental Appropriations Act, 2022, 135 Stat. at 375 (appropriating an additional $976,100,000 for special immigrant visa holders from Afghanistan, among other things). Yet the government, through the Refugee Funding Suspension, is indefinitely refusing to spend that money, even though Congress has commanded that it do so for statutorily mandated purposes—including providing employment and English training to refugees already placed with USCCB. *See* 8 U.S.C. § 1522(a)(1)(A). The government instead has left USCCB and its assigned refugees to fend for themselves. The government simply does not have "discretionary control over the outlay of funds" that Congress not only has appropriated for specific purposes but also mandated that the government spend for those same purposes. *Train v. City of New York*, 420 U.S. 35, 45 (1975).

16

*The Impoundment Control Act*.  The Refugee Funding Suspension is independently unlawful because it violates the Impoundment Control Act.  That Act limits the authority of the Executive Branch "to defer any budget authority provided for a specific purpose or project."  2 U.S.C. § 684(a).  It defines a "deferral of budget authority" broadly to include "*withholding or delaying* the obligation or expenditure of budget authority . . . provided for projects or activities," or "any other type of Executive action or inaction which *effectively precludes the obligation or expenditure* of budget authority."  *Id.* § 682(1) (emphases added); *see Matter of Henry M. Jackson, U.S. Senate*, B-200685, 1980 WL 14499, at *1 (Comp. Gen. Dec. 23, 1980) ("[A]ny executive branch action or inaction whether based on programmatic, budgetary, or other factors, is potentially subject to the Impoundment Control Act if it precludes or delays, the use of budget authority.").

Here, the Refugee Funding Suspension effects a "deferral of budget authority" within the meaning of the Impoundment Control Act.  The suspension indefinitely halts the disbursement of millions in funds that Congress appropriated to the government for refugee assistance and the government committed to expending through cooperative agreements with USCCB.  Despite Congress's specific appropriation of funds for refugee assistance, the government seeks categorically not to spend those funds indefinitely.  That is unquestionably a "dela[y]" in the "expenditure of budget authority" or an "action" that "effectively precludes the . . . expenditure of budget authority" under the Impoundment Control Act.  2 U.S.C. § 682(1); *see also New York v. Trump*, 2025 WL 357368, at *2–3 (D.R.I. Jan. 31, 2025) (holding, in APA suit, that Executive's indefinite pause of all federal financial assistance likely violates the Impoundment Control Act).

The Refugee Funding Suspension's deferral of budget authority violates the Impoundment Control Act's procedural requirements by ignoring them altogether.  The Act provides that if the government intends to defer spending money that it has been appropriated, "the President shall

transmit" a special message to Congress specifying, among other things, how much budget authority he wishes to defer and for how long, the specific projects or governmental functions involved, his reasons and legal authority for doing so, and the "fiscal, economic, and budgetary effect of the proposed deferral." 2 U.S.C. § 684(a). But here, there is no indication the President has transmitted to Congress any special message explaining and justifying the Refugee Funding Suspension.

The Refugee Funding Suspension also runs afoul of the Act's substantive limitations. The Act provides that "[d]eferrals shall be permissible *only*" to "(1) provide for contingencies; (2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law." 2 U.S.C. § 684(b) (emphasis added). "No officer or employee of the United States may defer any budget authority for any other purpose"—including based on policy disagreements. *Id.* As the D.C. Circuit has explained, the "President sometimes has policy reasons (as distinct from constitutional reasons) . . . for wanting to spend less than the full amount appropriated by Congress for a particular program." *In re Aiken County*, 725 F.3d at 261, n.1. "But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds." *Id.* "Instead, the President must propose the rescission of funds," under the Impoundment Control Act, "and Congress then may decide whether to approve a rescission bill." *Id.*; *see also City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) ("policy" deferrals "are ordinarily intended to *negate* the will of Congress by substituting the fiscal policies of the Executive Branch for those established by the enactment of budget legislation").

The Refugee Funding Suspension is an impermissible policy-based deferral. The suspension letter USCCB received states that the government is deferring spending because the awards "may no longer effectuate agency priorities." Ex. C, Suspension Letter, *supra*. To the extent that

rationale has any discernable meaning at all, it expresses nothing more than a pure policy disagreement—indeed, merely a *potential* policy disagreement. As the D.C. Circuit has recognized, such policy disagreements fall outside the Act's three enumerated categories of permissible deferrals. 2 U.S.C. § 684(b)(1)–(3); *see In re Aiken County*, 725 F.3d at 261, n.1 ("[I]n those circumstances, even the President does not have unilateral authority to refuse to spend the funds.").

The government has argued in other cases that the Impoundment Control Act can be enforced exclusively by the Comptroller General, who is "empowered" to sue for violations of the Act. 2 U.S.C. § 687. But the existence of that remedy—which does not purport to be exclusive—does not supply the "clear and convincing evidence of congressional intent" needed to overcome the "well-settled presumption" of judicial review under the APA. *Make The Rd. New York v. Wolf*, 962 F.3d 612, 624 (D.C. Cir. 2020) (quotation marks omitted). The government has relied primarily on a forty-year-old district court decision, *Public Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981), which applied a rigid version of the zone-of-interests test that the Supreme Court has since held is "not especially demanding," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129–32 (2014) (quotation marks omitted). And a more recent district court decision has enforced the Act's requirements in an APA suit. *New York*, 2025 WL 357368, at *2. This Court should do so as well.

### B. The Refugee Funding Suspension Is Arbitrary And Capricious

The APA requires agency action to be "reasonable and reasonably explained." *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (quotation marks omitted). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*

*Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also, e.g.*, *Clark County v. Fed. Aviation Admin.*, 522 F.3d 437, 441 (D.C. Cir. 2008) (applying the reasoned decision-making requirement to an informal adjudication).  Among the most important factors that an agency must consider are "serious reliance interests" engendered by its prior policies and significant alternatives to its chosen course of action.  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (reliance interests); *Allied Local & Reg'l Mfrs. Caucus v. Env't Prot. Agency*, 215 F.3d 61, 80 (D.C. Cir. 2000) (alternatives).

The Refugee Funding Suspension is a textbook arbitrary-and-capricious agency action. The government utterly failed to consider the dire consequences of its actions and an obvious, superior alternative; it gave no reasoned explanation for its decisions; and it ignored its own regulations.

*First*, the government "entirely failed to consider . . . important aspect[s] of the problem." *State Farm*, 463 U.S. at 43.  Most glaringly, the government did not account for the obvious and serious consequences that an immediate funding suspension would have on award recipients like USCCB, its subrecipients, and individual refugees—including irreparable damage to USCCB's reputation, relationships, and mission, and to refugees who may lose essential services and training during the critical first months of their resettlement periods.  *See* Decl. ¶ 22.  The government made no effort whatsoever to identify (let alone weigh) the costs and benefits of its blunderbuss Refugee Funding Suspension—and tellingly could provide no explanation even after USCCB raised these issues with PRM post suspension.

In so failing, the government also ignored the substantial, reasonable reliance interests imperiled by a sudden suspension of refugee-assistance awards.  *Regents*, 591 U.S. at 30 ("When an agency changes course . . . it must be cognizant that longstanding policies may have engendered

serious reliance interests that must be taken into account." (quotation marks omitted)); *see also Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). For decades, USCCB has reasonably relied on awards from the government under the terms of its cooperative agreements. USCCB has entered into agreements with and received reimbursement from the government every year since 1980, and *never*—until the Refugee Funding Suspension—has the government halted funding mid-agreement. USCCB has fulfilled its obligations under the agreements to provide high-quality, essential resettlement assistance to hundreds of thousands of refugees, and it reasonably expects in return, based on past experience and the terms of the agreements, that the government will meet its statutory funding obligations.

By abruptly cutting off funding without notice, the government predictably eviscerated USCCB's serious reliance interests. USCCB has about $13 million (and growing) of unreimbursed costs that it incurred prior to the Refugee Funding Suspension in reliance on its cooperative agreements and owes an additional $11.6 million to its subrecipients for services rendered. Decl. ¶ 16. Because of the Refugee Funding Suspension, USCCB on February 7 had no choice but to notify 50 employees—more than half of its refugee-resettlement staff—of impending termination, all of whom relied on continued funding pursuant to its cooperative agreements. *Id.* ¶ 17. Moreover, USCCB already has had to stop reimbursing its subrecipients providing direct services to refugees, causing those organizations to go unpaid despite *their* reliance on the State Department's compliance with its funding obligations. And most disheartening, lawfully admitted refugees who resettled in this country relying on the government's promise to aid their integration may soon lose the essential services provided to them by USCCB and its subrecipients.

The APA "required" the government—*before* taking action—"to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against

competing policy concerns." *Regents*, 591 U.S. at 33. As one court in this District recently concluded in a case addressing a separate funding suspension under the Foreign Aid Executive Order, the government's "implementation of the blanket suspension is likely arbitrary and capricious given the apparent failure to consider immense reliance interests, including among businesses and other organizations across the country." *AIDS Vaccine Advoc. Coal. v. Dep't of State*, --- F. Supp. 3d ---, 2025 WL 485324, at *5 (D.D.C. Feb. 13, 2025). So too here.

The government also failed to consider an obvious, less disruptive "alternative way of achieving [its] objectives," *State Farm*, 463 U.S. at 48—namely, conducting a review of its outstanding cooperative agreements to ensure their compliance with agency priorities *before* halting funds to active awardees. The government has "not offered any explanation for why a blanket suspension of all congressionally appropriated foreign aid, which set off a shockwave and upended reliance interests for thousands of businesses, nonprofits, and organizations around the country, was a rational precursor to reviewing programs." *AIDS Vaccine Advoc. Coal.*, 2025 WL 485324, at *5. That glaring failure also dooms the Refugee Funding Suspension. *Yakima Valley Cablevision, Inc. v. Fed. Commc'ns Comm'n*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986) ("The failure of an agency to consider obvious alternatives has led uniformly to reversal.").

*Second*, the Refugee Funding Suspension is arbitrary and capricious because the reasons the government *did* provide are manifestly inadequate.

The government's first rationale for the Refugee Funding Suspension was that it is "[c]onsistent with" the President's Foreign Aid Executive Order. But the Foreign Aid Executive Order applies only to "foreign assistance." "Foreign assistance," whatever its meaning, cannot plausibly include awards to an *American* non-profit for refugees *in the United States*. *Cf.* 22 U.S.C.

§ 2394(b) ("foreign assistance" means aid provided "to a foreign country or international organi-zation"). That is particularly so because the statute under which the government provides funding to USCCB refers to awards for refugee resettlement as "*domestic* assistance." 8 U.S.C. § 1522(a)(3) (emphasis added). At a minimum, the government made no effort to explain how USCCB's activities constitute "foreign assistance" or how the Refugee Funding Suspension oth-erwise would be "consistent with" the Foreign Aid Executive Order.

Nor could the Foreign Aid Executive Order (or the follow-on Rubio Memo) save the gov-ernment's funding suspension even if they applied here. The Foreign Aid Executive Order cannot relieve the government of its statutorily imposed funding obligations because "an executive order cannot supersede a statute." *Marks v. Cent. Intel. Agency*, 590 F.2d 997, 1003 (D.C. Cir. 1978). And in any event, the Foreign Aid Executive Order and the Rubio Memo likewise fail to provide any reasoned explanation and evince no consideration of critical aspects of the problem or obvious, superior alternatives—which is why the government has been temporarily enjoined from enforcing them in another case. *See AIDS Vaccine Advoc. Coal.*, 2025 WL 485324, at *5.

The government's second rationale for the Refugee Funding Suspension fares no better. The government stated that USCCB's cooperative agreements "may no longer effectuate agency priorities," but it did not explain what those priorities are. Ex. C, Suspension Letter, *supra*. More problematic, the government did not explain *why* its agreements with USCCB may no longer ef-fectuate those priorities—a particularly glaring omission given that the government has continu-ously funded USCCB's refugee programs for decades. It is a basic precept of administrative law that "conclusory statements" like these "do not meet the requirement that 'the agency adequately explain its result.'" *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1407 (D.C. Cir. 1995).

The government also failed to provide *any* explanation for its unwritten suspension of re-imbursements for pre-January 24 expenses incurred pursuant to USCCB's cooperative agree-ments. It simply stopped reimbursing these expenses even though the written suspension letter that USCCB received contemplates their reimbursement.

Under bedrock administrative-law principles, the government cannot now come to this Court and offer additional justifications for the Refugee Funding Suspension. *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 88–90 (1943). Rather, the government is limited to the reasons it has already provided, and those rationales simply do not pass muster under the APA.

*Third*, in issuing the Refugee Funding Suspension, the government also ignored its own regulations. "[A]n agency action may [also] be set aside as arbitrary and capricious if the agency fails to comply with its own regulations." *Nat'l Env't Dev. Ass'n's Clean Air Project v. Env't Prot. Agency*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quotation marks omitted). The State Depart-ment has a regulation providing that "[p]ayments for allowable costs [incurred under a Federal award] must not be withheld . . . unless required by Federal statute, regulations, or" if the "recipient or subrecipient has failed to comply with the terms and conditions of the Federal award" or is "delinquent in a debt." 2 C.F.R. § 200.305(b)(6) (incorporated by reference into the State Depart-ment's federal award regulations at 2 C.F.R. § 600.101).

Here, no statute or regulation requires the payments to USCCB to be withheld, and the government has not asserted that USCCB has failed to comply with the terms of the award or is delinquent in a debt. And even if the Refugee Funding Suspension theoretically allows reimburse-ments for "legitimate expenses" incurred prior to January 24, as the suspension letter stated, the

Department has in fact effectuated an unwritten policy of refusing to reimburse even those "allowable costs." 2 C.F.R. § 200.305(b)(6). The government's departure from its own regulations, without explanation, independently violates the APA.

### C. The Refugee Funding Suspension Violates The APA's Notice-And-Comment Requirements

The Refugee Funding Suspension is also a substantive rule issued without the notice-and-comment procedures required by the APA. Before issuing a "substantive rule," the APA commands agencies to publish a "[g]eneral notice of proposed rule making" and "give interested persons an opportunity to participate in the rule making." 5 U.S.C. § 553. An agency's failure to do so requires setting aside the agency's resulting action. *See Kooritzky v. Reich*, 17 F.3d 1509, 1514 (D.C. Cir. 1994).

The Refugee Funding Suspension is a substantive rule because it "alter[s] the rights or interests of parties." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (quotation marks omitted). Far from merely putting the public "on notice of *pre-existing* legal obligations or rights" or adjudicating an individual's rights "case-by-case" under pre-existing law, the Refugee Funding Suspension has the legal effect of prospectively altering the rights of refugees and resettlement organizations like USCCB to receive funding. *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83, 85 (D.C. Cir. 2020). The government therefore was required to provide public notice and an opportunity for comment before implementing this significant, prospective change. Its failure to do so also violates the APA.

\* \* \*

The Refugee Funding Suspension is unlawful for numerous independent reasons, any one of which would require it to be enjoined. USCCB thus has established a likelihood of success on the merits of its challenge to the suspension.

## II.    USCCB Is Suffering And Will Continue To Suffer Irreparable Injury

USCCB is suffering serious and ongoing irreparable harm as a direct result of the Refugee Funding Suspension.  Irreparable harm is an imminent injury that is "'both certain and great'" and is "beyond remediation" through money damages.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see also Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009).  The massive, unexpected, and continually accruing costs inflicted on USCCB as a direct result of the Refugee Funding Suspension have caused layoffs and reputational harm that put USCCB's entire refugee-resettlement program at risk—injuries that compound every day the suspension remains in effect.  Decl. ¶¶ 17, 19–20.

To date, USCCB and its subrecipients have accrued approximately $13 million in unpaid expenses for services provided to refugees under USCCB's existing cooperative agreements.  Additional unpaid expenses continue to accrue by millions of dollars a week.  As a result, USCCB's Migration & Refugees Services office already has been forced to notice terminations for 50 staff members—more than half of its resettlement staff.  Decl. ¶ 17.  And if the Refugee Funding Suspension remains in effect, USCCB likely will need to lay off additional employees.  *Id.*  USCCB also has been forced to refuse its subrecipients' reimbursement requests, totaling nearly $11.6 million, which has caused the subrecipients in turn to cut staff.  *Id.* ¶ 16.  The remaining staff are being strained to provide necessary services to refugees that the government has assigned to USCCB. *Id.* ¶¶ 19, 22.  If the funding suspension continues, USCCB and its subrecipients will not be able to continue meeting the needs of the refugees assigned to them.  *Id.*  None of these harms are "based upon expectations of receiving future grants or aid" but rather "upon expectations set in *existing* [cooperative agreements] with" the government.  *AIDS Vaccine Advoc. Coal.*, 2025 WL 485324, at *2 (emphasis added).

USCCB's compounding injuries cannot be remedied by money damages after the fact. USCCB may never be able to replace the skills and expertise of staff who have departed and may soon depart. Decl. ¶ 17; *see also AIDS Vaccine Advoc. Coal.*, 2025 WL 485324, at *3 (finding plaintiffs' significant layoffs to constitute irreparable harm). USCCB's staff have "valuable accumulated experience" with USCCB's programs, its subrecipients, its partnership with PRM, and the refugee communities that USCCB serves. *Id.* ¶ 17. Once they depart, they may not be able to wait for a decision on the merits in this case before moving on to future employment. Their invaluable expertise thus might be permanently lost to USCCB.

USCCB is also suffering serious reputational harm. Decl. ¶ 20. Over decades, USCCB has developed a reputation as a trusted employer and resettlement partner. *Id.* The Refugee Funding Suspension, by making it impossible for USCCB to pay its employees and partners, damages USCCB's hard-earned good will and makes it more difficult for USCCB to find employees and subrecipient partners in the future. *Id.* That independently constitutes ongoing irreparable harm. *See, e.g.*, *Human Touch DC, Inc. v. Merriweather*, 2015 WL 12564166, at *5 (D.D.C. May 26, 2015) (finding irreparable harm based on damage to business reputation and patient relationships); *Otero Sav. & Loan Ass'n v. Fed. Rsrv. Bank of Kansas City*, 665 F.2d 275, 278 (10th Cir. 1981) (finding irreparable harm based on "interrupt[ing] services" to thousands of customers and the consequent "severe confusion of processes and loss of good will and customer confidence" (quotation marks omitted)).

Taken together, moreover, these "obstacles unquestionably make it more difficult for [USCCB's Migration & Refugee Services] to accomplish [its] primary mission" of aiding refugees through its resettlement program—a separate form of "irreparable harm." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *see also AIDS Vaccine Advoc. Coal.*,

2025 WL 485324, at *3 (finding that the funding suspension caused irreparable harm because it "undermined [plaintiffs'] core missions and jeopardized vital services to vulnerable populations"); *Whitman-Walker Clinic, Inc. v. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 57–58 (D.D.C. 2020) (finding irreparable harm based on "significant financial and operational harms" that threatened the plaintiffs' "ability to deliver timely and effective" services to the constituencies they served); *Caron Found. of Fla., Inc. v. City of Delray Beach*, 879 F. Supp. 2d 1353, 1373 (S.D. Fla. 2012) ("Frustration of a rehabilitation provider's mission can cause irreparable harm.").

These harms also "threaten the very existence of" USCCB's refugee-resettlement programs. *Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 31 (D.D.C. 2001) (citing *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)); *accord AIDS Vaccine Advoc. Coal.*, 2025 WL 485324, at *4. Although USCCB previously has scaled its initial resettlement services up and down to match federal funding levels, those prior changes were planned and orderly and allowed USCCB to adjust its program without disrupting its business relationships or harming its reputation as a reliable partner with its subrecipients. Decl. ¶ 21. The Refugee Funding Suspension is fundamentally different. If the government can indefinitely suspend, without notice, almost the entirety of USCCB's budget for refugee resettlement—and refuse even to reimburse USCCB for expenses already incurred—it will become untenable for USCCB and its partners to continue serving refugees through this program. *See id.* ¶¶ 19, 21. And once shuttered, the program may never fully recover. *Id.*

Were there any doubt, the government recently conceded in another case involving a funding suspension that the categories of harms USCCB is suffering "are types of harm that are appropriately considered in the irreparable harm inquiry." *AIDS Vaccine Advoc. Coal.*, 2025 WL

485324, at *3.  USCCB, like plaintiffs in that case, thus has made "a strong preliminary showing of irreparable harm." *Id.* at *4.

### III.    The Balance Of The Equities And The Public Interest Favor Granting Relief

The balance of the equities and the public interest also strongly favor granting a temporary restraining order.  To start, "there is a substantial public interest in having government agencies abide by the federal laws—such as the APA"—and "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quotation marks omitted).  Thus, for all the same reasons that USCCB is likely to prevail on the merits, equity and the public interest favor relief.

In addition, as discussed, the Refugee Funding Suspension is causing widespread harm to USCCB, its employees, and its subrecipients and their employees—and it endangers the essential services they provide to some of the most vulnerable members of American society.

The infliction of that harm is highly inequitable.  It is unfair for the government to assign USCCB nearly 7,000 refugees and impose contractual and moral obligations on USCCB to provide essential services to those refugees, only to suddenly and indefinitely suspend the millions of dollars in funding needed to provide those services.  Nor is it fair to the refugees in USCCB's care.  Those refugees are scattered throughout the country in different communities, and many do not speak English, are resettling with families, and face significant risk of poverty and homelessness without continued funding.  And many of them relied on the promises of initial-resettlement services in making the decision to resettle in the United States.  Thousands of refugees, like Azizullah Areiyaee, currently rely on the continuing support of USCCB and its local partners. *See generally* Declaration of Azizullah Areiyaee In Support of Plaintiff's Motion For Temporary

Restraining Order.  Azizullah and his family left all they had when they fled Afghanistan in December 2021.  *Id.* ¶¶ 5–6.  They received special immigrant visas and arrived in the United States in December 2024.  *Id.* ¶ 7.  When they did, USCCB's partner, Catholic Charities, ensured they had shelter and food for their immediate needs, as USCCB's cooperative agreements require.  *Id.* ¶ 7–9.  Catholic Charities enabled Azizullah to obtain an apartment lease, enroll his children in school, and successfully apply for a job.  *Id.* ¶¶ 9–11.  The organization also continues to support his resettlement by providing English and other professional skills classes.  *Id.* ¶ 12.  When USCCB's partners' own funds inevitably evaporate as the suspension continues, they will be unable to assist refugees like Azizullah at their moments of greatest need.

Continued funding for services that USCCB provides, by contrast, is equitable and consistent with the public interest.  That is evident in Congress's enactment of multiple federal statutes and decades-worth of significant appropriations providing for refugee resettlement.  *Cf. Human Touch DC*, 2015 WL 12564166, at *5 ("Congress' passage of HIPAA . . . reflects this public interest" in maintaining the privacy of that information).  And the results bear out Congress's judgment.  For decades, USCCB's services have successfully integrated refugees into communities and enabled refugees to be self-sufficient.  When so integrated, refugees have a significant, positive impact on society and the U.S. economy:  From 2005 to 2019, for example, refugees served by HHS's Office of Refugee Resettlement yielded a net positive fiscal impact of $123.8 billion and generated $581 billion for state and federal governments.  *See* Off. of Assistant Sec'y for Plan. & Evaluation, U.S. Dep't of Health & Hum. Servs., *The Fiscal Impact of Refugees and Asylees at the Federal, State, and Local Levels from 2005 to 2019*, at 4 (Feb. 2024), https://perma.cc/Y95E-QLWS.

The balance of the equities and the public interest thus strongly favor requiring the government to continue to provide funding for the thousands of refugees in USCCB's care.

## IV. The Court Should Enjoin Enforcement Of The Refugee Funding Suspension And Compel Defendants To Resume Reimbursements

The Refugee Funding Suspension is unlawful, is causing USCCB irreparable harm, and the equities and public interest favor relief. This Court therefore should grant a temporary restraining order enjoining the government from taking any action to enforce or implement against USCCB the Refugee Funding Suspension, including the suspension letter and the suspension of payments for pre-January 24 expenses (and, to the extent applicable, the Foreign Aid Executive Order and the Rubio Memo). In doing so, the Court should make clear that the government must promptly reimburse all costs that USCCB has incurred or will incur under the terms of its cooperative agreements. The government has a statutory obligation to make those payments, which also have been "unlawfully withheld" or "unreasonably delayed" as a result of the unlawful funding suspension. 5 U.S.C. § 706. Holding the government to its payment obligations is the only way "to preserve status or rights pending conclusion of the review proceedings" given the irreparable harm that the government's actions are causing USCCB. *Id.* § 705; *see also* 28 U.S.C. § 1651(a). Ordering prompt reimbursements is also appropriate to ensure that the government does not tacitly continue its funding suspension by withholding reimbursements, as the government has done with respect to USCCB's pre-January 24 expenses.

Give the significant, ongoing irreparable harm to USCCB, its partners, and refugees, USCCB respectfully requests that this Court "expedite the consideration of" its motion for "good cause . . . shown." 28 U.S.C. § 1657(a). There is good cause to provide expedited consideration when the effectiveness of the requested relief depends on it being granted quickly. *See, e.g.*, *Virginians Against Corrupt Congress v. Moran*, 1992 WL 321508, at *1–2 (D.D.C. Oct. 21,

31

1992) (granting hearing as soon as allowed under the Federal Rules where plaintiff needed relief against allegedly unlawful election mailings before Election Day).  Here, USCCB seeks relief to redress grave ongoing injuries caused by the Refugee Funding Suspension, including layoffs that will become effective within the next several weeks, reputational damage as USCCB's resettlement partners go unreimbursed, and the looming possibility that refugees already in the United States will be cut off from essential services.  USCCB attempted for weeks to obtain reimbursement from the government but now has been forced to seek judicial relief because of its growing injuries and the likelihood of additional harm around the corner.  The near-certainty of additional irreparable injury here is "good cause" for expedited relief.  28 U.S.C. § 1657(a).

## CONCLUSION

This Court should grant USCCB's motion for a temporary restraining order.

February 19, 2025

Respectfully submitted,

*/s/ David W. Casazza*

William Quinn (D.C. Bar No. 1601853)*
Shannon Eckman (D.C. Bar No. 90024504)*
UNITED STATES CONFERENCE OF CATHOLIC BISHOPS
3211 Fourth Street, NE
Washington, DC 20017
(202) 541-3300
WQuinn@usccb.org

Dhananjay Manthripragada
  (D.C. Bar No. 990448)*
Nick Harper (D.C. Bar No. 144707)
David W. Casazza (D.C. Bar No. 1046918)
Connor P. Mui (D.C. Bar No. 90009004)*
Aly Cox (D.C. Bar No. 1780473)
Laura Stanley (D.C. Bar No. 90008623)*
Hunter Mason (D.C. Bar No. 90021049)*
Audrey Payne (D.C. Bar No. 90028352)*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500
DManthripragada@gibsondunn.com
NHarper@gibsondunn.com
DCasazza@gibsondunn.com
CMui@gibsondunn.com
ACox@gibsondunn.com
LStanley@gibsondunn.com
HMason@gibsondunn.com
APayne@gibsondunn.com

*pro hac vice* forthcoming