# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS;<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE;<br><br>MARCO A. RUBIO, in his official capacity as Secretary of State, Department of State;<br><br>BUREAU OF POPULATION, REFUGEES, AND MIGRATION, Department of State;<br><br>JENNIFER DAVIS, in her official capacity as Principal Deputy Assistant Secretary, Bureau of Population, Refugees, and Migration;<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, Department of Health and Human Services;<br><br>*Defendants.* | Case No. 1:25-cv-465<br><br>**DECLARATION OF WILLIAM CANNY IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |

## DECLARATION OF WILLIAM CANNY

1. I, William Canny, am the Executive Director of Migration & Refugee Services of the United States Conference of Catholic Bishops (USCCB).

2. I have held this position at the USCCB since 2015. I hold a Bachelor's Degree in Human Services from the University of Scranton and a Master's Degree in Public Health from the University of Pittsburgh. Before I joined USCCB, I had over 25 years of experience of service to the Catholic Church and refugees, including through my previous positions at Catholic Relief Services and the International Catholic Migration Commission.

3. I make this declaration based on personal knowledge and am competent to do so.

4. I am submitting this declaration in support of USCCB's Motion for a Temporary Restraining Order.

5. USCCB's Migration & Refugee Services is the largest non-governmental resettlement agency in the United States. In my role as Executive Director, I lead the office's efforts on policy formulation and communication about refugees and migrants, advocacy and education on the same, refugee resettlement, and other specialized services to at risk and vulnerable populations, such as victims of trafficking and unaccompanied minors. I am responsible for the execution of USCCB's cooperative agreements with the State Department's Bureau of Population, Refugees, and Migration (PRM), as well as the disbursement of those awards to USCCB's subrecipients. I am also responsible for oversight of all staff activities and USCCB's relationship with subrecipients of the cooperative agreement funds. And I am responsible for USCCB's relationship with the State Department for refugee resettlement services.

6. USCCB's Migration & Refugee Services has partnered with the federal government to provide refugee resettlement services since 1980, but the Catholic Church had

1

been serving refugees in the United States for decades before the partnership. USCCB's Migration & Refugee Services is part of a long tradition of the Catholic Church caring for refugees in the United States. It was created in 1965, at which time it assumed the responsibility for overseeing the Church's pre-existing refugee resettlement services in the United States. When the U.S. Refugee Admissions Program was created in 1980, USCCB's predecessor organization was among the original refugee resettlement agencies supporting its implementation. Over the years, it has consistently been the largest of these agencies and currently assists in resettling approximately 17% of refugees arriving in the United States. The Church engages in this work because we believe that every human person is created in the image and likeness of God and because of the Gospel imperatives to love thy neighbor and welcome the stranger. The refugees served in our programs come from many and varied religious backgrounds. We serve these refugees not because they are Catholic, but because *we* are Catholic.

7.  USCCB partners with dozens of subrecipient agencies across the country to provide refugee resettlement services. Most of these subrecipients are local Catholic Charities. These partners are strategically chosen in concert with the State Department and state refugee coordinators. Many refugees enter the United States with the hope of being reunited with family after years of separation due to war or violent conflict. USCCB and the other national resettlement agencies prioritize partnering with subrecipients in locations that will facilitate family reunification efforts. Since 1980, USCCB has resettled 932,637 refugees in the United States.

8.  USCCB entered into two cooperative agreements with PRM for Fiscal Year 2025. USCCB has entered into similar agreements with PRM every year since 1980. As

USCCB and its subrecipients provide services, USCCB receives subrecipient reimbursement requests for services rendered and submits reimbursement requests to PRM. In the usual course, a request to "draw down" funds from the award is submitted to PRM's grants office and typically is reimbursed to USCCB within 24 to 48 hours. USCCB then pays its subrecipients for the services rendered pursuant to the cooperative agreement, as well as its own operating costs and staff whose salaries are provided for in the cooperative agreements for the administration of the program. USCCB regularly monitors subrecipients to ensure both programmatic and fiscal compliance with our cooperative agreements. USCCB does so by, among other things, examining case files, conducting home visit interviews, meeting with subrecipient leadership, and maintaining contact with the officers of the State Refugee Coordinators and State Refugee Health Coordinators.

9. The first cooperative agreement with PRM provides an award of $43,657,781 to support USCCB's "expenses in administering the FY 2025 Reception and Placement Program" for refugees. *See* Ex. A at 4 (First PRM Agreement). The second cooperative agreement provides an award of $21,873,120 to fund the "FY 2025 Reception and Placement Program" for refugees and special immigrant visa (SIV) holders from Afghanistan. *See* Ex. B at 4 (Second PRM Agreement).

10. Under both cooperative agreements, USCCB agrees to provide initial core services for refugees and SIV holders (together, "refugees") for up to their initial 90 days in the United States. Through the Reception & Placement Program, USCCB and its subrecipients meet these refugees at the airport, and provide immediate physical needs of housing, food, and clothing. We ensure that their new home is safe, sanitary, and furnished. We assist them with

English-language learning, job training, cultural orientation, access to medical care, and all the necessary paperwork for their new lives in the United States.

11. On January 24, 2025, I received a suspension letter from Rachel Licina, a grants officer at PRM, regarding the cooperative agreements between PRM and USCCB. The suspension letter notified USCCB that all funding pursuant to these cooperative agreements was immediately suspended pending the State Department's review. The suspension letter instructed USCCB to stop work under the agreements and not to incur any "new costs." The suspension letter stated that USCCB could submit requests for legitimate expenses incurred prior to January 24, as well as legitimate expenses associated with the letter. *See* Ex. C.

12. On January 28, 2025, I responded to Ms. Licina. In my letter, I explained that based on our understanding of our awards, USCCB did not consider meeting present obligations to provide assistance to refugees and SIV holders already lawfully admitted to the United States to represent "new costs," as referenced in the suspension letter. I notified PRM that we would seek reimbursement for all costs for the refugees currently in their 90-day service period and in USCCB's care. I also asked for guidance on the applicability of any waivers and on "legitimate expenses" incurred before January 24, 2025. *See* Ex. D.

13. On January 31, Ms. Licina emailed an update about payment requests to USCCB. She stated that the suspension was issued in order to "comply[] with the [Foreign Aid] Executive Order." *See* Ex. E. She also directed USCCB to "abide by the notice of suspension issued to [the] organization." *Id.*

14. Although there has been some email traffic since then between USCCB and PRM, *e.g.*, Ex. F, PRM has not provided any further explanation for its funding suspension. As

4

of this date, USCCB has received no guidance on the applicability of any waivers or on the already-incurred "legitimate expenses."

15. On January 25, 2025, there were 6,758 refugees in the care of USCCB and its subrecipients who were still in their initial 90-day period for resettlement services. These refugees were allocated to USCCB by the federal government in a series of allocation meetings between the ten private resettlement agencies operating domestically within the United States and the Refugee Processing Center, an arm of PRM. Refugees are assigned to the resettlement agencies based on a variety of factors, including the location of subrecipients, specific medical needs, and an attempt toward even distribution over time for the agencies and their subrecipients to be able to provide consistent services.

16. Although the suspension letter stated that USCCB could submit reimbursement requests for services rendered before the suspension letter, USCCB has received no reimbursements since January 15, 2025. Currently, USCCB is waiting on approximately $13 million in reimbursement funds for initial-resettlement services rendered before the suspension letter went into effect. USCCB currently owes $11.6 million to its subrecipients for initial-resettlement services rendered, but that USCCB is unable to reimburse due to the cash-flow depletion caused by the suspension letter. These numbers will continue to rise, by millions of dollars every week, so long as the funding suspension remains in effect.

17. As a result of the funding suspension, USCCB was forced to give notice of planned terminations to 50 staff members in the Migration & Refugee Services office, more than half of our refugee resettlement staff. The first set of those 50 employees will have their last day of employment on March 7. These layoffs inflict irreparable harm to USCCB, which may never be able to replace the skills and expertise of the staff members it had to let go. These

workers have valuable accumulated experience, and they are familiar with our programs, with our partnership with PRM and our subrecipients, and with the needs of the refugees we serve. Losing these employees will adversely affect our ability to continue to serve refugees going forward. Remaining staff will be strained to provide the necessary services to refugees that the government allocated to USCCB. And USCCB will need to lay off additional staff if the funding suspension continues. Our employees who were laid off are also significantly harmed by their lost employment and the loss of their ability to live their vocation by assisting refugees.

18. Although USCCB spends more on refugee resettlement services each year than it receives in federal funding, the significant majority of funds for those services come from the federal government. For example, in 2023, USCCB spent $134 million on migration and refugee services, $130 million of which were provided by federal funding. KPMG, *United States Conference of Catholic Bishops and Affiliates: Consolidated Financial Statements with Supplemental Schedules, December 31, 2023 and 2022* at 29, *available at* https://www.usccb.org/about/financial-reporting. This does not include the local Catholic Charities' own cash and in-kind contributions and volunteer services to the program. In Fiscal Year 2024, for example, USCCB's subrecipient network generated $4,150,894 in cash contributions and $5,717,982 in in-kind contributions.

19. As USCCB and its subrecipients inevitably shrink their workforces and are deprived of the cooperative-agreement awards, our ability to serve refugees will be catastrophically diminished. USCCB's ability to provide the current scale of its refugee resettlement services is dependent on federal funding. The uncertainty surrounding this funding—and the 45-years partnership with the federal government to provide refugee resettlement services—will cause long-term, potentially fatal consequences to USCCB's

programs. Once shuttered, these programs may never recover. The catastrophic uncertainty caused by the funding suspension will make both USCCB and its subrecipients less likely to participate in refugee resettlement services at all, as the financial risk to these charitable organizations may be too high if it is unclear whether they will be reimbursed for the services rendered.

20. USCCB also faces reputational harm as an employer and service provider. The funding suspension has caused irreparable harm to USCCB's relationships with subrecipients (who have currently stopped being paid despite expecting to receive funds from USCCB) and will make it more difficult for USCCB to work with those organizations in the future to help refugees. Our inability to meet the expectations of our subrecipients—due the government's failure to meet its obligations to USCCB—will adversely affect our relationship with our subrecipients, who may be less likely to depend on us in future partnerships. And the employees lost during this time of confusion may not return, even if the funding resumes. These irreparable injuries to USCCB compound with every day that the funding USCCB is owed pursuant to its cooperative agreements is suspended and uncertainty as to its refugee-assistance programs remains. The reputational harms and forced staff reductions suffered by our subrecipients, too, will irreparably harm USCCB, by making it both more difficult to partner with these organizations in the future and more likely that the subrecipients will be institutionally incapable of providing services to refugees.

21. Throughout several of the prior Administrations, USCCB has scaled its resettlement services up and down to match the number of refugees being admitted into the United States. Those past changes happened in the ordinary course: They were planned and orderly, and allowed USCCB to scale its staff and services in an organized way, without

disrupting its business relationships or harming its reputation as a reliable partner with its subrecipients. This funding suspension has been anything but orderly; the dramatic suspension, and the uncertainty as to whether services provided before or after the suspension letter will be reimbursed, has caused disruptions to USCCB's business relationships and reputation that are categorically different, and from which USCCB's initial-resettlement program may not recover.

22. Finally, the funding suspension will cause irreparable harm to the refugees in USCCB's care, who rely on essential services and training in the first 90 days of resettlement. The longer subrecipients are deprived of funding for services rendered, the more likely it becomes that they will be financially incapable of assisting the refugees in their care with lifesaving services such as rent, food, and emergency medical services. Lost opportunities for English and job training in the earliest days of resettlement often can't be made up for later, and will cause significant but difficult-to-quantify harm to these refugees.

23. I declare under penalty of perjury that the foregoing is true and correct to the best of my understanding.

Executed on February 17, 2025,

William Canny
Executive Director, Migration & Refugee Services, USCCB