Exhibit A



# U.S. Department of State
# FEDERAL ASSISTANCE AWARD

| 1. Recipient Name<br>UNITED STATES CONFERENCE OF CATHOLIC BISHOPS | 2. Assistance Type: |
|---|---|

**2. Assistance Type:**
- ☑ Cooperative Agreement
- ☐ Fixed Amount Award
- ☐ Grant
- ☐ Property Grant
- ☐ Voluntary Contribution

**3. Address**
3211 FOURTH ST NE
WASHINGTON, DC
20017-1104
USA

**4. Recipient POC:** ███████████

**Phone Number:** ███████████

**Email:** ███████████

| 5. Type of Entity<br>U.S. Non-Profit Organization | 6. Unique Entity Identifier<br>████████████ | 7. EIN/ TIN<br>********** |
|---|---|---|
| 8. Assistance Listing Number<br>19.510 | 9. Statutory Authority for Assistance<br>Migration/Refugee Act | 10. Award Number<br>SPRMCO24CA0342 |
| 11. Period of Performance<br>Start Date  2024-10-01        End Date  2025-09-30 | | 12. Amendment Number<br>M001 |
| 13. Accounting and Appropriation Data<br>See following page | | 14. Funds Certified By<br>*Melony Hawkins*<br>Melony Hawkins |

## Funding Distribution

| 15. | Total Prior Costs | New Costs | Total Cost |
|---|---|---|---|
| U.S. Share of Costs | $13,480,448.00 | $30,177,333.00 | $43,657,781.00 |
| Recipient Share of Costs | $0.00 | $0.00 | $0.00 |
| Total Costs | $13,480,448.00 | $30,177,333.00 | $43,657,781.00 |

**16. Purpose of the Federal Award Activity**

To provide additional funding to ensure that all refugees approved for admission to the United States are provided with reception and placement services

**17. Specific Award Conditions**
☐ Attached

## Agreement

**The recipient agrees to execute the work in accordance with the Notice of Award, the approved application incorporated herein by reference or as attached, and 2 CFR Parts 200 and 600 including any subsequent revisions.**

| 18a. Recipient Name Anthony Granado | 19a. Grants Officer Name  Joseph Kouba |
|---|---|
| 18b. Recipient Signature<br><br>*Anthony Granado (electronically signed)* | 19b. Grants Officer Signature<br><br>*Joseph Kouba (electronically signed)* |
| 18c. Title | 18d. Date (dd-mmm-yyyy)<br>2024-12-20 | 19c. Bureau/Office/Post<br>BUREAU OF POPULATION,<br>REFUGEES AND MIGRATION<br>(PRM) | 19d. Date (dd-mmm-yyyy)<br>2024-12-20 |

By signing this Federal award, the recipient acknowledges that it will comply with Federal regulations, the Terms and Conditions, and any Special Award Conditions associated with this award. Receipt of the recipient's signature and return of the Federal Award Coversheet is required within ten (10) business days of the Grants Officer's signature. Please return to the Grants Officer address indicated here:

# Continuation of Accounting and Appropriation Data

| Fiscal Details | Amount |
|---|---|
| 1900-2024--19___X11430009-1037-PRM-2512--SPRMCO24CA0342-4122-RPADM004-031000-----2024FDSTRRM1439-SPRMCO24CA0342-M-TX9-HA.1 | $0.00 |
| 1900-2025--19___X11430009-1037-PRM-2512--SPRMCO24CA0342-4122-RPADM002-031000-----2025FDSTRRM1439-SPRMCO24CA0342-M-TX9-HA.1 | $30,177,333.00 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001

Contents

1. **Federal Award Identification Number (FAIN):** SPRMCO24CA0342 ........................................... 4

2. **Federal Share of Award:** $43,657,781.00 ........................................................................... 4

3. **Purpose and Objectives of Award** ..................................................................................... 4

  3.1 **Purpose** ....................................................................................................................... 4

  3.2 **Objectives and Expected Outcomes** ........................................................................... 5

  3.3 **Objectives and Indicators** ........................................................................................... 6

4. **Contact Information** ......................................................................................................... 6

5. **Authorized Budget Summary** ............................................................................................ 6

6. **Indirect Costs** .................................................................................................................. 10

7. **Pre-Award Costs** .............................................................................................................. 11

8. **Program Income** .............................................................................................................. 11

9. **Cost-Sharing:** .................................................................................................................. 11

10. **Subrecipients** .................................................................................................................. 11

11. **Changes in Subrecipients:** ................................................................................................ 11

12. **Payments** ........................................................................................................................ 11

13. **Reporting and Monitoring** ............................................................................................... 12

  13.1 **Performance Progress Report Schedule and Requirements** ........................................ 12

  13.2 **Performance Reports** ................................................................................................. 12

  13.3 **Annual Report** ........................................................................................................... 14

  13.4 **R&P Period Reports** .................................................................................................. 15

  13.5 **Federal Financial Report Schedule and Requirements** .............................................. 15

  13.6 **Reconciliation of Claimed Refugee Sponsorships** ...................................................... 15

  13.7 **Inventory Report** ....................................................................................................... 15

  13.8 **Reporting on Fraud, Waste, Abuse, Diversion and Destruction** ................................. 16

  13.9 **Reporting on Sexual Exploitation or Abuse** ............................................................... 16

  13.10 **Quarterly Status Report** ............................................................................................ 17

  13.11 **Availability of Per Capita Funds** ................................................................................ 17

  13.12 **IOM Promissory Note Repayments** ............................................................................ 18

14. **Substantial Involvement** .................................................................................................. 18

15. **Waiver of Acknowledgment of Department of State Support and Branding and Marking Requirements** ...................................................................................................................... 19

**16. Additional Bureau Specific Requirements** ................................................................... 19

**16.1 Responsibilities of the Recipient** ......................................................................... 19

   **i. Program Management** .......................................................................................... 19

   **ii. Confidentiality of Case Files and Refugee Data** ............................................ 20

   iii.**Prior Approval Requirements and Revision of Budget and Program Plans** ..................... 21

**16.2 Reception and Placement Program Core Services** ............................................. 21

   i. **Definitions** ............................................................................................................. 21

   ii. **Performance Standards** .................................................................................... 23

   iii.**Performance of Core Services by or Under the Direction of the Recipient** ..................... 30

   iv.**Delegation of Functions by the Recipient** ....................................................... 33

   v. **Coordination and Consultation with Public Agencies** ................................ 36

   vi.**Limitation of Responsibility to Perform Core Services** ................................ 38

   **vii. Core Services** .................................................................................................... 38

    a. Pre-Arrival Services ..................................................................................... 38

    b. Reception Services ....................................................................................... 38

    c. Material Needs Support .............................................................................. 39

    d. Post-Arrival Services ................................................................................... 41

    e. Case File Preparation and Maintenance ................................................. 50

    f. Assistance to Refugee Minor Children .................................................... 51

    g. Foster Care .................................................................................................... 54

    h. Loan Services ................................................................................................ 56

   **viii. Virtual R&P Services for Eligible Refugees** ............................................ 57

    a. Disbursement Requirements ..................................................................... 57

    b. Performance Standards. .............................................................................. 58

    c. Coordination and Consultation. ............................................................... 58

    d. Core Services ................................................................................................ 58

**17. Specific Conditions** ...................................................................................................... 59

**18. Special Provision for Performance in a Designated Combat Area (SPOT):** ........... 59

**19. State Department Leahy Amendment Vetting Requirements:** ............................... 60

**20. Reporting Taxes on Foreign Assistance funds:** ....................................................... 60

**21. Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment:** 60

United States Conference of Catholic Bishops                          SPRMCO24CA0342-M001

**22. Key Personnel:** ...................................................................................................................... 60

**23. Language:** ................................................................................................................................ 60

**24. Award Sensitivity Designation:** ............................................................................................ 60

**25. Funding Restrictions for the United Nations Relief and Works Agency (UNRWA):** ............... 61

**26. Prohibition on Funding Activities that Encourage Mass-Migration Caravans towards the United States Southwest Boarder:** ........................................................................................... 61

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001



# U.S. Department of State
# Award Provisions

During the period of performance, the Recipient must comply with:

- The Award Provisions below;
- The Department of State Standard Terms and Conditions for Federal Awards, which are incorporated by reference and made part of this Federal Award. Electronic copies containing the complete text are available at: https://www.state.gov/about-us-office-of-the-procurement-executive/;

- The applicable sections of 2 CFR §200 and 2 CFR §600; and
- All assurances and certifications made during the application process.

## 1. Federal Award Identification Number (FAIN):
SPRMCO24CA0342

## 2. Federal Share of Award: $43,657,781.00

## 3. Purpose and Objectives of Award

### 3.1 Purpose

**United States Conference of Catholic Bishops (USCCB)**, (hereinafter referred to as the "Recipient") is hereby provided a federal award, the purpose of which is to:

Partially support the Recipient's expenses in administering the FY 2025 Reception and Placement Program as authorized under the applicable provisions of the Migration and Refugee Assistance Act of 1962, as amended, and the Immigration and Nationality Act, as amended (the "INA").

The Recipient shall, in accordance with its proposal (Attachment A to this award):

i.  arrange for the reception and placement of refugees in the United States and offer appropriate assistance during their initial resettlement in the United States;
ii.  provide refugees with core services during their initial period of resettlement; and
iii.  in coordination with publicly supported refugee service and assistance programs, assist refugees in achieving economic self-sufficiency through employment as soon as possible after their arrival in the United States.

United States Conference of Catholic Bishops                 SPRMCO24CA0342-M001

The Recipient shall carry out this award in accordance with its proposal dated July 24, 2024, and any revisions to which both parties agree to in writing. The Recipient's proposal and any subsequent negotiated revisions are hereby incorporated by reference.

## 3.2 Objectives and Expected Outcomes

The Recipient agrees to perform the program and meet the specific objectives below:

    i.    Promote effective resettlement through community involvement including, but not limited to, community sponsorship as defined herein; coordination with ethnic and other community-based, public, and private organizations; and through consultation and coordination with state and local public officials involved in assisting refugees;

    ii.    Promote refugee placement through agencies that maximize the use of private resources and programs and engage their local communities in refugee resettlement;

    iii.    Promote the placement of all refugees in areas conducive to the attainment of economic self-sufficiency and/or reunification with family or friends;

    iv.    Maintain the capability and flexibility to receive and place new caseloads, including refugees with special needs, and to shift program and staff resources to reflect changing refugee populations and arrival patterns;

    v.    Ensure that R&P core services are made available in an appropriate language to refugees through its nationwide network of affiliated offices;

    vi.    Ensure that each refugee receives R&P core services according to standards included in the Cooperative Agreement within the specified time frame, and that provision of such services is well-documented in case files;

    vii.    ensure effective monitoring of local affiliates performing R&P services in accordance with the Cooperative Agreement;

    viii.    achieve R&P performance outcomes, specifically:

    a.  Refugee is in a safe, stable environment.
      1)  Refugee is picked up at the airport upon arrival with appropriate language interpretation as needed.
      2)  Refugee is placed in a safe dwelling.
      3)  Refugee is placed in an affordable dwelling.
      4)  Refugee has basic necessities.

    b.  Refugee can navigate appropriate and relevant systems.
      1)  Refugee can access/use appropriate transportation.
      2)  Refugee obtains own food and material needs.
      3)  Refugee obtained social security card and other identification as needed.
      4)  Refugee accesses health care.
      5)  Refugee demonstrates ability to contact emergency services.
      6)  Refugee children are enrolled in school within 30 days of arrival.
      7)  Refugee knows how to ask for interpretation services.

    c.  Refugee family is connected to means of ongoing support for self/family.
      1)  Refugee is connected to or enrolled in eligible services.
      2)  Refugee is financially supported (or self-sufficient).

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

    3) Refugee can explain where the household money will come from when the initial assistance is finished.

   d. Refugee understands surroundings and situation.

    1) Refugee knows his/her address, knows how to make phone calls, and how to be contacted.

    2) Refugee understands the effects of moving.

    3) Refugee knows the role of the resettlement agency and expectations of the resettlement agency and self.

    4) Refugee has a basic understanding of U.S. laws and cultural practices; and

  ix. ensure that R&P program and performance information is accessible to the public.

## 3.3 Objectives and Indicators

Specific Recipient Objectives and Indicators are detailed within the attached Recipient's proposal (Attachment A).

# 4. Contact Information

    i. Grants Officer:
        Rachel Licina
        Office of the Comptroller
        Bureau of Population, Refugees, and Migration
        United States Department of State
        2201 C Street, NW, 8th Floor, SA-9
        Washington, DC 20520
        Email: licinarm@state.gov
        Phone: 771-204-2944

    ii. Grants Officer Representative:
        Jennifer Gillyard
        Office of Admissions
        Bureau of Population, Refugees, and Migration
        United States Department of State
        2201 C Street, NW, 8th Floor, SA-9
        Washington, DC 20520
        Email: gillyardjc@state.gov
        Phone: 771-204-6824

# 5. Authorized Budget Summary

Unless otherwise stipulated, funds provided under this award may only be expended on authorized activities which take place during the period of performance.

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

| Budget Categories | Prior Costs | New Costs | Total Costs |
|---|---|---|---|
| 1. Personnel | | | |
| 2. Fringe Benefits | | | |
| 3. Travel | | | |
| 4. Equipment | | | |
| 5. Supplies | | | |
| 6. Contractual | | | |
| 7. Construction | | | |
| 8. Other Direct Costs<br>  a) Refugee Per Capita ▮▮▮<br><br>▮▮▮▮▮▮ b) Affiliate Capacity Per Capita<br>▮▮▮▮▮▮<br><br>  c) Other Direct Costs: | | | |
| 9. Total Direct Costs (lines 1-8) | | | |
| 10. Indirect Costs | | | |
| 11. U.S. Share of Costs (lines 9-10) | $13,480,448.00 | $30,177,333.00 | $43,657,781.00 |
| 12. Recipient Share of Costs | $0.00 | $0.00 | $0.00 |

    i.  Any anticipated purchase of non-expendable equipment, such as computers or vehicles with an acquisition cost of $5,000 or more per unit and were not part of the approved budget (Attachment A to this agreement), requires the prior written approval of the Bureau.

   ii.  If any part of the costs of goods and services charged under this agreement are collected from or reimbursed by the refugees or other sources, such collections shall be paid promptly to the Department or off-set against charges to the agreement; thereby, ensuring that no charges to this agreement results in duplicated reimbursement to the Recipient.

  iii.  Local Offices/Affiliates and Services to Refugees Per Capita Grant.
     a.  The Bureau shall provide the Recipient fixed per capita grants for each refugee admitted under Section 207 of the INA who is assigned to the Recipient pursuant to this agreement.  It is the intent of the Bureau that the per capita grants shall be spent in their entirety on expenses related to meeting the material needs of refugees and providing services to them, within the parameters of this subsection 5.iii.
     b.  Of the refugee per capita grant:

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001

1) At least $1,650 (direct assistance per capita) is to be provided in its entirety to the affiliate to which the refugee is assigned and is to be used to cover payments made by the affiliate to or on behalf of individual refugees for cash disbursement and/or purchases on behalf of the refugee for the purpose of meeting material needs according to the requirements of the program;

2) No less than $1,250 of this $1,650 must be spent on behalf of the refugee by the affiliate to which the refugee is assigned during that refugee's R&P service delivery period;

3) Up to $400 of this $1,650 may be spent on behalf of other vulnerable refugees assigned to the same affiliate who have unmet needs during their R&P period. The Recipient shall ensure affiliates who make use of this flexible funding have in place a policy that shall be reviewed and approved by the Recipient prior to implementation. Each policy shall include clear criteria to determine which cases will receive additional funds, how funds will be allocated, and how disbursement will be tracked and managed. The Recipient's process and standards for reviewing affiliate policies must receive PRM approval.

c. No more than $1,350 (affiliate capacity per capita) may be used to partially cover the actual expenses of the affiliates to which refugees are assigned in providing reception and placement services, including rent and security deposits associated with unoccupied housing (temporary or permanent) secured no more than 60 days in advance of an arrival, expenses that will lower the client-to-staff ratio, support positions that will coordinate volunteers or develop resources for the R&P program, deliver cultural orientation to refugees, and/or otherwise improve the quality of the R&P services received by refugees. Affiliate capacity per capita funds may not be used for construction, renovations, property development or management-related expenses, payments made by the affiliate to or on behalf of individual refugees for cash disbursement and/or purchases on behalf of the refugees for the purpose of meeting material needs according to the requirements of the program.

1) The Recipient will demonstrate through the reporting required under this agreement that the amounts funded for the per capita grants were provided by the Recipient in their entirety to affiliates based on the total number of refugees assigned to the Recipient during the period October 1, 2024 through September 30, 2025.

d. Payment of the amounts specified in subsection 5.3 ii.b. shall be made only for the number of assigned refugees who actually arrive in the United States during the period October 1, 2024 through September 30, 2025, but in no case shall the total payment of refugee per capita funds exceed $13,422,750.00 during this period.

e. Payment of the amounts specified in subsection 5.iii.c. may be made in advance of actual refugee arrivals and shall be for the actual expenses of affiliates up to $21,281,400.00 OR shall be made only for the number of assigned refugees who actually arrive in the United States during the period

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

October 1, 2024 through September 30, 2025, whichever is higher.  In no case shall the total payment of affiliate capacity per capita funds exceed $21,281,400.00 during this period.

    f.   This agreement may be amended to reflect the actual number of refugee arrivals during the period October 1, 2024 through September 30, 2025 and to adjust the amount of funds accordingly.

  iv.   The funds awarded under this agreement may be used only for the performance of the Recipient's responsibilities, authorized herein and by PRM Admissions Program Announcements which reference this agreement, for the provision of reception and placement services.  Program Announcements do not otherwise create additional responsibilities that require additional funds.  The funds awarded under this agreement may not be used to cover expenses of other activities or services that may be provided to refugees during their resettlement.  For example, funding provided under this agreement shall not be used to cover any expenses of collecting the IOM Promissory Note.

  v.   The affiliate capacity per capita funds earned under this agreement must be used in their entirety to cover affiliates' expenses and shall not be used to cover national management expenses, as specified in subsection 5.iii.c.

  vi.   The refugee per capita funds earned under this agreement must be used in their entirety by the Recipient's affiliate to which the refugee is assigned to cover cash disbursements to refugees and/or purchases on behalf of the refugee for the purpose of meeting his/her material needs according to the requirements of this program and shall not be used to cover national management expenses, as specified in subsection 5.iii.b.

  vii.   In the event that the Recipient's activities related to the performance of its responsibilities under this agreement are also eligible for funding under other federal government grants or agreements, the Bureau and the Recipient shall consult each other, and any other federal agency concerned to prevent attribution of the same expenditures to two (2) separate federal funding agreements.

  viii.   National Management.  Any unexpended funds available to the Recipient for national management expenses at the end of the validity period of this agreement must be returned to the Bureau and may not be used to cover affiliate expenses or for payments to or on behalf of refugees.

  ix.   Per Capita Funds

    a.   Any unexpended per capita funds designated for affiliates' expenses may be used to continue authorized core services beyond the R&P period for refugees assigned under this agreement, excluding payments to or on behalf of refugees which must be expended by the end of the R&P period.

    b.   Per capita funds designated for payment to or on behalf of each refugee may be used only to cover direct payments to or on behalf of each refugee and must be

United States Conference of Catholic Bishops                     SPRMCO24CA0342-M001

expended by the end of their R&P period. A minimum of $1,250 per capita must be spent on each refugee.

c. Up to $400 per capita of funds designated for payment to or on behalf of refugees may be used only to cover direct payments to or on behalf of any refugee placed at the affiliate that received the per capita.

d. All per capita funds earned under this agreement, however, must be expended no later than three (3) months following September 30, 2025. Per capita amounts funded during this three-month period must be reported as part of the final or interim final financial report for the period October 1, 2024 through September 30, 2025. Funds remaining at the end of the above-specified period shall be returned to the Bureau.

e. Any interest accrued on per capita funds made available under this agreement may be expended only (1) for the Recipient's responsibilities under this agreement; and (2) within the same time period specified as the period of performance in box 11 of Form DS-1909. Interest remaining at the end of such period shall be returned to the Bureau.

f. With the written approval of the Bureau, the Recipient may enter into funding arrangements with other voluntary organizations participating in the Bureau's initial reception and placement program that will ensure that each organization is reimbursed for the actual number of refugees to whom it has provided services required by this agreement.

x.   Transportation: Funds awarded under this agreement may not be used for travel outside the fifty (50) United States without the prior written approval of the Bureau. All approved international travel to be paid with funds awarded under this agreement shall be performed on U.S. flag carriers to the extent such service is available in accordance with the provisions of the "Federal Travel Regulations."

xi.  Grants and Grantee Requirements for Breach Response: When a grant recipient uses or operates a Federal information system or creates, collects, uses, processes, stores, maintains, disseminates, discloses, or disposes of PII within the scope of a Federal award, the agency shall ensure that the grant recipient has procedures in place to respond to a breach and include terms and conditions requiring the recipient to notify the Federal awarding agency in the event of a breach. The procedures should promote cooperation and the free exchange of information with Federal awarding agency officials, as needed, to properly escalate, refer, and respond to a breach.

## 6. Indirect Costs

| Type | Rate (%) | Applicable to |
|---|---|---|
| ███████ | ████ | Base: Direct salaries and wages excluding all fringe benefits. |

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

The base of application for the rate(s) above is defined in the Recipient's Negotiated Indirect Cost Rate Agreement dated February 16, 2024.

## 7. Pre-Award Costs

N/A

## 8. Program Income

Deduction: Any program income earned by the Recipient as a result of this award and during the period of performance must be deducted from the total allowable costs in order to determine the net allowable costs for the award.

## 9. Cost-Sharing:

N/A

## 10. Subrecipients

Any subawards must comply with the requirements of 2 CFR §200.332—Requirements for pass-through entities.

Issuing a subaward that was not proposed with the specific subrecipient's name in the Recipient's approved proposal requires prior approval. The Recipient must submit the proposed subaward budget and scope of work to the GO for review of cost allowability and approval prior to executing a subaward.  The executed subaward does not need to be submitted to the GO but must be provided upon request.

## 11. Changes in Subrecipients:

The inclusion of specific subrecipient(s) was a determining factor in the merit review or eligibility process. Changes in subrecipient(s) require GO approval.

## 12. Payments

  i.  Payments under this award will be made through the U.S. Department of Health and Human Services (HHS) Payment Management System (PMS). Unless otherwise stipulated, the Recipient may request payments on a reimbursement or advance basis. Instructions for requesting payments are available at: https://pms.psc.gov/.

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001

Advance payments must be limited to the minimum amounts needed and be timed to be in accordance with the actual, immediate cash requirements of the Recipient in carrying out the purpose of this award. The timing and amount of advance payments must be as close as is administratively feasible to the actual disbursements by the Recipient for direct program or project costs and the proportionate share of any allowable indirect costs.

Failure to comply with the terms and conditions of this award may result in payment delays.

ii.    Requests for reimbursement of National Management Expenses shall be submitted separately from requests for other funds and only in amounts that are required to meet the immediate cash needs of this activity.

iii.   Requests for payment of the refugee per capita shall be submitted only for those assigned refugees who have actually arrived in the United States.

## 13.  Reporting and Monitoring

The Recipient is required to submit quarterly performance and quarterly financial reports. The Recipient is required to submit Performance Reports and Financial Reports according to the reporting cycles and dates listed below. Performance Reports must be signed and include the following statement: "By signing this report, I certify to the best of my knowledge and belief that the report is true, complete, and accurate." Financial Reports must be signed and certified.

Reports are due thirty (30) calendar days after the end of a reporting period and in accordance with the schedule below. **A final program and financial report is due 120 calendar days after the period of performance end date.** Failure to comply with these reporting requirements may jeopardize the Recipient's eligibility for future awards and/or delays in payments.

### 13.1 Performance Progress Report Schedule and Requirements

| Report Range Start | Report Range End | Due Date |
|---|---|---|
| October 1, 2024 | December 31, 2024 | January 30, 2025 |
| January 1, 2025 | March 31, 2025 | April 30, 2025 |
| April 1, 2025 | June 30, 2025 | July 30, 2025 |
| July 1, 2025 | September 30, 2025 | January 30, 2026 |

### 13.2 Performance Reports

As appropriate, performance reports must contain:

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

      i.    A comparison of actual accomplishments to the objectives of the federal award established for the period, including the number of clients served during the reporting period under this award, broken out by refugees and SIVs. This should include information on how costs are tied to accomplishments;

     ii.    The reasons why established goals were not met; and

   iii.    Additional pertinent information including an analysis and explanation of cost overruns or high unit costs.

   iv.    Each report should address the specific Recipient objectives and indicators set forth in Section 3.3. and the extent to which they were accomplished, by quarter and cumulative year-to-date. The Recipient shall include in the Program Progress Report a brief summary and/or data as applicable on each of the following:

        a.   program activities, such as conferences, workshops, and training or other activities funded through this agreement;

        b.   the Recipient's affiliate monitoring activities to include findings and recommendations on each affiliate monitored, as well as a notation of the number of clients served under this award whose case file was reviewed or who received a home visit as part of each reported monitoring;

        c.   a discussion of actions taken to address any identified weaknesses in R&P core service delivery for clients served under this award, such as follow-up on corrective actions taken as a result of prior Recipient or Bureau monitoring;

        d.   follow-up actions to ensure final compliance with all prior Recipient or Bureau monitoring findings and recommendations relevant to this award;

        e.   percentage of affiliates, and remote placement community partners where relevant, in full compliance with all requirements for quarterly consultations, any consultation best practices, and discussion of any issues that prevent adequate resettlement in a given community or result in changes in the Recipient's placement plans;

        f.   national and local community sponsorship initiatives, challenges, successes, and outcomes;

        g.   the percentage of cases resettled through Cash-Based R&P Services and a brief discussion of trends and challenges; and

        h.   The number of arrived refugees who were served through remote placement as well as the city and state where they were placed, and any trends observed among cases served through remote placement and/or community partner service provision.

        i.   The number of arrived refugees who were served through Virtual R&P under this award, the city and state where they resettled, and any trends observed among cases served through Virtual R&P.

By submitting each program report through the MyGrants federal assistance management system, the Recipient is certifying that to the best of their knowledge and belief the report is correct and complete for performance of activities for the purposes set forth in the award documents.

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

Performance Reports must be submitted to the Grants Officers and Grants Officer Representative via **MyGrants**.

The Recipient acknowledges that the Department of State may make site visits as determined by the Grants Officer.

The final three (3) month report should also contain a brief summary of the activities carried out during the full period of the agreement.

## 13.3 Annual Report

The Recipient shall submit no later than March 31, 2026, a report to be submitted by the Bureau to Congress pursuant to Section 412(b)(7)I of the INA.  The report will be considered timely if submitted on or before the due date.  Such report shall describe for the period October 1, 2024 through September 30, 2025:

    i.    the number of refugees placed by county of placement and the total expenditures incurred during the year, including the proportion of such expenditures used for administrative purposes (National Management) and for provision of services (Local Offices/Affiliates and Payments to or on Behalf of Refugees);

    ii.    to the extent the information is available, the Recipient will make its best effort to determine the proportion of refugees placed during the agreement period by the Recipient and who, on September 30, 2025, are receiving publicly funded cash or medical assistance;

    iii.    the Recipient's program to monitor placement of the refugees and the activities of its affiliates and community partners where relevant;

    iv.    the efforts by the Recipient and its affiliates, and remote placement community partners where relevant, to coordinate with local social service providers so as to avoid duplication of services;

    v.    the efforts by the Recipient and its affiliates, and remote placement community partners where relevant, to notify public welfare offices of refugees who have been offered employment and to provide documentation to public welfare offices to which refugees have applied for cash assistance concerning cash or other resources directly provided to such refugees;

    vi.    the efforts of the Recipient's affiliates, and remote placement community partners where relevant, to inform appropriate public health agencies of the arrival of refugees known to have medical conditions affecting the public health and requiring treatment; and

    vii.    any complaints received from beneficiaries about provision of services by the Recipient pursuant to this agreement.

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

### 13.4 R&P Period Reports

A copy of the R&P period report form will be provided to the Recipient.  Data from this form will be submitted to the Refugee Processing Center (RPC) no later than the 15th day of the second month following the end of the R&P period and shall be considered timely if electronically submitted on or before the due date.  The report shall be submitted to the RPC at Incoming-Datafiles@wrapsnet.org. The Recipient will retain the reported information for a period of not less than one year from the date of arrival and will make it available for review by the Bureau upon request.

### 13.5 Federal Financial Report Schedule and Requirements

| Quarter Start Date | Quarter End Date | Report Due Date |
|---|---|---|
| October 1, 2024 | December 31, 2024 | January 30, 2025 |
| January 1, 2025 | March 31, 2025 | April 30, 2025 |
| April 1, 2025 | June 30, 2025 | July 30, 2025 |
| July 1, 2025 | September 30, 2025 | January 30, 2026 |

All financial reports must be submitted using form SF-425—Federal Financial Report. Financial reports shall be completed in the Payment Management system. Instructions for completing the SF-425 in PMS are available at: https://pms.psc.gov/.

Financial Reports completed in PMS must also be downloaded and submitted to the Grants Officers and Grants Officer Representative via **MyGrants**.

### 13.6 Reconciliation of Claimed Refugee Sponsorships

The Recipient shall reconcile with the RPC within sixty (60) calendar days its claimed arrivals each month.  A final summary of the Recipient's claimed arrivals for the period October 1, 2024 through September 30, 2025 must be reconciled with the RPC no later than January 15, 2026.

### 13.7 Inventory Report

A report shall be submitted within thirty (30) calendar days prior to the expiration of this agreement listing all items and purchase price of all non-expendable tangible personal property having a useful life of more than one year and having a current per unit fair market value of $5,000 or more per unit which were purchased with funds provided under this agreement.  This report must include the following information for each item purchased: description, date of purchase, serial number, and the country in which the item was used.

This required inventory report shall include any items of non-expendable tangible personal property that were purchased under a previous Bureau funding arrangement that continue to be used in activities funded under this agreement.

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001

The required inventory report shall also include the Recipient's specific recommendations for the disposition of each item of non-expendable tangible personal property.  In certain circumstances, the proposed disposition may include a recommendation to retain specified items for continued use in other Bureau funded activities or similar activities carried out by the Recipient.  If such property is no longer required for authorized activities, a recommendation for final disposition, e.g., sale, donation or disposal, shall be specified.

## 13.8 Reporting on Fraud, Waste, Abuse, Diversion and Destruction

Consistent with 2 CFR 200.113 and in compliance with Department of State Standard Terms and Conditions, provision P on Mandatory Disclosure, the Bureau reiterates the importance of prompt disclosure of credible allegations regarding cases of misconduct or misuse, fraud, waste, abuse, diversion, or attempts to divert assistance away from intended beneficiaries; destruction of PRM-funded assistance; or unauthorized interference by authorities. Any instances should be reported to both Department of State OIG and PRM as soon as possible but in no case later than 30 days from the date when the allegation is determined to be credible.

For each allegation, the recipient will take all reasonable efforts to include applicable details about the circumstances of the credible allegation or reported incident; the name of the individual or entity causing or alleged/reported to have caused the incident; the approximate date and location of the incident; if the incident included a material impact, the estimated value of the implicated assistance and the individual or group benefitting from the misconduct and/or misuse; and the corrective action, if any, taken to address the incident. The recipient will provide updates on the status of the case, as appropriate.

## 13.9 Reporting on Sexual Exploitation or Abuse

The recipient will inform both Department of State OIG and PRM as soon as possible but in no case later than 30 days from the date when an allegation of sexual exploitation or abuse is determined to be credible.  This includes such allegations that: (i) are directly related to the activities funded by this agreement; or (ii) in the recipient's view, would have a significant impact on the partnership between the recipient and Department of State or the U.S. Government. The notification should indicate, as available and applicable, the following: nature, date, and location of the alleged misconduct; date of first report to the recipient; involvement of any implementing partner(s); status of investigation; action that will be taken by the recipient; and whether the case has been referred to law enforcement. The recipient will provide updates on the status of the case, as appropriate.

Upon request from PRM or Department of State OIG, the recipient agrees to provide further available, relevant information for allegations notified under the previous paragraph unless disclosure of such information would be inconsistent with the recipient's rules and procedures concerning disclosure of information.

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001

### 13.10 Quarterly Status Report

The Recipient shall submit calendar quarterly status reports, in the formats attached hereto, as Attachment C.  The Attachment C reports shall be submitted within thirty (30) calendar days following the end of each calendar year quarter (January 30th, April 30th, July 30th, October 30th) during the validity period and **transmitted as a Post Award Task through https://mygrants.service-now.com.**   Proposed revisions or adjustments to the report may only be made within the subsequent sixty (60) calendar days following the report deadline for each calendar quarter or ninety (90) calendar days from the end of the calendar quarter.  Adjustments to direct costs proposed subsequently to this ninety (90) day period will not be considered for reimbursement under this agreement, except for possible charges for post-performance activities such as audits, evaluations and adjustments for indirect costs.

In recognition of the delay in determining final per capita earnings based on final reconciliation of arrivals, the Recipient may adjust the allocation of expenses between per capita and private resources, but may not increase expenses, during the one hundred twenty (120) day period for submission of the final expenditure report.

A final Attachment C report for expenditures together with a summary report of the previously reported quarterly expenditures shall be due March 31, 2026.  This report is to include any proposed revisions or adjustments to direct costs and to include earned income based on the reconciliation of arrivals with the Refugee Processing Center.  After this date, no revisions or adjustments of direct expenditures or adjustments of direct costs charges or earned per capita income will be recognized for consideration under this agreement.

**For National Management expenses**: In addition to the SF-425 required above, a listing of total expenditures by the Items of Expenditure Categories set forth in Attachment C of this agreement reflecting separately the costs being charged to this agreement and those charged to other sources. The quarterly line-item expenditure reports must be **transmitted as a Post Award Task through https://mygrants.service-now.com.**

**For Local Office/Affiliate and Payments to or on Behalf of Refugees expenses:** In addition to the SF-425 required above, a reporting of expenditures shall be completed as set forth in Attachment C of this agreement that indicate per capita income earned during the reporting period, expenditures incurred chargeable to per capita funds, and the total amount of non-Federal funds used to augment the per capita funds.  This information is to be provided by affiliate, or community partner where relevant, noting the affiliate or community partner RPC code and city, number of refugees arrived, affiliate/community partner expenses per capita expenditure, and per capita expenditures to or on behalf of refugees during the quarter as set forth in Attachment C. The quarterly expenditure reports must be **transmitted as a Post Award Task through https://mygrants.service-now.com.**

### 13.11 Availability of Per Capita Funds

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

A written statement must be submitted on or before December 31, 2025 **as a Post Award Task through https://mygrants.service-now.com** reporting the amount of per capita funds and accrued interest unexpended and available as of September 30, 2025.  This statement must confirm the amount of those funds that were expended and reported as a part of the quarterly financial reports for the period October 1, 2024 through September 30, 2025.

Should the Recipient have any unexpended per capita funds as of the financial report due on March 31, 2026, such funds must be returned to the Bureau no later than April 30, 2026.

### 13.12 IOM Promissory Note Repayments

The Recipient shall submit **as a Post Award Task through https://mygrants.service-now.com.**quarterly reports of transportation loan repayments indicating amounts repaid and remitted to the International Organization for Migration within thirty (30) calendar days of the end of each reporting period.  The reports shall be due on or before January 30, 2025, April 30, 2025, July 30, 2025 and October 30, 2025.

## 14.  Substantial Involvement

The Department of State will be substantially involved in carrying out the following aspects of this cooperative agreement:

The Recipient shall carry out its operational and administrative responsibilities hereunder in close coordination with and under the direction of the Bureau.  For the information of the Recipient, responsibilities relevant to this agreement are allocated as follows.

    **i.**    Office of Admissions

Acting as the Grants Officer's representative:

    a.  Provides overall policy guidance and program direction.
    b.  Reviews and comments on proposed budget for the Recipient.
    c.  Reviews and comments on proposed changes or revisions in terms of this agreement.
    d.  Monitors and evaluates the general performance of the Recipient's operations under this agreement to ensure that the established responsibilities and objectives are being successfully met, maintains contact, including site visits and liaison, with the Recipient, assists the Grants Officer in the review of required Recipient Program and Financial Progress Reports to verify timely and adequate performance, and provides the Bureau regular written reports on whether performance is in compliance with all the terms and conditions of this agreement.

    **ii.**    Office of the Comptroller

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

    a. Reviews and negotiates with the Recipient headquarters the Recipient's budget and any subsequent requests for funding.

    b. Prepares and executes the cooperative agreement, interprets the terms thereof, arranges for payment, works with the Recipient's headquarters for the overall administration of the funded activities, and is the mandatory control point of record for all official communications and contacts with the Recipient that may affect the budget, the project scope, or terms and conditions of the award.

    c. Considers requests for amendments to the cooperative agreement and, upon determination of appropriateness, prepares and executes formal amendments to the cooperative agreement.  Only the Grants Officer may amend the cooperative agreement.

    d. Monitors and evaluates the Recipient's performance in providing refugee transportation loan services.

## 15.  Waiver of Acknowledgment of Department of State Support and Branding and Marking Requirements

N/A

## 16.  Additional Bureau Specific Requirements

### 16.1 Responsibilities of the Recipient

The Recipient shall perform its responsibilities under this agreement in coordination with the Bureau and in a manner consistent with United States law and policy.

    **i.  Program Management**

    a. The Recipient shall provide the core services specified in subsection 16.2 below to refugees who are assigned to it under this agreement and who arrive in the United States during the period of this agreement in a manner consistent with United States law and policy.

    b. In compliance with the Bureau's policy that all funded activities be implemented in a manner that fully meets the standard of conduct established by the Inter-Agency Standing Committee (IASC) Task Force on Protection from Sexual Exploitation and Abuse in Humanitarian Crises, ensure that the activities conducted with funds provided under this agreement are implemented in accordance with the Recipient's established code of conduct submitted to the Bureau in its proposal (Attachment A). Should any change be made to the Recipient's code of conduct during the validity period of this agreement, inform the Bureau in writing within thirty (30) calendar days of the changes for consideration of whether the revised code continues to meet the Bureau's standard of core principles.

    c. The Recipient is reminded that U.S. Executive Orders and U.S. laws prohibit transactions with, and the provision of resources and support to, individuals and organizations associated with terrorism.  It is the legal responsibility of the

Recipient to ensure compliance with these Executive Orders and laws. This provision must be included in all sub-contracts/sub-awards issued under this agreement.

d. The U.S. Government is opposed to prostitution and related activities, which are inherently harmful and dehumanizing, and contribute to the phenomenon of trafficking in persons. None of the funds made available under this agreement may be used to promote, support, or advocate the legalization or practice of prostitution. Nothing in the preceding sentence shall be construed to preclude assistance designed to ameliorate the suffering of, or health risks to, victims while they are being trafficked or after they are out of the situation that resulted from such victims being trafficked. This provision shall be incorporated into all sub-agreements under this agreement.

e. Branding and Marking Strategy: State in all appropriate publications, electronic and printed descriptions, including press releases, annual reports, and financial statements that reception and placement activities conducted under this agreement are paid for, in part, through financial assistance provided by the Department of State.

f. Accord the Bureau and its authorized representatives the legally enforceable right to examine, audit and copy, at any reasonable time, all records in its possession pertaining to this agreement.

g. Assist the Bureau, as appropriate, in evaluating the Recipient's performance under this agreement by facilitating access to all relevant records and to all persons directly involved under this agreement.

h. Permit the Bureau to make available to the public the Recipient's performance outcomes, the Bureau's monitoring reports on the Recipient and its affiliates, and the Recipient's final consolidated placement plan, in a manner to be determined by the Bureau.

i. PRM Admissions Program Announcements and other formal communications, including emails, from PRM are for USRAP partner use only and are **not** for further or public distribution. Such information cannot be forwarded outside the organization, including to subsidiaries, without prior approval from PRM.

## ii. Confidentiality of Case Files and Refugee Data

**Government records, data and information on refugees may not be used, disclosed, or disseminated, except in connection with the administration of the U.S. Refugee Admissions Program and only with the prior written consent of the Department of State. Administration of the U.S. Refugee Admissions Program permits data and information-sharing among USRAP partners, including UNHCR, IOM, DHS, HHS, Resettlement Support Centers, and Resettlement Agencies, when access to the information is needed to carry out the USRAP.** All sharing of individual information is subject to the Privacy Act, 5 U.S.C. 552a and Department of State Privacy Policies. In accordance with these laws, relevant implementing regulations and policies, refugee records, information and data originating from START and/or WRAPS may not be shared without prior written consent of the Department of

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001

State, no matter whether those records, information or data have been transferred into the Recipient's database and/or de-identified. Refugee data originating from START and/or WRAPS may not be used for research purposes without the prior written consent of the Department of State. The policies and regulations of the Department of Health and Human Services and Department of Homeland Security do not replace or supersede the laws, regulations, and policies of the Department of State's restrictions on the sharing of refugee records, information and data.

### iii.  Prior Approval Requirements and Revision of Budget and Program Plans

The Recipient must submit all requests for prior approvals and revisions required under this award in writing to the GO/GOR, before the project period end date indicated on form DS-1909. Final approval is subject to review and acceptance by the GO.  The transfer of funds among direct cost categories or programs, functions and activities for which the cumulative amount of such transfers exceeds or is expected to exceed 10 percent of the total approved budget (see 2 CFR 200.308(e)) requires prior approval by the GO by way of amendment.

## 16.2 Reception and Placement Program Core Services

### i.  Definitions

For the purposes of this agreement and the Attachments thereto, which are an integral part of it:

a. "**Affiliate**" means:
1) a regional office of an Agency, which is part of the corporate structure of the Agency;
2) a public entity or a private nonprofit legal entity which has accepted in a written agreement with the Agency responsibility to provide, or ensure the provision of, reception and placement services to certain refugees sponsored by an Agency; or
3) a sub-office of an entity referred to in subsection b. "Agency" above that the Recipient proposes for affiliate status in the proposal for the FY 2024 program or during the course of the year, and that the Bureau agrees in writing may serve as an affiliate.  A "sub-office" is defined as an office where reception and placement services are provided and refugee case files are maintained during the reception and placement period with management oversight provided by a nearby affiliate office.
4) a satellite office of an affiliate referred to in subsection c. "Affiliate" above that the Recipient proposes as a temporary or off-site location where affiliate staff meet with refugees to deliver services.
b. "**Agency**" means a public entity or a private nonprofit organization, registered as such with the Internal Revenue Service under 26 U.S.C. 501(c)(3), having a cooperative agreement with the Bureau for reception and placement services.
c. "**Appropriate language interpretation/translation**" means interpretation/translation which allows for communication with the refugee in his/her native language, if possible, or in a common language in which the

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

refugee is fluent.  Appropriate language interpretation/translation that promotes gender equality shall be provided by an individual who is not associated with the refugee (i.e., family member, U.S. Tie).  Staff and/or independent paid and volunteer interpreters (not associated with the refugee) may be used.  In-person interpretation is preferred, although telephonic interpretation may be used, if necessary.

d.  "**Assurance**" means a written commitment, submitted by a Recipient, to provide, or ensure the provision of the core services specified in subsections 16.2 vii.a through 16.2 vii.f of the cooperative agreement for the refugee(s) named on the assurance form.

e.  "**Community Partner**" refers to a community group or organization, which has accepted in a written agreement with the Recipient the responsibility to provide, or ensure provision of, all R&P services to refugees under remote placement. It is not required that a community partner be a 501c3 nonprofit organization, but it must be able to assume full responsibility for resettlement of its caseload.  Community partners are overseen by the Recipient and cases are allocated and assured directly to them in the same way that resettlement affiliates receive cases. Individuals may not serve as community partners.

f.  "**Community Sponsorship**" is an umbrella term to describe different models of resettlement whereby certain refugees are paired with volunteers or groups of volunteers that commit to providing in-kind and/or financial contributions as well as volunteer services to support the welcome and integration of refugees in a local community. Community sponsorship can include a range of formal and informal individuals and/or community groups such as local clubs, university communities, faith-based institutions, sports teams, book clubs, and groups of friends or neighbors interested in community sponsorship. Co-sponsors are forms of community sponsorship.

g.  "**Co-sponsor**" refers to a community group that has accepted, in a non-legally binding written agreement with a local affiliate, the responsibility to provide, or ensure the provision of, **the majority or all** of R&P core services, as described in 16.2 vii.a. through e., in partnership with a local affiliate. Co-sponsors are overseen by the local affiliate.

h.  "**Employable Refugee**" means any refugee, aged 18 through 64, other than a refugee who: is required to be in the home to care for a child under one year of age or other fully dependent person (only one adult per household unit may be considered to be in this category); or is unable to work for physical or mental health reasons.

i.  "**Loan Services**" means those activities deemed appropriate through consultation with the International Organization for Migration and the Bureau to ensure that maximum efforts are made to conduct required loan activities for refugees signing Promissory Notes executed by IOM for funds advanced by the Bureau to cover transportation costs to the United States.

j.  "**Reception and Placement Period**" (R&P period) means an initial thirty (30)-day period that can be extended up to ninety (90) calendar days after arrival should more than thirty (30) calendar days be required to complete R&P Program requirements.

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

k. "**Refugee**" means a person admitted to the United States under section 207(c) of the Immigration and Nationality Act, as amended, or a person to whom eligibility for the resettlement assistance available to individuals admitted under section 207(c) has been extended by statute.

l. "**The Refugee Processing Center**" (RPC) means the center located at 1100 N. Wilson Boulevard, Arlington, Virginia 22209, which will manage, on behalf of the Bureau, data processing of refugee cases.

m. "**Remote Placement**" occurs when an approved Recipient allocates and assures certain cases to approved remote placement community partners that are at least 50 miles away from the closest same-state affiliate. Community partners provide or ensure the provision of all R&P services. Affiliates maintain a 100-mile placement radius even if a community partner is approved to provide R&P services within that radius.

n. "**Resettlement Director**" refers to the affiliate staff member who manages or oversees the R&P Program at that affiliate. The "resettlement director" may vary in title and each Recipient is responsible for identifying a resettlement director for each of its affiliates.

o. "**Support Team**" refers to a community group that has committed to providing less than a majority of R&P core services, as described in 16.2 vii.a. through e., in partnership with the local affiliate. Because, in most cases, support teams are not assuming as much responsibility as co-sponsors they are not required to sign a written agreement. Like co-sponsor groups, they are overseen by the local affiliate.

p. "U.S. Tie" refers to an individual who has been identified by the Principal Applicant refugee as a family member or friend and who is currently living in the United States. For the purposes of reception and placement under this cooperative agreement, the U.S. Tie is expected to have a close and personal relationship with the refugee and is expected to assist in supporting the refugee after arrival, as necessary. The level of support needed from each U.S. Tie is determined by the relevant local resettlement agency(ies), in consultation with the State Refugee Coordinator and State Refugee Health Coordinator.

q. "**Virtual Reception and Placement Services (Virtual R&P Services)**" refers to the provision of R&P services through centrally managed virtual caseworkers.

r. "**Cash-Based Reception and Placement Services (Cash-Based R&P Services)**" refers to a mode of R&P service delivery for eligible refugees where, in lieu of standard R&P core services, refugees receive the R&P per capita funds and a local resource guide upon arrival and a well-being check prior to being closed out of the R&P program.

ii. **Performance Standards**

The Bureau will evaluate, as applicable, Recipient performance on an ongoing basis and will expect timely Recipient cooperation to remedy any identified weaknesses in affiliate, community partner where relevant, or Recipient performance. The Bureau may find it

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

necessary to restrict placement of cases to affiliates and/or community partners where relevant for a period of time to allow for corrective action by the national Agency.

The Recipient will permit the Bureau to monitor its affiliates and community partners where relevant upon advance notice, and, when Bureau on-site or remote monitoring results in recommendations for modifications in the operations of an affiliate of the Recipient, respond to the Bureau's recommendations in writing and ensure that required modifications are implemented at the local level within the specified timeframe.  If the Recipient fails to comply with this provision, the Recipient may be prohibited by the Bureau from utilizing funds received under this agreement for further resettlement by the affiliate or community partner, where relevant.

The Bureau will evaluate, as applicable, Recipient performance in the following areas:

    a.  Reception and Placement Program Objectives and Expected Outcomes and Recipient Objectives and Indicators as stated in Subsections 3.2 and 3.3.

    b.  National Resettlement Agency Program Management

        1)  **Staff Training:** The Recipient shall have in place a formal plan for training new national resettlement agency (RA) staff and local affiliate directors and should ensure that each affiliate has a structured training plan for each of its new employees.  The Recipient shall also have in place a mechanism for training existing RA and affiliate staff at all levels on changes that occur in the R&P Program, as well as on relevant legislative changes that affect refugee resettlement.  Training for new and existing staff at all levels shall include the national and/or local established code of conduct.

        2)  **Communication with Affiliates on Policy Changes**: The Recipient shall have in place mechanisms for informing affiliates of policy changes and shifts in expected refugee arrivals.  The Recipient shall also have in place mechanisms for informal communications with affiliates on everyday resettlement issues.

        3)  **Strategy for Site Selection**: The Recipient shall have in place a coherent strategy for selecting resettlement sites, placement of individual refugee cases, and managing placement across its network.  That strategy should show evidence of adaptability to new circumstances, e.g., influx of new populations, welfare, or economic changes in any given location.  Such strategy should also provide adequate justification for continued use of a site with poor employment outcomes.

        4)  **Corrective Action on Program Deficiencies**: The Recipient shall maintain records of corrective actions taken and evidence of final compliance by affiliates in response to recommendations made by Recipient and Bureau monitors during on-site and remote monitoring reviews.  These records should show evidence of follow-up as needed and should address each recommendation made by the monitors.

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

5) **Employment of Refugees**: Although the Recipient is not required to effect job placement through its own efforts, this agreement requires that the Recipient provide employment orientation and assistance with enrollment in appropriate employment services. Refugee program service providers or other resources available in the community may accomplish job placement.

6) **Out-Migration of Refugees**: The Bureau will review the Recipient's out-migration performance as a part of its annual review.

7) **On-Site Affiliate Monitoring and New Resettlement Director Management Visits**

   I.    **Frequency of Monitoring**

      1. The Recipient shall maintain records verifying that it conducts on-site monitoring of each affiliate and sub-office in its network at least every three (3) fiscal years unless the affiliate or sub-office has resettled fewer than fifty (50) refugees during the previous fiscal year.

      2. If the Recipient monitoring is scheduled in the same 12-month period following a PRM monitoring that resulted in a compliant or mostly compliant rating by PRM, the Recipient may, without a written request, postpone their monitoring up to twelve (12) months after PRM's monitoring even if beyond the three-year requirement in order to reduce redundancy and unnecessary staff burden. If the PRM monitoring rating was less than mostly compliant, then the Recipient may, without a written request, postpone their monitoring up to six (6) months beyond the three-year requirement in order to provide the affiliate time to implement corrective actions prior to the Recipient monitoring. Any revisions to the RA affiliate monitoring plan must be shared with the respective PRM program officer along with an explanation of changes.

      3. The Recipient should perform and document on-site monitoring of a new affiliate or sub-office within twelve (12) months of the date opened in START or WRAPS. The Recipient should also perform and document on-site or remote visits to affiliate offices that have experienced a turnover in resettlement directors within twelve (12) months of the new director's appointment. This new resettlement director management visit will not reset the three (3) fiscal years monitoring cycle for that affiliate. The Bureau may approve exceptions to these requirements, based on the submission of a written request describing the rationale for the proposed monitoring plan changes and new monitoring schedule.

   II.    **Mode of Monitoring**

United States Conference of Catholic Bishops                     SPRMCO24CA0342-M001

1. When on-site monitoring activities, such as in-person home visits, are not possible due to public health or other concerns, the Bureau may approve exceptions to monitoring requirements, based on the submission of a written request justifying the rationale for the proposed monitoring changes and new temporary monitoring protocol. Case file review may occur remotely as part of regular on-site monitoring activities without prior approval from the Bureau.

III.   **Written Reports**: Recipient monitors shall write a formal report for each affiliate/sub-office monitoring visit or new resettlement director management visit they conduct.  The reports shall include:

1. **On-Site Affiliate Monitoring Report**
   a)  a description that quantifies and qualifies how the affiliate coordinates volunteers and develops private resources for Reception and Placement activities;
   b)  evidence of the affiliate's policy on how refugee per capita funds beyond the $1,250 per person minimum are spent, which shall include clear criteria to determine which cases will receive additional funds, how funds will be allocated, and how disbursement will be tracked and managed;
   c)  evidence of the affiliate's policy on pocket money disbursement, including amount and timing of provision of pocket money as well as procedures to ensure appropriate acknowledgement of receipt of pocket money;
   d)  evidence of the affiliate's policy for the disbursement of per capita funds (other than pocket money) to be used to cover payments made by the affiliate to or on behalf of individual refugees for the purpose of meeting refugees' material needs in accordance with the requirements of the program;
   e)  a narrative statement describing the affiliate's R&P program, including quality of housing, availability of relevant local services, and the local resettlement environment;
   f)  evidence of a review of the affiliate's performance and compliance with R&P requirements;
   g)  evidence of contacts made by the monitor(s) with state and local refugee program officials, including the state refugee coordinator and state refugee health coordinator;

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

h) evidence of compliance with quarterly consultation requirements;

i) evidence of the affiliate's training for new and existing staff;

j) evidence of the affiliate's policy on protection from sexual exploitation and abuse;

k) evidence of the affiliate's grievance policy;

l) evidence of implementation of Accountability to Affected Populations (AAP);

m) evidence of the monitor's review of at least fifteen (15) case files for cases which arrived during the preceding twelve (12)-month period, including a representative sample of cases assisted by co-sponsors and those resettled through Cash-Based R&P Services, if applicable. Case file review may occur on-site or remotely. For affiliates that resettled more than 600 individuals in the preceding 12-month period, at least 20 case files must be reviewed. The monitoring report must indicate whether the case files contained complete R&P service plans for each adult, evidence of timely and compliant delivery of all required services, evidence of compliant documentation of R&P per capita expenditures, and the accuracy of R&P period reports as measured against the information contained in the case files. The report must also indicate whether the case note logs presented a complete and accurate picture of the resettlement process;

n) evidence of the monitor's in-person visit to at least four (4) refugee cases in their homes, and an assessment of the welfare, living conditions, current needs, and the affiliate's assistance with the provision of core services. If more than 600 individuals have been resettled in the period, six (6) home visits shall be conducted;

o) evidence of the affiliate's policy for the delivery of required cultural orientation, including a sound mechanism for assessing refugee understanding of cultural orientation topics;

p) recommendations for any necessary follow-up; and

q) evidence of a timeline for compliance with recommendations; and

r) final compliance with all prior Recipient or Bureau monitoring findings and recommendations for the affiliate.

United States Conference of Catholic Bishops                         SPRMCO24CA0342-M001

**2.  New Resettlement Director Management Visit Report**
The written report may include charts and checklists for
efficiency. The new resettlement director management visit
and report will be focused on management and leadership
functions. The reports shall include:

a)  evidence of discussion regarding how the affiliate
    coordinates volunteers and develops private
    resources for Reception and Placement activities;

b)  evidence of the affiliate's policy on how refugee
    per capita funds beyond the $1,250 per person
    minimum are spent;

c)  evidence of the affiliate's policy on pocket money
    disbursement, including amount and timing of
    provision of pocket money as well as procedures to
    ensure appropriate acknowledgement of receipt of
    pocket money;

d)  evidence of the affiliate's policy for the
    disbursement of per capita funds (other than pocket
    money) to be used to cover payments made by the
    affiliate to or on behalf of individual refugees for
    the purpose of meeting refugees' material needs in
    accordance with the requirements of the program;

e)  evidence of contacts made by the Recipient(s) with
    state and local refugee program officials, including
    the state refugee coordinator and state refugee
    health coordinator;

f)  evidence of compliance with quarterly consultation
    requirements;

g)  evidence of the affiliate's training for new and
    existing staff;

h)  evidence of the affiliate's policy on protection from
    sexual exploitation and abuse;

i)  evidence of the affiliate's grievance policy;

j)  evidence of implementation of Accountability to
    Affected Populations (AAP);

k)  evidence of the affiliate's quality assurance process
    for case file documentation;

l)  evidence of the Recipient's review of at least three
    (3) case files for cases which arrived during the
    preceding twelve (12) month period. Case file
    review may occur on-site or remotely; and

m)  recommendations for any necessary follow-up.

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

8) **The following documents shall be available to the Bureau upon request.** The documents shall be accurate and complete, be submitted in a timely manner, and adhere to all requirements:
   I.     R&P Period Report
   II.    Sponsorship Assurances
   III.   Affidavits of Relationship
   IV.    Ninety (90)-day follow-up reports for minors coded M2-M3 and M5-M7
   V.     Quarterly R&P Program Reports
   VI.    Record of affiliates' local consultations
   VII.   Annual Report
   VIII.  Reconciliation of Claimed Refugee Sponsorships
   IX.    Quarterly Financial Status Reports
   X.     Availability of Funds Statement for Current Fiscal Year
   XI.    Audit Data Collection Form and Reporting Package
   XII.   Staff training plans and reports of training, to include schedule, agenda/topics, attendance by name and title, and outcomes
   XIII.  Policy on Protection from Sexual Exploitation and Abuse
   XIV.   Accountability to Affected Populations Framework
   XV.    Recipient grievance policy
   XVI.   Virtual R&P Services case files (For Virtual R&P agencies only

   XVII.  Evidence of assessment for cases resettled through Cash-Based R&P Services and affiliate policies on Cash-Based R&P Services

9) Recipients managing remote placement will be evaluated on the requirements specified in subsections 16.2.iv.d and 16.2.v.b.

c.  Bureau Monitoring of Local Affiliates
    1) **On-Site Monitoring Visits**: All affiliates and sub-offices are subject to monitoring by the Bureau with advance notice to the Recipient and affiliate. Findings and recommendations will be reported in writing to the Recipient, which will respond to the recommendations in writing before reports become final. Evaluation will be based on affiliate staff interviews, oral and written questionnaires, case file reviews, and refugee home visits. Reviews will include evaluation of:
       I.    Affiliate staff understanding of required R&P services;
       II.   Demonstration of effective coordination with other organizations and agencies that provide services to refugees;
       III.  Compliance and quality of R&P core service delivery;
       IV.   Presence of all documents in files and degree to which each has been thoroughly and legibly completed;
       V.    Evidence of the affiliate's training of new and existing staff, volunteers, and co-sponsors where relevant;

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

      VI.   Evidence of the affiliate's policy on protection from sexual
           exploitation and abuse;
     VII.   Evidence of the affiliate's grievance policy;
   VIII.   Evidence of the affiliate's implementation of Accountability
           to Affected Populations (AAP);
      IX.   Affiliate R&P performance outcomes; and
       X.   Evidence of final compliance with prior Bureau monitoring
           findings and recommendations.

The Bureau will provide an oral overview of its findings and recommendations to the affiliate immediately following the review.

   d.   National Resettlement Agency Response
      1)   The responsiveness of the Recipient to the Bureau's monitoring reports, including timeliness of response to the draft report and timely implementation of recommendations will be elevated.

### iii.   Performance of Core Services by or Under the Direction of the Recipient

   a.   A written proposal, submitted by the Recipient and incorporated into this agreement as Attachment A, will constitute the basis for the assignment of Reception and Placement responsibility for specific refugees. Subject to any limitations established in this agreement (e.g., the inability of the Recipient to assist refugees of a particular linguistic group), the Bureau may assign a reasonable number of special cases to any participating Recipient. The Recipient shall describe its network of affiliates in its annual proposal, including the proposed service area to be covered by each affiliate.  A Recipient may assure and place a case assigned to it under the Agreement only within the approved service area and caseload projections of its approved affiliates as set forth in the proposal.  The Bureau authorizes cases with U.S. Ties as well as those without U.S. Ties to be placed within a radius of 100 miles within the same state of the affiliate. The service area for unaccompanied refugee minors entering foster care (minors coded M4) shall be dependent upon the state or county licensing guidelines, as appropriate, for each affiliate approved to serve minors coded M4.
   b.   The Bureau will consider approving a larger service area for cases with U.S. Ties when the Recipient demonstrates to the satisfaction of the Bureau that the larger area will not impair the quality of service provided to refugees placed in that area. The Recipient will ensure that the affiliate will be able to respond on a same day basis to any urgent needs of the refugees and assist the refugees to resolve the issues.
   c.   Approved Recipients can also place cases outside a 50 mile same-state radius from affiliates via remote placement community partners, as defined herein.
   d.   Approved Recipients may serve certain cases through Virtual R&P Services instead of through local affiliates, based upon individual assessment of each case's suitability to receive R&P services in this manner.  The Bureau will

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

issue guidance, separate from this award, via program announcements, regarding which cases may be eligible to be served through Virtual R&P.

e.  The Recipient may resettle certain cases through Cash-Based R&P Services as found eligible according to an established policy, which should include an individual case assessment, including a review of biodata components, ability to secure and/or maintain housing, personal safety, and ability to navigate core services described herein independently and/or with the assistance of U.S. Ties or other community members. This assessment must be conducted with appropriate language interpretation no later than seven (7) working days after arrival and include an agreement signed by each adult member of the case. For all cases resettled through Cash-Based R&P Services, in addition to the assessment described above, the Recipient must provide the R&P direct assistance per capita and, as specified throughout the Cooperative Agreement, Reception Services, counseling regarding recommended material needs support, an intake interview, counseling regarding any necessary post-arrival services, and a well-being check, to the extent possible. The Recipient shall also provide refugees resettled through Cash-Based R&P Services a local resource guide to assist refugees to independently access available services and benefits for which they may be eligible. The Recipient shall maintain a case file for cases resettled through Cash-Based R&P Services as specified in section 16.2 vii.e.

Participation in this model, if an affiliate or community partner chooses to make use of it, should be offered only to those who meet established eligibility and individual assessment criteria. Cases that meet the following criteria are not eligible for Cash-Based R&P Services:

- Cases that include minors coded M2-M7
- Cases with members with complex medical conditions
- Cases with Class A medical conditions, as well as Class B conditions, as appropriate

f.  The Recipient may propose to open a new affiliate or sub-office during the validity period. The Recipient must provide a statement of rationale for each proposed new affiliate or sub-office.  The rationale should be accompanied by a completed abstract; a letter of support from the proposed organization's governing entity; a letter of support from the state refugee coordinator; letters of support from quarterly consultation participants (optional); an explanation of the proposed management structure at the new location; a timeline for the opening of the proposed affiliate or sub-office and implementation of program activities; and a detailed training plan for R&P staff.  Each affiliate or sub-office abstract should present information pertaining only to activities of that specific office and should not include data related to activities corresponding to partner agencies, sub-offices, or administering affiliates.  Abstracts must contain information in all fields regarding only the sponsoring Agency's activities; it should not reflect a combination of partner Agencies' information. The Bureau may request additional information.

United States Conference of Catholic Bishops                          SPRMCO24CA0342-M001

g.  The Recipient must inform the Bureau and the relevant state refugee coordinator in writing of the intended closure of an established affiliate or sub-office at least thirty (30) calendar days in advance of closure.  The notification submitted to the Recipient's designated program officer in the Bureau should include:  a plan for completion of services for all active R&P cases; a list of all assured cases that have not arrived which are to be transferred or returned to the RPC for reallocation; a list of all outstanding (not allocated, or allocated and not assured) Affidavits of Relationship (AORs),  including pre-case ID numbers, and anchor contact information; a plan for the disposition of all R&P records and case files (to be retained for a period of no fewer than three years), including a plan to transfer files to the affiliate designated to receive active cases; and a copy of the Recipients' notice of closure letter to the state refugee coordinator.

h.  As a part of the affiliate closure process, the Bureau must approve in advance the Recipient's plan to transfer or return all outstanding AORs as well as all assured cases with U.S. Ties.  If an assured case has a U.S. Tie in a location where only one other Resettlement Agency is present, the Recipient's closure plan may include intent to transfer that case directly to the other Resettlement Agency.  All other assured cases with U.S. Ties must be returned to the RPC for reallocation.

i.  The Recipient will ensure that its affiliate provides written notification to all active cases and to persons with outstanding AORs on file at the closing affiliate or sub-office.  The closing affiliate or sub-office should inform filers of outstanding AORs that they may express in writing a preference to work with a specific alternate affiliate.  If the filer of an outstanding AOR identifies a preference to work with an alternate affiliate, the Recipient will identify the gaining Resettlement Agency in the transfer plan submitted to the Bureau.  If the filer of an outstanding AOR does not state a preference to work with an alternate affiliate, the case must be returned to the RPC for reallocation. Upon approval by the Bureau, the closure plan will be forwarded to the RPC for action.

j.  In the case of planned consolidation of a sub-office operation into an administering affiliate, the Recipient should follow the procedures outlined above and prepare a revised abstract for submission to the Bureau which reflects the consolidation information.

k.  The Recipient will maintain a copy of the signed assurance form on file for a period of at least one year from the date the refugee enters the United States.

l.  With respect to every placement, the Recipient or affiliate will have on staff, or available from within the community of resettlement, persons who can communicate with each refugee in a common language and who can assist with the provision of services in person or virtually, as needed.

m. The procedures for initial assignment, assurance, and transfer of refugee cases are set forth in the Allocations Handbook, which may be updated during the agreement period and is hereby incorporated by reference.

United States Conference of Catholic Bishops                     SPRMCO24CA0342-M001

n. The core services shall be provided to any refugee assigned to the Recipient during the R&P period after the refugee's arrival in the United States, except where a different period of time is stated.

o. The core services shall be provided in accordance with the proposal submitted by the Recipient as approved by the Bureau. Deviations from the proposal involving the addition of affiliates or increases of more than ten percent (10%) in each proposed affiliate's caseload or budget must be approved in advance in writing by the Bureau. An increase in an affiliate's caseload or budget does not increase the total number of a Recipient's proposed and accepted total network capacity for refugee arrivals during the fiscal year, nor does it increase the total amount of the approved affiliate administrative funding for the Recipient's network. Any increase in a Recipient's total network capacity for refugee arrivals must be requested by the Recipient in writing and approved in advance in writing by the Bureau. It is understood that caseload may fall short of that in the proposal, and deviations resulting from such shortfall do not require Bureau approval.

p. Faith-based Recipients should take steps to ensure their inherently religious activities, such as religious worship, instruction, or proselytizing, are separate in time or location from the government-funded services that they offer. Also, the Recipients may not require refugees to profess a certain faith or participate in religious activities in order to receive services.

q. Recipients shall request prior approval from the Bureau for one or more of the following program or National Management budget-related reasons:

   1) Change in the scope or the objective of the project or program (even if there is no associated budget revision requiring prior written approval).
   2) Change in a key person specified in the application or award document (as specified in the 2 CFR 200).
   3) The absence for more than three months, or a twenty-five percent (25%) reduction in time devoted to the project, by the approved project director.

### iv. Delegation of Functions by the Recipient

a. Unless otherwise provided herein, the responsibilities assumed by the Recipient shall be delegated only to an affiliate designated in the approved proposal or a remote placement community partner approved by the Bureau, who may re-delegate such responsibilities to a co-sponsor. When the Recipient relies on an affiliate, remote placement community partner, or co-sponsor to provide a service, the Recipient shall remain responsible for ensuring that the service is provided.

b. Any co-sponsor to whom the Recipient's responsibility for providing core services is re-delegated by an approved affiliate must be located in the affiliate's approved area of geographic responsibility, as designated in the proposal. When the affiliate has an agreement, written or otherwise, with a co-sponsor to provide core services, the affiliate shall remain responsible for ensuring that the services are provided.

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

    c. Community sponsorship resources, including training and program support, can be found through the Bureau's community sponsorship technical assistance provider, the Refugee Welcome Collective (RefugeeWelcome.Org), including the following recommendations for effective community sponsorship that fosters welcome and successful integration:

        1) A minimum of five people.

        2) **Meaningful Engagement:** Foster involvement and commitment to deliver R&P core services.

        3) **Baseline Training:** Ensure all community sponsors share a common understanding of critical R&P concepts.

        4) **Sponsor-Refugee Relationships:** Educate and guide community sponsors to effectively navigate their interactions with refugees.

        5) **Ongoing Training and Support:** Equip community sponsors with the necessary training and support to maintain compliance with core service delivery standards.

        6) **Clear Agreement: O**utline the roles and responsibilities of community sponsors and affiliates.

        7) **Regular Check-Ins:** Facilitate regular check-ins with a designated affiliate point of contact who is well-trained to support community sponsorship groups.

        8) **Transition Plan:** Ensure community sponsors have a clear understanding of when and how their role will conclude as they empower clients to achieve self-sufficiency.

        9) **Feedback Mechanism:** Enable both refugees and community sponsors to share their input and experiences.

    d. The Recipient, and any affiliate or co-sponsor to which a delegation is made, must carry out its responsibilities in accordance with Title VI of the Civil Rights Act of 1964.

    e. Approved Recipients may also place cases at least 50 miles away from an affiliate within the same state via remote placement community partners, as defined herein. In order for a community partner to resettle refugees through remote placement, the approved Recipient must first submit to their PRM program officer a request for approval of the community partner. The Recipient shall ensure that the state refugee coordinator has been consulted and a summary of the consultation shall also be submitted. If requesting a remote placement community partner be permitted to resettle refugees without U.S. Ties, the Recipient shall consult with the state refugee coordinator and the same local stakeholders as required for a new affiliate and submit a summary of the consultations to PRM. The Recipient shall notify the state refugee coordinator of each case assured to new or existing remote placement community partners once the case is ready for departure, prior to arrival. The Recipient shall train the community partner on the overall sponsorship process and the provision of R&P services. The Recipient shall also provide ongoing oversight of R&P activities conducted by the local community partner, including maintaining regular contact with the community partner throughout

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

the R&P service period to ensure provision of services. R&P remote placement community partners must follow the R&P service requirements delineated herein, except as provided in subsections 1) through 13) as set forth below, which modify certain requirements for services to refugees that are provided by remote placement community partners:

1) Subsection 16.2 i.k. shall be replaced with "Appropriate language interpretation/translation" means interpretation/translation which allows for communication with the refugee in his/her native language, if possible, or in a common language in which the refugee is fluent. Appropriate language interpretation/translation that promotes gender equality shall be provided by an individual who is not associated with the refugee (i.e., family member, U.S. Tie). For U.S. Tie cases only, the U.S. Tie may provide interpretation if there are no cost-effective interpreter resources available.  Staff and/or independent paid and volunteer interpreters may be used.  In-person interpretation is preferred, although telephonic interpretation may be used, if necessary."

2) The first paragraph of subsection 16.2 vii.e.9) shall be replaced with "a R&P period report, which will be retained by the Recipient for a period of not less than three (3) years from the date of arrival. Technical instructions for completion of the R&P Period Report are issued separately by the Bureau.

3) Subsection 16.2 vii.b. shall be replaced with "The Recipient shall ensure that refugees assigned to it are met at the airport of final destination and transported to furnished living quarters and provided culturally appropriate, ready-to-eat food and seasonal clothing as necessary to meet immediate needs. The Recipient shall ensure that the community partner confirms the arrival of the refugee(s) within 24 hours of arrival. The Recipient shall ensure that refugees assigned to it are visited within 72 hours after arrival, unless a next calendar day home visit is required per the conditions set forth in section 16.2 vii.b.4) to ensure that all immediate basic needs have been met and to provide refugees with basic orientation regarding housing and personal safety matters, including emergency contacts and procedures, and to conduct intake and complete relevant applications. These services shall be provided with appropriate language interpretation.

4) Subsection 16.2 vii.d.2) shall be replaced with "At least two (2) home visits within thirty (30) calendar days of arrival, and an additional home visit if the refugee moves from temporary to permanent housing during the R&P period. All required home visits shall include an assessment of the welfare, living conditions and any current or expected needs of the refugee(s), and assistance with any material needs. In cases where the placement location is so remote as to cause an in-person visit to be an undue hardship, a virtual home visit or phone call to include the same substantive content of a home visit shall

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001

suffice in place of the second home visit. Required home visits shall be provided with appropriate language interpretation."

### v.    Coordination and Consultation with Public Agencies

The Recipient shall:

a.    Conduct placement planning, reception, and material needs and core service activities in close cooperation and coordination with state and local governments. In each placement location, affiliates shall actively participate in all quarterly consultations convened or co-convened by the state refugee coordinator (SRC) that are relevant to their location whether the focus is statewide, covers a metropolitan region (including multiple cities and/or counties), or is focused on a particular local community. Local consultations should occur at a minimum of twice per fiscal year. One of these local consultations shall take place in preparation of an Agency's application to participate in the R&P Program the following fiscal year. Should the SRC convene at least two local consultations in the affiliate's placement location, then the affiliate is not responsible for convening separate local consultations. If local consultations are not convened by the SRC, the affiliate shall convene their own local consultations to ensure at least two meetings are held in their locality each fiscal year, to promote and strengthen local community coordination. Affiliates in the same locality should collaborate to convene local consultations jointly.

When affiliates convene local consultations, invitees must include: the state refugee coordinator and state refugee health coordinator; all local resettlement agency affiliates funded to provide R&P program activities; any other local agencies responsible for administering a portion of the Refugee Resettlement Program in the state (including Office of Refugee Resettlement discretionary grants); ethnic community-based organizations; representatives of State and local governments, which may include local governance (city and/or county, as applicable); public schools and other local education agencies; health and mental health service agencies; public safety officials; and other key implementing partners. Consultations may take place in person and simultaneously via teleconference, videoconference, or a combination thereof.

As with SRC-convened consultations, local meetings convened by affiliates should be designed as consultations, involving discussion and exchange of ideas among participants, rather than focusing solely on information delivery. Information regarding year-to-date arrivals and projections through the end of the current federal fiscal year compared to approved placement numbers; a presentation of characteristics of arriving refugee populations including nationality, ethnicity, average family size and composition, language and education background, and common medical conditions should be shared in writing prior to or during the meeting. The content of the meeting itself should

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001

include a discussion of projected refugee needs and services and community capacity to support projected arrivals, as well as coordination of supports and services for refugees.  Affiliates are also encouraged to include in the meeting a discussion about community strategies to support refugee integration and participation in civic life. Issues that might prevent adequate resettlement should be discussed. Concerns that might result in changes to the approved placement plan should be raised with the affiliate's/affiliates' national office(s) immediately and resolved.  Existing procedures and protocols between the Bureau and the resettlement agencies shall be used to make any necessary changes to approved placement plans.

Agencies will keep a record of their affiliates' participation in both the relevant SRC-led quarterly consultations and any affiliate-convened local consultations and report on the percentage of their affiliates in compliance with this guidance. Affiliates are responsible for conducting and documenting follow-up with invitees who do not attend the two required local consultations whether convened by the state refugee coordinator or the affiliate(s). For local consultations convened jointly by multiple affiliates, a single affiliate may conduct this follow-up but must ensure all local affiliates are aware of when the follow-up occurred and the outcome.

b.  While actively providing R&P services, remote placement community partners resettling more than one refugee case in a single fiscal year shall consult at a minimum of twice per fiscal year with all required local consultation invitees, as described herein, but consultation need not occur simultaneously or in-person. Active provision of R&P services begins once a case is assured.  Local consultations are required in the following quarter after a case's arrival if there are outstanding issues or the status of the case changes.

c.  Ensure that its affiliates participate in appropriate meetings called by state and local governments in their geographic areas of responsibility to coordinate plans for the placement of refugees;

d.  Coordinate with other publicly supported refugee services programs or refugee case management systems; and

e.  Inform both the Bureau and the Department of Homeland Security U.S. Citizenship and Immigration Services of any suspected fraud in any refugee case sponsored by the Recipient.  Such reporting is required of the Recipient regardless of whether the applicants are still overseas or whether they have already been admitted into the United States as refugees.

f.  The Recipient affiliates should report any observed or alleged instances of fraud, whether internal or external to their organizations, to their national management office. Within 24 hours of receiving an allegation of fraud, bribery, waste, or abuse, the Recipient is required to inform the PRM Domestic Team Program Officer of said allegation and copy prm-admissions-fraud@state.gov.  Notification to PRM should be made even if the Recipient is still gathering information on the fraud, bribery, waste, or abuse. The Recipient must concurrently inform the State Department Office of the

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

Inspector General (OIG). Disclosures to the OIG should be sent through the OIG website. For activities being performed in accordance with cooperative agreements awarded by PRM, this reporting shall be consistent with 2 CFR §200.113 per the Department of State Standard Terms and Conditions.

### vi.    Limitation of Responsibility to Perform Core Services

The Recipient shall be relieved of its responsibilities under this agreement to the extent they cannot be carried out because (1) the refugee does not remain in the general geographic area where initially placed and cannot be transferred; or (2) the refugee refuses to receive services from or to cooperate with the Recipient, its affiliates, remote placement community partners, or co-sponsors. In cases when non-cooperation by the refugee makes compliance impossible, the Recipient should ensure that the refugee is counseled and that such counseling and result is noted in the case file. Unexpended refugee per capita funds shall be retained by the affiliate and returned to the Bureau.  Any other barriers to full compliance that are beyond the control of the Recipient should be documented in the case notes. When service delivery occurs outside of the required timeframes in order to optimize scheduling based on local systems and coordination, or due to an unusually high number of arrivals in a given time period, such reasons must be documented in the case note log, including how individual refugee well-being was prioritized and considered.

### vii.    Core Services
#### a.    Pre-Arrival Services
The responsibilities in subsection 16.2.vii.a.1)-4) below may not be delegated; the responsibilities in subsection 16.2.vii.a.5 for training co-sponsors may be delegated to an affiliate or an approved third party.  The Recipient shall:
1) Assume responsibility for sponsorship of the refugees assigned to the Recipient under this agreement;
2) Arrange the placement of sponsored refugees in accordance with the policies established under Section 412(a)(2) of the INA and this agreement;
3) Ensure that its affiliates, remote placement community partners, and/or co-sponsors share relevant information with health care providers and/or state and local officials, as needed, in order to plan for the provision of appropriate health services for refugees who have health care requirements;
4) Submit sponsorship assurances to the RPC; and
5) Train, or validate that training has been received by an approved third party, any affiliate and/or co-sponsor that has agreed to assist the Recipient in sponsorship and ensure that the affiliate and/or co-sponsor understands the overall sponsorship process, the Recipient's role, and the responsibilities of affiliates and/or co-sponsors.

#### b.    Reception Services

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001

A U.S. Tie, volunteer, or agency staff member may provide reception services. All reception services and home visits shall be provided with appropriate language interpretation, with the exception of airport reception and initial housing and personal safety orientation when a U.S. Tie, or other relative or friend, may provide interpretation.

1) The Recipient shall ensure that refugees assigned to it are met at the airport of final destination and transported to living quarters (furnished as described below) and provided culturally appropriate, ready-to-eat food upon arrival, as well as culturally appropriate food and seasonal clothing as necessary to meet immediate needs prior to receiving their first home visit.

2) The Recipient shall also ensure prior to the first home visit that refugees assigned to it are provided with information regarding initial housing and personal safety matters, including emergency contacts and procedures.

3) The Recipient shall ensure that refugees assigned to it are visited within 72 hours after arrival, unless a next calendar day home visit is required per the conditions set forth below in section 16.2 vii.b.4), to assess the welfare, living conditions, and any current or expected needs of the refugee(s). During the home visit, the Recipient shall also assist with any material needs and provide refugees with any additional needed orientation regarding housing and personal safety matters including emergency contacts and procedures.

4) The Recipient shall ensure refugees assigned to it are visited the next calendar day after arrival if a U.S. Tie meets the refugee(s) at the airport without the presence of an affiliate staff member or volunteer, or if none of the case members have immediate access to a phone in case of an emergency, or if the case includes a minor entering the United States unaccompanied by parents and seeking to be united with relatives, or other caretakers, including parents (codes M2, M3, M5, M6).

c.  Material Needs Support

1) Upon arrival, and for a period of not less than thirty (30) calendar days after arrival, the Recipient shall provide, ensure that the refugees assigned to it are provided, or in the case of refugees resettled through Cash-Based R&P Services, ensure refugees and U.S. Ties are counseled regarding, decent, safe, and sanitary housing in accordance with applicable local, state, and federal standards, and the following:

I.    All areas and components of the housing (interior and exterior) should be free of visible health and safety hazards and in good repair, including no visible bare wiring, no peeling or flaking interior paint for dwellings built before 1978, no visible mold, and no detectable dangerous or unsanitary odors.

II.   Housing should include identified and accessible emergency escape route(s); fire extinguishers in accessible locations where

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

required; working locks on all windows and outside doors; appropriate number of working smoke detectors; windows in working order; adequate heat, ventilation, lighting, and hot and cold running water in working order; and electrical fixtures in good repair.

III.    Housing should provide minimum habitable area for each occupant, including number of bedrooms or sleeping areas.

IV.    Each residence shall be equipped with stove, oven, refrigerator, sink, flush toilet, and shower or bath in good repair.

V.    Each residence shall have easily accessible storage or disposal facility for garbage.

VI.    Each residence shall be free of rodent and insect infestation.

VII.    In cases of refugees with disabilities, housing should be free of, or permit the removal of, architectural barriers and otherwise accommodate known disabilities, to the extent required by law.

VIII.    To the extent possible, the family should be able to assume payment of rent at the end of the R&P period, based upon projected family income from all sources.  The family should be left with sufficient resources for other essential expenses (food, transportation, utilities, etc.) after rent payments made.

Refugee housing resources, tools, technical assistance, and guidance can be found through the Bureau's refugee housing technical assistance provider, Refugee Housing Solutions (RefugeeHousing.Org).

2) The Recipient shall provide, ensure that the refugees assigned to it are provided or possess, or, in the case of refugees resettled through Cash-Based R&P Services, ensure refugees and U.S. Tie are counseled regarding, the following items sufficient to meet each refugee's basic and initial needs. Items need not be new, but must be clean, in good condition, and functional.

I.    The following should be provided and/or present upon arrival:

1.    Beds appropriate for age and gender composition of family; one pillow for each person; and sufficient seasonally appropriate linens.  While other family members are not precluded from sharing beds, only married couples or young children of the same gender may be expected to share beds;

2.    personal hygiene items, including bath towels and toiletry items;

3.    kitchen items to meet the family's basic needs, including cookware and cooking and eating utensils; and

4.    baby items, including diapers, as needed.

II.    The following should be provided and/or present, as needed, within 30 days of moving into permanent housing:

1.    A set of drawers, closet shelves, or other unit appropriate for storage of clothing;

2.    one kitchen table per family and one kitchen chair per person;

United States Conference of Catholic Bishops                   SPRMCO24CA0342-M001

3.  one couch, or equivalent seating, per family, in addition to kitchen chairs;
4.  one lamp per room, unless installed lighting is present and adequate, and light bulbs; and
5.  household cleaning supplies.

3) Food or a food allowance to include:
   I.   Culturally appropriate, ready-to-eat food available on arrival, plus up to 72 hours' additional food and staples (including baby food as needed) sufficient to meet the individual or family's immediate needs.
   II.  Ongoing food or food allowance at least equivalent to the prorated Supplemental Nutrition Assistance Program (SNAP) allocation for the family unit and continued food assistance until receipt of SNAP assistance or until the individual or family is able to provide food for themselves.

4) Appropriate seasonal clothing for work, school, and everyday use for all members of the family, including proper footwear for each member of the family.  Clothing need not be new, but must be clean, in good condition, and functional.

5) An appropriate amount of pocket money for each adult to allow independent spending at the refugee's discretion. Pocket money should be disbursed and available to each adult within 24 hours after arrival in accordance with the affiliate's pocket money policy.

d.  Post-Arrival Services

For provision of these services, the date of arrival is defined as the date of the arrival at the final destination.

1) Intake Interview: An intake interview shall be conducted no later than seven (7) working days after arrival and include verifying refugee documentation; discussing roles and responsibilities of the Recipient and any other individual or group assisting in sponsorship as well as the refugee's role and responsibilities; and explaining established beneficiary grievance policies. Intake shall be provided with appropriate language interpretation.
2) R&P Service Plan: Within seven (7) working days of arrival, the Recipient shall, with appropriate language interpretation, assess each adult for needed R&P services and in collaboration with each adult develop a written service plan for the R&P period. For cases resettled through Cash-Based R&P Services, the assessment and signed agreement may replace the R&P Service Plan requirement.

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

3) Home Visits: In addition to the initial home visit, the Recipient shall conduct a second home visit within thirty (30) days of arrival. An additional home visit to assess living conditions is also required if the refugee moves from temporary to permanent housing during the R&P period. All required home visits shall include an assessment of the welfare, living conditions and any current or expected needs of the refugee(s), and assistance with any material needs. Required home visits shall be provided with appropriate language interpretation. Refugees resettled through Cash-Based R&P Services shall receive a well-being check-in visit in lieu of additional home visits, no later than ninety (90) calendar days after arrival, which may be conducted in-person or virtually, which shall determine which core services, as outlined in section 16.2 vii, have been completed, including the completion of the initial health screening; the status of refugee enrollment in school for school-aged children; receipt of SNAP assistance, cash assistance, and health insurance; and enrollment in employment and English language services; to be documented in the R&P Period Report. The Recipient shall counsel the refugee(s) on the importance of completing any outstanding services. The well-being check-in visit must be conducted with appropriate language interpretation.

The Recipient shall provide refugees with the following assistance, with appropriate language interpretation, if necessary, in order that refugees can access needed and/or eligible services and benefits and follow U.S. law. For cases resettled through Cash-Based R&P Services, the Recipient shall counsel refugees on the meaning and importance of the following, as appropriate and to the extent possible.

4) Assistance with tracking of, or application for, social security card(s) as follows:
   I. **Refugees**: Social Security Cards (SSCs) should be received by mail within three (3) weeks after arrival.  If the SSC is not delivered within the three (3) week timeframe, the affiliate should contact the local Social Security Field Office within three (3) working days either to schedule an appointment or to directly follow up and consult whether a new application is necessary. Employment Authorization Documents (EADs) should be delivered approximately (4) weeks after arrival. If an EAD is not delivered within the four (4) week timeframe, affiliates should elevate to USCIS then, if unresolved, to their national office who will follow PRM established protocols for troubleshooting. If an EAD is determined to have been lost in the mail, the Recipient shall assist the refugee(s) to apply for a new EAD via Form I-765. Any delay of SSCs and EADs shall be clearly documented in the case file;

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001

II. **Lawful Permanent Residents (SIV holders, Amerasians):** SSCs should be received by mail within three (3) weeks after the date of domestic arrival. If the SSC is not delivered within this timeframe, the affiliate should contact the local Social Security Field Office within 3 working days either to schedule an appointment or to directly follow up and consult whether a new application is necessary:

III. **Visa 93/Follow-to-Join cases:** These cases are facilitated by either RSC Africa, RSC Asia, or various Consular Sections, thus, the I-765 completion process may vary. Affiliates should check the USCIS EAD Receipt Notice to verify if the SSC was requested. If the SSC was requested, the card should arrive within fourteen (14) working days after the Notice Date of the EAD Receipt Notice. If the SSC was not requested, the affiliates should contact the local Social Security Field Office within three (3) working days either to schedule an appointment or to directly follow up and consult whether a new application is necessary. If a delayed arrival of the EAD Receipt Notice precludes the affiliate from meeting the above deadline, follow-up with the Social Security Field Office shall take place no later than four (4) weeks from domestic arrival even if the Notice is not yet received). Any delays shall be clearly documented in the case file.  EADs should be delivered within four (4) weeks after the I-765 is processed by USCIS.

5) Assistance with applying for cash assistance, as appropriate, no later than seven (7) working days after arrival.

6) Assistance with applying for health insurance/medical assistance, as appropriate, no later than seven (7) working days after arrival.

7) Assistance with applying for SNAP assistance, as appropriate, no later than seven (7) working days after arrival.

8) Assistance with enrolling in or applying for other services, such as Supplemental Security Income and Special Supplemental Nutrition Program for Women, Infants and Children, as appropriate and as eligibility requirements are met.

9) Assistance with enrolling in English language programs, as appropriate, no later than thirty (30) calendar days after arrival.

10) Assistance with enrolling in employment services, as appropriate, no later than thirty (30) calendar days after arrival.

11) Assistance with meeting school enrollment requirements and registering children for school no later than thirty (30) calendar days after arrival.

12) Assistance with registration with the Selective Service no later than thirty (30) calendar days after arrival for males, who are 18 through 25, as appropriate.

13) Assistance with providing information on the legal requirement to notify the Selective Service of each change of address and new address.

14) Assistance with providing information on the legal requirement to notify the U.S. Department of Homeland Security of each change of address and

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

new address no later than 10 (ten) calendar days of moving, and assisted, to comply with this requirement. Authority: Secs. 103, 265 of the Immigration and Nationality Act, as amended by sec.11, Public Law 97-166, 95 Stat. 1617 (8 U.S.C. 1103, 1305).

15) Assistance with updating addresses via myUSCIS accounts no later than ten (10) calendar days of moving with the U.S. Department of Homeland Security (and Selective Service, as applicable) for all changes of address, including initial and temporary housing, during the R&P period.

16) Assistance with orienting refugees to the process of completing changes of address with the U.S. Post Office.

17) Assistance with providing refugees with information on permanent resident alien status and family reunion procedures and assist with completing and filing Affidavits of Relationship as appropriate and as requested.

18) Transportation in compliance with local motor safety laws.

19) Transportation to job interviews and job training.

20) Assistance with Access to Health Services: These responsibilities must be performed by the affiliate or the affiliate in active collaboration with the co-sponsor.  The Recipient shall:

    I.    Coordinate with state and /or local health care providers to provide medical services to refugees requiring medical care upon arrival;

    II.    Ensure that refugees with acute health care requirements receive appropriate and timely medical attention;

    III.    To the maximum extent possible, assist refugees (other than those with Class A conditions, covered below in subsection 21) in obtaining a health screening within ninety (90) calendar days after arrival.  When a health screening cannot occur within ninety (90) calendar days, the delay and circumstances must be clearly documented including the expected timeframe for when the screening will take place and logistical plans to ensure refugee attendance at their appointment.  For refugees resettled through Cash-Based R&P Services, unless it is possible to self-schedule a health screening appointment, the Recipient shall assist with the scheduling of the health screening and notify the refugee(s) of the time and location of the appointment(s).

    IV.    Assist refugees in obtaining other health care services, as needed, during the R&P period; Encourage and assist refugees as soon as possible after arrival to obtain or complete immunizations as required for adjustment to permanent resident alien status one year after arrival;

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001

V.  Assist refugees in accessing appropriate providers of continued therapy or preventive treatment for health conditions affecting the public health;

VI.  In the case of a refugee who fails or refuses to receive health screenings, provide additional information and counseling to the refugee, including an explanation of local health regulations and practices, and document the circumstances and action taken in the case file; and

VII.  Ensure that its affiliates and co-sponsors cooperate with state and local public health officials by sharing information needed to locate refugees, including secondary migrants to the degree possible, for the purpose of providing health services to them.

21) Class A Health Conditions: These responsibilities may not be delegated beyond an affiliate or remote placement community partner.  The Recipient shall:

I.  Advise, encourage, and assist, insofar as possible, refugees with Class A physical disorders affecting the public health (as designated by the Public Health Service) to report within seven (7) calendar days of arrival to the official public health agency in the resettlement area; request the local health provider (by telephone or in person) to give refugees with Class A health conditions an appointment date within seven (7) calendar days of their arrival; and document in the case file the dates of such advice, assistance, and requests, including the name of the individual contacted; and

II.  Advise, encourage, and assist, insofar as possible, a refugee who has a Class A mental disorder to receive within thirty (30) calendar days of arrival an initial evaluation by the health care provider who supplied a written commitment prior to the granting of a waiver for admission; request the health care provider to provide a copy of the initial evaluation to Refugee Activity, Division of Quarantine, Centers for Disease Control and Prevention, Atlanta, Georgia 30333; make reasonable efforts to ensure that such refugee receives assistance in seeking medical treatment, education, and training that any previously identified mental disorder may require; and document in the case file the dates of such advice, assistance, and requests, including the name of the individual contacted.

22) Communication with State and Local Welfare Authorities: These responsibilities may not be delegated beyond an affiliate or remote placement community partner.  The Recipient shall:

I.  Notify the appropriate state, county, or other local welfare office per their local requirements at the time the Recipient, its affiliate or co-sponsor becomes aware that a refugee receiving welfare

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001

benefits has been offered employment or has voluntarily quit a job and notify the refugee that such information has been provided to the welfare office. Notice of offered employment shall be given whether or not the refugee accepts the offer;

II.  Respond to inquiries from a state, county, or other local welfare office relating to a refugee's application for and receipt of cash or medical assistance, and furnish, upon request of such office or agency, documentation regarding any cash or other resources provided directly by the Recipient, its affiliate, remote placement community partner, co-sponsor, or other sources, to the refugee; and

III. Maintain in the case file required under subsection 16.2 vii.e. above a record of all notifications from a state, county, or other local welfare office that the refugee has applied for welfare benefits and a record of all information provided by the Recipient to state, county, or other local welfare offices and of all information provided by such offices to the Recipient.

23) Cultural Orientation

I.   During the initial reception and placement period, the Recipient shall provide or ensure that the refugees assigned to it are provided cultural orientation that covers the topics and objectives noted below, with appropriate language interpretation.

II.  To the extent practical, the Recipient shall use the standard domestic curriculum, The Road Ahead, provided by the technical assistance unit the Cultural Orientation Resource Exchange (CORE). If the Recipient is unable to use the standard domestic curriculum, they must ensure cultural orientation as outlined below and that written cultural orientation materials in an appropriate language are made available.

III. The Recipient shall ensure each affiliate develops a sound mechanism for assessing refugee understanding of cultural orientation topics. Complete cultural orientation on all topics shall be completed before the end of the R&P period. Cultural orientation materials, including refugee-facing materials, are available from the Cultural Orientation Resource Exchange at www.coresourceexchange.org and www.settlein.us.org. Cultural orientation must cover the below topics and objectives. The Recipient can download a complete set of domestic topics, objectives, and indicators at www.coreresourceexchange.org/cultural-orientation-objectives-and-indicators:

IV.  Role of the local Resettlement Agency

1.  The local affiliate is not a government agency.

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

    2.  Assistance provided by the affiliate and public assistance is limited and benefits vary across agencies, locations, and cases.

    3.  There are several organizations that will work alongside affiliates to assist with access to locally available programs and provision of services.

    4.  The affiliate provides assistance to refugees through the provision of items and/or money to meet initial needs, a limited scope of services, and advocacy on refugees' behalf to receive services for which they are eligible.

    5.  The affiliate ensures provision of necessary furnishings and supplies, the quality and quantity of which will vary.

    6.  Refugees are responsible for their own successful resettlement in partnership with the affiliate.

V.  Newcomer Rights and Responsibilities

    1.  There are rights and responsibilities related to refugee status and status adjustment.

VI. Learning English

    1.  Learning English is critical to successful adjustment in the U.S., and there are a variety of ways to learn English.

VII.  Public Assistance

    1.  Public assistance is available to help refugees pay for their needs but is limited in amount and scope.

    2.  There are a variety of types of government assistance.

    3.  The affiliate will provide help in accessing public assistance services.

    4.  There are responsibilities associated with some types of assistance.

VIII.  U.S. Laws

    1.  The U.S. is governed by the rule of law.

    2.  Refugees are responsible to know and follow the laws in the U.S.

    3.  There are legal rights and responsibilities related to family life.

IX. Your New Community

    1.  There are community and public services that are available to support residents.

    2.  The affiliate will assist refugees in becoming acquainted with their new community.

    3.  Members of the refugee's ethnic or religious group who live in the area may be a good source of support.

X.  Employment

    1.  Early employment and job retention are essential to self-sufficiency in the U.S. and must be the primary focus for all employable adults.

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

    2. A person's initial job might not be in their chosen profession.
    3. Refugees play a central role in finding/obtaining employment in the U.S.
    4. A crucial way of finding better paying jobs is learning how to speak English.
    5. There are general characteristics of U.S. professional and work culture to which refugees must adapt to be successful in finding and maintaining employment.
    6. Employees have rights as well as responsibilities in the workplace.

XI. Health & Hygiene
    1. Only critical and immediate health care needs may be met in the initial weeks of resettlement.
    2. Initial health screenings and immunizations take place as soon as possible after arrival, and generally within ninety (90) calendar days of arrival.
    3. The U.S. has no universal healthcare system and refugee medical assistance (RMA) differs state by state. In many cases, RMA is available for twelve months for eligible refugees.
    4. There are a variety of health care services available in the U.S.
    5. Preventative health care plays a large role in maintaining good health.
    6. There are norms associated with health care services in the U.S.
    7. U.S. health practices may differ from those of other cultures or countries.
    8. Refugees should know how to locate and access medical and behavioral health care information and services in an accessible language or format.
    9. Public health is important to community and personal safety.
    10. There are norms for good hygiene in the U.S.

XII.      Budgeting and Personal Finance
    1. Refugees are responsible for managing their personal finances.
    2. There are many ways to build and maintain a good credit history.
    3. Paying taxes is a legal obligation in the U.S.

XIII.      Housing
    1. There are a variety of types of housing arrangements in the U.S. (including shared housing, apartment, house, etc.).

United States Conference of Catholic Bishops                 SPRMCO24CA0342-M001

     2. Housing comes with rights, responsibilities, restrictions, and regulations.
     3. The affiliate provides assistance in home orientation, after which housekeeping, and home maintenance are individual and family responsibilities.
     4. Understanding basic safety considerations and use of appliances/facilities will promote safety in the home.

XIV.    Safety
     1. Paying attention to personal safety is an important consideration for all people.
     2. The role of the police in the U.S. is to maintain public order and safety, enforce the law, and protect individuals from criminal behavior.
     3. It is important to be prepared for emergencies.
     4. It is important to be familiar with safety procedures.

XV.    Cultural Adjustment
     1. The U.S. is a nation of diverse communities and individuals.
     2. There may be cultural differences between refugees' cultures and the culture in the U.S., including social norms and laws.
     3. There are numerous phases of cultural adjustment.
     4. Resettlement may have an impact on family roles and dynamics.
     5. There are coping mechanisms that can assist in managing stressors and adjustment.

XVI.    Education
     1. Public school is free, is required by law for children, and there are legal requirements and expectations regarding schooling in the U.S.
     2. Education is a lifelong experience and should be weighed against the need to work.

XVII.    Transportation
     1. Transportation options exist in most communities.
     2. Owning or having access to a personal vehicle comes with benefits and responsibilities.

XVIII.    Digital Technology and Literacy
     1. Refugees will need to use digital communication tools to access services and connect with their community and local affiliate.
     2. Refugees understand how to engage in safe digital practices to protect themselves, their families, and their digital information.

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

e.   Case File Preparation and Maintenance

The Recipient shall establish and maintain a case file for each arriving refugee case.  This responsibility may be delegated only to an affiliate or remote placement community partner.  Each case file shall be treated as confidential, as stipulated in subsection 16.1 ii. above.  Case files may be retained in electronic or hard copy format.  Case files covering minors coded M2 through M7 must be clearly identified and easily segregated. Secure electronic signatures are acceptable.  Case files belonging to refugees resettled through Cash-Based R&P Services shall include, in lieu of the below requirements, a copy of the assessment and signed agreement, evidence of the intake interview, evidence that the direct assistance per capita was disbursed and acknowledged by an adult member of the refugee case, a legible copy of the Form I-94 (or visa for SIV holders) for each member of the case, a copy of the assurance or equivalent documentation, and the R&P Period Report reflecting completed services as appropriate and to the extent possible.

Each case file shall contain:

1) a clearly legible case note log which shows the date, mode, event or substance, and use of appropriate interpretation when required for regular contact with the refugee throughout the R&P period, and which identifies the person or entity making such contact.

2) a record of Reception Services, Material Needs Support, and Post Arrival Services, as described herein in subsection 16.2 vii.b. through d. This record may be included in the case note log and/or elsewhere in the case file as separate documents, but must include case-specific detail sufficient to constitute a complete record and demonstrate the use of appropriate interpretation when required;

3) a copy of the R&P service plan and evidence of appropriate interpretation;

4) a record of cash and in-kind support provided to meet the refugees' material needs, as stated in subsection 5.3 ii., for at least the initial thirty (30)-day period, including clear acknowledgement by the adult member of the refugee case in receipt of cash, including pocket money, and in-kind support, and evidence that the amount provided either in cash or documented cash payments on behalf of the refugee case is equal to at least $1,250 times the number of individuals in that case and reflects the total Bureau R&P per capita amount spent on the refugee case. As pocket money must be provided to each adult member of the case, this record should also include clear acknowledgment of receipt of pocket money by each adult;

5) documentation of refugee understanding of orientation topics;

6) a record of all public assistance applied for and received or denied, indicating type(s) of assistance and start date(s) including a record of all notifications from a state, county, or other local welfare office that the refugee has applied for welfare benefits and a record of all information the Recipient provided to state, county, or other local

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001

       welfare offices and of all information provided by such offices to the
       Recipient;

7) if appropriate, a copy of the signed co-sponsor agreement; and

8) a legible copy of the Form I-94 (or visa for SIV holders) for each
    refugee in the case;

9) the social security number for each refugee in the case (if received), as
    well as a record that an EAD was received by each refugee in the case;

10) an R&P period report, which will be retained by the affiliate for a
     period of not fewer than three (3) years from the date of arrival.
     Technical instructions for completion of the R&P Period Report are
     issued separately by the Bureau;

11) a copy of the assurance form or equivalent documentation; and

12) where applicable, copies of suitability determinations for placement of
     refugee minors, follow-up evaluation forms, signed statements
     concerning responsibilities and legal obligations in the state of
     residence, and a copy of the best interest determination (BID) of the
     child, if available.

### f.   Assistance to Refugee Minor Children

Unaccompanied refugee minors (under 18 years of age) are defined and categorized by
their relationships with traveling companions and ultimate resettlement circumstances.
The following codes are used to identify the circumstances of refugee minor children.

Refugee Minor Codes:

**M1:** Minors attached to, traveling with, and resettling with biological or legally adoptive
parents;

**M2:** Minors attached to, traveling with, and resettling with blood relatives other than
biological or legally adoptive parents;

**M3:** Minors attached to, traveling with and resettling with non-relatives and minors
traveling alone to join non-relatives (only those agencies with refugee foster care
responsibilities as described in subsection 16.2 vii.g. will have the authority to place
refugee children in this category unless otherwise approved by the Bureau);

**M4:** Minors destined for foster care (only those agencies with refugee foster care
responsibilities as described in the cooperative agreement will have the authority to place
refugee children in this category);

**M5:** Minors traveling apart from but destined to join biological or legally adoptive
parent(s).  This includes minors traveling alone to join parent(s) in the U.S., minors
traveling with relatives other than parents to join parent(s) in the U.S. and minors
traveling with non-relatives to join parent(s) in the U.S.;

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

**M6:** Minors traveling apart from the blood relative(s) (other than parents) they are destined to join.  This includes minors traveling alone to join a relative (not parent) in the U.S. and minors traveling with non-relatives to join a relative (not parent) in the U.S.;

**M7:** Minors who are married regardless of their traveling companions or U.S.-based relatives.

With respect to any minor allocated to the Recipient under this agreement entering the United States according to one of the minor codes listed above, the Recipient shall:

1) Have knowledge of the state and local child abuse and neglect mandatory reporting requirements and follow such requirements during the R&P period;
2) Ensure that case files covering such minors can readily be identified and segregated (codes M2-M7) and include a copy of the Best Interest Determination (BID) of the child, if available;
3) In the case of a minor entering the United States unaccompanied by parents and seeking to be united with relatives, or other caretakers, including parents (codes M2, M3, M5, M6), conduct a suitability determination of the family unit, taking into account the principle that children should be reunited with relatives whenever possible and appropriate.  The suitability determination shall be conducted prior to submitting a sponsorship assurance for minors whose designated caregivers are already in the U.S. (codes M5, M6, M3) and within seven (7) calendar days of arrival for minors who are traveling with relatives or other caretakers (codes M2, M3) and with appropriate language interpretation, in accordance with subsection 16.2 vii.a.4) above and will include, but need not be limited to:
   I. An assessment of the nature and extent of any previous relationship between the child and the family unit prior to the minor's arrival in this country;
   II. An assessment of the nature and extent of the current relationship between the child and others in the family unit;
   III. An assessment of whether the family unit is willing and able to provide ongoing care and supervision of the child, and how the family plans to provide for the child;
   IV. An assessment of the family unit's understanding of and intentions regarding securing legal responsibility for the child; and
   V. An assessment of the requirements of state law, including whether the family unit must be licensed as a foster care provider or must acquire legal custody or guardianship so that the child may legally remain in the household.
4) If the Recipient's professional resettlement staff determine that the placement is not suitable, the Recipient shall immediately notify the Bureau and return the case to the RPC so that the minor (codes M3,

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

M6,) can be reclassified to enter the United States as an unaccompanied minor requiring foster case.  In the event that a caseworker deems a parent unsuitable to receive a minor (code M5), the State Refugee Coordinator and the Bureau must be immediately notified.  If the Recipient's professional resettlement staff determines that the placement is not suitable during a post-arrival suitability determination (M2, M3), the Recipient shall immediately notify the Bureau and the State Refugee Coordinator.  A copy of the statement of suitability determination shall be retained in the minor's case file (codes M2, M3, M5, M6);

5) If the minor is traveling with non-relatives to be resettled with the same or other non-relatives (code M3), the Recipient shall undertake the assessment as described above within seven (7) calendar days of arrival of the family.  If the Recipient's professional resettlement staff determines that the child's placement with the non-parental unit is not suitable, the Recipient shall notify the Bureau immediately in order to coordinate transfer of the unaccompanied minor to foster care;

6) In the case of a minor entering with or coming to join non-relatives (code M3), the Recipient, other than those referenced in subsection 16.2 vii.f. above, shall obtain the Bureau's agreement to the placement before assuring the case;

7) For unaccompanied minors resettling with non-relatives or non-parental relatives (code M2, M3, M6), the Recipient shall orient the family unit to the nature and expectations of U.S. practices and legal requirements respecting child care using appropriate language interpretation, and provide the family unit with a written statement, provided or approved by the state, county, or local child welfare bureau, and translated as necessary, of its responsibilities and legal obligations in caring for the child.  This statement shall include requirements for guardianship, licensing as a foster care provider if relevant, or other forms of legal responsibility.  The acknowledgement of understanding and commitment to carry out such responsibilities in the written statement shall be documented by having the responsible adult(s) in the family unit sign the statement.  Copies of the signed statement shall be given to the family unit and retained in the case file covering the minor.  In the case of a minor entering the United States alone, this will be done at the time of the suitability determination described in subsection 16.2 vii.f.3) above.  In the case of a minor traveling with relatives, this will be done during the orientation described in subsection 3.2.vi.c.5)  above;

8) For minors described as codes M2, M3, M5, M6 and M7, the Recipient shall, with appropriate language interpretation:

   I.  Advise, encourage, and assist the family in regard to the above-mentioned responsibilities and legal obligations in caring for the child under the requirements of the state;

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001

II. Provide regular and personal contact with the minor for ninety (90) calendar days following arrival, and maintain in the case file covering the minor records of assistance to the minor and of the minor's needs during the ninety (90)-day period;

III. Within fourteen (14) calendar days after the ninetieth (90th) calendar day after arrival, conduct a follow-up home visit to determine the continued suitability of the placement and to assess the need for continued services and arrange for such services, if needed and feasible; and

IV. Within thirty (30) calendar days after the ninetieth (90th) calendar day after arrival submit a minor follow-up evaluation report, including an assessment of the family unit's understanding and intentions regarding the securing of legal responsibility for the minor under state law. Copies of this evaluation shall be retained in the case file covering the minor and sent to the Recipient and the State Refugee Coordinator so that further action may be taken by the state if the state deems it necessary. The Recipient should maintain the completed Minor Follow-up Evaluation Forms for no less than one year after the minor's arrival to the United States.

Responsibilities enumerated in subsection 16.2 vii.f. may not be delegated beyond an affiliate and may only be performed by professional resettlement staff.

g. Foster Care

1) General

I. The services performed by the Recipient under this section shall be performed for the purposes of (a) ensuring that foster care minors (minor code M4) approved for admission to the United States are sponsored as required by law, (b) facilitating Department of Health and Human Services/Office of Refugee Resettlement (HHS/ORR) efforts to place such children under the laws of the states pursuant to section 412(d)(2)(B) of the INA, and (c) ensuring that foster care minors are admitted and moved to their resettlement locations in a manner that takes due regard of their special circumstances;

II. The Recipient shall perform the program services specified in subsection 16.2 vii.g.2) through 16.2 vii.g.4). below on behalf of foster care minors who are assigned to it under this agreement; and

III. The program services shall be performed by paid staff of the Recipient.

2) Pre-arrival Services

The Recipient shall, with respect to foster care minors assigned to it by the RPC, prior to their arrival in the United States:

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

    I.   Provide for such foster care minors the sponsorship assurances required for their admission to the United States;

   II.   Prepare and submit on behalf of such foster care minors sponsorship assurances and other documents required for admission to the RPC for transmission to appropriate overseas processing offices of the Department of Homeland Security, the Department of State, or their designees;

  III.  After a careful review of the case (including, but not necessarily limited to, consideration of the minor's ethnicity, educational level, medical status, family relationships, reunification potential, age, and religion), and in consultation with the appropriate overseas processing post and Agency, assign the case to one of the state-authorized providers of foster care services (hereinafter referred to as an "approved provider") listed in the proposal;

  IV. Notify the approved provider that the case has been assigned to it, transmit available information (including appropriate documentation) concerning the foster care minor to the approved provider, respond to inquiries from the approved provider and other appropriate state or local social service providers concerning the foster care minor, and obtain additional information as needed from the appropriate processing post and Agency;

   V.  Upon request, consult with and provide advice to the approved provider concerning problem cases, including cases that may require transfer to another core provider; prepare the necessary paperwork for cases that require transfer; and accept appropriate pre-arrival transfer cases and assign them to an approved provider;

  VI. Provide orientation on the initial reception and placement of foster care minors as needed to the staffs of approved providers; and

       1.   Assist in the preparation of documents needed to process applications for the parents of foster care minors for admission to the United States as refugees.

   3)  Post-arrival Services

The Recipient shall, with respect to foster care minors assigned to it under this agreement, after their arrival in the United States:

    I.   Facilitate refugee travel to resettlement sites in the United States;

   II.   Upon request, consult with and provide advice to the approved provider concerning difficult cases;

  III.  When the Recipient deems it appropriate, provide funding for emergency needs of foster care minors that cannot be met through other social service programs and that arise within ninety (90) calendar days of a minor's arrival in the United States; and

  IV. Initiate preparation of the Interstate Compact Form and prepare documents that are required to transfer a foster care minor to

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001

another state, if necessary.

4)  Case Files
The Recipient shall establish and maintain a case file on each arriving foster care minor assigned under this agreement that includes a written confirmation of sponsorship, biographic data, and other information pertinent to managing the minor's initial resettlement.  The Bureau, the Inspector General of the Department of State, and any of their authorized representatives shall have the right to examine at any reasonable time the case files maintained by the Recipient.  It is expected that all case files will be treated as confidential.

h.  Loan Services

1)  Recipient hereby confirms that it will operate in accordance with all the terms of the current Memorandum of Understanding (MOU) entered into by the Recipient or its representative with IOM for servicing refugee transportation loans, and also confirms that it will actively participate in all meetings organized by the IOM, in consultation with the Bureau, to discuss methods, policies and procedures for standardizing services among all participating organizations.  These meetings are intended to provide information and guidance that will improve loan services.

2)  In accordance with the MOU, entered into by the Recipient or its representative with IOM, the Recipient is required to use its best efforts for transportation loan services through the establishment and maintenance of a computerized system that permits the initial bill to be sent within six (6) months of the refugee's arrival in the U.S.; the regular mailing of bills and reminder notices to encourage repayments to be made according to schedule; the management of the loan billing and repayment records; and full accounting and appropriate transfer of funds to IOM.  In accordance with the terms, criteria, policies and procedures of the MOU, entered into by the Recipient or its representative with IOM, the Recipient's efforts shall include:

I.  developing and maintaining a loan tracking system that provides for the prompt billing of refugees within six (6) months of arrival, provided required loan information has been received;

II.  billing refugees monthly provided a valid address is available;

III.  maintaining a system that actively seeks refugees' current addresses and social security numbers for use in billing activities;

IV.  maintaining a system that records and calculates balances on individual refugee loan accounts;

V.  establishing and maintaining a procedure for reviewing and determining the appropriateness of requests for deferral, in accordance with established criteria;

VI.  maintaining a procedure for transferring funds to IOM on a monthly basis with required accounting details;

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001

VII. reporting accounts status and fund transfers on a quarterly basis to IOM and to the Bureau;

VIII. transferring to IOM all loan notes becoming in default;

IX. submitting requests to IOM as needed for approval to forgive ("cancel") loans for humanitarian reasons; and

X. reporting monthly to a consumer reporting agency ("CRA").

3) In addition, the Recipient will ensure that each affiliate or remote placement community partner, during the Reception and Placement period informs each refugee who signed an IOM loan note that the loan is a legal debt that must be repaid in accordance with the terms of the note, and documents this notification in the case file; reports to the Recipient on a monthly basis any known change in the address of an adult refugee; and requests and maintains a record of the Social Security number obtained by each refugee in connection with the assistance provided under subsection 16.2.vii.d. of the Cooperative Agreement.

4) The Recipient agrees to cover all expenses of loan services activities from the twenty-five percent (25%) amount that is authorized to be retained from the funds repaid by refugees and to transfer the remaining seventy-five percent (75%) promptly to IOM.

5) In the event Recipient provides resettlement services to a refugee but is not designated by IOM as the billing agency for the refugee's transportation loan or has returned the loan to IOM, Recipient shall assist IOM or any other entity assigned responsibility for providing loan services to refugees being resettled under this Cooperative Agreement. The assistance shall continue during the Reception and Placement period and include: informing each adult refugee having signed a loan note of their legal responsibility to fully repay the loan in accordance with the schedule set forth in their loan note, unless revised in writing by the loan servicing agency; reporting each adult refugee's initial resettlement address or subsequent address change; responding to inquiries from the loan servicing agency for address information; and providing the social security number of each adult refugee holding a loan.

**viii.    Virtual R&P Services for Eligible Refugees**

Reception and Placement Program Core Services provided through Virtual R&P Services shall follow the requirements established under sections 16.2, i through vii except as outlined in the following provisions:

a. Disbursement Requirements

1) The Recipient will provide all per capita direct assistance via a secure method. To ensure gender equality, resettlement agencies are encouraged to transfer funds to each adult in a case and split the minor's funds between parents/legal guardians on a case, where applicable.

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

b. Performance Standards
   1) The Recipient shall develop and implement a Virtual R&P Services monitoring policy, which must be approved by the Bureau.
   2) Funds for the purpose of supporting unexpected, emergency housing needs for Virtual R&P Services clients (also known as homelessness prevention funds) shall be administered per a policy established by the Recipient, and approved by the Grants Officer before funds can be used for these expenses.
   3) Such funds should be used on unmet needs and not duplicate or supplant programs available under any other Federal source of funding.

c. Coordination and Consultation
   1) The Recipient shall attend relevant state refugee coordinator led quarterly consultation and any affiliate-convened local consultations in states with a significant number of Virtual R&P Services cases, to be determined in consultation with the Bureau.

d. Core Services
   1) Pre-Arrival Services
      The Recipient shall:
      I. Assume responsibility for sponsorship of the refugees assigned to the Recipient under this agreement;
      II. Arrange the placement of sponsored refugees in accordance with the policies established under Section 412(a)(2) of the INA and this agreement;
      III. Share relevant information with health care providers and/or state and local officials, as needed, in order to plan for the provision of appropriate health services for refugees who have health care requirements;
      IV. Submit sponsorship assurances to the RPC; and
      V. Counsel the U.S. Tie regarding responsibilities for assisting the refugees, as appropriate, especially the requirement to arrange for housing.

   2) Post-Arrival Services
      I. Airport Reception Services
         1. The Recipient will counsel the U.S. Tie regarding their responsibilities for providing airport reception services, where applicable.
      II. Post-Arrival Services
         1. Within seven (7) working days of arrival, caseworkers will virtually assess the needs of each adult on a case, identifying and prioritizing services that clients can access and complete themselves versus those requiring the assistance of the case worker.

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

    2. The Recipient will provide R&P services based on the needs assessment and access to local services.

    3. The Recipient will conduct at least one home visit virtually to assess the welfare, living conditions and any current or expected needs of all case members between thirty (30) and sixty (60) calendar days after arrival.

  III. Case File Preparation and Maintenance

The Recipient shall establish and maintain a digital case file for each Virtual R&P Services case. Each case file shall be treated as confidential. Each case file shall contain:

1. A clearly legible case note log which shows the date, mode, event or substance, and use of appropriate interpretation for regular contact with the refugee throughout the R&P period, and which identifies the person or entity making such contact;

2. a record of Virtual R&P Post Arrival services as described herein Section 16.2 viii.c.2)II. This record may be included in the case note log or elsewhere in the case file but must include case-specific detail sufficient to constitute a complete record;

3. a record of the one-time per capita assistance payment to each adult, including evidence of confirmation of receipt.

4. a record of all public assistance applied for and received or denied, indicating type(s) of assistance and start date(s), if applicable;

5. a record of school enrollment, including actual or projected start date, for all school-aged children;

6. a copy of Form I-94 (or visa for SIV holders) for each refugee in the case;

7. the social security number for each refugee in the case (if received), as well as a record that an EAD was received by each refugee in the case; and

8. an R&P period report as described in section 16.2 vii.e.10).

# 17. Specific Conditions

N/A

# 18.  Special Provision for Performance in a Designated Combat Area (SPOT):

N/A

United States Conference of Catholic Bishops                SPRMCO24CA0342-M001

## 19.  State Department Leahy Amendment Vetting Requirements:

N/A

## 20.  Reporting Taxes on Foreign Assistance funds:

N/A

## 21.  Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment:

N/A

## 22.  Key Personnel:

The following are Key Personnel for this award:

The Recipient agrees the personnel identified within the attached Proposal for PRM Funding (Attachment A to this award) are considered Key Personnel.

Changes in Key Personnel require prior written GO approval in accordance with 2 CFR 200.308(f)(2).

## 23.  Language:

The Recipient must submit performance reports and official correspondence for this award in English.

## 24.  Award Sensitivity Designation:

N/A

United States Conference of Catholic Bishops                    SPRMCO24CA0342-M001

## 25.  Funding Restrictions for the United Nations Relief and Works Agency (UNRWA):

None of the funds awarded under this agreement may be made available for subawards, direct financial support, or otherwise used to provide any payment or transfer to United Nations Relief and Works Agency (UNRWA).

## 26.  Prohibition on Funding Activities that Encourage Mass-Migration Caravans towards the United States Southwest Boarder:

None of the funds awarded under this grant may be made available to encourage, mobilize, publicize, or manage mass-migration caravans towards the United States southwest border. Funds may not be made available for legal counseling on the United States asylum process; and/or for referrals to legal representation in the United States.

Funds may only be used for cash cards for use in the country in which they are provided or to facilitate assisted voluntary returns and other purposes that do not encourage, mobilize, publicize, or manage mass migration caravans towards the United States southwest border. The provision of humanitarian assistance is permitted.

**Quarterly Status Report**
**Reception and Placement Program**
**Award Number**
**Summary**

Organization:
Reporting Period:

| Federal Expenditures | Oct-Dec | Jan-Mar | Apr-Jun | Jul-Sep | Total |
|---|---|---|---|---|---|
| National Management Expenses - Direct | $0 | $0 | $0 | $0 | $0 |
| National Management Expenses - Indirect | $0 | $0 | $0 | $0 | $0 |
| Per Capita Expenses - Affiliates | $0 | $0 | $0 | $0 | $0 |
| Per Capita Expenses - Refugees | $0 | $0 | $0 | $0 | $0 |
| **Total (Equates to Line 10e of SF-425)** | **$0** | **$0** | **$0** | **$0** | **$0** |

| Recipient Share | Oct-Dec | Jan-Mar | Apr-Jun | Jul-Sep | Total |
|---|---|---|---|---|---|
| Non-Federal Funds -Direct | $0 | $0 | $0 | $0 | $0 |
| Non-Federal Funds - Indirect | $0 | $0 | $0 | $0 | $0 |
| Non-Federal Fund Expenditures | $0 | $0 | $0 | $0 | $0 |
| **Total (Equates to Line 10j of SF-425)** | **$0** | **$0** | **$0** | **$0** | **$0** |

| Summary of Arrivals/Per Capita Earned | Oct-Dec | Jan-Mar | Apr-Jun | Jul-Sep | Total |
|---|---|---|---|---|---|
| Total Number of Refugee Arrivals | | | | | $0 |
| Total Per Capita Earned | $0 | $0 | $0 | $0 | $0 |

| Indirect Cost Calculation | Oct-Dec | Jan-Mar | Apr-Jun | Jul-Sep | Total |
|---|---|---|---|---|---|
| National Management Base | | | | | $0 |
| Per Capita Base | | | | | $0 |
| Total Indirect Cost Base | $0 | $0 | $0 | $0 | $0 |
| Indirect Cost Rate | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Indirect Costs | $0 | $0 | $0 | $0 | $0 |

**Quarterly Status Report**
**Reception and Placement Program**
**Award Number**
**National Management**

**Organization:**
**Reporting Period:**

| Federal Funds | Oct-Dec | Jan-Mar | Apr-Jun | Jul-Sep | Total |
|---|---|---|---|---|---|
| Personnel/Fringe Benefits | | | | | $0 |
| Travel | | | | | $0 |
| Equipment | | | | | $0 |
| Office Supplies | | | | | $0 |
| Professional Fees | | | | | $0 |
| Space/Utilities | | | | | $0 |
| Other | | | | | $0 |
| Subtotal, Direct | $0 | $0 | $0 | $0 | $0 |
| Indirect Costs (From Summary) | $0 | $0 | $0 | $0 | $0 |
| **Total, National Management** | **$0** | **$0** | **$0** | **$0** | **$0** |

| Non-Federal Funds | Oct-Dec | Jan-Mar | Apr-Jun | Jul-Sep | Total |
|---|---|---|---|---|---|
| Personnel/Fringe Benefits | | | | | $0 |
| Travel | | | | | $0 |
| Equipment | | | | | $0 |
| Office Supplies | | | | | $0 |
| Professional Fees | | | | | $0 |
| Space/Utilities | | | | | $0 |
| Other | | | | | $0 |
| Subtotal, Direct | $0 | $0 | $0 | $0 | $0 |
| Indirect Costs (Rate=  xx.xx%) | | | | | $0 |
| **Total** | **$0** | **$0** | **$0** | **$0** | **$0** |

| Total | Oct-Dec | Jan-Mar | Apr-Jun | Jul-Sep | Total |
|---|---|---|---|---|---|
| Personnel/Fringe Benefits | $0 | $0 | $0 | $0 | $0 |
| Travel | $0 | $0 | $0 | $0 | $0 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Office Supplies | $0 | $0 | $0 | $0 | $0 |
| Professional Fees | $0 | $0 | $0 | $0 | $0 |
| Space/Utilities | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| Subtotal, Direct | $0 | $0 | $0 | $0 | $0 |
| Indirect Costs (Rate=  xx.xx%) | $0 | $0 | $0 | $0 | $0 |
| **Total** | **$0** | **$0** | **$0** | **$0** | **$0** |

**Quarterly Status Report**

**Reception and Placement Program**

**Award Number**

**Per Capita Expenses**

Organization:

Reporting Period:

| Per Capita Income Earned | Oct -Dec | Jan-Mar | Apr-Jun | Jul-Sep | Total |
|---|---|---|---|---|---|
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Total | $0 | $0 | $0 | $0 | $0 |

| Per Capita Expenditures- Affiliates | Oct -Dec | Jan-Mar | Apr-Jun | Jul-Sep | Total |
|---|---|---|---|---|---|
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Total | $0 | $0 | $0 | $0 | $0 |

| Per Capita Expenditures- Refugees | Oct -Dec | Jan-Mar | Apr-Jun | Jul-Sep | Total |
|---|---|---|---|---|---|
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |

**Quarterly Status Report**
**Reception and Placement Program**
**Award Number**
**Per Capita Expenses**

**Organization:**
**Reporting Period:**

| | | | | | |
|---|---|---|---|---|---|
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| **Total** | **$0** | **$0** | **$0** | **$0** | **$0** |

| Non-Federal Fund Expenditures | Oct -Dec | Jan-Mar | Apr-Jun | Jul-Sep | Total |
|---|---|---|---|---|---|
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| Affiliate RPC Code and City | | | | | $0 |
| **Total** | **$0** | **$0** | **$0** | **$0** | **$0** |

# NONPROFIT RATE AGREEMENT

EIN: ██████████

ORGANIZATION:
United States Conference of Catholic Bishops
3211 Fourth Street, NE
Washington, DC 20017–1194

Date: 02/16/2024
FILING REF.: The preceding
agreement was dated
06/23/2022

The rates approved in this agreement are for use on grants, contracts and other agreements with the Federal Government, subject to the conditions in Section III.

## SECTION I: INDIRECT COST RATES

RATE TYPES:    FIXED    FINAL    PROV. (PROVISIONAL)        PRED. (PREDETERMINED)

| TYPE | EFFECTIVE PERIOD FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|------|------|------|------|
| ██ | ██ | ██ | ██ | ██ | All Programs |
| ██ | ██ | ██ | ██ | ██ | All Programs |
| ██ | ██ | ██ | ██ | ██ | Use same rates and conditions as those cited for fiscal year ending Dec 31, 2021 |

*BASE

Direct salaries and wages excluding all fringe benefits.

ORGANIZATION: United States Conference of Catholic Bishops
AGREEMENT DATE: 02/16/2024

## SECTION II: SPECIAL REMARKS

TREATMENT OF FRINGE BENEFITS:
The fringe benefits are specifically identified to each employee and are charged individually as direct costs. The directly claimed fringe benefits are listed below.

TREATMENT OF PAID ABSENCES:
Vacation, holiday, sick leave pay and other paid absences are included in salaries and wages and are claimed on grants, contracts and other agreements as part of the normal cost for salaries and wages. Separate claims are not made for the cost of these paid absences.

Fringe Benefits include: FICA, Health Care and Hospitalization Benefit, Prescription Drugs Program, Dental Benefits, Vision Benefits, Employee Assistance Program, Life Insurance and Accidental Death or Dismemberment, Short–Term Disability, Long–Term Disability Coverage, Pension Plan, Healthcare Flexible Spending Account, Tax–Deferred Annuity Plan, Child Care Subsidy, Educational Assistance, and SmartBenefit Program.

The next indirect cost rate proposal based actual costs for FYE 12/31/2022 was due in our office 06/30/2023.

Equipment means tangible personal property (including information technology systems) having a useful life of more than one year and a per–unit acquisition cost which equals or exceeds $5000.

ORGANIZATION: United States Conference of Catholic Bishops
AGREEMENT DATE: 02/16/2024

## SECTION III: GENERAL

A.    LIMITATIONS:

The rates in this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract or other agreement only to the extent that funds are available. Acceptance of the rates is subject to the following conditions: (1) Only costs incurred by the organization were included in its indirect cost pool as finally accepted: such costs are legal obligations of the organization and are allowable under the governing cost principles; (2) The same costs that have been treated as indirect costs are not claimed as direct costs; (3) Similar types of costs have been accorded consistent accounting treatment; and (4) The information provided by the organization which was used to establish the rates is not later found to be materially incomplete or inaccurate by the Federal Government. In such situations the rate(s) would be subject to renegotiation at the discretion of the Federal Government.

B.    ACCOUNTING CHANGES:

This Agreement is based on the accounting system purported by the organization to be in effect during the Agreement period. Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the cognizant agency. Such changes include, but are not limited to, changes in the charging of a particular type of cost from indirect to direct. Failure to obtain approval may result in cost disallowances.

C.    FIXED RATES:

If a fixed rate is in this Agreement, it is based on an estimate of the costs for the period covered by the rate. When the actual costs for this period are determined, an adjustment will be made to a rate of a future year(s) to compensate for the difference between the costs used to establish the fixed rate and actual costs.

D.    USE BY OTHER FEDERAL AGENCIES:

The rates in this Agreement were approved in accordance with the authority in Title 2 of the Code of Federal Regulations, Part 200 (2 CFR 200), and should be applied to grants, contracts and other agreements covered by 2 CFR 200, subject to any limitations in A above. The organization may provide copies of the Agreement to other Federal Agencies to give them early notification of the Agreement.

E.    OTHER:

If any Federal contract, grant or other agreement is reimbursing indirect costs by a means other than the approved rate(s) in this Agreement, the organization should (1) credit such costs to the affected programs, and (2) apply the approved rate(s) to the appropriate base to identify the proper amount of indirect costs allocable to these programs.

BY THE INSTITUTION:

United States Conference of Catholic Bishops

(INSTITUTION)

▬▬▬▬▬▬▬▬▬
(SIGNATURE)

Joyce L. Jones
(NAME)

▬▬▬▬▬▬▬▬▬
(TITLE)

2/29/2024
(DATE)

ON BEHALF OF THE GOVERNMENT:

DEPARTMENT OF HEALTH AND HUMAN SERVICES
(AGENCY)

Darryl W. Mayes -S    Digitally signed by Darryl W.
                      Mayes -S
                      Date: 2024.02.29 07:47:54 -05'00'
(SIGNATURE)

Darryl W. Mayes
(NAME)

Deputy Director, Cost Allocation Services
(TITLE)

02/16/2024
(DATE)

HHS REPRESENTATIVE:    Jasvinder Kaur

TELEPHONE:             (301) 492-4855

# U.S. DEPARTMENT OF STATE
# STANDARD TERMS AND CONDITIONS FOR FEDERAL AWARDS
### EFFECTIVE OCTOBER 21, 2020

| | | | |
|---|---|---|---|
| * | **A.** | Introduction | **02** |
| * | **B.** | Order of Precedence | **02** |
| * | **C.** | Applicability | **02** |
| * | **D.** | Department of State Responsibilities | **03** |
| | **E.** | Recipient Responsibilities and Compliance with Federal Requirements | **03** |
| | **F.** | Universal Identifier and System of Award Management | **04** |
| | **G.** | Reporting Subaward and Executive Compensation Information | **04** |
| * | **H.** | Award Term for Trafficking in Persons | **04** |
| * | **I.** | Never Contract with the Enemy | **04** |
| * | **J.** | Nonprocurement Debarment and Suspension | **05** |
| | **K.** | Governmentwide Requirements for Drug-Free Workplace | **05** |
| * | **L.** | Domestic Preference for Procurements | **05** |
| | **M.** | Prior Approval Requirements | **06** |
| * | **N.** | Branding and Marking | **06** |
| * | **O.** | Government-financed Air Transportation | **07** |
| * | **P.** | Mandatory Disclosure | **07** |
| * | **Q.** | Conflict of Interest | **07** |
| * | **R.** | Restrictions on Lobbying | **08** |
| * | **S.** | Prohibition Against Assignment | **08** |
| | **T.** | Indirect Costs | **09** |
| | **U.** | Audits | **09** |
| * | **V.** | Termination | **09** |
| * | **W.** | Appeals | **10** |
| | **X.** | Closeout | **10** |
| * | **Y.** | Nondiscrimination in Department of State Programs | **11** |
| * | **Z.** | Prohibition of Assistance to Drug Traffickers | **12** |
| * | **AA.** | Prohibition on Use of Funds for Performance or Research Respecting Abortions or Involuntary Sterilization | **12** |
| * | **BB.** | Policy Guidance | **12** |
| | | Appendix 1 | **13** |
| | | Appendix 2 | **14** |
| * | | Appendix 3 | **17** |
| | | Appendix 4 | **19** |

*Applicable to Awards to Individuals

## A.  INTRODUCTION

These Standard Terms and Conditions for Federal Awards outline the Department of State's mandatory award terms as required by Title 2—Grants and Agreements, of the Code of Federal Regulations. Certain applicable Federal administrative standards are incorporated by reference. Electronic copies containing the complete text of the Code of Federal Regulations are available at https://www.ecfr.gov.

The recipient shall provide the principal investigator(s) or project director(s) with a copy of these terms and conditions, including the award provisions, and any subsequent changes to the award. Electronic copies of these Terms and Conditions are publicly available at https://www.state.gov/about-us-office-of-the-procurement-executive/.

These term and conditions may be duplicated, copied or otherwise reproduced as appropriate.

## B.  ORDER OF PRECEDENCE

In the event of any inconsistency between provisions of the award, the inconsistency will be resolved by giving precedence in the following order:

(1) Applicable laws and statutes of the United States, including any specific legislative provisions mandated in the statutory authority for the award.

(2) Code of Federal Regulations (CFR)

(3) Standard Terms and Conditions

(4) Award Provisions

(5) Other award documents and attachments

## C.  APPLICABILITY

| Organization Type | Applicable Administrative Requirements |
|---|---|
| Domestic Non-federal entity (including state, local government, Indian tribe, institution of higher education (IHE), or nonprofit organization) | • 2 CFR 200: Subparts A through F<br>• 2 CFR 600 & 601 |
| Foreign Non-Profit Organization | • 2 CFR 200: Subparts A through E<br>• 2 CFR 600 & 601 |
| Domestic & Foreign For-Profit Organization | • 2 CFR 200: Subparts A through D<br>• 2 CFR 600 & 601<br>• 48 CFR Part 30 & 31 |
| Individuals | • None |
| Foreign Public Entities<br>(Including Public International Organizations) | • None |

## D.  DEPARTMENT OF STATE RESPONSIBILITIES

The Department of State (hereinafter referred to as the Department) has overall responsibility for Department-funded awards, including providing oversight for technical, programmatic, financial and administrative performance.

Grants Officer (GO):

Authorized by a warrant issued by the Department's Procurement Executive, the GO is responsible for all actions on behalf of the Department, including entering into, amending, or terminating the award. In addition, the GO is responsible for the administrative coordination and liaison with the recipient. The GO is the only person authorized to approve changes to any of the requirements in the award.

Grants Officer Representative (GOR):

In accordance with Department policy, the GO is responsible for all aspects of the award, but may designate technically qualified personnel to join in the administration of grants. The GOR is delegated by the GO and responsible for the programmatic, technical, and/or scientific aspects of the award. The recipient should direct all correspondence related to programmatic and budgetary issues to both the GO and GOR.

## E.  RECIPIENT RESPONSIBILITIES AND COMPLIANCE WITH FEDERAL REQUIREMENTS

The recipient is responsible for notifying the Department of any significant problems relating to the administrative, programmatic or financial aspects of the award.

The recipient has full responsibility for the management of the project or activity supported under the award and for adherence to Federal regulations, the award provisions, and these terms and conditions. Although the recipient is encouraged to seek the advice and opinion of the GO and/or the GOR on special problems that may arise, such advice does not diminish the recipient's responsibility for making prudent and sound administrative judgments under the circumstances prevailing at the time the decision was made and should not imply that the responsibility for operating decisions has shifted to the Department.

In addition to the requirements specified in 2 CFR 200.331, these terms and conditions flow down to all subrecipients and must be included in the recipient's subaward instrument. Depending on the type of entity, all subrecipients and subcontractors are subject to the Federal regulations specified in provision *C–Applicability* of these terms and conditions.

Nothing in this provision alters the recipient's responsibility for conduct of the project and compliance with all applicable laws and regulations.

## F. UNIVERSAL IDENTIFIER AND SYSTEM OF AWARD MANAGEMENT

In compliance with 2 CFR 25.220, the Department has adopted the Award term—System for Award Management and Universal Identifier Requirements. The full text of this award term is included as Appendix 1 to these terms and conditions.

## G. REPORTING SUBAWARD AND EXECUTIVE COMPENSATION INFORMATION

In compliance with 2 CFR 170.220, the Department has adopted the Award term—Reporting Subawards and Executive Compensation. The full text of this award terms is included as Appendix 2 to these terms and conditions.

Awards that are deemed "sensitive" and therefore do not require Federal Funding Accountability and Transparency Act (FFATA) reporting will be designated in the award provisions stating that the award is not subject to the FFATA subaward reporting requirements as outlined in the Office of Management and Budgets (OMB) guidance issued August 27, 2010.

## H. AWARD TERM FOR TRAFFICKING IN PERSONS

In compliance with 2 CFR 175.15(a), the Department has adopted the Award term—Trafficking in Persons. The full text of this award term is included as Appendix 3 to these terms and conditions.

## I. NEVER CONTRACT WITH THE ENEMY

In accordance with 2 CFR 183, the following terms apply if the award exceeds $50,000 and is performed outside the United States, including U.S. territories, and is in support of a contingency operation in which members of the Armed Forces are actively engaged in hostilities. It does not apply to the authorized intelligence or law enforcement activities of the Federal Government.

    I.   Prohibition on Providing Funds to the Enemy

        A.  The recipient must—

            1.  Exercise due diligence to ensure that none of the funds, including supplies and services, received under this grant or cooperative agreement are provided directly or indirectly (including through subawards or contracts) to a person or entity who is actively opposing the United States or coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities, which must be completed through 2 CFR 180.300 prior to issuing a subaward or contract and;

            2.  Terminate or void in whole or in part any subaward or contract with a person or entity listed in SAM as a prohibited or restricted source pursuant to subtitle E of Title VIII of the NDAA for FY 2015, unless the Department of State provides written approval to continue the subaward or contract.

B.  The recipient may include the substance of this clause, including paragraph (A) of this clause, in subawards under this grant or cooperative agreement that have an estimated value over $50,000 and will be performed outside the United States, including its outlying areas.

C.  The Department of State has the authority to terminate or void this grant or cooperative agreement, in whole or in part, if the Department becomes aware that the recipient failed to exercise due diligence as required by paragraph (A) of this clause or if the Department becomes aware that any funds received under this grant or cooperative agreement have been provided directly or indirectly to a person or entity who is actively opposing coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities.

II.  Additional Access to Recipient Records

A.  In addition to any other existing examination-of-records authority, the Federal Government is authorized to examine any records of the recipient and its subawards or contracts to the extent necessary to ensure that funds, including supplies and services, available under this grant or cooperative agreement are not provided, directly or indirectly, to a person or entity that is actively opposing United States or coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities, except for awards awarded by the Department of Defense on or before Dec 19, 2017 that will be performed in the United States Central Command (USCENTCOM) theater of operations.

B.  The substance of this clause, including this paragraph (B), is required to be included in subawards or contracts under this grant or cooperative agreement that have an estimated value over $50,000 and will be performed outside the United States, including its outlying areas.

## J.  NONPROCUREMENT DEBARMENT AND SUSPENSION

In compliance with 2 CFR 180.20, the Department has adopted the OMB guidance in subparts A through I of 2 CFR 180 (and as supplemented by 2 CFR 601), as the Department's policy and procedures for nonprocurement debarment and suspension.

## K.  GOVERNMENTWIDE REQUIREMENTS FOR DRUG-FREE WORKPLACE

In compliance with 2 CFR 182.20, the Department has adopted the OMB guidance in subparts A through F of 2 CFR 182 (and supplemented by 22 CFR 133), as the Department's policies and procedures for the drug-free workplace requirements.

## L.  DOMESTIC PREFERENCE FOR PROCUREMENTS

In accordance with 2 CFR 200.322, the recipient should to the greatest extent practicable under the award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States (including but not limited to iron, aluminum, steel, cement, and other

manufactured products). The requirements of this section must be included in all subawards including all contracts and purchase orders for work or products under the award.

For purposes of this section:

"Produced in the United States" means, for iron and steel products, that all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States.

"Manufactured products" means items and construction materials composed in whole or in part of non-ferrous metals such as aluminum; plastics and polymer-based products such as polyvinyl chloride pipe; aggregates such as concrete; glass, including optical fiber; and lumber.

## M. PRIOR APPROVAL REQUIREMENTS

In addition to prior approval requirements specified in 2 CFR 200.308, the recipient must receive prior approval in order to transfer funds between direct cost categories when the Federal share of the award exceeds the Simplified Acquisition Threshold ($250,000) and the cumulative amount of such transfers exceeds or is expected to exceed 10 percent of the total budget as last approved by the Department. When requesting approval for budget revisions, the recipient must use the same format for budget information that was used in the application.

## N. BRANDING AND MARKING

All programs, projects, assistance, activities, and public communications to foreign audiences, partially or fully funded by the Department, must be marked appropriately overseas with the standard U.S. flag in a size and prominence equal to (or greater than) any other logo or identity. The recipient may continue to use existing logos or program materials; however, a standard rectangular U.S. flag must be used in conjunction with such logos. Recipients wishing to use the Department of State seal in addition to the U.S. flag must receive prior written permission from the GO.

This requirement does not apply to the recipient's own corporate communications or in the United States. For general questions about the Department marking policy and overall branding strategy, please contact VisiblyAmerican@state.gov.

The recipient must appropriately acknowledge the U.S. Government support in all dealings with program participants, and in press releases, ceremonies, dedications, interviews, publicity, etc. Furthermore, the recipient must coordinate publicity, ceremonial events, dedications, etc., with the sponsoring Department office or embassy office and public affairs officer.

For all Department funded awards, publications or articles resulting from the award must acknowledge the support of the Department and include a disclaimer of official endorsement as follows: "*This [article] was funded [in part] by a grant from the United States Department of State. The opinions, findings and conclusions stated herein are those of the author[s] and do not necessarily reflect those of the United States Department of State*." The recipient must ensure that this disclaimer be included on all brochures, flyers, posters, billboards, or other graphic artwork that are produced under the award.

## O.   GOVERNMENT-FINANCED AIR TRANSPORTATION

All Federal government financed international air transportation is required by 49 U.S.C. 40118, commonly referred to as the "Fly America Act," to use U.S. air carrier service for all air travel and cargo transportation services. One exception to this requirement is transportation provided under a bilateral or multilateral air transport agreement, to which the U.S. government and the government of a foreign country are parties, and which the Department of Transportation has determined meets the requirements of the Fly America Act.

Current "Open Skies Agreements" that are in effect can be found here: https://www.gsa.gov/policy-regulations/policy/travel-management-policy/fly-america-act.

It is the recipient's responsibility for making determinations and documenting the decision as to whether an exemption to this requirement applies.

Exceptions vary depending on the direction of travel and are outlined in 41 CFR 301-10.136 and 41 CFR 301-10.137.

## P.   MANDATORY DISCLOSURE

Consistent with 2 CFR 200.113, the recipient and any subrecipient must disclose, in a timely manner, in writing to the Department or pass-through entity all violations of Federal criminal law involving fraud, bribery, or gratuity violations potentially affecting the award. Recipients that have received a Federal award including the term and condition outlined in Appendix 4 are required to report certain civil, criminal, or administrative proceedings to SAM (currently FAPIIS). Failure to make required disclosures can result in any of the remedies described in 2 CFR 200.340.

Disclosures must be made to:

> U.S. Department of State
> Office of Inspector General
> P.O. Box 9778
> Arlington, VA 22219
> Phone: 1-800-409-9926 or 202-647-3320
> Website: https://oig.state.gov/hotline

If the total value a recipient's currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of the award, then you as the recipient must comply with Appendix 4 of these terms and conditions.

## Q.   CONFLICT OF INTEREST

In accordance with 2 CFR 200.318, the recipient must maintain written standards of conduct covering conflicts of interest and governing the action of its employees engaged in the selection, award, and administration of contracts. In addition, the recipient must also maintain written standards of conduct covering organizational conflicts of interest.

The recipient must disclose any conflict of interest, including organizational conflicts of interest, and the recipient's approach for resolving the conflict of interest to the GO for the award within ten (10) calendar days of the discovery of the conflict of interest. Upon notice from the recipient of a potential conflict of interest and the approach for resolving it, the GO will make a determination regarding the effectiveness of the recipient's actions to resolve the conflict of interest within thirty (30) calendar days of receipt of the recipient's notice, unless the GO advises the recipient that a longer period is necessary. The recipient must not request payment from the Department for costs for transactions subject to the conflict of interest pending notification of the GO's determination. The recipient's failure to disclose a conflict of interest may result in cost disallowances.

## R.    RESTRICTIONS ON LOBBYING

In accordance with 31 USC 1352, the recipient is required to abide by the policy and procedures codified at 22 CFR 138 et seq. By accepting the award, the recipient agrees that:

(1) No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

(2) If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

(3) The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $20,134 and not more than $201,340 for each such failure.

## S.    PROHIBITION AGAINST ASSIGNMENT

Notwithstanding any other provision of the award, the recipient must not transfer, pledge, mortgage, or otherwise assign the award, or any interest therein, or any claim arising thereunder, to any party or parties, bank trust companies, or other financing or financial institutions.

## T.  INDIRECT COSTS

A non-profit organization which has not previously established an indirect cost rate with a Federal agency, that believes the Department should be its cognizant agency, shall submit its initial indirect cost proposal immediately after the organization is advised that the award will be made and, in no event, later than three months after the effective date of the award. When requested by the recipient, the GO will provide instructions on how to submit the indirect cost rate proposal.

## U.  AUDITS

All U.S. recipients (not including for-profit organizations) that expend $750,000 or more during the recipient's fiscal year in Federal awards must have a single or program-specific audit conducted for that year in accordance with the provisions of 2 CFR Part 200 Subpart F. In addition, the recipients are subject to the audit requirements found in the Single Audit Act of 1984, 31 U.S.C. 7501-7506. The cost of an audit may be charged to the award in accordance with 2 CFR 200.425.

All foreign recipients that expend $750,000 or more during the recipient's fiscal year in Department of State awards must have a single or program-specific audit conducted for that year in accordance with these terms and conditions. In the event the recipient undergoes an audit for another Federal agency, a second audit does not need to be procured so long as the Department's funding was analyzed under the same audit. A program-specific audit means an audit of one Federal award program. Single audit means an audit that includes both the recipient's financial statements and the Department awards received to be conducted in accordance with Generally Accepted Government Auditing Standards (GAGAS).

The audit must be independently and professionally executed in accordance with GAGAS either prescribed by a government's Supreme Audit Institution with auditing standards approved by the Comptroller General of the United States, or in accordance with the host country's laws or adopted by the host country's public accountants or associations of public accountants, together with generally accepted international auditing standards. However, foreign entity audits consistent with International Standards for Auditing or other auditing standards are acceptable with the GO's approval.

The Department and its authorized representatives have the legally enforceable right to examine, audit, and copy, at any reasonable time, all records in the Department's possession pertaining to the award. Furthermore, the Inspector General or any of his or her duly authorized representatives shall have access to any pertinent books, documents, papers and records of the recipient. Information accessible to the Inspector General includes written, printed, recorded, produced, or reproduced by any mechanical, magnetic, or other process or medium. The Department reserves the right to make audits, inspections, excerpts, transcriptions or other examinations as authorized by law of the recipient's documents and facilities.

## V.  TERMINATION

In compliance with 2 CFR 200.340, any award may be terminated in whole or in part as follows:

(1) By the Department, if the recipient fails to comply with the terms and conditions of the award;

(2) By the Department, to the greatest extent authorized by law, if the award no longer effectuates the program goals or agency priorities;

(3) By the Department with the consent of the recipient, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated;

(4) By the recipient upon sending to the Department GO written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Department determines in the case of partial termination that the reduced or modified portion of the award will not accomplish the purposes for which the award was made, the Department may terminate the award in its entirety; or

(5) By the Department pursuant to termination provisions included in the award provisions.

## W.  APPEALS

If the recipient fails to comply with Federal statutes, regulations or the terms and conditions of the award, the GO may take appropriate action including, but not limited to, withholding payments, disallowing costs, suspending or terminating the award, or initiating suspension and debarment proceedings.

In accordance with 2 CFR 200.341, the GO will provide the recipient an opportunity to object and provide information and documentation challenging the action. The recipient has 30 days after receiving the written notification to submit its appeal. The recipient's appeal should contain:

A cover letter with a brief statement of the recipient's argument and the disputed factual, legal, or other issues.

(1) the date the recipient received the GO's decision;

(2) the amount of disallowed costs in dispute (if applicable); and

(3) any other relevant documents.

## X.  CLOSEOUT

In accordance with 2 CFR 200.345, the closeout of the award does not affect any of the following:

(1) the right of the Department to disallow costs and recover funds on the basis of a later audit or other review.

(2) The requirement for the recipient to return any funds due as a result of later refunds, corrections, or other transactions including final indirect cost rate adjustments.

(3) The ability of the Department to make financial adjustments to a previously closed award such as resolving indirect cost payments and making final payments.

(4) Audit requirements in subpart F of 2 CFR 200.

(5) Property management and disposition requirements in 2 CFR 200.310 through 200.316.

(6) Records retention as required in 2 CFR 200.334 through 200.337.

After closeout of the award, a relationship created under the award may be modified or ended in whole or in part with the consent of the Department and the recipient, provided the responsibilities of the recipient referred to above including those for property management as applicable, are considered and provisions made for continuing responsibilities of the recipient, as appropriate.

The recipient may charge the award during closeout for the costs of publication or sharing of research results if the costs are not incurred during the period of performance of the award.

## Y.  NONDISCRIMINATION IN DEPARTMENT OF STATE PROGRAMS

### Nondiscrimination on the Basis of Handicap in Programs or Activities Receiving Federal Financial Assistance

In accordance with 29 USC 701 et seq., the recipient is required to abide by the policy and procedures codified at 22 CFR 142, which is designed to eliminate discrimination on the basis of handicap in any program or activity receiving Federal financial assistance.

### Nondiscrimination in Federally-Assisted Programs of the Department of State — Effectuation of Title VI of the Civil Rights Act of 1964

In accordance with 42 USC 2000d et seq., the recipient is required to abide by the policy and procedures codified at 22 CFR 141, which stipulates that no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity receiving Federal financial assistance from the Department of State.

### Nondiscrimination on the Basis of Age in Programs or Activities Receiving Federal Financial Assistance

In accordance with 42 USC 6101 et seq., the recipient is required to abide by the governmentwide policy and procedures codified at 45 CFR 90 and as supplemented by 22 CFR 143, which prohibits discrimination on the basis of age in programs or activities in the United States receiving Federal financial assistance.

### Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance

In accordance with 20 USC 1681 et seq., the recipient is required to abide by the policy and procedures codified at 22 CFR 146, which prohibits discrimination on the basis of sex in any education program or activity receiving Federal financial assistance.

## Z.  PROHIBITION OF ASSISTANCE TO DRUG TRAFFICKERS

In accordance with 22 USC 2291f, the recipient is required to abide by the policy and procedures codified at 22 CFR 140, which is designed to ensure that Federal assistance funds are not provided to or through any individual or entity that:

(1) Has been convicted of a violation of, or a conspiracy to violate, any law or regulation of the United States, a State or the District of Columbia, or a foreign country relating [to] narcotic or psychotropic drugs or other controlled substances; or

(2) Is or has been an illicit trafficker in any such controlled substance or is or has been a knowing assistor, abettor, conspirator, or colluder with others in the illicit trafficking in any such substance.

## AA.  PROHIBITION ON USE OF FUNDS FOR PERFORMANCE OR RESEARCH RESPECTING ABORTIONS OR INVOLUNTARY STERILIZATION

The recipient agrees that in accordance with 22 USC 2151b(f) no foreign assistance funds provided by the award shall be used to:

(1) pay for the performance of abortions as a method of family planning or to motivate or coerce any person to practice abortions (Helms Amendment, 1973).

(2) pay for the performance of involuntary sterilizations as a method of family planning or to coerce or provide any financial incentive to any person to undergo sterilizations (Involuntary Sterilization Amendment, 1978).

(3) pay for any biomedical research which relates, in whole or in part, to methods of, or the performance of, abortions or involuntary sterilization as a means of family planning (Biden Amendment, 1981).

Furthermore, the recipient agrees in accordance with the Department of State's annual appropriation bill, that no funds provided by the award may be used to lobby for or against abortion (Siljander Amendment, 1981).

## BB.  POLICY GUIDANCE

The recipient shall comply with the following Executive Orders as applicable:

(1) E.O. 12432 – Minority business enterprise development

(2) E.O. 13224 - Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism

(3) E.O. 13279 - Equal Protection of the Laws for Faith-Based and Community Organizations

# APPENDIX 1

I.   System for Award Management and Universal Identifier Requirements

    A.   Requirement for System for Award Management

        Unless you are exempted from this requirement under 2 CFR 25.110, you as the recipient must maintain current information in the SAM. This includes information on your immediate and highest level owner and subsidiaries, as well as on all of your predecessors that have been awarded a Federal contract or Federal financial assistance within the last three years, if applicable, until you submit the final financial report required under this Federal award or receive the final payment, whichever is later. This requires that you review and update the information at least annually after the initial registration, and more frequently if required by changes in your information or another Federal award term.

    B.   Requirement for Unique Entity Identifier

        If you are authorized to make subawards under this Federal award, you:

        1.   Must notify potential subrecipients that no entity (see definition in paragraph C of this award term) may receive a subaward from you until the entity has provided its Unique Entity Identifier to you.

        2.   May not make a subaward to an entity unless the entity has provided its Unique Entity Identifier to you. Subrecipients are not required to obtain an active SAM registration, but must obtain a Unique Entity Identifier.

    C.   Definitions

        For purposes of this term:

        1.   System for Award Management (SAM) means the Federal repository into which a recipient must provide information required for the conduct of business as a recipient. Additional information about registration procedures may be found at the SAM internet site (currently at https://www.sam.gov).

        2.   Unique Entity Identifier means the identifier assigned by SAM to uniquely identify business entities.

        3.   Entity includes non-Federal entities as defined at 2 CFR 200.1 and also includes all of the following, for purposes of this part:

            a.   A foreign organization;

            b.   A foreign public entity;

            c.   A domestic for-profit organization; and

            d.   A domestic or foreign for-profit organization; and

            e.   A Federal agency.

        4.   Subaward has the meaning given in 2 CFR 200.1.

        5.   Subrecipient has the meaning given in 2 CFR 200.1.

# APPENDIX 2

I.  Reporting Subawards and Executive Compensation

    A.  Reporting of first-tier subawards.

        1.  Applicability. Unless you are exempt as provided in paragraph D. of this award term, you must report each action that equals or exceeds $30,000 in Federal funds for a subaward to a non-Federal entity or Federal agency (see definitions in paragraph E. of this award term).

        2.  Where and when to report.

            a.  The non-Federal entity or Federal agency must report each obligating action described in paragraph A.1. of this award term to http://www.fsrs.gov.

            b.  For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported by no later than December 31, 2010.)

        3.  What to report. You must report the information about each obligating action that the submission instructions posted at http://www.fsrs.gov specify.

    B.  Reporting total compensation of recipient executives for non-Federal entities.

        1.  Applicability and what to report. You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if—

            a.  The total Federal funding authorized to date under this Federal award equals or exceeds $30,000 as defined in 2 CFR 170.320;

            b.  In the preceding fiscal year, you received—

                i.  80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards), and

                ii.  $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and,

            c.  The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

        2.  Where and when to report. You must report executive total compensation described in paragraph B.1. of this award term:

            a.  As part of your registration profile at https://www.sam.gov.

      b.  By the end of the month following the month in which this award is made, and annually thereafter.

C.  Reporting of Total Compensation of Subrecipient Executives.

    1.  Applicability and what to report. Unless you are exempt as provided in paragraph D. of this award term, for each first-tier non-Federal entity subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if—

        a.  in the subrecipient's preceding fiscal year, the subrecipient received—

            i.  80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards) and,

           ii.  $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

        b.  The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

    2.  Where and when to report. You must report subrecipient executive total compensation described in paragraph C.1. of this award term:

        a.  To the recipient.

        b.  By the end of the month following the month during which you make the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (i.e., between October 1 and 31), you must report any required compensation information of the subrecipient by November 30 of that year.

D.  Exemptions.

    1.  If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

        a.  Subawards, and

        b.  The total compensation of the five most highly compensated executives of any subrecipient.

E.  Definitions. For purposes of this award term:

    1.  Federal Agency means a Federal agency as defined at 5 U.S.C. 551(1) and further clarified by 5 U.S.C. 552(f).

    2.  Non-Federal entity means all of the following, as defined in 2 CFR part 25:

    a. A Governmental organization, which is a State, local government, or Indian tribe;

    b. A foreign public entity;

    c. A domestic or foreign nonprofit organization; and,

    d. A domestic or foreign for-profit organization.

3. Executive means officers, managing partners, or any other employees in management positions.

4. Subaward:

    a. This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

    b. The term does not include your procurement of property and services needed to carry out the project or program (for further explanation, see 2 CFR 200.331).

    c. A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.

5. Subrecipient means a non-Federal entity or Federal agency that:

    a. Receives a subaward from you (the recipient) under this award; and

    b. Is accountable to you for the use of the Federal funds provided by the subaward.

6. Total compensation means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)).

# APPENDIX 3

I. Trafficking in persons.

   A. Provisions applicable to a recipient that is a private entity.

      1. You as the recipient, your employees, subrecipients under this award, and subrecipients' employees may not—

         a. Engage in severe forms of trafficking in persons during the period of time that the award is in effect;

         b. Procure a commercial sex act during the period of time that the award is in effect; or

         c. Use forced labor in the performance of the award or subawards under the award.

      2. We as the Federal awarding agency may unilaterally terminate this award, without penalty, if you or a subrecipient that is a private entity —

         a. Is determined to have violated a prohibition in paragraph A.1 of this award term; or

         b. Has an employee who is determined by the agency official authorized to terminate the award to have violated a prohibition in paragraph A.1 of this award term through conduct that is either—

            i. Associated with performance under this award; or

            ii. Imputed to you or the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," as implemented by our agency at 2 CFR part 601.

   B. Provision applicable to a recipient other than a private entity. We as the Federal awarding agency may unilaterally terminate this award, without penalty, if a subrecipient that is a private entity—

      1. Is determined to have violated an applicable prohibition in paragraph A.1 of this award term; or

      2. Has an employee who is determined by the agency official authorized to terminate the award to have violated an applicable prohibition in paragraph A.1 of this award term through conduct that is either—

         a. Associated with performance under this award; or

         b. Imputed to the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," as implemented by our agency at 2 CFR part 601.

   C. Provisions applicable to any recipient.

- 17 -

1. You must inform us immediately of any information you receive from any source alleging a violation of a prohibition in paragraph A.1 of this award term.

2. Our right to terminate unilaterally that is described in paragraph A.2 or b. of this section:

   a. Implements section 106(g) of the Trafficking Victims Protection Act of 2000 (TVPA), as amended (22 U.S.C. 7104(g)), and

   b. Is in addition to all other remedies for noncompliance that are available to us under this award.

3. You must include the requirements of paragraph A.1 of this award term in any subaward you make to a private entity.

D. Definitions. For purposes of this award term:

1. "Employee" means either:

   a. An individual employed by you or a subrecipient who is engaged in the performance of the project or program under this award; or

   b. Another person engaged in the performance of the project or program under this award and not compensated by you including, but not limited to, a volunteer or individual whose services are contributed by a third party as an in-kind contribution toward cost sharing or matching requirements.

2. "Forced labor" means labor obtained by any of the following methods: the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

3. "Private entity":

   a. Means any entity other than a State, local government, Indian tribe, or foreign public entity, as those terms are defined in 2 CFR 175.25.

   b. Includes:

      i. A nonprofit organization, including any nonprofit institution of higher education, hospital, or tribal organization other than one included in the definition of Indian tribe at 2 CFR 175.25(b).

      ii. A for-profit organization.

4. "Severe forms of trafficking in persons," "commercial sex act," and "coercion" have the meanings given at section 103 of the TVPA, as amended (22 U.S.C. 7102).

# APPENDIX 4

I. Reporting of Matters Related to Recipient Integrity and Performance

    A. General Reporting Requirement

       If the total value of your currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then you as the recipient during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in paragraph 2 of this award term and condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

    B. Proceedings About Which You Must Report

       Submit the information required about each proceeding that:

       1. Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

       2. Reached its final disposition during the most recent five-year period; and

       3. Is one of the following:

           a. A criminal proceeding that resulted in a conviction, as defined in paragraph 5 of this award term and condition;

           b. A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

           c. An administrative proceeding, as defined in paragraph E.1. of this award term and condition, that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

           d. Any other criminal, civil, or administrative proceeding if:

               i. It could have led to an outcome described in paragraph B.3.a., b., or c. of this award term and condition;

               ii. It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and

               iii. The requirement in this award term and condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

C. Reporting Procedures

Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in paragraph B of this award term and condition. You do not need to submit the information a second time under assistance awards that you received if you already provided the information through SAM because you were required to do so under Federal procurement contracts that you were awarded.

D. Reporting Frequency

During any period of time when you are subject to the requirement in paragraph A of this award term and condition, you must report proceedings information through SAM for the most recent five year period, either to report new information about any proceeding(s) that you have not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

E. Definitions

For purposes of this award term and condition:

1. Administrative proceeding means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant. It does not include audits, site visits, corrective plans, or inspection of deliverables.

2. Conviction, for purposes of this award term and condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

3. Total value of currently active grants, cooperative agreements, and procurement contracts includes—

    a. Only the Federal share of the funding under any Federal award with a recipient cost share or match; and

    b. The value of all expected funding increments under a Federal award and options, even if not yet exercised.

- 20 -