UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| U.S. CONFERENCE OF CATHOLIC BISHOPS, <br><br>         Plaintiff, <br><br>    v. <br><br> DEPARTMENT OF STATE, et al. <br><br>         Defendants. | Civil Action No. 25-0465 (TNM) |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ........................................................................................................................... 1

STATUTORY BACKGROUND ..................................................................................................... 2

FACTUAL BACKGROUND .......................................................................................................... 4

     I.     The Executive Orders ......................................................................................... 4

     II.    Implementation of the Executive Orders ............................................................ 5

STANDARD OF REVIEW ............................................................................................................. 6

ARGUMENT .................................................................................................................................. 7

     I.     Plaintiff Fails to Demonstrate A Likelihood of Success on the Merits. ................. 7

          A.    Plaintiff Does Not Allege An Agency Action ............................................. 8

          B.    Plaintiff Does Not Allege Any Final Agency Action ................................. 9

          C.    The State Department Has Not Acted Contrary to Law ............................. 9

          D.    The State Department's Temporary Pause Is Not Arbitrary and Capricious ............................................................................................................... 11

          E.    Implementation of an Executive Order Is Not Subject to Notice and Comment ........................................................................................................... 14

     II.    Plaintiff Cannot Establish a Likelihood of Immediate Irreparable Harm ............. 14

     III.   The Balance of Harms and the Public Interest Weigh Against Relief ................. 16

     IV.   The Court Should Require Plaintiff to Post Security ............................................ 17

CONCLUSION ............................................................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**

*AIDS Vaccine Advoc. Coal. v. United States,*
  Civ. A. 25-0400 (AHA), 2025 WL 485324 (D.D.C. Feb. 13, 2025 ........................................ 16

*Aminjavaheri v. Biden,*
  Civ. A. No. 21-2246 (RCL), 2021 WL 4399690 (D.D.C. Sept. 27, 2021) ............................... 2

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council,*
  426 U.S. 87 (1983) ................................................................................................................. 7

*Basel Action Network v. Mar. Admin.,*
  285 F. Supp. 2d 58 (D.D.C. 2003) ......................................................................................... 6

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................................................... 9

*Bowman Transp., Inc. v. Ark.-Best Freight Sys.,*
  419 U.S. 281 (1974) ............................................................................................................... 7

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) ......................................................................................... 7, 15

*City of New Haven v. United States,*
  809 F.2d 900 (D.C. Cir. 1987) ............................................................................................. 10

*CityFed Fin. Corp. v. Office of Thrift Superv.,*
  58 F.3d 738 (D.C. Cir. 1995) ............................................................................................... 14

*Cobell v. Norton,*
  240 F.3d 1081 (D.C. Cir. 2001) ............................................................................................. 8

*Consolo v. Fed. Maritime Comm.,*
  383 U.S. 607 (1966) ............................................................................................................... 7

*Detroit Int'l Bridge Co. v. Gov't of Canada,*
  189 F. Supp. 3d 85 (D.D.C. 2016), ........................................................................................ 8

*Dickson v. Sec'y of Def.,*
  68 F.3d 1396 (D.C. Cir. 1995) ............................................................................................... 7

*Dorfmann v. Boozer,*
  414 F.2d 1168 (D.C. Cir. 1969) ............................................................................................. 2

*Farris v. Rice,*
  453 F. Supp. 2d 76 (D.D.C. 2006) ....................................................................................... 15

*Hall v. Johnson,*
  599 F. Supp. 2d 1 (D.D.C. 2009) ........................................................................................... 6

*Hospitality Staffing Sols., LLC v. Reyes,*
  736 F. Supp. 2d 192 (D.D.C. 2010) ....................................................................................... 7

*League of Women Voters of the U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ................................................................................................... 6

*League of Women Voters v. Newby*,
Civ. A. No. 16-236 (RJL), 2016 WL 8808743 (D.D.C. Feb. 23, 2016) ................................. 15

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........................................................................................................... 8

*Maryland v. King*,
567 U.S. 1301 (2012) ......................................................................................................... 16

*Mdewakanton Sioux Indians of Minn.*,
255 F. Supp. 3d 48 (D.D.C. 2017) ..................................................................................... 14

*Miller v. Lehman*,
801 F.2d 492 (D.C. Cir. 1986) ............................................................................................ 7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................................................................. 7

*Nat'l Wildlife Fed'nv. Snow*,
561 F.2d 227 (D.C. Cir. 1976) ............................................................................................ 14

*Pursuing Am.'s Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) ............................................................................................ 6

*Spadone v. McHugh*,
842 F. Supp. 2d 295 (D.D.C. 2012) ................................................................................... 15

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ........................................................................................................... 16

**Statutes**

5 U.S.C. § 553(a)(2) ................................................................................................................. 14

5 U.S.C. § 704 ..................................................................................................................... 8, 9

5 U.S.C. § 706(2)(A) ................................................................................................................. 7

8 U.S.C. § 1101(a)(42) ......................................................................................................... 2, 3

8 U.S.C. § 1157(a)(2) ................................................................................................................. 2

8 U.S.C. § 1157(c)(1) ................................................................................................................. 2

8 U.S.C. § 1157(c)(2)(A) ........................................................................................................... 3

8 U.S.C. § 1157(c)(3) ................................................................................................................. 3

8 U.S.C. § 1182(a) ..................................................................................................................... 2

8 U.S.C. § 1522(a)(1)(A) ........................................................................................................... 4

8 U.S.C. § 1522(b)(1)(A)(ii) ..................................................................................................... 10

Pub. L. No. 96-212 ..................................................................................................................... 2

**Regulations**

2 C.F.R. § 200.305(b)(6) ........................................................................................................... 13

8 C.F.R. § 207.7(a) ............................................................................................................... 3, 4

45 C.F.R. § 400.11(a)........................................................................................................... 4

45 C.F.R. § 400.56 ............................................................................................................... 4

Defendants, by and through the undersigned counsel, respectfully file this memorandum in opposition to Plaintiff's motion for temporary restraining order (ECF No. 5, "Pl.'s Mot."). For the reasons discussed below and, the Court should deny Plaintiff's motion.

## INTRODUCTION

On January 20, 2025, the President issued a ninety-day pause in foreign development assistance to assess programmatic efficiencies, and to ensure that all foreign aid is consistent with foreign policy. *See* Exec. Order No. 14,169, Reevaluating & Realigning United States Foreign Aid, 90 Fed. Reg. 8,610 (Jan. 20, 2025) ("Foreign Aid Order") §§ 2, 3. As a result, the Department of State ("State Department") paused all foreign aid related to the U.S. Refugee Admissions Program ("USRAP" or the "Program") was paused, to include payments to refugee resettlement agencies.

Plaintiff U.S. Conference for Catholic Bishops, a national refugee resettlement agency, has moved for emergency relief under the Administrative Procedure Act ("APA") to enjoin the Program from continuing the pause in payments and to direct the Program to promptly reimburse Plaintiff for any expenses. Plaintiff's motion fails.

First, Plaintiff fails to demonstrate a likelihood of success on the merits: (1) Plaintiff does not identify an agency action or a final agency action; (2) the State Department has not acted contrary to law; (3) the State Department's pause in funding is not arbitrary and capricious; and (4) the State Department's implementation of the Foreign Aid Order is not subject to notice and comment rulemaking procedures. Second, Plaintiff fails to establish irreparable harm because its alleged harms are monetary. And, third, the balance of harms and the public interest weigh in favor of the President's ability to implement his agenda consistent with his constitutional and statutory authorities.

Accordingly, for the reasons discussed below, the Court should deny Plaintiff's demand for extraordinary relief, especially Plaintiff's demand that it be granted the requested ultimate relief, *see Aminjavaheri v. Biden*, Civ. A. No. 21-2246 (RCL), 2021 WL 4399690, at *5 (D.D.C. Sept. 27, 2021) ("Moreover, the D.C. Circuit has cautioned that a preliminary injunction 'should not work to give a party essentially the full relief he seeks on the merits.'" (quoting *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 n.13 (D.C. Cir. 1969) (citations omitted)).

## STATUTORY BACKGROUND

The Refugee Act of 1980 amended the Immigration and Nationality Act ("INA") to establish "a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for [their] effective resettlement." Pub. L. No. 96-212, 94 Stat. 102, § 101(b). The Refugee Act provides that the maximum number of refugees that may be admitted annually shall be "such number as the President determines, before the beginning of the fiscal year and after appropriate consultation [with Congress], is justified by humanitarian concerns or is otherwise in the national interest." 8 U.S.C. § 1157(a)(2).

Subject to numerical limits set annually by the President, the Secretary of Homeland Security has discretion to admit "any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible (except as otherwise provided under [8 U.S.C. § 1157(c)(3)]) as an immigrant" under the INA. 8 U.S.C. § 1157(c)(1); *see also* 8 U.S.C. §§ 1101(a)(42) (defining "refugee"), 1182(a) (general inadmissibility grounds). Which refugees are determined to be "of special humanitarian concern" to the United States for the purpose of refugee resettlement is determined in the Report to Congress on Proposed Refugee Admissions prior to the beginning of the fiscal year. Zerbinopoulos Decl.

¶ 9, attached hereto as Ex. A.  Refugees admitted in accordance with this provision are sometimes referred to as "principal" applicants or refugees.

In addition, certain individuals who do not meet the statutory definition of a refugee under 8 U.S.C. § 1101(a)(42) may nonetheless be entitled to refugee status if they are accompanying or "following-to-join" a principal refugee.  *See* 8 U.S.C. § 1157(c)(2)(A); 8 C.F.R. § 207.7(a).   To obtain "derivative refugee" status, an applicant must be the spouse or unmarried child under the age of 21 of a principal refugee and must also be admissible (except as otherwise provided under 8 U.S.C. § 1157(c)(3)) as an immigrant under the INA.  8 U.S.C. § 1157(c)(2)(A). Derivative refugees who are either in the physical company of the principal refugee when admitted to the United States or admitted within four months of the principal refugee's admission are called "accompanying" refugees.  8 C.F.R. § 207.7(a).  Derivative refugees who seek admission more than four months after the principal refugee are called "following-to-join" refugees.  *Id*.

The INA provides only that such derivative refugees are entitled to refugee status if the appropriate application or petition is processed and their relationship as the spouse or child of a principal refugee and their admissibility is established.[1]  *See* 8 U.S.C. § 1157(c)(2)(A).  The INA does not, however, entitle derivative refugees to be admitted to the United States without qualification.  The admission of a derivative who has obtained refugee status is contingent on there being room under the subsection allocation under which the principal refugee's admission is charged, as well as, by implication, the annual refugee limit, set by the President, and that individual establishing their eligibility for admission.  *Id*.

---

[1]     Accompanying derivatives are processed via Form I-590, Registration for Classification as Refugee, which is filed in conjunction with the Form I-590 by the principal refugee overseas. Following-to-join derivatives are processed via Form I-730, Refugee/Asylee Relative Petition, which the admitted principal refugee files on behalf of the derivative, who may be overseas or in the United States.

Following admission, the INA authorizes the funding of programs by public and private organizations to assist refugees in achieving self-sufficiency.  8 U.S.C. § 1522; 45 C.F.R. pt. 400. Government support for these programs, however, is only permitted "to the extent of available appropriations."  8 U.S.C. § 1522(a)(1)(A); *see also* 45 C.F.R. §§ 400.11(a), 400.56.

## FACTUAL BACKGROUND

### I.    The Executive Orders

On January 20, 2025, the President signed Executive Order No. 14,163, Realigning the United States Refugee Admissions Program, 90 Fed. Reg. 8,459 (Jan. 20, 2025) ("Refugee Order"), which suspended admission of refugees under the Program, pursuant to the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a) and based on the President's finding that the "United States lacks the ability to absorb large numbers of migrants, and in particular, refugees, into its communities in a manner that does not compromise the availability of resources for Americans, that protects their safety and security, and that ensures the appropriate assimilation of refugees."  Refugee Order § 1.  The Refugee Order also suspended "decisions on applications for refugee status."  *Id.* § 3(b).  Notwithstanding the suspension, the Refugee Order allows for admission of refugees on a case-by-case basis should the Secretaries of Homeland Security and State jointly determine such admission is in the national interest and would not threaten national security or welfare, and sets a process for resuming refugee admissions in the future. *Id.* §§ 3(c), 4.

That same day, the President also signed the Foreign Aid Order (i.e., Executive Order No. 14,169, which required agency heads to "immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors pending reviews of such programs . . . to be conducted within 90 days."  Foreign Aid Order § 3(a).  The Foreign Aid Order also required agency heads to review each foreign assistance program under guidelines provided

by the Secretary of State to determine "whether to continue, modify, or cease each foreign assistance program." *Id.* § 3(b)–(c).  Notwithstanding the pause, the Foreign Aid Order allows the Secretary of State to waive the ninety-day pause on incurring new development assistance funds and allows for the resumption of programs prior to the end of the ninety-day period with the Secretary of State's approval.  *Id.* § 3(d)–(e).

## II.    <u>Implementation of the Executive Orders</u>

In the days before the administration change, the incoming administration informed senior officials in the State Department's Bureau of Population and Migration ("PRM" or "Migration Bureau") that President Trump intended to suspend refugee admissions under the Program through executive order.  Zerbinopoulos Decl. ¶18.  In anticipation of the Refugee Order, the State Department, upon learning that the suspension would go into effect on January 27, 2025, cancelled all travel after 12:00 p.m. on January 20, 2025.  Zerbinopoulos Decl. ¶ 20.  The State Department did so out of an abundance of caution because most refugees travel to the United States from around the world, a trip that involves multiple layovers and can take multiple days.  *Id*.  Consequently, the State Department cancelled travel scheduled between January 20 and 27, 2025 to avoid the not insignificant risk that refugees would not arrive in the United States before the suspension went into effect at 12:01 a.m. on January 27, 2025, and to avoid the possibility that some refugees would be stranded at a U.S. port of entry or at an airport in a foreign country.  *Id*.

In response to the Refugee Order's directive to suspend any decisions on refugee applications, the State Department also suspended the Program's processing activities.  Zerbinopoulos Decl. ¶21.  The suspension was intended to prevent inefficiencies, as it would be illogical for the Government and resettlement partners to move refugees to transit centers or conduct pre-departure activities when refugee admissions were suspended.  Zerbinopoulos Decl. ¶¶ 21–22.  And some processing activities, such as medical exams and security checks, expire after

a certain amount of time.  Zerbinopoulos Decl. ¶ 22.  Further, the State Department could not be sure when and which classes of refugees the President would find to be in the United States' interest upon resumption of refugee admissions.  Zerbinopoulos Decl. ¶ 22.

Following the Foreign Aid Order's directive to immediately cease foreign aid payments, the State Department, on January 24, 2025, issued 25 STATE 6828, an "All Diplomatic and Consular Posts" (or "ALDAC") cable "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID."  Zerbinopoulos Decl. ¶ 26.  This pause applied to assistance funded from accounts in title III of the Department of State, Foreign Operations, and Related Programs Appropriations Act, to include the Migration and Refugee Assistance account, from which funding for initial reception and placement services is provided to resettlement agencies.  Zerbinopoulos Decl. ¶¶ 23–26.  Thus, the Order's halt on foreign aid necessarily included payments to resettlement agencies in the United States.  Zerbinopoulos Decl. ¶¶ 24–26.

## STANDARD OF REVIEW

"A [temporary restraining order] is an extraordinary remedy and should be granted sparingly."  *Basel Action Network v. Mar. Admin.*, 285 F. Supp. 2d 58, 60 (D.D.C. 2003).  A party seeking temporary restraining order must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest."  *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)); *Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("The same standard applies to both temporary restraining orders and to preliminary injunctions").  The moving party bears the burden of persuasion and must demonstrate, "by a clear showing," that the requested relief is warranted.  *Hospitality Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192,

197 (D.D.C. 2010) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

## ARGUMENT

### I.  <u>Plaintiff Fails to Demonstrate A Likelihood of Success on the Merits.</u>

The APA permits a reviewing court to set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[T]he scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under the APA standard of review, an agency's decision need not be "a model of analytical precision to survive a challenge." *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995). "A reviewing court will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 286 (1974)). It is sufficient if an agency's explanation of its decision contains "a rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. In addition, "if the necessary articulation of basis for administrative action can be discerned by reference to clearly relevant sources other than a formal statement of reasons, [the court] will make the reference." *Miller v. Lehman*, 801 F.2d 492, 497 (D.C. Cir. 1986) (internal quotation marks omitted).

The "arbitrary and capricious" standard of the APA review asks whether the agency's actions meet a basic standard of reasonableness. *See, e.g., Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 426 U.S. 87, 105 (1983); *Consolo v. Fed. Maritime Comm.*, 383 U.S. 607, 619–20 (1966).

### A.    Plaintiff Does Not Allege An Agency Action

Review under the APA is available only for "agency action."  5 U.S.C. § 704.  Presidential actions are not agency actions reviewable under the APA and thus, the Foreign Aid Order is not reviewable.  *Franklin*, 505 U.S. at 801.

Here, Plaintiff challenges the State Department's implementation of the Foreign Aid Order, which resulted in the suspension of payments under the cooperative agreements.  Because Plaintiff effectively seeks review of the President's action by suing an agency acting on behalf of the President, the State Department's actions are not reviewable under the APA.  *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 104 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017), *opinion amended and superseded*, 883 F.3d 895 (D.C. Cir. 2018), *as amended on denial of reh'g* (Mar. 6, 2018), *and aff'd*, 883 F.3d 895 (D.C. Cir. 2018).

Moreover, to the extent Plaintiff challenges the State Department's general implementation of the Foreign Aid Order, that is not a discrete, identifiable "agency action" subject to challenge.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890–91 (1990) (holding plaintiff cannot challenge "the continuing (and thus constantly changing) operations" of the agency in carrying out a program, but must instead "direct its attack against some particular 'agency action' that causes it harm").  As the Supreme Court has recognized, the APA precludes "'wholesale improvement of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made.'"  *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) (quoting *Lujan*, 497 U.S. at 891).  To sidestep this, Plaintiff advert to a notice of suspension reflecting the directives contained in the Foreign Aid Order.  Letter of Jan. 24, 2025 (ECF No. 1-10).  But the heart of Plaintiff's claims is the "impact" of the Foreign Aid Order itself as opposed to any particular discrete agency determination or action.  That is the exact type of

broad programmatic challenge that courts have repeatedly ruled are impermissible under the APA. As such, Plaintiff fails to a challenge an agency action.

**B.    Plaintiff Does Not Allege Any Final Agency Action**

Agency action must be "final" to be reviewable under the APA.  5 U.S.C. § 704.  Agency action is final only if (1) the agency action marks "the consummation of the agency's decisionmaking process" and (2) the "action must be one by which rights or obligations have been determined, or from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).

Plaintiff fails to identify any final agency action.  That is because there is no final agency action where, as here, the Foreign Aid Order is temporary.  The Foreign Aid Order calls for a determination to be made "within 90 days of this order on whether to continue, modify, or cease" foreign assistance.  Foreign Aid Order ¶ 3(c).  In other words, the agency's decisionmaking process is ongoing—not consummated—and there is no final agency action here.  In addition, there is also no provision in the law that requires the funds to be disbursed at a particular time in the fiscal year.

As such, Plaintiff fails to allege a challenge to a final agency action.

**C.    The State Department Has Not Acted Contrary to Law**

Plaintiff asserts, "Congress has imposed (with the President's assent) two independent restrictions on the Executive Branch's ability to suspend funding for refugee resettlement."  Pl.'s Mem. (ECF No. 5-2) at 15.  Plaintiff is incorrect.

First, the Department's temporary pause of funding does not violate the Refugee Act. Plaintiff claims the State Department's suspension "contravenes Congress's command that in administering the initial-resettlement program, the government must promptly provide certain services to admitted refugees."  Pl.'s Mem. (ECF No. 5-2) at 15.  While it is true that section 1522(b), in conjunction with the Presidential letter dated January 13, 1981, authorizes the

Secretary of State "to make grants to, and contracts with, public or private nonprofit agencies for initial resettlement (including initial reception and placement with sponsors) of refugees in the United States," nothing requires the Secretary to exercise this authority at all or to any specific degree. 8 U.S.C. § 1522(b)(1)(A)(ii). Importantly, nothing in the statute mandates the timing of any payment under a cooperative agreement—which is exactly what Plaintiff's demand.

Second, the Department's temporary pause of funding does not violate the Impoundment Control Act. Plaintiff asserts, "That Act limits the authority of the Executive Branch 'to defer any budget authority provided for a specific purpose or project.'" Pl.'s Mem. (ECF No. 5-2) at 17 (quoting 2 U.S.C. § 684(a)). Not so. Plaintiff misconstrues the Foreign Aid Order, claiming "Despite Congress's specific appropriation of funds for refugee assistance, the government seeks categorically not to spend those funds indefinitely." *Id*. It is not an indefinite suspension. The Foreign Aid Order requires, a "90-day pause" pending "reviews of such programs for programmatic efficiency and consistency with United States foreign policy." Foreign Aid Order § 3(a). Temporary pauses in obligations or payments of appropriations are quite common. *See City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously "acknowledged that 'the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year' and such delays may result from the 'normal and orderly operation of the government'" (quoting H.R. Rep. No. 658, 93d Cong., 1st Sess. 41 (1971)). The Government Accountability Office, itself an entity within the Legislative Branch, has approved of agencies "taking the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated." *In re James R. Jones*, House of Representatives, B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981). The Foreign Aid Order fits comfortably within this Executive Branch's practice of short-term

delays to determine how best to implement programs consistent with the President's policy objectives and consistent with the underlying law governing the refugee resettlement program. Thus, the State Department's pause is not in excess of its authority.

As such, the State Department did not exceed its authority to implement the Foreign Aid Order and suspend funding of the cooperative agreement.

### D.    The State Department's Temporary Pause Is Not Arbitrary and Capricious

Plaintiff asserts, "[t]he government utterly failed to consider the dire consequences of its actions and an obvious, superior alternative; it gave no reasoned explanation for its decisions; and it ignored its own regulations."  Pl.'s Mem. (ECF No. 5-2) at 20.  Again, Plaintiff is incorrect.

There is clearly a rational connection between the executive orders and the Department's actions.  The State Department's suspension of all Program funding was consistent with the Foreign Aid Order.  Zerbinopoulos Decl. ¶¶ 23–27.  Funds for activities to meet refugee and migration needs, including funds for including initial reception and placement benefits, are appropriated under the "Migration and Refugee Assistance" heading of title III of the Department of State, Foreign Operations, and Related Programs Appropriations Act ("State Department Appropriations Act").  Zerbinopoulos Decl. ¶24.  On January 20, 2025, President Trump issued the Foreign Aid Order stating that "[i]t is the policy of [the] United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States."  Section 3(a) directed that "[a]ll department and agency heads . . . shall immediately pause new obligations and disbursements of development assistance funds . . . pending reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of this order."  To ensure foreign assistance is provided consistent with President Trump's foreign policy, Secretary Rubio issued the January 24 cable, "paus[ing] all new obligations of funding, pending a review,

for foreign assistance programs funded by or through the Department and USAID." Zerbinopoulos Decl. ¶ 26.  For existing foreign assistance awards, the Secretary directed contracting officers and grant officers to "immediately issue stop work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review."  *Id.*  This pause applied to assistance funded from, among others, accounts in title III of the State Department Appropriations Act, to include Migration and Refugee Assistance funds—which includes the resettlement funds at issue here.  *Id.*

Consistent with the Foreign Aid Order, the Migration Bureau issued a "Notice of Suspension" on January 24, 2025, to its implementing partners, to Plaintiff.  Zerbinopoulos Decl. ¶ 27; Letter of Jan. 24, 2025 (ECF No. 1-10).  This Notice advised recipients that awards were "immediately suspended pending a department-wide review of foreign assistance programs" and that "[d]ecisions whether to continue, modify, or terminate" awards would be made following that review.  *Id.*  Recipients were directed to stop all work under the awards and not incur any new costs after January 24, 2025.  *Id.*  Additionally, recipients were advised they could submit payment for legitimate expenses incurred prior to the date of the Notice or for legitimate expenses associated with the Notice.  *Id.*

Plaintiff asserts that the suspension of funds fails to consider its dependence on "awards from the government.  Pl.'s Mem. (ECF No. 5-2) at 21.  But the suspension of foreign aid is temporary.  The Foreign Aid Order provides for a ninety-day suspension and the Secretary of State has issued implementing guidance directing a review to take place within the Department of State and relevant components of other agencies "to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda and that data regarding all foreign assistance spending in the future is aggregated and inputted into a comprehensive internal Department repository,"

following which "[d]ecisions whether to continue, modify, or terminate programs will be made following this review." Zerbinopoulos Decl., Attach. A. As such, Plaintiff's assertion is unlikely to succeed on the merits. Again, Plaintiff has no entitlement to receive the funds at any particular time.

Moreover, the Department also considered the reliance interests of the resettlement agencies by providing a means for reimbursement of costs incurred prior to the issuance of the Foreign Aid Order and by requiring "contracting officers and grant officers" to "immediately issue stop-work orders, consistent with the terms of the relevant award," for "existing foreign assistance awards." Compl. (ECF No. 1), Ex C. Additionally, the Migration Bureau stated that payments would be allowed for "\expenses incurred prior to January 24, 2025 and expenses associated with stop work orders. Thus, resettlement agencies have a means to recoup costs incurred and were directed to refrain from incurring additional costs. Thus, the agencies' decision to immediately suspend the funding of the Program was rational and consistent with the Foreign Aid Order.

Further, Plaintiff's claim, "The government also failed to consider an obvious, less disruptive alternative way of achieving [its] objectives, namely, conducting a review of its outstanding cooperative agreements to ensure their compliance with agency priorities before halting funds to active awardees," is not persuasive. Pl.'s Mem. (ECF No. 5-2) at 22. However, policy disagreements cannot form the basis of an APA arbitrary and capricious claim.

Lastly, Plaintiff are incorrect that the Department failed to comply with 2 C.F.R. § 200.305(b)(6). Pl.'s Mem. (ECF No. 5-2) at 24. Section 200.305(b)(6) directs that an agency may not withhold a payment. 2 C.F.R. § 200.305(b)(6). Again, the Foreign Aid Order is a pause to allow for review, which is different from a withholding.

As such, the State Department's implementation of the Foreign Aid Order was not arbitrary and capricious.

### E.    Implementation of an Executive Order Is Not Subject to Notice and Comment

Plaintiff asserts, "The Refugee Funding Suspension is also a substantive rule issued without the notice-and-comment procedures required by the APA." Pl.'s Mem. (ECF No. 5-2) at 25. Plaintiff is mistaken. 5 U.S.C. § 553(a)(2) exempts, "a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts" from notice-and-comment rule making. 5 U.S.C. § 553(a)(2); *see also Lincoln v. Vigil*, 508 U.S. 182, 196 (1993) ("Section 553 has no application, for example, to 'a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.'" (quoting section 553(a)(2)). The State Department's implementation of the executive orders, pausing payments under the agreement with Plaintiff clearly involves "loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(1). As such, the State Department was exempt from the requirement of section 553(b). *See Nat'l Wildlife Fed'nv. Snow*, 561 F.2d 227, 232 (D.C. Cir. 1976) (exempting from notice and comment rulemaking procedures regulations governing the Federal Aid Highway grant program).

In addition, the executive orders and the agencies' implementation of them leave open the possibility for future notice-and-comment rulemaking, and expressly state that the executive orders should be implemented only "to the extent consistent with applicable law."

## II.    Plaintiff Cannot Establish a Likelihood of Immediate Irreparable Harm.

"Regardless of how the other three factors are analyzed, it is required that the movant demonstrate an irreparable injury." *Mdewakanton Sioux Indians of Minn.*, 255 F. Supp. 3d 48, 51 (D.D.C. 2017). "The basis of injunctive relief in the federal courts has always been irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 88 (1974); *see also CityFed Fin. Corp. v. Office of Thrift Superv.*, 58 F.3d 738, 747 (D.C. Cir. 1995). The Supreme Court's "frequently reiterated standard

requires Petitioners seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). "[I]f a party makes no showing of irreparable injury, the court may deny the motion without considering the other factors." *Henke v. Dep't of Interior*, 842 F. Supp. 2d 54, 59 (D.D.C. 2012) (quoting *CityFed Fin.*, 58 F.3d at 747); *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."). And where a party seeks to change the status quo through action rather than merely to preserve the status quo, typically the moving party must meet an even higher standard than in the ordinary case: the movant must show 'clearly' that [it] is entitled to relief or that extreme or very serious damage will result." *Farris v. Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006) (collecting authorities); *see League of Women Voters v. Newby*, Civ. A. No. 16-236 (RJL), 2016 WL 8808743, at *1 (D.D.C. Feb. 23, 2016) ("This conclusion is bolstered by the fact that plaintiffs here seek not to maintain the status quo, but instead to restore the status quo ante, requiring this Court to proceed with the utmost caution.").

Plaintiff has failed to demonstrate irreparable harm sufficient to warrant extraordinary injunctive relief. Although Plaintiff characterizes the harm as damaging its ability to complete its mission due to layoffs and its reputation, Plaintiff's harm is monetary—it allegedly "accrued approximately $13 million in unpaid expenses." Pl.'s Mem. (ECF No. 5-2) at 26. "Monetary injuries alone, even if they are substantial, ordinarily do not constitute irreparable harm." *Spadone v. McHugh*, 842 F. Supp. 2d 295, 301 (D.D.C. 2012) (citations omitted).

Moreover, a preliminary injunction with respect to the Foreign Aid Order and the State Department's implementation has been issued by another court in this District. That court has enjoined the government from "enforcing and giving effect to Sections 1, 5, 7, 8, and 9 of Dep't

of State, Memorandum, 25 STATE 6828 (Jan. 24, 2025) and any other directives that implement Sections 3(a) and 3(c) of the [Foreign Aid Order]." *AIDS Vaccine Advoc. Coal. v. United States*, Civ. A. 25-0400 (AHA), 2025 WL 485324, at *6 (D.D.C. Feb. 13, 2025). These provisions are the exact same provisions from which Plaintiff here seek relief. *See* Pl.'s Prop. Order (ECF No. 5-1). A second overlapping injunction on complex issues such as those raised here would risk imposing inconsistent obligations on the Government. The existing injunction also greatly reduces or eliminates Plaintiff's claim of present harm. *See E. Bay Sanctuary Covenant v. Trump*, Civ. A. No. 18-6810, 2019 WL 1048238, at * 2 (N.D. Cal. Mar. 5, 2019) ("noting that where there is a preliminary injunction in place, not merely a TRO, 'Plaintiffs are unlikely to suffer harm if the Court stays these proceedings because the preliminary injunction preventing Defendants from enforcing the Rule will remain in place'").

As such, the Court should find that Plaintiff has not established irreparable harm.

### III.   The Balance of Harms and the Public Interest Weigh Against Relief.

The party seeking a preliminary injunction must show that the balance of equities tips in their favor and that the injunction is in the public interest. *Winter*, 555 U.S. at 20. A court "'should pay particular regard for the public consequences'" of injunctive relief. *Id*. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

Plaintiff asserts that there is a public interest in the resettlement of refugees. Pl.'s Mem. (ECF No. 5-2) at 30. An injunction here, however, would effectively disable the President from effectuating the President's agenda consistent with his constitutional and statutory authorities. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up). And where the Government is legally entitled to make decisions about the disbursement or allocation of federal funds but is nonetheless

ordered to release the funds, such funds may not be retrievable afterwards.  Thus, the balance of the equities weighs in favor of the Government and relief should be denied.

## IV.    **The Court Should Require Plaintiff to Post Security**

Federal Rule of Civil Procedure 65(c) states, "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  To the extent that the Court grants relief to Plaintiff, Defendants respectfully request that the Court require Plaintiff to post security for any taxpayer funds distributed during the pendency of the Court's Order.  This case is ultimately about money, and thus, the requirements of Rule 65(c) to post security are plainly at play.

### CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court deny Plaintiff's motion for emergency relief.

Dated:   February 20, 2025
       Washington, DC

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By:_____/s/ *Joseph F. Carilli, Jr.*
    JOSEPH F. CARILLI, JR.
    Assistant United States Attorney
    601 D Street, NW
    Washington, DC 20530
    (202) 252-2525

*Counsel for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

U.S. CONFERENCE OF CATHOLIC
BISHOPS,

          Plaintiff,

   v.

DEPARTMENT OF STATE, et al.

          Defendants.

Civil Action No. 25-0465 (TNM)

**[PROPOSED] ORDER**

UPON CONSIDERATION of Plaintiff's motion for temporary restraining order and for preliminary injunction, and the entire record herein, it is hereby

ORDERED that Plaintiff's motion is DENIED.


SO ORDERED:


_____                _____

Date                                   TREVOR N. MCFADDEN
United States District Judge