# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES CONFERENCE OF
CATHOLIC BISHOPS,

*Plaintiff,*

*v.*

UNITED STATES DEPARTMENT OF
STATE;

MARCO RUBIO, in his official capacity as Secretary of State, Department of State;

BUREAU OF POPULATION, REFUGEES,
AND MIGRATION, Department of State;

JENNIFER DAVIS, in her official capacity as
Principal Deputy Assistant Secretary, Bureau
of Population, Refugees, and Migration,
Department of State;

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and Human
Services, Department of Health and Human
Services;

*Defendants.*

Case No. 1:25-cv-465-TNM

**SUPPLEMENTAL MEMORANDUM
IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................iii

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................ 1

    I.    USCCB Is Suffering Irreparable Harm From The Refugee Funding Suspension .......... 1

    II.   The Balance Of The Equities And Public Interest Favor Relief.................................. 10

    III.  USCCB Is Likely To Succeed On The Merits............................................................ 10

        A.    The Government Has Withheld Allowable Costs In Violation Of

              Section 200.305................................................................................................ 10

        B.    The Government Has Imposed An Unlawful Suspension, Not A

              Permissible Termination ................................................................................... 12

        C.    This Is A Heartland APA Case, Not A Tucker Act Case.................................... 14

CONCLUSION....................................................................................................... 16

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alpine Sec. Corp. v. FINRA*,
121 F.4th 1314 (D.C. Cir. 2024) ........................................................................8

*Armour & Co. v. Freeman*,
304 F.2d 404 (D.C. Cir. 1962) ...........................................................................3

*\*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ...................................................................................14, 15

*\*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ..............................................................1, 2, 3, 9

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ..............................................................................9

*Express One Int'l, Inc. v. U.S. Postal Serv.*,
814 F. Supp. 87 (D.D.C. 1992) ..........................................................................4

*Freedom Holdings, Inc. v. Spitzer*,
408 F.3d 112 (2d Cir. 2005) ...............................................................................1

*Glycine & More, Inc. v. United States*,
880 F.3d 1335 (Fed. Cir. 2018) ........................................................................11

*James v. Caldera*,
159 F.3d 573 (Fed. Cir. 1998) ..........................................................................15

*Jones v. District of Columbia*,
177 F. Supp. 3d 542 (D.D.C. 2016) ...................................................................3

*Katz v. Cisneros*,
16 F.3d 1204 (Fed. Cir. 1994) ..........................................................................16

*\*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ...............................................................6, 7, 9, 10

*\*Louisiana v. Biden*,
55 F.4th 1017 (5th Cir. 2022) ........................................................................2, 3

*New York v. U.S. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020) .............................................................................6, 9

*Otero Sav. & Loan Ass'n v. Fed. Reserve Bank of Kansas City*,
665 F.2d 275 (10th Cir. 1981) ...........................................................................4

*Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.*,
  963 F. Supp. 1 (D.D.C. 1997) ......................................................................................4

*In re Polar Bear Endangered Species Act Listing*,
  709 F.3d 1 (D.C. Cir. 2013) ........................................................................................11

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020) .......................................................................................................8

*Rumsfeld v. United Tech. Grp.*,
  315 F.3d 1361 (Fed. Cir. 2003) ..................................................................................11

*Sergent's Mechanical Sys., Inc. v. United States*,
  157 Fed. Cl. 41 (2021) ................................................................................................16

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) .............................................................................6, 7, 9

*Yorktown Sys. Grp., Inc. v. Threat Tec LLC*,
  108 F.4th 1287 (11th Cir. 2024) ..........................................................................2, 4, 5

## Statutes

5 U.S.C. § 702 ...................................................................................................................14

5 U.S.C. § 704 .............................................................................................................14, 15

8 U.S.C. § 1522(a) .............................................................................................................13

28 U.S.C. § 1491(a)(2) .......................................................................................................16

Pub. L. No. 96-212, § 101, 94 Stat. 102, 102 (1980) ........................................................10

## Regulations

2 C.F.R. § 200.1 .................................................................................................................13

2 C.F.R. § 200.305(b)(6) ...............................................................................1, 10, 11, 12, 14

2 C.F.R. § 200.339 ........................................................................................................13, 14

2 C.F.R. § 200.340 ....................................................................................................12, 13, 14

2 C.F.R. § 200.341 ....................................................................................................12, 13, 14

2 C.F.R. § 600.101 ....................................................................................................10, 11, 12, 14

FAR § 52.242 .....................................................................................................................13

## Other Authorities

11A Charles Alan Wright *et al.*, Federal Practice and Procedure
  § 2948.1 (3d ed. 2013 & 2015 Supp.) ..........................................................................3

Merriam-Webster's Collegiate Dictionary (11th ed. 2014) ..........................................................11

Webster's New World College Dictionary (5th ed. 2014) ..........................................................11

**INTRODUCTION**

This supplemental memorandum addresses issues that the Court raised at the February 20, 2025 hearing on USCCB's motion for a temporary restraining order, including irreparable harm, the public interest, the meaning of "withheld" under 2 C.F.R. § 200.305(b)(6), the inapplicability of any termination provisions under federal law or the cooperative agreements, and the availability of equitable relief. USCCB continues to press all the arguments in its memorandum in support of its motion for a temporary restraining order and preliminary injunction.

**ARGUMENT**

**I.    USCCB Is Suffering Irreparable Harm From The Refugee Funding Suspension**

An irreparable harm is an injury that is (1) "certain and great"; and (2) "beyond remediation" through the sorts of "compensatory or other corrective relief" that a court is capable of granting "in the ordinary course of litigation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297–98 (D.C. Cir. 2006). The second factor asks whether the plaintiff's injury is judicially "redressable" after litigation concludes, regardless of whether the plaintiff might someday return to its prior position through its own efforts. *Id.* at 298; *see Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (injury is irreparable when it "cannot be remedied 'if a court waits until the end of trial to resolve the harm'"). The answer here is no. The government's abrupt funding suspension—while USCCB was actively providing services to already-arrived refugees—is inflicting on USCCB three ongoing irreparable harms that cannot be redressed by post hoc compensatory relief: (1) the loss of staff expertise and experience; (2) injury to USCCB's goodwill and relationships with its partners; and (3) damage to USCCB's refugee programs in frustration of one of its core missions.

1

*First*, losing employees with valuable expertise and relationships is irreparable harm to an organization; a court's "'compensatory or other corrective relief'" cannot restore its lost human capital. *England*, 454 F.3d at 297. As the Fifth Circuit has explained, the "loss of an employee and the associated costs—monetary and otherwise—are nonrecoverable costs": Even if "a new employee [is] hired" to replace the one lost, plaintiffs "would be harmed and would have no recourse for this harm." *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022). Similarly, the Eleventh Circuit recently held that an organization experiences irreparable injury that "cannot be undone through monetary remedies" when it loses "skilled employees" with the "institutional knowledge and experience" to fulfill "government contracts." *Yorktown Sys. Grp., Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1296 (11th Cir. 2024). This makes sense because an organization's capabilities and expertise are diminished when it is forced to lay off experienced employees, even if it eventually replaces them. And that is so regardless of whether the layoff irreparably harms the employees.

The Refugee Funding Suspension has forced USCCB to notice terminations for 50 staff members with decades of accumulated experience providing refugee services in partnership with the government, with more layoffs around the corner if the suspension continues. Canny Decl. ¶ 17. The first of these terminations will become effective on March 7, at which point USCCB will lose 27 employees. Fuller Decl. ¶ 11. USCCB will imminently lose the staff and their "institutional knowledge and experience" that it needs to serve refugees through its cooperative agreements, which the government might restart at any point in the future. *Yorktown*, 108 F.4th at 1296; *see also* Fuller Decl. ¶ 11 (explaining the expertise USCCB will lose). This contrasts sharply with past fluctuations in program size, through which "USCCB was also able to retain the required institutional knowledge and expertise of its employees for the program to continue." Second

2

Canny Decl. ¶ 4.  "Previously, when USCCB reduced the size of its refugee services staff in response to changing needs, it had much more time to carry out those reductions," and "[d]uring that time, USCCB could preserve institutional expertise by ensuring that departing staff members transferred their knowledge and partner contacts to remaining staff before leaving for new roles."  *Id.* ¶ 5.  But the "rapid, forced layoffs that USCCB is now experiencing" have "made similar efforts today nearly impossible" and will therefore "damage its institutional knowledge and relationships in a categorically more severe way."  *Id.*  Compensatory relief cannot undo this injury even if it enables USCCB to hire "new employee[s]" in the future.  *Louisiana*, 55 F.4th at 1034.

Nor does the possibility that USCCB might eventually have to lay off employees due to the Administration's suspension of refugee admissions negate the irreparable harm being caused by the Refugee Funding Suspension.  To begin, it is speculative whether the Administration will permanently stop admitting all the refugees who would become part of USCCB's programs.  And the mere *possibility* that an organization would suffer a similar harm anyway does not make the current injury any less "certain and great" and "beyond remediation" through compensatory relief. *England*, 454 F.3d at 297.  In other words, USCCB is suffering an irreparable injury *now* regardless of what else might happen in the future.  But regardless, as already discussed, even if refugee-admissions reductions would cause future layoffs, the sudden nature of the layoffs forced by the funding suspension has exacerbated the damage to USCCB's institutional knowledge.

*Second*, organizations suffer irreparable harm when a defendant damages their reputation, goodwill, and relationships with their partners.  Because "'[i]njury to reputation and goodwill is not easily measured in monetary terms,' it is 'often viewed as irreparable.'"  *Jones v. District of Columbia*, 177 F. Supp. 3d 542, 547 (D.D.C. 2016) (quoting 11A Charles Alan Wright *et al.*, Federal Practice and Procedure § 2948.1 (3d ed. 2013 & 2015 Supp.)); *see also Armour & Co. v.*

*Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (irreparable injury where government action "could not fail to damage [the plaintiff's] good name"); *Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) ("irreparable harm in damage to [plaintiffs'] business reputation").

Similarly, damage to an organization's relationships with its customers or partners is irreparable. For example, the Eleventh Circuit recently found irreparable harm when the "[a]brupt termination" of an organization's work "harm[ed] its reputation" and impeded its ability to fulfill "government contracts in the future." *Yorktown*, 108 F.4th at 1297; *see also, e.g.*, *Otero Sav. & Loan Ass'n v. Fed. Reserve Bank of Kansas City*, 665 F.2d 275, 278 (10th Cir. 1981) (irreparable harm where plaintiff was "forced to interrupt services," resulting in "severe confusion" and "loss of good will and customer confidence" (quotation marks omitted)); *Express One Int'l, Inc. v. U.S. Postal Serv.*, 814 F. Supp. 87, 90–91 (D.D.C. 1992) (same where contractor would incur "significant lay-off, capital, and facility costs" and be "particularly hurt" by the "loss of" its "relationship with its primary subcontractor").

The Refugee Funding Suspension is damaging USCCB's goodwill and relationships with its partners—local charities who provide direct services to refugees in reliance on USCCB's funding. It has prevented USCCB from reimbursing $10.4 million (and growing) in costs incurred by its partners, who in turn have needed to lay off their own employees.[1] Canny Decl. ¶ 16; Fuller Decl. ¶ 9 (revised sum). Commonwealth Catholic Charities, for example, has $497,000 of unreimbursed expenses, has depleted its cash reserves, and has needed to lay off 26 employees—despite still having 231 refugees in its resettlement program. Brown Decl. ¶¶ 5–7. Similarly, Catholic Charities of Central and Northern Missouri, which had about 500 refugees in its program on

---

[1] Previous filings tallied this number at $11.6 million. In the interim, USCCB realized that it had miscalculated this figure based on duplicated invoices.

January 24, needed to lay off half its staff.  Main Decl. ¶¶ 5–6.  Catholic Charities of the Archdiocese of Galveston-Houston likewise has dismissed 130 employees, requiring it to cut resettlement services to a bare minimum.  Colbert Decl. ¶¶ 6–7.

All these partners have declared that despite their desire to keep helping refugees, the serious risk of future funding shortfalls makes it unlikely they will work with USCCB again:

- "If we cannot rely on funding for the programs the intermediary offers, we cannot justify joining those [USCCB] programs."  Brown Decl. ¶ 11.

- "[T]his unfortunate experience will make us incredibly reluctant to engage with [USCCB] in government-sponsored programs again."  Main Decl. ¶ 9.

- "[G]iven the ongoing funding uncertainty, . . . [w]e do not anticipate taking on any more refugees referred to us by USCCB as part of government-sponsored resettlement programs."  Colbert Decl. ¶ 10.

And in the case of Catholic Charities of Central and Northern Missouri, the suspension has foreclosed *any* future partnership with USCCB to help refugees resettle in that area because it has decided to wind down its refugee resettlement arm altogether:

- "With heavy hearts, and despite CCNMO's passion for serving our refugee brothers and sisters, we have begun the process of permanently closing our refugee resettlement program. . . . We cannot risk the more stable programs that we can continue to administer independent of government assistance to keep the refugee resettlement program running during periods of government recalcitrance."  Main Decl. ¶ 8.

The ongoing damage to USCCB's partnerships caused by the "[a]brupt termination" of funding will significantly impair USCCB's ability to fulfill "government [cooperative agreements] in the future."  *Yorktown*, 108 F.4th at 1297; Bishop Seitz Decl. ¶ 9.  This damage to USCCB's

partnerships is unique to the Refugee Funding Suspension, as past orderly wind-downs did not prevent subrecipients from working with USCCB again when refugee resettlement scaled back up. Second Canny Decl. ¶ 4.  In the past, the "winding down was gradual" and "federal funding for the program was never interrupted," so partners were able to "provide the full gamut of services as provided for in the cooperative agreements" without going unpaid for work done.  *Id*.  Not so today, as USCCB's partners go unreimbursed for work already performed.  Retroactive monetary relief cannot restore USCCB's partners' willingness to work with it on refugee resettlement.  If the government decides to lift the suspension after this structural damage to USCCB's network and infrastructure is already done, USCCB will not be able to provide for the more than 27,000 refugees it was allocated by the government for FY2025.  *Id*. ¶ 5.

*Third*, an organization is irreparably harmed if: (1) the actions taken by the defendant have "perceptibly impaired the organization's programs," and (2) the defendant's actions "directly con- flict with the organization's mission."  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (quotation marks and alterations omitted).  In other words, a defendant's actions must make "the organization's *activities* more difficult," in frustration of one of the organization's bona fide missions.  *Id*.; *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (irreparable harm based on "ongoing harms to . . . organizational missions"); *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 61, 86 (2d Cir. 2020) (the "perceptible impairment" of an organization's "activities" suffices for irreparable harm).

The Refugee Funding Suspension has (to say the least) "perceptibly impaired" USCCB's "programs" and frustrated one of its core "mission[s]."  *Newby*, 838 F.3d at 8.  Massive layoffs and permanent damage to crucial partner relationships make it vastly more difficult for USCCB to

provide refugee-resettlement assistance, now and in the future.  USCCB's "operational and invest-ment reserves cannot sustain" the drain caused by the Refugee Funding Suspension "without jeop-ardizing the entire operation of the USCCB."  Fuller Decl. ¶ 10.  And USCCB is "headed towards a potential 100% reduction" in its "capacity . . . to properly resettle refugees."  Second Canny Decl. ¶ 5.

Even more disheartening, however, is the fact that the funding suspension now has forced USCCB and its subrecipients to stop providing services to refugees in their care:

- Commonwealth Catholic Charities is "no longer able to guarantee financial assistance requests from" refugees in the program, "many [of whom] are on the brink of losing their new homes."  Brown Decl. ¶ 7.

- Catholic Charities of Central and Northern Missouri has had to stop providing all services to 250 refugees still within their initial 90-day resettlement period.  Main Decl. ¶ 5.

- Catholic Charities of the Archdiocese of Galveston-Houston's "ability to serve these ref-ugees is already severely curtailed and will continue to decrease."  Colbert Decl. ¶ 6.

As a result, refugees in USCCB's programs today are no longer receiving services, in contraven-tion of the terms of USCCB's cooperative agreements—not to mention the government's statutory obligation to assist recent arrivals.  In other words, USCCB can no longer implement its resettle-ment programs with respect to a significant number of refugees.  Those programs are at the very least "perceptibly impaired."  *Newby*, 838 F.3d at 8.

USCCB is thereby suffering "ongoing harms" to one of its core "organizational missions." *Valle del Sol Inc.*, 732 F.3d at 1029.  The Church, "from her origin . . . has been intrinsically linked to the plight of refugees"; as such, the "Church's accompaniment of refugees dates back to the earliest days of Christianity."  Bishop Seitz Decl. ¶ 6.  Further, "the Gospel compels the Church

to act in service of the poor and vulnerable." *Id.* ¶ 7.  USCCB's "refugee resettlement efforts are an expression of the Gospel's mandates to 'love thy neighbor' and 'welcome the stranger,' and are core to its mission to organize and conduct the religious, charitable and social welfare work of the Catholic Church in the United States."  *Id.* ¶ 8; *accord* Fuller Decl. ¶ 5.  "It is because of these deeply held religious beliefs that, consistent with the work of the Church since its inception, the USCCB runs the largest refugee resettlement agency in the United States."  Bishop Seitz Decl. ¶ 7. That this work is core to USCCB's mission is evident from the fact that nearly a third of its staff and operations are dedicated to refugee resettlement.  Fuller Decl. ¶ 6.

No amount of money awarded in the future can retroactively redress the fact that the funding suspension is preventing USCCB from fulfilling its mission to assist thousands of refugees currently in its care.  That forced failure is irreparable.  USCCB has a deeply held religious mission to implement the Gospel by helping refugees in their initial resettlement periods.  *See* Bishop Seitz Decl. ¶¶ 4–8.  The government is preventing it from doing so, and compensatory relief months or years from now would not enable USCCB to go back in time and help the refugees that it felt called to help.  *Cf. Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (Church's inability to conduct worship services, "for even minimal periods of time, unquestionably constitutes irreparable injury." (quotation marks omitted)).  Similarly, USCCB's layoffs and damage to its partner-charity relationships also are irreparable injuries to its religious mission.  They frustrate USCCB's ability to care for refugees today and make it vastly more difficult for USCCB to do so in the future.  *See Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1329 (D.C. Cir. 2024) (finding irreparable harm where the "crushing consequences" for an organization's "operations" made it unrealistic to expect that it "could simply reopen its doors" later); *accord* Bishop Seitz

Decl. ¶ 8 ("[T]he funding suspension threatens the USCCB's ability to exercise its moral obliga-
tion to provide for the particular refugees currently assigned to its care."). These irreparable harms
are growing every day.

While caring for refugees *is* one of USCCB's core missions, USCCB need not establish
that this is its only or primary mission. Although the D.C. Circuit in *Newby* mentioned the organ-
ization's "mission"—singular—it nowhere stated that only frustration of an organization's sole or
primary mission constitutes irreparable harm, or that damage to just one of multiple organizational
missions would not. Nor would such a rule make sense. Whether damage to an organization's
mission is "certain and great" and not retroactively "redressable," *England*, 454 F.3d at 297–98,
in no way depends on whether the organization has one mission or multiple: In either case, a
mission-driven organization's inability to carry out a mission for a period of time cannot be rem-
edied with money damages.

Moreover, *Newby* explained that the purpose of the "mission" requirement is "to ensure
that organizations cannot engage in activities simply to create an injury." 838 F.3d at 8. That
purpose is satisfied so long as the mission being impaired is at least one of the organization's pre-
existing, bona fide missions. Conversely, a "primary mission" requirement would leave courts
guessing about where to draw the line between an organization's primary and secondary missions.
Thus, other courts of appeals have recognized that irreparable harm can be based on "ongoing
harms to [the plaintiff's] organizational *missions*." *Valle del Sol*, 732 F.3d at 1029 (emphasis
added); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677–78 (9th Cir. 2021) (ir-
reparable harm where organizations "established that they will suffer a significant change in their
programs" frustrating their "organizational missions"); *New York*, 969 F.3d at 62–63 (same where

organizations showed "'perceptible impairment' of [their] activities," and their interest "stem[med] from their assorted missions to increase non-citizen well-being and status").

## II.    The Balance Of The Equities And Public Interest Favor Relief

In addition to the arguments in USCCB's opening brief—including that: (1) there is "no public interest in the perpetuation of unlawful agency action," *Newby*, 838 F.3d at 12; (2) the Refugee Act declared that refugee assistance is the "historic policy of the United States," Pub. L. No. 96-212, § 101, 94 Stat. 102, 102 (1980); and (3) it is unfair for the government to suspend funding for refugees already placed in USCCB's care—the ongoing harm to refugees weighs heavily in favor of relief.  It is now clear that refugees have stopped receiving essential services as a result of the suspension—including assistance with food and housing costs, English training, and job placement. Main Decl. ¶ 5.  Vulnerable refugees whom the government brought to this country are now at imminent risk of losing their homes, if they have not done so already.  Brown Decl. ¶ 7. It serves no one—and no conceivable governmental policy interest—for refugees already in the United States to lose their homes, English instruction, and job training instead of being integrated into American society.

## III.    USCCB Is Likely To Succeed On The Merits

### A.    The Government Has Withheld Allowable Costs In Violation Of Section 200.305

The government's refusal to reimburse USCCB's expenses pursuant to its cooperative agreements is arbitrary and capricious because it violates 2 C.F.R. § 200.305(b)(6)—an OMB regulation governing federal grants that the State Department has incorporated into its own regulations, see 2 C.F.R. § 600.101.  Section 200.305(b)(6) provides that "[p]ayments for allowable costs *must not be withheld at any time* during the period of performance unless required by Federal statute, regulations, or" if the recipient has "failed to comply with the terms and conditions of the

Federal award" or is "delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6) (emphasis added). The government has not suggested that the suspension is required by a federal statute or regulation, or that USCCB violated the terms of its award or is delinquent in a debt. Nor is there any dispute that the reimbursement requests USCCB has submitted are for "allowable costs" under the terms of its agreements, or that USCCB remains within the agreements' "period[s] of performance"—which run until September 30, 2025.

Yet the government nevertheless has impermissibly "withheld" payment for allowable costs by refusing—through its Refugee Funding Suspension—to process USCCB's reimbursement requests in the ordinary course. The term "withheld" carries its ordinary meaning based on "common English usage" because there is no relevant regulatory definition. *In re Polar Bear Endangered Species Act Listing*, 709 F.3d 1, 15 (D.C. Cir. 2013); *see Rumsfeld v. United Tech. Grp.*, 315 F.3d 1361, 1370 (Fed. Cir. 2003) (turning to "standard dictionary definitions" where term was undefined); *Glycine & More, Inc. v. United States*, 880 F.3d 1335, 1344 (Fed. Cir. 2018). "Withhold" means "to refrain from granting," "to keep in custody," or to "hold back." Webster's New World College Dictionary (5th ed. 2014); Merriam-Webster's Collegiate Dictionary (11th ed. 2014). Since January 24, the government has refrained from granting, kept in custody, and held back reimbursement payments for costs USCCB incurred pursuant to its cooperative agreements. It has therefore "withheld" payments.

The purportedly temporary nature of the funding suspension does not alter that conclusion. Section 200.305(b)(6) provides that allowable costs "*must not be withheld at any time*"; it makes no exception for temporary withholdings. And it is perfectly natural to use the word "withhold" to describe a temporary suspension: A court of appeals, for example, might withhold issuance of the mandate until a rehearing poll is completed; or a homeowner might withhold a contractor's

11

payment until the work is done.  So too here with the government's purportedly temporary with-holding of payments.  That does not mean that every de minimis, ordinary-course processing delay violates Section 200.305(b)(6).  But where, as here, the government expressly and intentionally stops payment for a significant period of time—as it has done here through a suspension letter and a tacit refusal to reimburse pre-January 24 expenses—it has unquestionably "withheld" payment.[2]

### B.    The Government Has Imposed An Unlawful Suspension, Not A Permissible Termination

Nothing in USCCB's cooperative agreements or applicable federal regulations allows the government's funding suspension.  The agreements incorporate the termination provisions of 2 C.F.R. § 200.340, which allows the agency to "terminate[]" an award "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."   2 C.F.R. § 200.340(a)(4).  But the government has not purported to terminate USCCB's agreements pursu-ant to this provision; the suspension letter purports to "suspend[]" the award because it "*may* no longer effectuate agency priorities," and says that a decision "whether to continue, modify, or terminate award(s) *will be made* following this review."  Mot. TRO, Ex. C, at 2 (emphasis added).

Nor *could* the government have terminated USCCB's awards on January 24, for at least three reasons: (1) The government had not (and still has not) determined that they "no longer effectuat[e] the program goals or agency priorities," § 200.340(a)(4); (2) under 2 C.F.R. § 200.341(a), the government "must provide written notice of termination to the recipient" includ-ing "the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable"—which it has not; and (3) 8 U.S.C. § 1522(a) *requires* the Department

---

[2] Although the government has not expressly stated that it is refusing to reimburse pre-January 24 expenses, the fact that it has not reimbursed USCCB for these expenses for more than a month—in light of the usual processing time of 24 to 48 hours—is powerful evidence that the government has intentionally "withheld" payment.

to provide employment and English training to already-arrived refugees, so termination would not be "authorized by law" as required by 2 C.F.R. § 200.340(a)(4).

Rather than terminating the agreement, the government did exactly what it said: It unilaterally *suspended* funding for the agreements *without* terminating them. In other words, USCCB's cooperative agreements remain in effect—refugees who have already arrived are still in USCCB's programs and are owed assistance—but the government has simply stopped paying.

Nothing in the agreements or regulations permits this funding suspension. Federal regulations differentiate between "termination" and "suspension." "Termination" is when an agency "discontinue[s] a Federal award . . . before the planned end date of the period of performance," 2 C.F.R. § 200.1, and, as explained, it is governed by 2 C.F.R. §§ 200.340 and 200.341. The regulations do not expressly define what counts as a "suspension" of award payments, but 2 C.F.R. § 200.339 makes clear that it means something different. It provides that *as a remedy for "noncompliance"* with federal law or the award's terms and conditions, an agency may "[s]uspend *or* terminate" the award. 2 C.F.R. § 200.339(c) (emphasis added). Sometimes the government *does* include broader suspension clauses in its contracts and agreements. *See, e.g.*, FAR § 52.242-14 ("Suspension of Work" clause that the government inserts into certain construction contracts allowing it to order a contractor "to suspend . . . all or any part of the work . . . for the convenience of the Government"); *id.* § 52.242-15 (optional contract provision allowing "stop-work order[s]"). But USCCB's agreements just echo 2 C.F.R. § 200.339. *See* Mot. TRO, Ex. A, at 81 (the government may "suspend[]" USCCB's award for noncompliance with federal law or the award's terms). And the government has not alleged that USCCB has been noncompliant in any way.[3]

_____

[3] A suspension of funding *for noncompliance* under 2 C.F.R. § 200.339(c) likely would be a permissible withholding under 2 C.F.R. § 200.305(b)(6), which allows payments to be "withheld"

*(Cont'd on next page)*

Thus, if the government wanted to stop funding USCCB's agreements for policy reasons, it needed to comply with 2 C.F.R. §§ 200.340 and 200.341's requirements for termination. It did not. Instead, it *suspended* funding based on a *potential* policy disagreement. That was unlawful.

**C.      This Is A Heartland APA Case, Not A Tucker Act Case**

USCCB seeks a preliminary injunction ordering the government to stop enforcing its unlawful suspension and to resume reimbursements pursuant to USCCB's cooperative agreements and federal law. As the Supreme Court explained in *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988), that is a request for specific equitable relief cognizable in this Court under the APA, not the Court of Federal Claims under the Tucker Act.

*First*, USCCB has a cause of action under the APA because it is "suffering legal wrong" and has been "adversely affected" by "agency action"—namely, the State Department's suspension of funding under USCCB's cooperative agreements. 5 U.S.C. § 702. USCCB thus "is entitled to judicial review thereof" under the APA. *Id.*; *see Bowen*, 487 U.S. at 892.

*Second*, USCCB's suit is not one for "money damages" that would be excluded from the APA's cause of action and waiver of sovereign immunity. 5 U.S.C. §§ 702, 704. *Bowen* held that actions seeking "declaratory and injunctive relief" are "certainly not actions for money damages." 487 U.S. at 893. The plaintiffs in *Bowen* wanted the government to reimburse them for expenditures under the Medicaid program. *Id.* at 882. But the "fact that a judicial remedy may require one party to pay money to another [was] not a sufficient reason to characterize the relief as 'money damages.'" *Id.* at 893. The Court distinguished between money damages, which "are given to the

---

when "required by Federal statute, regulations, or" if the recipient "has failed to comply with the terms and conditions of the federal award."

14

plaintiff to *substitute* for a suffered loss," and "specific remedies," which are "not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Id.* at 895 (quotation marks omitted). When the plaintiff seeks "funds to which a statute allegedly entitles it," that is a request for "specific relief" in the same way that a request for "in-kind benefits" mandated by federal law would be specific relief rather than "money damages." *Id.* (quotation marks omitted). Thus, plaintiffs' APA suit to set aside the agency's denial of reimbursement and enforce payment requirements under federal law was cognizable in district court. *Id.* at 909–11.

So too here. Like the *Bowen* plaintiffs, USCCB seeks to set aside unlawful agency action denying "reimbursement"—which is not a request for a "money judgment"—and the preliminary injunction USCCB requests is "specific relief," not "money damages." 487 U.S. at 909–10. As in *Bowen*, USCCB has not asked for a monetary award; it has asked the government to comply with federal law and the terms of its cooperative agreements by resuming the processing of reimbursement requests in the same way and on a similar timeline as it always has.

*Third*, the Tucker Act does not displace the APA's cause of action because the Court of Federal Claims is not an adequate alternative forum for USCCB's claim. 5 U.S.C. § 704. As *Bowen* explained, the Court of Federal Claims "does not have the general equitable powers of a district court to grant prospective" or "equitable relief." 487 U.S. at 905. It cannot grant equitable relief unless it is "'an incident of and collateral to' a money judgment," *James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998) (quoting 28 U.S.C. § 1491(a)(2))—for instance, ordering "restoration to office or position," 28 U.S.C. § 1491(a)(2). And the Federal Circuit has applied *Bowen* to hold that a request that an agency properly calculate and pay contract rents was not a suit for money damages, but "equitable relief" within the district court's jurisdiction. *Katz v. Cisneros*, 16 F.3d

1204, 1208–09 (Fed. Cir. 1994) (plaintiff "seeks payments to which it alleges it is entitled pursuant to federal statute and regulations; it does not seek money as compensation for a loss suffered").

Given the relief USCCB is requesting, the Court of Federal Claims would decline jurisdiction over this case, *see Katz*, 16 F.3d at 1207–09, and USCCB would not be able to obtain the preliminary injunction it needs to prevent ongoing irreparable harm, *see Sergent's Mechanical Sys., Inc. v. United States*, 157 Fed. Cl. 41, 48 (2021) ("a preliminary injunction, by definition, cannot be 'incident of and collateral to' a final money judgment").

## CONCLUSION

This Court should grant USCCB's motion for a preliminary injunction.

February 24, 2025

Respectfully submitted,

*/s/ David W. Casazza*

William Quinn (D.C. Bar No. 1601853)
Shannon Eckman (D.C. Bar No. 90024504)**
UNITED STATES CONFERENCE OF CATHOLIC BISHOPS
3211 Fourth Street, NE
Washington, DC 20017
(202) 541-3300
WQuinn@usccb.org


*pro hac vice*
**pro hac vice* forthcoming

Dhananjay Manthripragada*
  (D.C. Bar No. 990448)
Nick Harper (D.C. Bar No. 144707)
David W. Casazza (D.C. Bar No. 1046918)
Connor P. Mui* (D.C. Bar No. 90009004)
Aly Cox (D.C. Bar No. 1780473)
Laura Stanley* (D.C. Bar No. 90008623)
Hunter Mason* (D.C. Bar No. 90021049)
Audrey Payne* (D.C. Bar No. 90028352)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500
DManthripragada@gibsondunn.com
NHarper@gibsondunn.com
DCasazza@gibsondunn.com
CMui@gibsondunn.com
ACox@gibsondunn.com
LStanley@gibsondunn.com
HMason@gibsondunn.com
APayne@gibsondunn.com