IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, <br><br> *Plaintiff,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE; <br><br> MARCO RUBIO, in his official capacity as Secretary of State, Department of State; <br><br> BUREAU OF POPULATION, REFUGEES, AND MIGRATION, Department of State; <br><br> JENNIFER DAVIS, in her official capacity as Principal Deputy Assistant Secretary, Bureau of Population, Refugees, and Migration, Department of State; <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; <br><br> ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, Department of Health and Human Services; <br><br> *Defendants.* | Case No. 1:25-cv-465 <br><br> **DECLARATION OF JASON BROWN IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

## DECLARATION OF JASON BROWN

1. I, Jason Brown, am the Chief Executive Officer at Commonwealth Catholic Charities in Virginia ("CCC"). As Chief Executive Officer, I oversee our refugee assistance services, including by coordinating with the United States Conference of Catholic Bishops ("USCCB") to request reimbursements from the government for those services.

2. I make this declaration based on personal knowledge and am competent to do so.

3. I am submitting this declaration in support of USCCB's Motion for a Preliminary Injunction.

4. CCC's charitable work is driven by its mission to offer quality and compassionate human services to all people, especially the most vulnerable, regardless of faith. As an important part of that mission, CCC has partnered with USCCB to provide resettlement services to refugees admitted through the U.S. Refugee Admissions Program for the last fifteen years. Before that, since the 1980s, the Diocese of Richmond cooperated with USCCB in this endeavor, eventually transferring its refugee services to CCC.

5. The government's suspension of anticipated funding for refugee assistance has significantly and adversely affected CCC's mission by decimating our capacity to serve the refugees we have already committed to care for during their initial resettlement period. Between October 2024 and January 2025, we took on 373 refugees, expecting that the costs of providing our typical slate of resettlement services would be reimbursed through USCCB's agreements with the government. 231 of those refugees are still eligible for care under the resettlement program. To date, CCC has provided $497,000 of unreimbursed expenses under the program. Since USCCB has been unable to reimburse us for these expenses, we have already been forced to cease providing most services to our refugees, who are still in dire need of our support.

6. As a result of the funding suspension, CCC has laid off twenty-six employees—representing twenty percent of our workforce. Consequently, we are unable to provide regular case management services for our assigned refugees, such as day-to-day help looking for housing and employment, applying for public benefits, and help shopping for groceries.

7. CCC's cash reserves used to pay for rental assistance, food, and clothing for our refugees have already depleted. As of January 24, 2025, we were no longer able to guarantee financial assistance requests from these vulnerable individuals and families provided for normally by the program, and many are on the brink of losing their new homes. We are still trying to assist where we can, but any payment now requires us to reallocate resources from our other charitable programs, thus straining our entire organization.

8. The abrupt suspension of funding affects more than CCC's refugee services. It also hampers our ability to carry out our overall charitable mission. For example, the organization is at risk of defaulting on two of its office leases for lack of cash. We also had to cancel the opening of a planned fourth office. As noted, the adverse effects have spilled over into the rest of our charitable projects, crippling our ability to provide much-needed services to many different at-risk populations. Absent immediate relief, we will lose facilities and resources—essential to our overall mission—that will take us years to rebuild, forcing us to operate at a highly diminished capacity in the interim.

9. This situation is unprecedented in our partnership with USCCB. In the past, we have had ample notice of fluctuations in funding levels and have been able to adjust our intake of refugees and staffing capacity accordingly. CCC has never before faced the agonizing situation of denying help to refugees already admitted to our program.

10. The suspension has forced CCC to reevaluate the viability of offering refugee resettlement services in the future. Refugee assistance is important work, but CCC's independent assets are insufficient to sustain a serious program in the long run. We depend on government assistance, and that assistance alone has justified the substantial costs associated just with keeping our refugee program open, such as building leases and staffing. If government funding can disappear on a dime, it does not make sense for us to keep this program running. We have already had internal discussions about closing our refugee resettlement office in eastern Virginia.

11. So, too, has CCC reflected on its ability to partner with USCCB moving forward. In our model of cooperation, USCCB acts as intermediary between CCC and the government. If we cannot rely on funding for the programs the intermediary offers, we cannot justify joining those programs. Although we would like to continue our partnership with USCCB, the risk of government funding suspensions such as the one we are currently facing makes us hesitant to accept work from USCCB for which we may ultimately be on the hook.

12. I declare under penalty of perjury that the foregoing is true and correct to the best of my understanding.

Signed this 22nd of February 2025,

/s/
Jason "Jay" Brown