IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE, *et al.*,<br><br>    Defendants. | Case No. 1:25-cv-465-TNM<br><br>***AMICUS CURIAE* BRIEF OF JONATHAN CROSMER AND KATHLEEN CROSMER IN SUPPORT OF PLAINTIFF'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

TABLE OF CONTENTS

Table of Authorities.................................................................................................................3

Interest of *Amici* ...................................................................................................................4

Contributions..........................................................................................................................4

Argument ...............................................................................................................................5

    I. Background.................................................................................................................5

    II. The government's actions constitute an uncompensated "taking" from the Crosmers. ..............................................................................................................................7

    III. The government's actions are creating chaos. ............................................................7

    IV. The harm being caused by the government cannot be remedied by monetary damages....................................................................................................................................8

Conclusion .............................................................................................................................9

## TABLE OF AUTHORITIES

*Brown v. Legal Found. of Washington*, 538 U.S. 216 (2003) ............................................................7

Local Rule 7 .................................................................................................................................4

Fed. R. App. P. 29 ........................................................................................................................4

P.L. 79-404, 60 Stat. 237 (1946) ...................................................................................................8

*United States v. Pewee Coal Co.*, 341 U.S. 114 (1951) ................................................................7

U.S. Const. amend. V...................................................................................................................7

## INTEREST OF *AMICI*

*Amici curiae* authoring this brief are Jonathan Crosmer and Kathleen Crosmer (the "Crosmers"), married, pro se, filing by leave of the Court granted in response to an unopposed motion by the Crosmers pursuant to Local Rule 7(o).  The Crosmers are landlords to a family of five Syrian refugee tenants (the "Tenants")[1] served by Kentucky Refugee Ministries, Inc. ("KRM"), a Kentucky non-profit corporation.  KRM is in a similar position to the Plaintiff, United States Conference of Catholic Bishops ("USCCB").  KRM had been assisting the Tenants with paying rent to the Crosmers.  As a result of the suspension of the US Refugee Admissions Program, KRM is no longer able to provide them rental assistance.  Thus the Tenants have fallen behind on the rent owed to the Crosmers, who were thereby harmed by the government's actions.  Therefore, the Crosmers support the Plaintiffs in their request for relief.

## CONTRIBUTIONS

Pursuant to Local Rule 7(o)(5) and Fed. R. App. P. 29(a)(4), the Crosmers state the following:

1. No party's counsel authored this brief in whole or in part.

2. No party nor any party's counsel contributed money that was intended to fund preparing or submitting this brief.

3.  No person contributed money that was intended to fund preparing or submitting this brief.

---

[1] The names of the family members are irrelevant and therefore omitted for their privacy.

ARGUMENT

The Crosmers offer to the Court their perspective as third parties who were harmed by the government's actions described by the USCCB. The Crosmers humbly suggest that the Defendants have caused significantly more harm than they admit. The balance of harms and the public interest weigh in favor of injunctive relief for the USCCB, which will also relieve the Crosmers, the Tenants, KRM, and many similarly situated parties.

**I. Background.**

The Crosmers became interested in working with refugees after the disastrous U.S. withdrawal from Afghanistan in 2021 led to an influx of migration. The Crosmers own exactly one house in Lexington, Kentucky. They began renting this house to refugees in August 2023. The current Tenants, refugees from Syria, are the third refugee family to occupy the house. Two of the five family members are disabled. The Tenants are delighted to live in the United States and are working towards assimilation. They are very proud of keeping a clean house, and they have made friends with their American neighbors. They were receiving assistance from KRM prior to the Refugee Funding Suspension. *See* Pl.'s Compl. (ECF No. 1) at 3 ¶ 5.

On February 3, 2025, KRM sent a letter to the Crosmers, stating in part:

> The new presidential administration suspended the US Refugee Admissions Program (a program that dates back to 1980 and is the gold standard of safe, successful immigration with a path to citizenship) on 1/20/25, as well as the funding for it. This includes not only future funding during the indefinite arrivals suspension, but also the small per capita amount of start-up money, already appropriated by Congress, for the clients who already arrived in the United States. These are the dollars that allow newcomers to temporarily pay for essentials (like rent, food, and utilities) while they prepare to work (process documents, attend health and vaccine appointments, participate in English class at KRM, get their children enrolled in school, open a bank account, etc[.]). After this short initial period, most clients secure a steady income stream through employment, and then take on full responsibility for rent and bills, no longer needing KRM support. Some KRM Lexington clients arrived in the United States as recently as January 16, 2025. Even their start-up funding has been frozen.

5

> We have been told that KRM is unlikely to be reimbursed for the work we already completed throughout the month of January under federal agreements. Hence, both KRM and its clients are facing sudden shortfalls due to the suspension of signed government agreements and the reneging on payments owed to us. . . .
>
> We have been able to write rental assistance checks for a limited number of clients, and those are being disbursed today. If more funds become available, we may be able to make a second round of payments during February. . . .
>
> This situation is unprecedented in our nearly 30 years of welcoming newcomers to Lexington . . . .

Letter from "Kentucky Refugee Ministries/Lexington" to "Landlords and Property Managers working with KRM," February 3, 2025.

Then Tenants sent the following text message to the Crosmers:

> Good morning Mr. Jonathan. I would like to talk to you about the rent. KRM informed us that they will not help us from today onwards. They sent us a letter that I will send to you. This letter states that they will not help us at all. . . . They told us that they cut off the assistance two days before the month came. We were very shocked . . . If I pay it to you, I will not have a single dollar left to pay the bills. All respect and appreciation to you, Mr. Jonathan.

SMS text message from Tenants to Jonathan Crosmer, February 5, 2025.

This put the Crosmers in a difficult position. They could have (1) attempted to evict the refugees for breach of the lease and left them homeless, or (2) absorbed the cost themselves. The first option would have been inhumane, thus the Crosmers were forced to choose the second. Therefore, the government's actions in this case have caused financial harm and emotional distress to both the refugee Tenants and the Crosmers.

Naturally, the Tenants were grateful that the Crosmers did not throw them out on the street. On hearing that the Crosmers would not trouble them over late or missing rent, the Tenants replied: "All respect to you I am very happy to hear this from you because I was very sad and sick. For five days I could not sleep. Now I was very happy when I read this letter. . ." SMS text message from Tenants to Jonathan Crosmer, February 5, 2025.

**II. The government's actions constitute an uncompensated "taking" from the Crosmers.**

Even a temporary or emergency government action taking a leasehold requires just compensation under the Fifth Amendment. U.S. Const. amend. V; *United States v. Pewee Coal Co.*, 341 U.S. 114, 115-16 (1951) (wartime "taking" of mine to prevent strike required compensation); *Brown v. Legal Found. of Washington*, 538 U.S. 216, 233 (2003) ("compensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even though that use is temporary") (citation omitted). Assuming the government did not intend for all landlords of indigent refugees to evict them (thus creating potentially thousands of homeless refugees), then the government must intend for landlords to house refugees without compensation. Such action is an unlawful Fifth Amendment "taking."

**III. The government's actions are creating chaos.**

At this point, the Crosmers and the Tenants cannot predict at all what the government will do. The government defends its actions by describing the Refugee Funding Suspension as a "temporary pause," as if it were a minor technical hiccup. But from the Crosmers' perspective, the Refugee Funding Suspension was disruptive in the extreme. USCCB, KRM, the Crosmers, Tenants, and many others relied on the timely delivery of US Refugee Admissions Program funding. Likely many refugee tenants have breached their leases due to the Refugee Funding Suspension, as most refugees have few assets when they first arrive in the U.S. Therefore, many landlords like the Crosmers are facing uncertainty and must make the same difficult choice of absorbing the financial blow or passing it on to their refugee tenants.

The uncertainty faced by landlords and tenants is a great hardship. Defendants emphasize the supposed 90-day time limit of their "temporary pause." Defs.' Mem. (ECF No. 14) at 9. They attempt to characterize the Foreign Aid Order as a "short-term delay." *Id.* at 10-

11. However, Defendants fail to acknowledge that many refugees and non-profit refugee organizations operate with narrow margins. Even a 90-day funding delay for refugees is devastating. Imagine the outcry if the Social Security Administration decided to suspend all payments for 90 days to better help the President "implement his agenda." *See id.* at 6. This is not the "orderly operation of government" suggested by Defendants. *Id.* at 10 (citation omitted). Moreover, now no one can predict what the government will do after 90 days. Even the Defendants' own brief cites only the vaguest statements, such as the Order that the Secretary of State will determine "whether to continue, modify, or cease each foreign assistance program." *Id.* at 10 (quoting Foreign Aid Order § 3(b)-(c)). Refugees, refugee organizations, and landlords cannot reasonably expect to go back to business as usual after 90 days.

**IV. The harm being caused by the government cannot be remedied by monetary damages.**

The harm caused by Defendants is not "merely monetary." *Contra id.* at 6, 15. The government is inflicting on many parties emotional distress and significant economic harm that cannot be remedied by remuneration. Many of those harmed are indigent refugees who barely speak English and are incapable of representing their interests before our courts, so they will never be compensated. Others harmed include "mom and pop" landlords like the Crosmers, who have many responsibilities beyond trying to guess what the government will do next and how to prepare for it. One supposes this is why Congress adopted "AN ACT To improve the administration of justice by prescribing fair administrative procedure." P.L. 79-404, 60 Stat. 237 (1946) (Administrative Procedure Act). The government should not be allowed to abandon statutorily mandated "fair administrative procedure" by disingenuously pretending its actions are temporary and hurt no one, while forcing the Crosmers and others to bear the cost without compensation.

This case is no mere contract dispute with a government vendor. The government has taken highly disruptive actions that ripple far beyond what Defendants admit, affecting many thousands of vulnerable refugees, *see* Pl.'s Complaint (ECF No. 1) at 4 ¶ 6, and harming inter alia landlords like the Crosmers.

## CONCLUSION

For the reasons above, the Crosmers entirely support Plaintiff's Complaint and Prayer for Relief. *See* Pl.'s Compl. (ECF No. 1) at 34.

February 24, 2025                                                                 Respectfully Submitted,

*/s/ Jonathan Crosmer*   */s/ Kathleen Crosmer*

Jonathan Crosmer and Kathleen Crosmer
7347 Northmoor Drive
St. Louis, MO 63105
(501) 339-6050
jonathancrosmer@hotmail.com