UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| U.S. CONFERENCE OF CATHOLIC BISHOPS,<br><br>   Plaintiff,<br><br> v.<br><br>DEPARTMENT OF STATE, et al.,<br><br>   Defendants. | Civil Action No. 25-0465 (TNM) |

**DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS..............................................................................................................I

TABLE OF AUTHORITIES .....................................................................................................II

INTRODUCTION ...................................................................................................................... 1

STATUTORY BACKGROUND ................................................................................................ 2

    I.     Refugee Admission ................................................................................................ 2

    II.    Refugee Resettlement .......................................................................................... 4

FACTUAL BACKGROUND ..................................................................................................... 5

    I.     The Cooperative Agreements .............................................................................. 5

    II.    The Executive Orders ......................................................................................... 6

    III.   Implementation of the Executive Orders ........................................................... 7

STANDARD OF REVIEW ....................................................................................................... 8

ARGUMENT ........................................................................................................................... 10

    I.     Plaintiff Fails to Demonstrate A Likelihood of Success on the Merits. ............... 10

          A.    Plaintiff Fails to Establish This Court Has Jurisdiction........................... 10

          B.    The Secretary's Implementation of the Foreign Aid Order Is Unreviewable ................................................................................................. 17

          C.    Plaintiff Does Not Allege Any Final Agency Action ............................... 20

          D.    The State Department Has Not Acted Contrary to Law .......................... 20

          E.    The State Department's Temporary Pause Is Not Arbitrary and Capricious ................................................................................................. 23

          F.    Implementation of an Executive Order Is Not Subject to Notice and Comment .................................................................................................. 27

    II.    Plaintiff Cannot Establish a Likelihood of Immediate Irreparable Harm............. 27

    III.   The Balance of Harms and the Public Interest Weigh Against Relief................. 31

    IV.   The Court Should Require Plaintiff to Post Security............................................ 32

CONCLUSION........................................................................................................................ 33

# TABLE OF AUTHORITIES

**Cases**

*A & S Council Oil Co. v. Lader*,
56 F.3d 234 (D.C. Cir. 1995) ................................................................................................ 16

*AIDS Vaccine Advoc. Coal. v. United States*,
Civ. A. 25-0400 (AHA), 2025 WL 485324 (D.D.C. Feb. 13, 2025 ........................................... 31

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) ............................................................................................................. 18

*Am. Near E. Refugee Aid v. Agency for Int'l Dev.*,
Civ. A. No. 21-3184 (CRC), 2023 WL 10669678 (D.D.C. Mar. 21, 2023) ......... 11, 12. 14. 15. 16

*Aminjavaheri v. Biden*,
Civ. A. No. 21-2246 (RCL), 2021 WL 4399690 (D.D.C. Sept. 27, 2021) .................................... 2

*Ancient Coin Collectors Guild v. CBP*,
801 F. Supp. 2d 383 (D. Md. 2011) ....................................................................................... 18

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
426 U.S. 87 (1983) ............................................................................................................... 10

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................................................. 20

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ............................................................................................................. 13

*Bowman Transp., Inc. v. Ark.-Best Freight Sys.*,
419 U.S. 281 (1974) ............................................................................................................. 10

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ........................................................................................... 9, 28

*City of New Haven v. United States*,
809 F.2d 900 (D.C. Cir. 1987) ............................................................................................... 22

*CityFed Fin. Corp. v. Office of Thrift Superv.*,
58 F.3d 738 (D.C. Cir. 1995) ................................................................................................ 28

*Cobell v. Norton*,
240 F.3d 1081 (D.C. Cir. 2001) ............................................................................................ 20

*Coggeshall Dev. Corp. v. Diamond*,
884 F.2d 1 (1st Cir. 1989) ................................................................................................ 12, 14

*Consolo v. Fed. Maritime Comm.*,
383 U.S. 607 (1966) ................................................................................................ 10

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022) ........................................................................ 13, 16

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016) ........................................................................ 17

*Dickson v. Sec'y of Def.*,
68 F.3d 1396 (D.C. Cir. 1995) ............................................................................... 10

*Dorfmann v. Boozer*,
414 F.2d 1168 (D.C. Cir. 1969) ............................................................................... 2

*Farris v. Rice*,
453 F. Supp. 2d 76 (D.D.C. 2006) ........................................................................ 28

*First Nat'l City Bank v. Banco Nacional de Cuba*,
406 U.S. 759 (1972) ................................................................................................ 18

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ................................................................................................ 17

*Heckler v. Chaney*,
420 U.S. 821 (1985) ................................................................................................ 23

*Hospitality Staffing Sols., LLC v. Reyes*,
736 F. Supp. 2d 192 (D.D.C. 2010) ........................................................................ 9

*Kidwell v. Dep't of Army*,
56 F.3d 279 (D.C. Cir. 1995) ................................................................................. 11

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ..................................................................................... 8

*League of Women Voters v. Newby*,
Civ. A. No. 16-236 (RJL), 2016 WL 8808743 (D.D.C. Feb. 23, 2016) .............. 28

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ................................................................................................ 27

*Long Term Care Pharm. All. v. UnitedHealth Grp., Inc.*,
498 F. Supp. 2d 187 (D.D.C. 2007) ...................................................................... 13

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ................................................................................................ 19

*Maryland v. King*,
567 U.S. 1301 (2012) ................................................................................................ 32

*Mdewakanton Sioux Indians of Minn.*,
255 F. Supp. 3d 48 (D.D.C. 2017) ........................................................................... 27

*Mertens v. Hewitt Assocs.*,
508 U.S. 248 (1993) .................................................................................................. 13

*Miller v. Lehman*,
801 F.2d 492 (D.C. Cir. 1986) .................................................................................. 10

*Moore v. United States*,
48 Fed. Cl. 394 (2000) .............................................................................................. 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................................................................................................... 10

*Nat'l Wildlife Fed'nv. Snow*,
561 F.2d 227 (D.C. Cir. 1976) .................................................................................. 27

*Norton v. S. Utah Wilderness Alliance*,
542 U.S.55 (2004) ..................................................................................................... 14

*Pa. Dep't of Pub. Welfare v. United States*,
48 Fed. Cl. 785 (2001) .............................................................................................. 17

*Palisades Gen. Hosp. v. Leavitt*,
426 F.3d 400 (D.C. Cir. 2005) .................................................................................. 14

*Perry Cap. LLC v. Mnuchin*,
864 F.3d 591 (D.C. Cir. 2017) .................................................................................. 16

*PPG Indus., Inc. v. United States*,
52 F.3d 363 (D.C. Cir. 1995) .................................................................................... 14

*Pursuing Am.'s Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) .................................................................................... 8

*San Antonio Hous. Auth. v. United States*,
143 Fed. Cl. 425, 462 (2019) .................................................................................... 17

*Spadone v. McHugh*,
842 F. Supp. 2d 295 (D.D.C. 2012) .......................................................................... 28

*Spectrum Leasing Corp. v. United States*,
764 F.2d 891 (D.C. Cir. 1985) .................................................................................. 15

iv

*Tootle v. Sec'y of Navy,*
446 F.3d 167 (D.C. Cir. 2006) ............................................................................. 11

*Trauma Serv. Grp. v. United States,*
104 F.3d 1321 (Fed. Cir. 1997)............................................................................. 15

*Tulare County v. Bush,*
185 F. Supp. 2d 18 (D.D.C. 2001) ......................................................................... 18

*United States v. President & Fellows of Harvard Coll.,*
323 F. Supp. 2d 151 (D. Mass. 2004) .................................................................... 14

*United States v. Winstar Corp.,*
518 U.S. 839 (1996) .............................................................................................. 12

*Watkins v. Westinghouse Hanford Co.,*
12 F.3d 1517 (9th Cir.1993) ................................................................................. 13

*Weinberger v. Romero-Barcelo,*
456 U.S. 305 (1982) .............................................................................................. 31

*Winter v. Nat. Res. Def. Council,*
555 U.S. 7 (2008) ............................................................................................. 8, 31

*Yee v. Jewell,*
228 F. Supp. 3d 48 (D.D.C. 2017) ................................................................. 11, 16

**Statutes**

2 U.S.C. § 684(a) .................................................................................................. 22

5 U.S.C. § 553(a)(2) .............................................................................................. 27

5 U.S.C. § 704 ................................................................................................ 17, 20

5 U.S.C. § 706(2)(A) ............................................................................................. 10

8 U.S.C. § 1101(a)(42)......................................................................................... 2, 3

8 U.S.C. § 1157(a)(2)............................................................................................... 2

8 U.S.C. § 1157(c)(1)............................................................................................... 2

8 U.S.C. § 1157(c)(2)(A) .......................................................................................... 3

8 U.S.C. § 1157(c)(2)(A) .......................................................................................... 3

8 U.S.C. § 1157(c)(3)............................................................................................... 3

8 U.S.C. § 1182(a) ........................................................................................................ 2

8 U.S.C. § 1522(a)(1)(A) ....................................................................................... passim

8 U.S.C. § 1522(b)(1)(A)(ii) ...................................................................................... 21

22 U.S.C. § 2151b(c)(1) ............................................................................................. 19

22 U.S.C. § 2291(a)(4) ............................................................................................... 19

22 U.S.C. § 2347 ........................................................................................................ 19

22 U.S.C. § 2349aa .................................................................................................... 19

22 U.S.C. § 2601(c)(1) ............................................................................................... 19

28 U.S.C. § 1491(a)(1) ............................................................................................... 11

Pub. L. No. 96-212 ...................................................................................................... 2

Pub. L. 118-47 ........................................................................................................... 22

**Regulations**

2 C.F.R. § 200.305 ..................................................................................................... 26

2 C.F.R. § 200.305(b)(3) ............................................................................................ 26

2 C.F.R. § 200.305(b)(6) ............................................................................................ 12

8 C.F.R. § 207.7(a) ...................................................................................................... 3

Defendants, by and through the undersigned counsel, respectfully file this memorandum in opposition to Plaintiff's motion for preliminary injunction (ECF No. 5, "Pl.'s Mot.") and supplemental memorandum in support (ECF No. 22, "Pl.'s Supp. Mem."). For the reasons discussed below, the Court should deny Plaintiff's motion.

## INTRODUCTION

On January 20, 2025, the President issued a ninety-day pause in foreign development assistance to assess programmatic efficiencies, and to ensure that all foreign aid is consistent with foreign policy. *See* Exec. Order No. 14,169, Reevaluating & Realigning United States Foreign Aid, 90 Fed. Reg. 8,610 (Jan. 20, 2025) ("Foreign Aid Order") §§ 2, 3. As a result, the Department of State ("State Department") paused all foreign aid related to the U.S. Refugee Admissions Program ("USRAP" or the "Program"), to include payments to refugee resettlement agencies.

Plaintiff U.S. Conference for Catholic Bishops, a national refugee resettlement agency, has moved for emergency relief under the Administrative Procedure Act ("APA") to enjoin the Program from continuing the pause in payments and to direct the Program to promptly reimburse Plaintiff for any expenses. Plaintiff's motion fails.

First, Plaintiff fails to demonstrate a likelihood of success on the merits: (1) Plaintiff does not establish jurisdiction; (2) Plaintiff does not identify an agency action or a final agency action; (3) the State Department has not acted contrary to law; (4) the State Department's pause in funding is not arbitrary and capricious; and (5) the State Department's implementation of the Foreign Aid Order is not subject to notice and comment rulemaking procedures. Second, Plaintiff fails to establish irreparable harm because its alleged harms are monetary. And, third, the balance of harms and the public interest weigh in favor of the President's ability to implement his agenda consistent with his constitutional and statutory authorities.

Accordingly, for the reasons discussed below, the Court should deny Plaintiff's demand for extraordinary relief, especially Plaintiff's demand that it be granted the requested ultimate relief, *see Aminjavaheri v. Biden*, Civ. A. No. 21-2246 (RCL), 2021 WL 4399690, at *5 (D.D.C. Sept. 27, 2021) ("Moreover, the D.C. Circuit has cautioned that a preliminary injunction 'should not work to give a party essentially the full relief he seeks on the merits.'" (quoting *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 n.13 (D.C. Cir. 1969))).

## STATUTORY BACKGROUND

### I.    Refugee Admission

The Refugee Act of 1980 amended the Immigration and Nationality Act ("INA") to establish "a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for [their] effective resettlement." Pub. L. No. 96-212, 94 Stat. 102, § 101(b). The Refugee Act provides that the maximum number of refugees that may be admitted annually shall be "such number as the President determines, before the beginning of the fiscal year and after appropriate consultation [with Congress], is justified by humanitarian concerns or is otherwise in the national interest." 8 U.S.C. § 1157(a)(2).

Subject to numerical limits set annually by the President, the Secretary of Homeland Security has discretion to admit "any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible (except as otherwise provided under [8 U.S.C. § 1157(c)(3)]) as an immigrant" under the INA. 8 U.S.C. § 1157(c)(1); *see also* 8 U.S.C. §§ 1101(a)(42) (defining "refugee"), 1182(a) (general inadmissibility grounds). Which refugees are determined to be "of special humanitarian concern" to the United States for the purpose of refugee resettlement is determined in the Report to Congress on Proposed Refugee Admissions prior to the beginning of the fiscal year. Zerbinopoulos Decl.

¶ 9, attached hereto as Ex. A.  Refugees admitted in accordance with this provision are sometimes referred to as "principal" applicants or refugees.

In addition, certain individuals who do not meet the statutory definition of a refugee under 8 U.S.C. § 1101(a)(42) may nonetheless be entitled to refugee status if they are accompanying or "following-to-join" a principal refugee.  *See* 8 U.S.C. § 1157(c)(2)(A); 8 C.F.R. § 207.7(a).   To obtain "derivative refugee" status, an applicant must be the spouse or unmarried child under the age of 21 of a principal refugee and must also be admissible (except as otherwise provided under 8 U.S.C. § 1157(c)(3)) as an immigrant under the INA.  8 U.S.C. § 1157(c)(2)(A). Derivative refugees who are either in the physical company of the principal refugee when admitted to the United States or admitted within four months of the principal refugee's admission are called "accompanying" refugees.  8 C.F.R. § 207.7(a).  Derivative refugees who seek admission more than four months after the principal refugee are called "following-to-join" refugees.  *Id*.

The INA provides only that such derivative refugees are entitled to refugee status if the appropriate application or petition is processed and their relationship as the spouse or child of a principal refugee and their admissibility is established.[1]  *See* 8 U.S.C. § 1157(c)(2)(A).  The INA does not, however, entitle derivative refugees to be admitted to the United States without qualification.  The admission of a derivative who has obtained refugee status is contingent on there being room under the subsection allocation under which the principal refugee's admission is charged, as well as, by implication, the annual refugee limit, set by the President, and that individual establishing their eligibility for admission.  *Id*.

---

[1]      Accompanying derivatives are processed via Form I-590, Registration for Classification as Refugee, which is filed in conjunction with the Form I-590 by the principal refugee overseas. Following-to-join derivatives are processed via Form I-730, Refugee/Asylee Relative Petition, which the admitted principal refugee files on behalf of the derivative, who may be overseas or in the United States.

## II.   <u>Refugee Resettlement</u>

Following admission, the United States, through public and private organizations, provides

resettlement services to assist refugees in achieving self-sufficiency.  To administer the services,

Congress established the Office of Refugee Resettlement (or "ORR") in the Department of Health

and Human Services, which is headed by a Director.  8 U.S.C. § 1521(a).  "The function of the

Office and its Director is to fund and administer (directly or through arrangements with other

Federal agencies), in consultation with the Secretary of State, programs" to provide resettlement

services.  8 U.S.C. § 1521(b).  The Director

> shall, to the extent of available appropriations, (i) make available sufficient
> resources for employment training and placement in order to achieve economic
> self-sufficiency among refugees as quickly as possible, (ii) provide refugees with
> the opportunity to acquire sufficient English language training to enable them to
> become effectively resettled as quickly as possible, (iii) insure that cash assistance
> is made available to refugees in such a manner as not to discourage their economic
> self-sufficiency, in accordance with subsection (e)(2), and (iv) insure that women
> have the same opportunities as men to participate in training and instruction.

8 U.S.C. § 1522(a)(1)(A); *see also* 45 C.F.R. § 400.11(a).  Accordingly, the Director, ORR

provides a majority of the services for resettlement, *e.g.*, cash assistance and medical services for

up to twelve months, child welfare services for unaccompanied refugee children, and employment

assistance and English language learning for up to five years.  8 U.S.C. 1522(c)-(e), 45 CFR Part

400, Subparts E, G and I; Extending Refugee Cash Assistance and Refugee Medical Assistance

from 8 months to 12 months, 87 Fed. Reg. 17,312 (Mar. 28, 2025).

In addition to the services required under section 1522(a)(1)(A), the Secretary of State "is

authorized, to make grants to, and contracts with, public or private nonprofit agencies for initial

resettlement (including initial reception and placement with sponsors) of refugees in the United

States."  8 U.S.C. §§ 1522(b)(1)(A)(ii), (b)(1)(B); 3 Pub. Papers. 2879 (Jan. 13, 1981) (Exec. Off.

Of the Pres.) (authorizing the Secretary of State under section 1522(b)(1)(B) to exercise the

authority).  Accordingly, the Secretary of State through cooperative agreements, provides initial resettlement services, which last between thirty and ninety days and include:

- Agreement to accept refugees for management by local resettlement affiliates;

- Pre-arrival resettlement planning, including placement and arrangement for health care requirements, as needed;

- Reception on arrival, including transportation from the airport to living quarters;

- Basic needs support (including identification and securing of housing, as well as provision of furnishings, food, and clothing);

- Cultural orientation;

- Assistance with access to healthcare, employment, education, and other services, as needed;

- Assistance with applying for and/or enrolling in other benefits and services, as appropriate and as eligible

- Development and implementation of an initial service plan for each refugee.

2d Decl. of Adam Zerbinopoulos (Feb. 25, 2025) ¶¶ 10, 11, enclosed herewith.

## FACTUAL BACKGROUND

### I.    The Cooperative Agreements

State Department's Bureau of Population and Migration ("PRM" or "Migration Bureau") awarded Plaintiff two cooperative agreements to provide initial resettlement services for fiscal year 2025 (collectively, the "Agreements").  Cooperative Agmt. SPRMCO24CA0342 (ECF No. 5-4), Cooperative Agmt. SPRMCO24CA0336 (ECF No. 5-5).  Pursuant to the Agreements, Plaintiff received 6,259 refugees, 1,796 Afghan or Iraqi special immigrants, and four Amerasians special immigrants for provision of initial services.  2d Zerbinopoulos Decl. ¶ 14.  As of February 24, 2025, 5,206 remain with the initial ninety-day period.  *Id*.

The Agreements require Plaintiff to provide core services for the individuals *e.g.*, reception services to apprise the refugee of the availability of initial housing. *See*, e.g., Cooperative Agmt. SPRMCO24CA0342 (ECF No. 5-4) § 16.2 ¶ vii (describing core services). The applicable administrative requirements for the Agreements are at 2 C.F.R. Part 200 Subparts A through F and 2 C.F.R. Parts 600 and 601. *Id.*, Std. Terms & Conds. for Fed. Awards.

As of February 24, 2025, Plaintiff has submitted six requests for payment of expenses to the Migration Bureau, totaling $13,015,130.49. 2d Zerbinopoulos Decl. ¶ 15.

## II.   **The Executive Orders**

On January 20, 2025, the President signed Executive Order No. 14,163, Realigning the United States Refugee Admissions Program, 90 Fed. Reg. 8,459 (Jan. 20, 2025) ("Refugee Order"), which suspended admission of refugees under the Program, pursuant to the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a) and based on the President's finding that the "United States lacks the ability to absorb large numbers of migrants, and in particular, refugees, into its communities in a manner that does not compromise the availability of resources for Americans, that protects their safety and security, and that ensures the appropriate assimilation of refugees." Refugee Order § 1. The Refugee Order also suspended "decisions on applications for refugee status." *Id.* § 3(b). Notwithstanding the suspension, the Refugee Order allows for admission of refugees on a case-by-case basis should the Secretaries of Homeland Security and State jointly determine such admission is in the national interest and would not threaten national security or welfare, and sets a process for resuming refugee admissions in the future. *Id.* §§ 3(c), 4.

That same day, the President also signed the Foreign Aid Order, i.e., Executive Order No. 14,169, which required agency heads to "immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors pending reviews of such

programs . . . to be conducted within 90 days." Foreign Aid Order § 3(a). The Foreign Aid Order also required agency heads to review each foreign assistance program under guidelines provided by the Secretary of State to determine "whether to continue, modify, or cease each foreign assistance program." *Id.* § 3(b)–(c). Notwithstanding the pause, the Foreign Aid Order allows the Secretary of State to waive the ninety-day pause on incurring new development assistance funds and allows for the resumption of programs prior to the end of the ninety-day period with the Secretary of State's approval. *Id.* § 3(d)–(e).

### III.    <u>Implementation of the Executive Orders</u>

In the days before the administration change, the incoming administration informed senior officials in the State Department's Migration Bureau that President Trump intended to suspend refugee admissions under the Program through executive order. Zerbinopoulos Decl. ¶ 18. In anticipation of the Refugee Order, the State Department, upon learning that the suspension would go into effect on January 27, 2025, cancelled all travel after 12:00 p.m. on January 20, 2025. Zerbinopoulos Decl. ¶ 20. The State Department did so out of an abundance of caution because most refugees travel to the United States from around the world, a trip that involves multiple layovers and can take multiple days. *Id.* Consequently, the State Department cancelled travel scheduled between January 20 and 27, 2025 to avoid the not insignificant risk that refugees would not arrive in the United States before the suspension went into effect at 12:01 a.m. on January 27, 2025, and to avoid the possibility that some refugees would be stranded at a U.S. port of entry or at an airport in a foreign country. *Id.*

In response to the Refugee Order's directive to suspend any decisions on refugee applications, the State Department also suspended the Program's processing activities. Zerbinopoulos Decl. ¶ 21. The suspension was intended to prevent inefficiencies, as it would be illogical for the Government and resettlement partners to move refugees to transit centers or

conduct pre-departure activities when refugee admissions were suspended. Zerbinopoulos Decl. ¶¶ 21–22. And some processing activities, such as medical exams and security checks, expire after a certain amount of time. Zerbinopoulos Decl. ¶ 22. Further, the State Department could not be sure when and which classes of refugees the President would find to be in the United States' interest upon resumption of refugee admissions. Zerbinopoulos Decl. ¶ 22.

Following the Foreign Aid Order's directive to immediately cease foreign aid payments, the State Department, on January 24, 2025, issued 25 STATE 6828, an "All Diplomatic and Consular Posts" (or "ALDAC") cable "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID." Zerbinopoulos Decl. ¶ 26. This pause applied to assistance funded from accounts in title III of the Department of State, Foreign Operations, and Related Programs Appropriations Act, to include the Migration and Refugee Assistance account, from which funding for initial reception and placement services is provided to resettlement agencies. Zerbinopoulos Decl. ¶¶ 23–26. Thus, the Order's halt on foreign aid necessarily included payments to resettlement agencies in the United States. Zerbinopoulos Decl. ¶¶ 24–26.

## STANDARD OF REVIEW

A preliminary injunction "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). A party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). The moving party bears the burden of persuasion and must demonstrate, "by a clear showing," that the requested relief is warranted. *Hospitality Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192,

197 (D.D.C. 2010) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Moreover, Plaintiff's "claim is not standard administrative fare." *Karimova v. Abate*, No. 23-5178, 2024 WL 3517852, at *5 (D.C. Cir. July 24, 2024). Diplomacy and foreign relations fall within the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319–20 (1936); *see Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) ("It cannot [] be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches."); *see Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006) ("[A]n extensive list of constitutional provisions . . . entrusted foreign affairs and national security powers to the political branches[.]"); *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative.''); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (noting that the President is "exclusively responsible" for "conduct of diplomatic and foreign affairs"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) (matters relating "to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *Worthy v. Herter*, 270 F.2d 905, 911 (D.C. Cir. 1959) ("It is settled that in respect to foreign affairs the President has the power of action and the courts will not attempt to review the merits of what he does. The President is the nation's organ in and for foreign affairs.''). As such, injunctive relief related to foreign affairs "deeply intrudes into the core concerns of the executive branch" and may be

awarded only upon "an extraordinarily strong showing" as to each element.  *Adams*, 570 F.2d at 954–55.

## ARGUMENT

### I.    Plaintiff Fails to Demonstrate A Likelihood of Success on the Merits.

The APA permits a reviewing court to set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[T]he scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under the APA standard of review, an agency's decision need not be "a model of analytical precision to survive a challenge." *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995). "A reviewing court will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 286 (1974)). It is sufficient if an agency's explanation of its decision contains "a rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. In addition, "if the necessary articulation of basis for administrative action can be discerned by reference to clearly relevant sources other than a formal statement of reasons, [the court] will make the reference." *Miller v. Lehman*, 801 F.2d 492, 497 (D.C. Cir. 1986) (internal quotation marks omitted).

The "arbitrary and capricious" standard of the APA review asks whether the agency's actions meet a basic standard of reasonableness. *See, e.g., Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 426 U.S. 87, 105 (1983); *Consolo v. Fed. Maritime Comm.*, 383 U.S. 607, 619–20 (1966).

### A.    Plaintiff Fails to Establish This Court Has Jurisdiction

Congress's waiver of sovereign immunity in the APA excludes "authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is

sought." 5 U.S.C. § 702.  Here, the Tucker Act impliedly forbids the application of APA Section 702 to Plaintiff's complaint.

"The Tucker Act waives sovereign immunity for actions 'founded . . . [upon] any express or implied contract with the United States' . . . for suits brought in the U.S. Court of Federal Claims." *Yee v. Jewell*, 228 F. Supp. 3d 48, 55 (D.D.C. 2017) (citing 28 U.S.C. § 1491(a)(1)).[2] "[T]he D.C. Circuit has instructed that a claim must be brought in the Claims Court, as opposed to the District Court, if it meets three requirements: (1) 'it explicitly or 'in essence' seeks more than $10,000 in monetary relief from the federal government,' *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995), (2) it 'is essentially a contract action,' *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004), and (3) the [Claims Court] would have jurisdiction over the matter[.]" *Am. Near E. Refugee Aid v. Agency for Int'l Dev.*, Civ. A. No. 21-3184 (CRC), 2023 WL 10669678, at *5 (D.D.C. Mar. 21, 2023) (citing *Yee*, 228 F. Supp. 3d at 56, and *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176–77 (D.C. Cir. 2006)).  Plaintiff's claim meets all these requirements.

### 1.    Plaintiff Seeks in Essence More than $10,000 in Monetary Relief

To be sure, Plaintiff avers that it is not seeking any money damages.  *See* Pl.'s Supp. Mem. (ECF No. 22) at 15 ("USCCB has not asked for a monetary award"); *see also* Compl. (ECF No 1) at Prayer for Relief.  The Complaint says otherwise.  *See* Compl. (ECF No. 1) at Prayer for Relief § 4 ("Enjoin—temporarily, preliminarily, and permanently—Defendants to reimburse USCCB for all expenses it has incurred or will incur pursuant to the terms of its cooperative agreements.").  Plaintiff further defines the point of this suit:  money.  *E.g.* Pl.'s Supp. Mem. (ECF No. 22) at 10

---

[2]    Because Plaintiff seeks "in essence" more than $10,000 in monetary relief—about $24 million, the District Court would not have concurrent jurisdiction under the "Little Tucker Act." 28 U.S.C. § 1346(a)(2).

("The government's refusal to reimburse [Plaintiff's] expenses pursuant to its cooperative agreements is arbitrary and capricious because it violates 2 C.F.R. § 200.305(b)(6)—an [Office of Management and Budget] regulation governing federal grants that the State Department has incorporated into its own regulations[.]").  Further, Plaintiff explains:

> Nor is there any dispute that the reimbursement requests [Plaintiff] has submitted are for "allowable costs" under the terms of its agreements, or that [Plaintiff] remains within the agreements' "period[s] of performance"—which run until September 30, 2025.

> Yet the government nevertheless has impermissibly "withheld" payment for allowable costs by refusing—through its Refugee Funding Suspension—to process [Plaintiff's] reimbursement requests in the ordinary course.

*Id*. at 11.

The "ordinary course" Plaintiff alludes to is the course of the cooperative agreement. Indeed, Plaintiff acknowledges that "it has asked the government to comply with federal law and the terms of its cooperative agreements by resuming the processing of reimbursement requests in the same way and on a similar timeline as it always has."  Pl.'s Mem. (ECF No. 5-2) at 15.  But where claimants "simply seek to receive the amount [agency] promised," the "true nature of" claim was for compensatory money damages and not equitable relief."  *Boaz*, 995 F.3d at 1368. Importantly, "damages are always the remedy for breach of contract."  *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996).  "Federal courts do not have the power to order specific performance by the United States of its alleged contractual obligations."  *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989).

Plaintiff's insistence that there is not a contract claim in the face of evidence to the contrary is just the sort of argument the D.C. Circuit has cautioned against, explaining that "plaintiffs may circumvent Tucker Act jurisdiction by disguising claims for monetary relief as ones for injunctive relief," *Am. Near E.*, 2023 WL 10669678, at *5, and has "cautioned plaintiffs that [the Circuit]

'prohibit[s] . . . the creative drafting of complaints,' for example, by 'disguis[ing]' a claim for money damages as one for equitable relief, to avoid the jurisdictional consequences of the Tucker Act," *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting *Kidwell*, 56 F.3d at 284; and citing *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969 (D.C. Cir. 1982)).  The D.C. Circuit has therefore instructed that the "plain language of a complaint . . . does not necessarily settle the question of Tucker Act jurisdiction," *Kidwell*, 56 F.3d at 284 (cleaned up), and that courts should look to the complaint's "substance, not merely its form." *Id.*; see also *Long Term Care Pharm. All. v. UnitedHealth Grp., Inc.*, 498 F. Supp. 2d 187, 194 (D.D.C. 2007) ("court must look to the 'substance of the remedy sought . . . rather than the label placed on that remedy'" (quoting *Watkins v. Westinghouse Hanford Co.*, 12 F.3d 1517, 1528 n.5 (9th Cir.1993))); *see also Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993)).

Moreover, Plaintiff's reliance on *Bowen v. Massachusetts*, 487 U.S. 879 (1988), is misplaced. Pl.'s Supp. Mem. (ECF No. 22) at 14.  Plaintiff is not seeking "funds to which a statute allegedly entitles it." *Bowen*, 487 U.S. at 895.  Plaintiff relies on 8 U.S.C. § 1522(a)(1)(A), which address action by the Director of Office of Refugee Resettlement, a Department of Health and Human Services official—not the Secretary of State—to provide services to refugees admitted into the United States.  8 U.S.C. § 1522(a)(1)(A).  Section 1522(a)(1)(A) does not require the Director or any other government official, to reimburse Plaintiff for providing resettlement services—only the terms or the cooperative agreements address it.

Further, Plaintiff's reliance on 5 U.S.C. § 704 is equally misplaced.  While Plaintiff demands prospective relief, the relief is not available under the APA.  Plaintiff demands this Court force the Department of State to continue under the terms of the Agreements and reimburse Plaintiff for any costs incurred since the Secretary directed Plaintiff to not engage in any other

activity under the Agreements.  Compl. (ECF No. 1) at Prayer for Relief ¶ 4; Letter of Jan. 24, 2025 (ECF No. 1-10) ("Effective immediately upon receipt of this Notice of Suspension the Recipient must stop all work under the award(s) and not incur any new costs after the effective date cited above.").  Importantly, the Court cannot order the government to continue under the terms of a contract.  *See Coggeshall*, 884 F.2d at 3.  In addition, the APA generally prohibits "specific relief," in the sense that, "when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards." *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995) (citations omitted); *see also Palisades Gen. Hosp. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005).  Again, Plaintiff demands specific relief—to enjoin the Department "to reimburse [Plaintiff] for all expenses it has incurred or will incur pursuant to the terms of its cooperative agreements."  Compl. (ECF No. 1) at Prayer for Relief ¶ 4.  Indeed, the Court cannot direct "how [the agency] shall act." *Norton v. S. Utah Wilderness Alliance*, 542 U.S.55, 63 (2004).  As such, the Tucker Act would provide relief resulting from the Department's suspension—money due under the Agreements, including the costs associated with the suspension.

2.    <u>Plaintiff's Claim Is Essentially a Contract Action</u>

To determine whether, this is essentially a contract action, the Court must consider, "whether the Cooperative Agreement is indeed a contract," and "it is the source of [Plaintiff's claim." *Am. Near E.*, 2023 WL 10669678, at *6.

a.    *The Cooperative Agreement is a Contract*

The Cooperative Agreement "appears to satisfy the requirements of a contract with the government—'mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government.'" *Id.* (citing *United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 164 (D. Mass. 2004) (citing

14

*Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997), and holding that cooperative agreements between USAID and Harvard University "constitute[d] contracts to assist Russia in developing capital markets and foreign investments")). Consideration exists because the State Department intended to "benefit economically and otherwise from" the initial resettlement services through the Cooperative Agreement. *See President & Fellows of Harvard Coll.*, 323 F.2d at 165. Indeed, the benefits to the State Department are explicitly acknowledged in the agreement itself, which provides that the objectives of the agreement is to provide initial refugee settlement services. *See*, *e.g.*, Cooperative Agmt. SPRMCO24CA0342 (ECF No. 5-4) §3.2.

### b.    *Plaintiff's Claim Arises out of the Cooperative Agreement*

"When deciding if a claim sounds in contract, courts consider 'the source of the rights upon which the plaintiff bases its claims' and 'the type of relief sought.'" *Am. Near E.*, 2023 WL 10669678, at *6 (quoting *Albrecht*, 357 F.3d at 68).

Clearly, "[t]he source of the right sought here arises from" the Agreements. *Id.* (citing *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (rejecting argument that the Debt Collection Act created the substantive right to the remedy sought by plaintiffs and noting that the right to payments were "created in the first instance by the contract")). The action that Plaintiff challenges is the State Department's suspension of the Agreements. As such, the terms of Agreements will determine whether the State Department had the authority to suspend the Agreements to assess its priorities.

Plaintiff attempts to argue that its claim arises not from the Agreements, but from the government's duty to provide refugee resettlement services pursuant to 8 U.S.C. § 1522(a)(1)(A). *See* Pl.'s Supp. Mem. (ECF No. 22) at 15; Pl.'s Mem. (ECF No. 5-2) at 6. But, Plaintiff acknowledges, "it has asked the government to comply with federal law and the terms of its cooperative agreements by resuming the processing of reimbursement requests in the same way

and on a similar timeline as it always has." *Id*. Additionally, section 1522 (a)(1)(A) applies to the Director of the Office of Refugee Resettlement, a Department of Health and Human Services official, not to the Secretary of State. *See* 8 U.S.C. § 1522(a)(1)(A).

Moreover, all other factors that courts have traditionally looked to in determining whether the contract is the source of a claimed right similarly lead to the conclusion that the Agreements are the source of Plaintiff's claimed right in this case. For example, courts look to whether the government is a party to the contract, *Crowley*, 38 F.4th at 1110 (distinguishing *Spectrum*, where the government had been part of the agreement, which "squarely indicate[ed] that the claims against" the government "arose under the contract."), here the government—the State Department—is a party. Moreover, for the reasons discussed above, Plaintiff seeks "in essence" more than $10,000 in monetary damages, *see supra*, a "'prototypical contract remedy'" that is "'specific to actions that sound in contract.'" *Crowley*, 38 F.4th at 1107 (citing *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *A & S Council Oil Co. v. Lader*, 56 F.3d 234, 240 (D.C. Cir. 1995))). Thus, Plaintiff's claim arises out of the Agreements.

### 3. Plaintiff's Action Could Have Properly been Brought in the Claims Court

The District Court "can only be deprived of jurisdiction if the action can properly be brought in the Court of Federal Claims." *Am. Near E.*, 2023 WL 10669678, at *6 (citing *Yee*, 228 F. Supp. 3d at 56 (noting that the D.C. Circuit has "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims" (citing *Tootle*, 446 F.3d at 176-77))). There is little doubt that a Tucker Act claim, alleging the breach of a money-mandating contract, may be brought in the Claims Court, as long as it is brought within the six-year statute of limitations, 28 U.S.C. § 2501. Jurisdiction exists in the Federal Circuit over "money-mandating" contracts, and cooperative agreements "have been held to be contracts within Tucker Act jurisdiction when all the requisite

elements of a contract were present." *Pa. Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 790 (2001) (further noting that it "is not this Court's position that grants can never be contracts within Tucker Act jurisdiction"); *see also San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 462 (2019); *Moore v. United States*, 48 Fed. Cl. 394, 397 (2000) (noting that "this court and its predecessor have also concluded that jurisdiction lies under the Tucker Act to consider alleged breaches of grants or cooperative agreements"). As such, Plaintiff could have brought his claims in the Claims Court.

*   *   *

In short, Plaintiff cannot meet its burden to establish that the claims fall within an applicable waiver of sovereign immunity and that this Court has subject-matter jurisdiction. Although Plaintiff superficially invokes the APA, which waives sovereign immunity as to nonmonetary claims, Plaintiff's own request for relief show that its claims seek payment of money and turn on the terms of the Agreements. As such, Plaintiff has not established that sovereign immunity is waived in this Court.

**B.    The Secretary's Implementation of the Foreign Aid Order Is Unreviewable**

1.    <u>The Implementation of Presidential Actions Are Not Reviewable</u>

Review under the APA is available only for "agency action." 5 U.S.C. § 704. Presidential actions are not agency actions reviewable under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) ("As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements."). Thus, actions taken by an executive branch agency to implement an executive order, pursuant to discretionary authority that was committed to the President, are equally unreviewable. *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017) (collecting cases, and reasoning that when the President retains final authority pursuant to the Constitution or

17

a valid statute, "presidential acquiescence constitutes an exercise of discretion that gives effect to the delegee's actions" and thus, the action is unreviewable under the APA), *opinion amended & superseded*, 883 F.3d 895 (D.C. Cir. 2018), *as amended on denial of reh'g* (Mar. 6, 2018), & *aff'd*, 883 F.3d 895 (D.C. Cir. 2018), *as amended on denial of reh'g* (Mar. 6, 2018); *see also Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 402 (D. Md. 2011) (concluding that where the State Department was acting on behalf of the President, their actions were not reviewable under the APA), *aff'd*, 698 F.3d 171 (4th Cir. 2012);. It would be "absurd" to suggest that the President himself must personally carry out an action for the APA's limitation on judicial review to apply. *Tulare County v. Bush*, 185 F. Supp. 2d 18, 28-29 (D.D.C. 2001).

By way of illustration, in *Detroit International Bridge*, the Court concluded that Congress had delegated authority to approve international bridges to the President, rather than the State Department, and that, therefore, these approvals were not subject to APA review even given the State Department's role in implementing the Presidential decision. *See Detroit Int'l Bridge*, 189 F. Supp. 3d at 104. As the court noted, had Congress intended to ensure the reviewability of permit approvals, it could have delegated the authority directly to the State Department and not to the President. *Id.* But because the statutory delegation of authority was to the President, judicial review under the APA was not permitted. *See id.*

Here, the President has "the lead role . . . in foreign policy." *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 767 (1972) (plurality opinion); *see also Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (concluding Article II of the Constitution places with the President the "'vast share of responsibility for the conduct of our foreign relations'" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring))). Similarly, under the statutory regime governing foreign assistance, and consistent

with his responsibilities regarding the conduct of U.S. foreign affairs, the President has broad discretion to set the terms and conditions on which the United States provides such assistance, to include the administration of the Program. *See*, *e.g.*, Foreign Assistance Act of 1961, Pub. L. No. 87-195 § 104(c)(1), 75 Stat. 424 (22 U.S.C. § 2151b(c)(1)) (health assistance); *id*. § 481(a)(4) (22 U.S.C. § 2291(a)(4)) (counternarcotics and anti-crime assistance); *id*. § 531 (22 U.S.C. § 2346) (assistance to promote economic or political stability); *id*. § 541(a) (22 U.S.C. § 2347) (International Military Education and Training assistance); *id*. § 551 (22 U.S.C. § 2348) (Peacekeeping Operations); *id*. § 571 (22 U.S.C. § 2349aa) (anti-terrorism assistance); Migration and Refugee Assistance Act of 1962, Pub. L. No. 87-510, § 2(c)(1), 76 Stat. 121 (codified as amended at 22 U.S.C. § 2601(c)(1)).  Pursuant to his authority, the President issued the Foreign Aid Order, directing a ninety-day pause and a review of each foreign development assistance programs, which includes the Program.  Foreign Aid Order § 3(a), (b).

As such, when the President exercised his discretionary authority to pause and review foreign development assistance programs, this exercise of discretion is not subject to APA review simply because the President relies on the Secretary of State to carry out his decision through the Secretary's cable. *See Detroit Int'l Bridge*, 189 F. Supp. 3d at 104; *Tulare County.*, 185 F. Supp. 2d at 28–29.

## 2.     Plaintiff Cannot Seek Programmatic Relief

To the extent Plaintiff challenges the State Department's general implementation of the Foreign Aid Order, that is not a discrete, identifiable "agency action" subject to challenge. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890–91 (1990) (holding plaintiff cannot challenge "the continuing (and thus constantly changing) operations" of the agency in carrying out a program, but must instead "direct its attack against some particular 'agency action' that causes it harm").  As the Supreme Court has recognized, the APA precludes "'wholesale improvement of [a]

19

program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made.'" *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) (quoting *Lujan*, 497 U.S. at 891). To sidestep this, Plaintiff advert to a notice of suspension reflecting the directives contained in the Foreign Aid Order. Letter of Jan. 24, 2025 (ECF No. 1-10). But the heart of Plaintiff's claims is the "impact" of the Foreign Aid Order itself as opposed to any particular discrete agency determination or action. That is the exact type of broad programmatic challenge that courts have repeatedly ruled are impermissible under the APA.

### C.    Plaintiff Does Not Allege Any Final Agency Action

Agency action must be "final" to be reviewable under the APA. 5 U.S.C. § 704. Agency action is final only if (1) the agency action marks "the consummation of the agency's decisionmaking process" and (2) the "action must be one by which rights or obligations have been determined, or from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).

Plaintiff fails to identify any final agency action. That is because there is no final agency action where, as here, the Foreign Aid Order is temporary. The Foreign Aid Order calls for a determination to be made "within 90 days of this order on whether to continue, modify, or cease" foreign assistance. Foreign Aid Order ¶ 3(c). In other words, the agency's decisionmaking process is ongoing—not consummated—and there is no final agency action to enjoin here. As such, Plaintiff fails to allege a challenge to a final agency action.

### D.    The State Department Has Not Acted Contrary to Law

Plaintiff asserts, "Congress has imposed (with the President's assent) two independent restrictions on the Executive Branch's ability to suspend funding for refugee resettlement." Pl.'s Mem. (ECF No. 5-2) at 15. Plaintiff is incorrect.

1.    Refugee Act

Plaintiff claims the State Department's suspension "contravenes Congress's command that in administering the initial-resettlement program, the government must promptly provide certain services to admitted refugees."  Pl.'s Mem. (ECF No. 5-2) at 15.  Plaintiff's argument is unpersuasive.  Plaintiff cites to 8 U.S.C. § 1522(a)(1)(A), but this section addresses the provision of resettlement services to refugees by the Director of the Office of Refugee Resettlement to provide—not the discretionary initial resettlement services contemplated under 8 U.S.C. § 1522(b)(1)(A)(ii), which are administered by the Secretary of State.  *See supra* Statutory Background § II.[3]  While it is true that section 1522(b), in conjunction with the Presidential letter dated January 13, 1981, authorizes the Secretary "to make grants to, and contracts with, public or private nonprofit agencies for initial resettlement (including initial reception and placement with sponsors) of refugees in the United States," nothing requires the Secretary to exercise this authority at all or to any specific degree.  8 U.S.C. §§ 1522(b)(1)(A)(ii), (b)(1)(B).  Indeed, section 1522(c) and (e) sets forth the authorization for the Director for the resettlement services described in section 1522(a)(1)(A).  8 U.S.C. § 1522(c).

Moreover, Plaintiff's argument sounds more in an APA section 706(1) or Mandamus Act, seeking to compel an action because section 1522(a)(1)(A) commands it.  Plaintiff "ask[] the government to comply with federal law," Pl.'s Supp. Mem. (ECF No. 22) at 15, and asserts, "the government, through the Refugee Funding Suspension, is indefinitely refusing to spend that money, even though Congress has commanded that it do so for statutorily mandated purposes—including providing employment and English training to refugees already placed with" Plaintiff.

---

[3]    Plaintiff is arguably not within the zone of interests of section 1522(a)(1)(A), which directs services to refugees.

Compl. (ECF No. 1) ¶ 69 (citing 8 U.S.C. § 1522(a)(1)(A)). Yet, Plaintiff does not bring such an action, nor could it, because there is no mandatory, non-discretionary duty for the Secretary to act. *See supra.*

### 2. Impoundment Control Act

Plaintiff asserts, "[The Impoundment Control Act] limits the authority of the Executive Branch 'to defer any budget authority provided for a specific purpose or project.'" Pl.'s Mem. (ECF No. 5-2) at 17 (quoting 2 U.S.C. § 684(a)). There has been no deferral. The appropriation, titled Migration and Refugee Assistance, authorizes:

> For necessary expenses not otherwise provided for, to enable the Secretary of State to carry out the provisions of section 2(a) and (b) of the Migration and Refugee Assistance Act of 1962 (22 U.S.C. 2601), and other activities to meet refugee and migration needs; salaries and expenses of personnel and dependents as authorized by the Foreign Service Act of 1980 (22 U.S.C. 3901 et seq.).

Pub. L. 118-47, 138 Stat. 744 (Mar. 23, 2024). Here, the Department is continuing to expend funds under the appropriation, paying for the salaries of personnel in the Migration Bureau and reimbursing organizations for work performed before the Secretary's suspension.

Moreover, Plaintiff misconstrues the Foreign Aid Order, claiming "Despite Congress's specific appropriation of funds for refugee assistance, the government seeks categorically not to spend those funds indefinitely." *Id.* It is not an indefinite suspension. The Foreign Aid Order requires, a "90-day pause" pending "reviews of such programs for programmatic efficiency and consistency with United States foreign policy." Foreign Aid Order § 3(a). Temporary pauses in obligations or payments of appropriations are quite common. *See City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously "acknowledged that 'the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year' and such delays may result from the 'normal and orderly operation of the government'" (quoting H.R. Rep. No. 658, 93d Cong., 1st Sess. 41 (1971))). The

Government Accountability Office, itself an entity within the Legislative Branch, has approved of agencies "taking the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated." *In re James R. Jones*, No. B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981). The Foreign Aid Order fits comfortably within this Executive Branch's practice of short-term delays to determine how best to implement programs consistent with the President's policy objectives and consistent with the underlying law governing the refugee resettlement program.

Further, Plaintiff fails to account for the President's distinct interest in foreign affairs. "[I]f a Congressional directive to spend were to interfere with the President's authority in an area confided by the Constitution to his substantive direction and control, such as his authority . . . over foreign affairs . . . a situation would be presented very different from [a domestic impoundment]." William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools, 1 Supp. Op. O.L.C. 303, 310–11 (1969) (Dec. 1, 1969). But in any event, no impoundment has taken place. See *supra*. Defendants' actions not only fit comfortably within the Executive Branch's unique expertise and constitutional role as to foreign affairs but also dovetail with its unreviewable discretion not to act. *Cf. Heckler v. Chaney*, 420 U.S. 821 (1985). It is precisely the sort of conduct that a federal court should be loath to disrupt, absent a valid and binding direction to the contrary.

### E.    The State Department's Temporary Pause Is Not Arbitrary and Capricious

Plaintiff asserts, "[t]he government utterly failed to consider the dire consequences of its actions and an obvious, superior alternative; it gave no reasoned explanation for its decisions; and it ignored its own regulations." Pl.'s Mem. (ECF No. 5-2) at 20. Again, Plaintiff is incorrect.

There is clearly a rational connection between the executive orders and the Department's actions. The State Department's suspension of all Program funding was consistent with the

Foreign Aid Order.  Zerbinopoulos Decl. ¶¶ 23–27.  Funds for activities to meet refugee and migration needs, including funds for including initial reception and placement benefits, are appropriated under the "Migration and Refugee Assistance" heading of title III of the Department of State, Foreign Operations, and Related Programs Appropriations Act ("State Department Appropriations Act").  Zerbinopoulos Decl. ¶ 24.  On January 20, 2025, President Trump issued the Foreign Aid Order stating that "[i]t is the policy of [the] United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States."  Section 3(a) directed that "[a]ll department and agency heads . . . shall immediately pause new obligations and disbursements of development assistance funds . . . pending reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of this order."  To ensure foreign assistance is provided consistent with President Trump's foreign policy, Secretary Rubio issued the January 24 cable, "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID."  Zerbinopoulos Decl. ¶ 26.  For existing foreign assistance awards, the Secretary directed contracting officers and grant officers to "immediately issue stop work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review."  *Id.*  This pause applied to assistance funded from, among others, accounts in title III of the State Department Appropriations Act, to include Migration and Refugee Assistance funds—which includes the initial resettlement funds at issue here.  *Id.*

Consistent with the Foreign Aid Order, the Migration Bureau issued a "Notice of Suspension" on January 24, 2025, to its implementing partners, including Plaintiff.  Zerbinopoulos Decl. ¶ 27; Letter of Jan. 24, 2025 (ECF No. 1-10).  This Notice advised recipients that awards

were "immediately suspended pending a department-wide review of foreign assistance programs" and that "[d]ecisions whether to continue, modify, or terminate" awards would be made following that review. *Id.* Recipients were directed to stop all work under the awards and not incur any new costs after January 24, 2025. *Id.* Additionally, recipients were advised they could submit payment for legitimate expenses incurred prior to the date of the Notice or for legitimate expenses associated with the Notice. *Id.*

Plaintiff asserts that the suspension of funds fails to consider its dependence on "awards from the government." Pl.'s Mem. (ECF No. 5-2) at 21. But the suspension of foreign aid is temporary. The Foreign Aid Order provides for a ninety-day suspension and the Secretary of State has issued implementing guidance directing a review to take place within the Department of State and relevant components of other agencies "to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda and that data regarding all foreign assistance spending in the future is aggregated and inputted into a comprehensive internal Department repository," following which "[d]ecisions whether to continue, modify, or terminate programs will be made following this review." Zerbinopoulos Decl., Attach. A. As such, Plaintiff's assertion is unlikely to succeed on the merits.

Moreover, the Department also considered the reliance interests of the resettlement agencies by providing a means for reimbursement of costs incurred prior to the issuance of the Foreign Aid Order and by requiring "contracting officers and grant officers" to "immediately issue stop-work orders, consistent with the terms of the relevant award," for "existing foreign assistance awards." Email dated Jan. 31, 2025 (ECF No. 1-12). Additionally, the Migration Bureau stated that payments would be allowed for expenses incurred prior to January 24, 2025, and expenses associated with stop work orders. Letter of Jan. 24, 2025 (ECF No. 1-10). Thus, resettlement

agencies have a means to recoup costs incurred and were directed to refrain from incurring additional costs.  Therefore, the agencies' decision to immediately suspend the funding of the Program was rational and consistent with the Foreign Aid Order.

Further, Plaintiff's claim, "The government also failed to consider an obvious, less disruptive alternative way of achieving [its] objectives, namely, conducting a review of its outstanding cooperative agreements to ensure their compliance with agency priorities before halting funds to active awardees," is not persuasive.  Pl.'s Mem. (ECF No. 5-2) at 22.  The President has the authority to order the pause.  And, however, policy disagreements cannot form the basis of an APA arbitrary and capricious claim.

Lastly, Plaintiff is incorrect that the Department failed to comply with 2 C.F.R. § 200.305.  Pl.'s Mem. (ECF No. 5-2) at 24.  *First*, Plaintiff is incorrect in contending that "[s]ince January 24, the government has refrained from granting, kept in custody, and held back reimbursement payments for costs [Plaintiff] incurred pursuant to its cooperative agreements."  Pl.'s Supp. Mem. (ECF No. 22) at 11.  Pursuant to 2 C.F.R. § 200.305(b)(3), the Migration Bureau "must make payment within 30 calendar days."  2 C.F.R. § 200.305(b)(3).  Plaintiff submitted requests from January 22, 2025, through February 11, 2025.  2d Zerbinopoulos Decl. ¶ 15.  As such, the Department has not withheld any payment save for one request, but the delay is too short as to equate to a withholding.[4]  *Second*, to the extent Plaintiff argues this regulation applies for expenses

---

[4]      In its earlier opposition (ECF No. 14) it (and, the undersigned at the hearing on February 20, 2025) represented that there was not timing required for payment.  To the extent this statement applied to requests for payment received by Plaintiff, the government and the undersigned acknowledges and corrects it earlier representation that the relevant regulation requires the Department to reimburse within thirty-days.  2 C.F.R. § 200.305(b)(3) ("When the reimbursement method is used, the Federal agency or pass-through entity must make payment within 30 calendar days after receipt of the payment request unless the Federal agency or pass-through entity reasonably believes the request to be improper.").

since the Secretary's suspension, Plaintiff has not submitted any invoices that would trigger the application of this regulation.

As such, the State Department's implementation of the Foreign Aid Order was not arbitrary and capricious.

### F.    Implementation of an Executive Order Is Not Subject to Notice and Comment

Plaintiff asserts, "The Refugee Funding Suspension is also a substantive rule issued without the notice-and-comment procedures required by the APA." Pl.'s Mem. (ECF No. 5-2) at 25. Plaintiff is mistaken. 5 U.S.C. § 553(a)(2) exempts, "a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts" from notice-and-comment rule making. 5 U.S.C. § 553(a)(2); *see also Lincoln v. Vigil*, 508 U.S. 182, 196 (1993) ("Section 553 has no application, for example, to 'a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.'" (quoting section 553(a)(2)). The State Department's implementation of the executive orders, pausing payments under the agreement with Plaintiff clearly involves "loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(1). As such, the State Department was exempt from the requirement of section 553(b). *See Nat'l Wildlife Fed'n v. Snow*, 561 F.2d 227, 232 (D.C. Cir. 1976) (exempting from notice and comment rulemaking procedures regulations governing the Federal Aid Highway grant program).

In addition, the executive orders and the agencies' implementation of them leave open the possibility for future notice-and-comment rulemaking, and expressly state that the executive orders should be implemented only "to the extent consistent with applicable law."

### II.    Plaintiff Cannot Establish a Likelihood of Immediate Irreparable Harm.

"Regardless of how the other three factors are analyzed, it is required that the movant demonstrate an irreparable injury." *Mdewakanton Sioux Indians of Minn. v. Zinke*, 255 F. Supp. 3d 48, 51 (D.D.C. 2017). "The basis of injunctive relief in the federal courts has always been

irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 88 (1974); *see also CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). The Supreme Court's "frequently reiterated standard requires Petitioners seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). "[I]f a party makes no showing of irreparable injury, the court may deny the motion without considering the other factors." *Henke v. Dep't of Interior*, 842 F. Supp. 2d 54, 59 (D.D.C. 2012) (quoting *CityFed Fin.*, 58 F.3d at 747); *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."). And where a party seeks to change the status quo through action rather than merely to preserve the status quo, typically the moving party must meet an even higher standard than in the ordinary case: the movant must show 'clearly' that [it] is entitled to relief or that extreme or very serious damage will result." *Farris v. Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006) (collecting authorities); *see also League of Women Voters v. Newby*, Civ. A. No. 16-0236 (RJL), 2016 WL 8808743, at *1 (D.D.C. Feb. 23, 2016) ("This conclusion is bolstered by the fact that plaintiffs here seek not to maintain the status quo, but instead to restore the status quo ante, requiring this Court to proceed with the utmost caution.").

Plaintiff has failed to demonstrate irreparable harm sufficient to warrant extraordinary injunctive relief. Although Plaintiff characterizes the harm as damaging its ability to complete its mission due to layoffs and its reputation, Plaintiff's harm is monetary—it allegedly "accrued approximately $13 million in unpaid expenses." Pl.'s Mem. (ECF No. 5-2) at 26. "Monetary injuries alone, even if they are substantial, ordinarily do not constitute irreparable harm." *Spadone v. McHugh*, 842 F. Supp. 2d 295, 301 (D.D.C. 2012) (citations omitted).

Moreover, Plaintiff's reimbursement practices undercut their assertion of irreparable harm. Plaintiff routinely did not submit its requests for payment until ninety days after it incurred the expenses. 2d Zerbinopoulos Decl. ¶ 15. For example, Plaintiff submitted a request for payment on February 3, 2025, for $4,821,898.46 in expenses from September 1 through 30, 2024. *Id.* As such, Plaintiff cannot claim irreparable harm when it, in most instances (for expenses totaling over $11 million), waited until ninety days after it incurred the expenses.

First, Plaintiff asserts, "organizations suffer irreparable harm when a defendant damages their reputation, goodwill, and relationships with their partners." Pl.'s Supp. Mem. (ECF No. 22) at 3. However, the harm Plaintiff alleges is associated with its relationships based on work with government sponsored programs. *See* Brown Decl. (ECF No. 22-2) ¶ 11 ("In our model of cooperation, [Plaintiff] acts as intermediary between CCC and the government. If we cannot rely on funding for the programs the intermediary offers, we cannot justify joining those programs."); Colbert Decl. (ECF No. 22-3) ¶ 10 ("However, given the ongoing funding uncertainty, the agency cannot commit to continuing refugee resettlement services at the service level required by [Plaintiff's] agreements with the government. We do not anticipate taking on any more refugees referred to us by [Plaintiff] as part of government-sponsored resettlement programs."); Main Decl. (ECF No. 22-5) ¶ 8 ("We cannot risk the more stable programs that we can continue to administer independent of government assistance to keep the refugee resettlement program running during periods of government recalcitrance."). In addition, Plaintiff does not indicate that its relationships with these organizations generally will suffer as a result of the Secretary's decision.

Second, Plaintiff asserts, "losing employees with valuable expertise and relationships is irreparable harm to an organization." Pl.'s Supp. Mem. (ECF No. 22) at 2. Plaintiff, however, as with all refugee resettlement organizations, must address the expanding and contracting nature of

Program operations.  As Plaintiff's declarant states, "Between 2016 and 2020, the number of refugees [Plaintiff] was allocated to resettle continually decreased, from 23,643 in 2016, 16,803 in 2017, 6,356 in 2018, 6,662 in 2019, and 3,766 in 2020."  Canny Decl. (ECF No. 22-6) ¶ 4. Additionally, while it may be true that the suspension has accelerated the potential drawdown of individuals, Plaintiff offers no evidence that it is only able to retain institutional knowledge and relationships with other organization through its employees, and not through other means.

Third, Plaintiff asserts, "The Refugee Funding Suspension has (to say the least) perceptibly impaired [Plaintiff's] programs and frustrated one of its core missions."  Pl.'s Supp. Mem. (ECF No. 22) at 6.  Other than Plaintiff's declarant concluding that "[o]ur operational and investment reserves cannot sustain a drain at that rate without jeopardizing the entire operation of" Plaintiff, , Fuller Decl. (ECF No. 22-4) ¶ 10, Plaintiff offers no other evidence to demonstrate harm to its overall operations.  Plaintiff does not offer any specific explanation on its other activities, and to what extent the services provided under the Agreements fit into its overall activities.  Importantly, Plaintiff appears to have assets totaling over $304 million in 2023, which included a $38.7 million gain from the previous year.  Catholic World New, *USCCB reports $2M operating deficit; assets increase because of investments* (Sept. 4, 2024), available  at  https://www.catholicculture. org/news/headlines/index.cfm?storyid=63287#:~:text=CWN%20Editor's%20Note%20The%20 United,About%20CWN%20news%20coverage (last visited Feb. 26, 2024).

Lastly, a preliminary injunction with respect to the Foreign Aid Order and the State Department's implementation has been issued by another court in this District.  That court has enjoined the government from "enforcing and giving effect to Sections 1, 5, 7, 8, and 9 of Dep't of State, Memorandum, 25 STATE 6828 (Jan. 24, 2025) and any other directives that implement Sections 3(a) and 3(c) of the [Foreign Aid Order]."  *AIDS Vaccine Advoc. Coal. v. United States*,

Civ. A. 25-0400 (AHA), 2025 WL 485324, at *6 (D.D.C. Feb. 13, 2025). These provisions are the same provisions from which Plaintiff here seek relief. *See* Pl.'s Prop. Order (ECF No. 5-1). A second overlapping injunction on complex issues such as those raised here would risk imposing inconsistent obligations on the Government. The existing injunction also greatly reduces or eliminates Plaintiff's claim of present harm. *See E. Bay Sanctuary Covenant v. Trump*, Civ. A. No. 18-6810, 2019 WL 1048238, at * 2 (N.D. Cal. Mar. 5, 2019) ("noting that where there is a preliminary injunction in place, not merely a TRO, 'Plaintiffs are unlikely to suffer harm if the Court stays these proceedings because the preliminary injunction preventing Defendants from enforcing the Rule will remain in place'").

As such, the Court should find that Plaintiff has not established irreparable harm.

## III.    **The Balance of Harms and the Public Interest Weigh Against Relief.**

The party seeking a preliminary injunction must show that the balance of equities tips in their favor and that the injunction is in the public interest. *Winter*, 555 U.S. at 20. A court "'should pay particular regard for the public consequences'" of injunctive relief. *Id*. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

Importantly, there is no public interest served by forcing the government to continue to operate under a contractual agreement. Here, the Secretary made clear to Plaintiff to stop work on the Agreements. Yet, Plaintiff demands that this Court force the government to remain in the agreement.

Moreover, Plaintiff asserts that there is a public interest in the resettlement of refugees. Pl.'s Mem. (ECF No. 5-2) at 30. An injunction here, however, would effectively disable the President from effectuating the President's agenda consistent with his constitutional and statutory authorities. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S.

1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up).  And where the Government is legally entitled to make decisions about the disbursement or allocation of federal funds but is nonetheless ordered to release the funds, such funds may not be retrievable afterwards.

Moreover, Plaintiff does not allege that the Director of the Office of Refugee Resettlement is not providing the resettlement resources delineated in 8 U.S.C. § 1522(a)(1)(A).

Thus, the balance of the equities weighs in favor of the Government and relief should be denied.

## IV.    The Court Should Require Plaintiff to Post Security

Federal Rule of Civil Procedure 65(c) states, "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  To the extent that the Court grants relief to Plaintiff, Defendants respectfully request that the Court require Plaintiff to post security for any taxpayer funds distributed during the pendency of the Court's Order.  This case is ultimately about money, and thus, the requirements of Rule 65(c) to post security are plainly at play.

*    *    *

## CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court deny Plaintiff's

motion for emergency relief.

Dated:  February 26, 2025                Respectfully submitted,
        Washington, DC

                                        EDWARD R. MARTIN, JR., D.C. Bar #481866
                                        United States Attorney

                                        BRIAN P. HUDAK
                                        Chief, Civil Division

                                        By:_____/s/ *Joseph F. Carilli, Jr.*
                                            JOSEPH F. CARILLI, JR.
                                            Assistant United States Attorney
                                            601 D Street, NW
                                            Washington, DC 20530
                                            (202) 252-2525

                                        *Counsel for the United States of America*

33

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| U.S. CONFERENCE OF CATHOLIC BISHOPS, <br><br>    Plaintiff, <br><br>  v. <br><br> DEPARTMENT OF STATE, et al. <br><br>    Defendants. | Civil Action No. 25-0465 (TNM) |

## **[PROPOSED] ORDER**

UPON CONSIDERATION of Plaintiff's motion for reupreliminary injunction, and the entire record herein, it is hereby

ORDERED that Plaintiff's motion is DENIED.


SO ORDERED:


_____         _____
Date                 TREVOR N. MCFADDEN
                    United States District Judge