**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
U.S. CONFERENCE OF CATHOLIC BISHOPS,  )
                                      )
        Plaintiff,                    )
                                      )      Case No. 1:25-cv-00465 (TNM)
        v.                            )
                                      )
DEPARTMENT OF STATE, *et al.*,        )
                                      )
        Defendants.                   )
_____)

**BRIEF *AMICUS CURIAE* OF**
**AMERICA'S FUTURE,**
**ORTHODOX CHURCH MISSION FUND OF TEXAS,**
**JUDICIAL ACTION GROUP, AND**
**CONSERVATIVE LEGAL DEFENSE AND EDUCATION FUND**
**IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Patrick M. McSweeney
Powhatan, Virginia

Jeffrey C. Tuomala
Winchester, Virginia

Phillip L. Jauregui
Birmingham, Alabama

Rick Boyer
Lynchburg, Virginia

Dated: February 26, 2025

William J. Olson (D.C. Bar No. 233833
Jeremiah L. Morgan (D.C. Bar No. 1012943)
    William J. Olson, P.C.
    370 Maple Avenue West, Suite 4
    Vienna, Virginia  22180-5615
    (703) 356-5070
    wjo@mindspring.com
Counsel for *Amici Curiae*

James N. Clymer
Lancaster, Pennsylvania

J. Mark Brewer
Johnson City, Texas

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTEREST OF AMICI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.     PLAINTIFF HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON
    THE MERITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.     President Trump's Executive Order in No Way Violated the
        Administrative Procedure Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.     The President Has Full Authority to Stop Expenditures on
        Illegal Aliens Served by Plaintiff Who Do Not Meet the Statutory
        Definition of "Refugee" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.    THE PRESIDENT HAS AUTHORITY TO SUSPEND PAYMENTS TO ENABLE HIM TO FULFILL
    HIS CONSTITUTIONAL DUTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.     Take Care Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.     Public Accounting Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    C.     The President's Authority and Responsibility over Foreign Affairs . . . . . . . . . . . 8

    D.     Department of Government Efficiency (DOGE) . . . . . . . . . . . . . . . . . . . . . . . 10

III.   PLAINTIFF SEEKS TO TRANSFER WHAT IT BELIEVES TO BE ITS OWN DUTY OF
    CHRISTIAN CHARITY TO THE FEDERAL GOVERNMENT . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.     Plaintiff Asks this Court to Take Funds Coercively Extracted from
        Taxpayers to Fund Their Exercise of a Duty Placed on Them by God . . . . . . . . 15

    B.     Plaintiff's Demands Contrasted with Biblical Charity . . . . . . . . . . . . . . . . . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ii

## TABLE OF AUTHORITIES

Page

**HOLY BIBLE**
*Proverbs* 19:17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
*Proverbs* 22:9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
*Luke* 6:38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
*Luke* 10:25-37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
*Luke* 21:1-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
*Hebrews* 13:16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
*James* 1:27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**CONSTITUTION**
Article I, Section 9, clause 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8
Article II, Section 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
First Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**STATUTES**
8 U.S.C. § 1101(a)(42) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Administrative Procedure Act, 5 U.S.C. §§ 551–559 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Virginia Declaration of Rights (1776) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**CASES**
*Bennett v. Spear*, 520 U.S. 154 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) . . . . . . . . . . . . . . . . 3
*Franklin v. Massachusetts*, 505 U.S. 788 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
*Pasquantino v. United States*, 544 U.S. 349 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . 9
*Zivotofsky v. Kerry*, 576 U.S. 1 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

**MISCELLANEOUS**
E. Colton, "Musk rips 'fraudulent' Treasury handouts as reports mount DOGE has
    access to federal payment system," *Fox News* (Feb. 2, 2025) . . . . . . . . . . . . . . . . . . . . . 12
M. Friel, "Elon Musk is looking for DOGE cuts. A GOP senator's list caught his eye,"
    *Business Insider* (Nov. 15, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
A. Miller, "'Disturbing': Whistleblower fumes at Biden-era agency promoting DEI
    program as department's 'mission,'" *Fox News* (Feb. 7, 2025) . . . . . . . . . . . . . . . . . . . . . 14
P. Overberg, N. Rattner, & S. Patterson, "DOGE Is Searching for Wasteful Spending.  It
    Isn't Hard to Find," *The Wall Street Journal* (Feb. 19, 2025) . . . . . . . . . . . . . . . . . . . . . . 14
A. Powell, "Johnson Says What DOGE Has 'Uncovered' Is 'Shocking,'"
    *Independent Journal Review* (Feb. 11, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Press Release, "At USAID, Waste and Abuse Runs Deep," *The White House*
    (Feb. 3, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

iii

J. Raasch, "Senator reveals 'crazy' USAID threatened her when she tried to curb its spending last year," *Daily Mail* (Feb. 4, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Report, "Asylum: Additional Actions Needed to Assess and Address Fraud Risks," Government Accountability Office (Dec. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

A. Shaw & P. Pinedo, "Trump freezes applications for Biden-era migrant programs amid fraud, national security concerns," *Fox News* (Feb. 19, 2025) . . . . . . . . . . . . . . . . 6

U.S. Conference of Catholic Bishops, "Welcome Circles" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S. Department of Justice, "False Claims Act Settlements and Judgments Exceed $2 Billion in Fiscal Year 2022" (Feb. 7, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

D. Wallace, "The President's Exclusive Foreign Affairs Powers over Foreign Aid: Part I," 1970 DUKE L.J. 293 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

N. Weatherholtz, "Lee Zeldin to Newsmax: Climate Hoax Blows Billions in Name of 'Environmental Justice,'" *Newsmax* (Feb. 13, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

The White House, "Memorandum on the Presidential Determination on Refugee Admissions for Fiscal Year 2025," (Sept. 30, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

T. Wise, "White House Releases List of USAID 'Waste and Abuse' on Everything from Al Qaeda to Trans Operas," *CBN News* (Feb. 7, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**INTEREST OF AMICI**[1]

The interest of the *amici curiae* are set out in the accompanying motion for leave to file.

**STATEMENT OF THE CASE**

On January 20, 2025, President Trump issued an Executive Order entitled "Reevaluating and Realigning United States Foreign Aid," imposing a "90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy."[2] Implementing that Executive Order, Defendant the U.S. Department of State paused all foreign aid related to the U.S. Refugee Admissions Program ("USRAP").

The U.S. Conference for Catholic Bishops ("USCCB") filed suit against the State Department and its Secretary, one of its Bureaus and its head, as well as the Department of Health and Human Services and its Secretary. USCCB's complaint was brought for violation of the Administrative Procedure Act, alleging that the Department's action was arbitrary and capricious, unlawfully neglected "notice and comment" rulemaking, and violated congressional appropriations acts. The USCCB sought a temporary restraining order and a preliminary injunction to require continued payment of USRAP funds to the USCCB.

The State Department argued that an Executive Order was not an agency determination, and there was no "final agency action" requiring notice and comment. Also, a 90-day pause was not a denial of complete expenditures for the ongoing fiscal year. On February 20, 2025, this court denied the temporary restraining order.

---

[1] No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members or their counsel contributed money that was intended to fund preparing or submitting this brief.

[2] Executive Order, "Reevaluating and Realigning United States Foreign Aid" (Jan. 20, 2025).

2

**ARGUMENT**

I.    **PLAINTIFF HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.**

      **A.    President Trump's Executive Order in No Way Violated the Administrative Procedure Act.**

Plaintiff grounds its claim in the unsupported and unsupportable assertions that the Administrative Procedure Act ("APA") applies to President Trump's Executive Order, that it constitutes final agency action, that it is arbitrary and capricious, and that it violates the notice and comments requirements of APA.  It also tries to assert a violation of Separation of Powers. Not only has Plaintiff not met the standard for injunctive relief, but this complaint is also utterly devoid of any actionable theory and should be dismissed out of hand.

As the State Department's brief points out, a presidential Executive Order is not an "agency action" and is not subject to review under the APA.  Defendants' Memorandum in Opposition ("Def. Memo.") at 8.  The Supreme Court has made clear that "the President is not an agency within the meaning of the [APA]," and that an executive order is not a "final agency action that may be reviewed under the APA standards." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).

Moreover, a pause in the funding stream does not constitute "final agency action."  As the Supreme Court has instructed, for an action to constitute a "**final agency action** it 'must mark the consummation of the agency's decisionmaking process; ... **it must not be of a merely tentative or interlocutory nature**.'" *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (emphasis added).  Nothing in the Executive Order indicates that a final decision has been made

3

to withhold funding, and in fact, the Order expressly instructs that the refugee program be reviewed to determine future funding decisions.

Nor was the letter from the State Department arbitrary and capricious. Even if the APA applied, the reliance interests of recipients such as Plaintiff were expressly considered and provided for. The order expressly advised recipients such as Plaintiff that the funds would be paused. "Recipients were directed to stop all work under the awards and not incur any new costs after January 24, 2025." Def. Memo. at 12. "Additionally, recipients were advised they could submit payment for legitimate expenses incurred prior to the date of the Notice or for legitimate expenses associated with the Notice." *Id.*

The mere fact that Plaintiff has worked with the Department of State on the refugee program since 1980 in no way creates a reliance interest that the government would continue the program in perpetuity. The federal government often reserves the right of "Termination for Convenience of the Government,"[3] a provision which may be in the State Department's agreement with Plaintiff. Plaintiff admits that its agreements with the Department were subject to annual renewal. Complaint ("Compl.") at 3. Although temporal limitations on grants do not automatically preclude some level of reliance interest, that interest must be considered in light of the fact that the grants make no claim to be perpetual. Temporal limitations in grants "are surely pertinent in considering the strength of any reliance interests." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 31 (2020). In this case, Plaintiff knew since November 5, 2024, that a new Administration had been selected by voters, and this new Administration had

---

[3] *See* FAR section 52.249-2, "Termination for Convenience of the Government (Fixed-Price)," *Acquisition.Gov* (Jan. 17, 2015).

4

a very different position on illegal immigrants than the prior administration. But any interest it had was considered and fully addressed by the allowance for "payment for legitimate expenses" that predated the effective date of the order.

**B.    The President Has Full Authority to Stop Expenditures on Illegal Aliens Served by Plaintiff Who Do Not Meet the Statutory Definition of "Refugee."**

Plaintiff notes that "Congress has appropriated specific sums of money for refugee assistance and resettlement to remain available until expended, and it has mandated that the government provide prompt and adequate funding for the initial resettlement of refugees...." Compl. at 5. It also argues that the Department's Bureau of Population, Refugees, and Migration ("PRM") "has committed to provide around $65 million in federal funding for the immediate physical needs and integration of refugees...." *Id.* at 3. Even if those statements were true, they are immaterial to the case at hand, as a vast number of persons who have entered the country now being served by Plaintiff are illegal aliens, not *bona fide* refugees.

Congress has provided a clear definition of the term "refugee" — and it is not synonymous with "illegal migrant," as Plaintiff pretends. Congress has defined "refugee" as a person:

> who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [his or her] country because of **persecution** or a well-founded fear of persecution **on account of race, religion, nationality,** membership in a particular **social group, or political opinion**, or (B) in such special circumstances as the President after appropriate consultation (as defined in section 1157(e) of this title) may specify. [8 U.S.C. § 1101(a)(42) (emphasis added).]

Nothing in the statutory definition allows persons to enter as refugees because they are suffering from economic hardship or the existence of political upheaval in their home countries.

5

However, it is generally believed that such persons were granted refugee status and were allowed admission into the country during th Biden Administration.

Making matters worse, on September 30, 2024, President Biden issued a memorandum to the Secretary of State which seemed designed to expand the pool of persons eligible to seek refugee status.  In part, this was by including those from countries where there is no existing wide-spread persecution.  In effect, he arbitrarily and illegally deemed eligible for refugee status persons from certain counties, such as Latvia, knowing they suffered no requisite persecution:

> I also specify that, for FY 2025, **the following persons may**, if otherwise qualified, **be considered refugees** for the purpose of admission to the United States within their countries of nationality or habitual residence:  Persons in Cuba; Persons in **Eurasia** and the **Baltics**; Persons in Iraq; Persons in El Salvador, Guatemala, and Honduras....[4]

The number of persons President Biden presumptively deemed to be eligible to become refugees in the United States was apparently not capped at the 125,000 identified at the outset of his order, but was unlimited.  He seemed to open the door to more than half of the world's population:

- **Eurasia** is generally defined as all of **Europe**, and all of **Asia (including Communist China)**, with a combined population of approximately **5.5 billion persons**.
- The **Baltics** is generally understood to include Estonia, Latvia, and Lithuania, with a combined population of approximately 6 million.
- The approximate population of the named countries:
  - Iraq (45 million);
  - El Salvador (6.4 million);
  - Guatemala (18.6 million); and
  - Honduras (11.0 million).

In operation, the memorandum appeared to amount to an illegal expansion of the term "refugee" to approximate the meaning of the term "illegal migrants."

---

[4]  The White House, "Memorandum on the Presidential Determination on Refugee Admissions for Fiscal Year 2025" (Sept. 30, 2024) (emphasis added).

6

The USCCB provides services to far more than just "refugees." It also provides services under the **Uniting4Ukraine** ("U4U") and Process 4 **Cubans, Haitians, Nicaraguans, and Venezuelans** (collectively known as "CHNV") programs.[5] The Trump administration has paused entry into the United States under those programs, citing fraud and national security concerns.[6] Indeed, "[o]ver 500,000 migrants flew in under [the CHNV] program," which was "briefly paused last year after DHS discovered fraud in sponsor applications," during the Biden administration. *Id.*

Based on President Biden's illegal memorandum, it appears clear that Plaintiff is now providing assistance to persons who do not qualify as refugees with money designed to aid only refugees. It is entirely likely that not all the PRM funds received by Plaintiff were carefully segregated and actually went to statutory "refugees," meaning that a considerable portion of the money received has been expended on other programs, such as the U4U and CHNV programs, for which it was not authorized.

Accordingly, given the known fraud uncovered in the CHNV program by the previous administration, in which some of Plaintiff's aid recipients participated, the President was entirely within his rights to pause expenditures and ensure that Congress' appropriations are in fact going to lawful recipients, and that the laws are in fact being "faithfully executed."

_____

[5] U.S. Conference of Catholic Bishops, "Welcome Circles."

[6] A. Shaw & P. Pinedo, "Trump freezes applications for Biden-era migrant programs amid fraud, national security concerns," *Fox News* (Feb. 19, 2025).

## II. THE PRESIDENT HAS AUTHORITY TO SUSPEND PAYMENTS TO ENABLE HIM TO FULFILL HIS CONSTITUTIONAL DUTIES.

### A. Take Care Clause

The President has several constitutional authorities relevant to his power to suspend

funding to a private organization.  The Take Care Clause states:

> He shall from time to time give to the Congress Information of the **State of the Union**, and recommend to their Consideration such **Measures** as he shall judge necessary and expedient.... he shall **take Care** that the Laws be faithfully executed... [Art. II, Sec. 3 (emphasis added).]

The President is scheduled to address a joint session of Congress next week, on March 4,

2025.  Both in that speech, and in subsequent State of the Union addresses to Congress, he needs

to know how the government has been spending taxpayer money.  Based on what he learns, he

may ask Congress to enact legislation "necessary and expedient" to control spending.  He cannot

"take Care" that the laws be faithfully executed if he turns money over to Plaintiff, but then does

not have certainty it is being spent lawfully and appropriately.  While private recipients of public

funds no doubt would prefer not to have their funding examined, this is a duty the Constitution

vests in the Presidency.

### B. Public Accounting Clause

Additionally, the Constitution's Public Accounting Clause imposes a duty that heretofore

has often been overlooked:

> No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and **a regular Statement and Account of the Receipts and Expenditures of all public Money** shall be published from time to time.  [Art. I, Sec. 9, cl. 7 (emphasis added).]

8

It is true that this Clause does not expressly state which branch of government has the duty to make public "a regular Statement and Account of the Receipts and Expenditures...." and it is true that the Clause appears in Article I of the Constitution.  Nonetheless, it seems clear that neither Congress nor the judicial branch could make such a report.  It is the President who is responsible for spending the money that Congress appropriates, and only he would have the information required for such an accounting.

This Clause has special significance relating to issues surrounding the Department of Government Efficiency because previous Presidents have not complied with this duty; in fact, Presidents may not have known or even cared about what is being spent until President Trump took office on January 20, 2025.  When Congress appropriate funds to be spent on certain purposes, the President has an independent duty to ensure the funds are spent lawfully and constitutionally.

Plaintiff's assertion that the Executive Order's funding pause implicates the separation of powers makes no sense.  Since assuming office January 20, the President has devoted significant efforts to reducing waste, fraud and abuse in the federal government.  A 2015 report by the Government Accountability Office found insufficient oversight to prevent fraud in the government's asylum program.[7]  The President has not just the authority, but the constitutional obligation, to ensure that congressionally appropriated funds are not being misspent.

### C.    The President's Authority and Responsibility over Foreign Affairs.

This is not only a domestic matter as Plaintiff would want this court to believe.  In

---

[7] Report, "Asylum: Additional Actions Needed to Assess and Address Fraud Risks." *Government Accountability Office* (Dec. 2, 2015).

9

addition to his other powers over the executive branch generally, the President has additional powers, grounded in his responsibility for America's foreign affairs, over the State Department, which makes judicial involvement highly inappropriate. The act that created that department enumerated certain foreign affairs responsibilities, and included "such other matters respecting foreign affairs as the President of the United States shall assign to the said department." A Bill to Establish a Department of Foreign Affairs (July 27, 1789). This is why it was stated a century ago that "'[t]he Department of State has generally been recognized as … being more directly subject to the control of the President than any other department.'"[8]

Plaintiff relies on Justice Jackson's well-cited concurring opinion for the proposition that "[t]he Executive's power therefore is at its 'lowest ebb' when it defies Congress's appropriations laws." Compl. at 22 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). Yet the Supreme Court has long held that "[i]n our system of government, the Executive is 'the sole organ of the federal government in the field of international relations.'" *Pasquantino v. United States*, 544 U.S. 349, 369 (2005) (quoting *United States v. Curtiss-Wright Export Corp*., 299 U.S. 304, 320 (1936)). Although the Supreme Court has narrowed this broad "sole organ" language in recent years, it is nonetheless clear that the President has substantial discretion in the realm of foreign affairs. The Court repeated in 2015 that "[t]he President's longstanding practice of exercising unenumerated foreign affairs powers reflects a constitutional directive that 'the President ha[s] primary responsibility — along with the necessary power — to protect the national security and to conduct the Nation's foreign

---

[8] Quoted in D. Wallace, "The President's Exclusive Foreign Affairs Powers over Foreign Aid: Part I," 1970 DUKE L.J. 293, 319 (1970).

10

relations.'" *Zivotofsky v. Kerry*, 576 U.S. 1, 34 (2015).

Plaintiff's hyperbolic rhetoric notwithstanding, the 90-day pause instituted by the President here allows him to review State Department spending for "programmatic efficiency and consistency with United States foreign policy" which is entirely within the President's authority, and indeed, supported by the President's constitutional obligations.

### D.    Department of Government Efficiency (DOGE)

President Trump selected Elon Musk to head a revamped United States Digital Service, known as the Department of Government Efficiency ("DOGE"), charged with identifying and eliminating wasteful federal spending. The revelations that have resulted demonstrate, better than any prior illustration, what happens when agencies headed by bureaucrats are entrusted with massive amounts of money to be expended. Every day that DOGE investigates, it releases more information on federal spending, and it becomes more and more clear that noncompliance with this constitutional requirement of transparency has led to reckless spending practices. If President Trump, with the assistance of Elon Musk and his team, had not taken on this project, such spending would have continued unabated.

One of the agencies that has been most reckless was the U.S. Agency for International Development ("USAID"), which works closely with the State Department, which has an annual budget between $40 and $50 billion, and which was used for purposes that have shocked the American People, including:

> $32,000 for a "transgender comic book" in Peru, $2 million for sex changes and "LGBT activism" in Guatemala, [h]undreds of thousands of dollars for a non-profit linked to designated terrorist organizations — even AFTER an inspector general launched an investigation ... "[h]undreds of thousands of meals that went to al Qaeda-affiliated fighters in Syria," [f]unding to print

11

"personalized" contraceptives birth control devices in developing countries, [and] [h]undreds of millions of dollars to fund "irrigation canals, farming equipment, and even fertilizer used to support the unprecedented poppy cultivation and heroin production in Afghanistan," benefiting the Taliban.[9]

Possessing vast authority to make arbitrary spending decisions, USAID resisted sharing that information with those in Congress who might be critical.  Senator Joni Ernst (R-IA) attempted to investigate USAID spending last year, but reports that she and her staff were stonewalled, threatened with being sued, and surveilled by USAID while reviewing only selected files.[10]  Now that President Trump has pried spending data from USAID, Senator Ernst added her own list of rudderless USAID expenditures, including:  "$20 million to create a Sesame Street in Iraq, $2 million for Moroccan pottery classes and promotion [and] $2 million promoting tourism to Lebanon."  She noted that "[m]ore than $9 million of USAID's 'humanitarian aid' intended to feed civilians in Syria ended up in the hands of violent terrorists, including an affiliate of Al Qaeda in Iraq."[11]

The problem is not limited to USAID.  Incoming Environmental Protection Agency head Lee Zeldin has also highlighted massive waste within his agency.  Zeldin recently noted that during former President Joe Biden's term, the EPA "gave $160 million up front to a Canadian

---

[9]  Press Release, "At USAID, Waste and Abuse Runs Deep," *The White House* (Feb. 3, 2025).

[10]  *See* J. Raasch, "Senator reveals 'crazy' USAID threatened her when she tried to curb its spending last year," *Daily Mail* (Feb. 4, 2025).

[11]  T. Wise, "White House Releases List of USAID 'Waste and Abuse' on Everything from Al Qaeda to Trans Operas," *CBN News* (Feb. 7, 2025).

12

electric vehicle company to make school buses."[12]  "'They still have not delivered $95 million of school buses,'" Zeldin said.  "'What has happened in the meantime?  They declared bankruptcy.  $95 million still not delivered that that company has already received and they've filed for bankruptcy and they're not even an American company.'"  *Id.*  Zeldin added, "'in the name of environmental justice, in the name of climate equity, they will distribute tens of billions, hundreds of billions of dollars of your tax dollars … and they will spend it recklessly where they are willing to just toss billions of dollars off the Titanic.  And who cares what happens next?'"  *Id.*

DOGE also investigated the Treasury Department, and discovered that "'payment approval officers at Treasury were instructed always to approve payments, even to known fraudulent or terrorist groups.  They literally never denied a payment in their entire career.  Not even once.'"[13]  DOGE is also reviewing a list of agency expenditures highlighted by Senator Rand Paul (R-KY), including a 2023 "USDA study on whether Labrador fur color affects their body temperature."[14]

House Speaker Mike Johnson (R-LA) responded that "'what they've uncovered is, frankly, shocking.  There are a lot of expenditures of the federal government that Congress has

---

[12]  N. Weatherholtz, "Lee Zeldin to Newsmax: Climate Hoax Blows Billions in Name of 'Environmental Justice,'" *Newsmax* (Feb. 13, 2025).

[13]  E. Colton, "Musk rips 'fraudulent' Treasury handouts as reports mount DOGE has access to federal payment system," *Fox News* (Feb. 2, 2025).

[14]  M. Friel, "Elon Musk is looking for DOGE cuts. A GOP senator's list caught his eye," *Business Insider* (Nov. 15, 2024).

13

not been aware of, in spite of our best efforts to do oversight, some of this has been hidden.'"[15] Regardless of whether those in Congress directed these expenditures, or knew of these expenditures and did nothing, or whether they were ignorant of what the money they appropriated was being spent on, the problem is the same.  Once the limitations on the constitutional powers to spend, tax, and regulate have been lifted by this Court, the government has grown so large that it simply cannot be monitored and run efficiently.  As a result, the non-delegation doctrine goes by the boards.

With this DOGE work underway, all that President Trump has done is to issue a 90-day halt until more information can be unearthed to see if spending is in accordance with appropriations statutes and constitutional restrictions.  Plaintiff might prefer if the President did not examine the legality or propriety of payments, but any meaningful report would include some review if the spending is lawful and appropriate.

It is highly suspicious that those drawing from the public fisc are challenging President Trump in several ways.  Other litigation is now pending seemingly designed to prevent the President from learning the truth about government spending.[16]  All of this litigation makes Americans more suspicious about what has been happening.  In view of information coming

---

[15] A. Powell, "Johnson Says What DOGE Has 'Uncovered' Is 'Shocking'," *Independent Journal Review* (Feb. 11, 2025).

[16] *See, e.g., Public Citizen, Inc. et al. v. Trump, et al.*, U.S.D.C.-D.C., No. 1:25-cv-00164, Complaint filed Jan. 20, 2025 (Federal Advisory Committee Act); *J. Doe 1-26 v. Musk*, U.S.D.C.-Md., No. 7-25-cv-00462-TDC, Complaint filed Feb. 13, 2025 (lack of Senate Confirmation); and *New Mexico et al. v. Musk*, U.S.D.C.-D.C., No. 1:25-cv-00429, Complaint filed Feb. 13, 2025 (Appointments Clause).

14

forward about lawlessness in government from government reports,[17] whistleblowers,[18] and the

press,[19] it is more than reasonable for President Trump to impose spending freezes in order to

provide the time necessary to learn the truth and ensure that no other improper or imprudent

contracts are being made with groups like Plaintiff.  There are questions that the American

People want answered before more money goes out the door into a deep and seemingly

bottomless pit, including the following:

- How is the money being spent?
- What are the conditions and circumstances in which children of aliens are being housed and cared for?
- Why have so many children gone missing?
- What counsel are they giving to aliens to facilitate them coming to the United States and going on various welfare programs to the enrichment of the refugee aid organizations?

The President must have the authority to freeze doling out taxpayer dollars to private

organizations to have time to determine if the law is being followed, if money is being properly

spent on real refugees, and if those persons and children being provided services upon coming

into the United States are being properly protected and treated.

---

[17] *See, e.g.,* U.S. Department of Justice, "False Claims Act Settlements and Judgments Exceed $2 Billion in Fiscal Year 2022" (Feb. 7, 2023) ("The government and whistleblowers were party to 351 settlements and judgments, the second-highest number of settlements and judgments in a single year. Recoveries since 1986, when Congress substantially strengthened the civil False Claims Act, now total more than $72 billion.")

[18] *See, e.g.,* A. Miller, "'Disturbing': Whistleblower fumes at Biden-era agency promoting DEI program as department's 'mission,'" *Fox News* (Feb. 7, 2025).

[19] *See, e.g.,* P. Overberg, N. Rattner, & S. Patterson, "DOGE Is Searching for Wasteful Spending.  It Isn't Hard to Find," *The Wall Street Journal* (Feb. 19, 2025).

15

### III.    PLAINTIFF SEEKS TO TRANSFER WHAT IT BELIEVES TO BE ITS OWN DUTY OF CHRISTIAN CHARITY TO THE FEDERAL GOVERNMENT.

#### A.    Plaintiff Asks this Court to Take Funds Coercively Extracted from Taxpayers to Fund Their Exercise of a Duty Placed on Them by God.

Plaintiff's complaint is grounded in what it believes is the Catholic Church's duty to perform acts of charity to help refugees:

> For nearly 80 years, the **Catholic Church has been caring** for refugees within the United States....  The **Church has long helped** to ease those burdens and integrate refugees....  This work is an expression of **charity** taken in **fulfilment of Christ's commandment** to serve those in need....  [Compl. ¶ 1 (emphasis added).]

Plaintiff unmistakably sources its duty on Roman Catholic teachings:

> The "duty of giving foreigners a hospitable reception" is "imposed by human solidarity and by **Christian charity**."  Pope Paul VI,  Populorum Progressio (Mar. 26, 1967), https://perma.cc/N36H-3FSX.  "Jesus Christ, loving everyone with a universal love, educates us in the permanent recognition of the dignity of every human being, without exception."  Letter of the Holy Father Francis to the Bishops of the United States of America (Feb. 10, 2025), https://perma.cc/38MM-RR4Z.  [Compl. ¶ 23 (emphasis added); *see also id.* ¶ 25.]

These *amici* dispute neither Plaintiff's assertion concerning "Christ's commandment to serve those in need," nor the assertion that the Catholic Church believes this to be a duty imposed on it.  These *amici* do dispute the existence of the power that Plaintiff ask this court to wield — to order the federal government to fund how Plaintiff fulfills that duty.  It most certainly is not the duty of all Americans of all religious stripes to fund the performance of "charity" by any particular religious body through taxes extracted from them.

The Complaint several times refers to Plaintiff's government-funded work being conducted together with local "Catholic Charities" (Compl. ¶¶ 4, 37, 39), but the concept of a government-funded charity is oxymoronic.  The immediate precursor to the First Amendment

16

religion clauses was the Virginia Declaration of Rights (1776) authored by George Mason and James Madison. That vital text defined "religion" as "the duty which we owe to our Creator and the manner of discharging it [which] can be directed only by reason and conviction, not by force or violence." The state is authorized to exercise force or violence, which includes the power to impose and collects taxes. The very notion of using force or violence to impose and collect taxes on Americans to fund Plaintiff's perceived religious duty to exercise "Christian charity" is obviously incomparable.

### B.      Plaintiff's Demands Contrasted with Biblical Charity

The Holy Bible teaches much about Christian Charity. For example, the Good Samaritan cared for the injured man from his own resources — not using government funds or any other funds obtained by coercion. *See Luke* 10:25-37. The Book of James speaks of religion as an individual, not governmental responsibility: "Pure religion and undefiled before God and the Father is this, To visit the fatherless and widows in their affliction, and to keep himself unspotted from the world." *James* 1:27.

Additionally, there are clear instructions in both testaments as to the source of funds for acts of charity. In *Proverbs* 22:9 we are taught: "Whoever has a bountiful eye will be blessed, for **he shares his bread** with the poor." (Emphasis added.) The book of *Hebrews* confirms from where the funds supporting acts of Christian Charity should come: "Do not neglect to do good and **to share what you have**, for such sacrifices are pleasing to God." *Hebrews* 13:16 (emphasis added). Also, "**[h]e** that hath pity upon the poor lendeth unto the Lord; and that **which he hath given** will he pay him again." *Proverbs* 19:17 (emphasis added).

17

While Plaintiff may be tempted to transfer the duty to pay for the acts of charity that they wish to perform — to fulfill a duty it believes it has — by demanding the government's money to fund those acts, using other people's money undermines the charitable and sacrificial nature of giving. *See Luke* 21:1-4 ("this poor widow has put in more than all of them. For they all contributed out of their abundance, but **she** out of her poverty **put in all she had** to live on." (Emphasis added)). Further, by using the funds of others, Plaintiff deprives itself of the blessing to which it otherwise would be entitled if it shared of its own wealth. *See Luke* 6:38 ("Give, and it will be given to **you**. Good measure, pressed down, shaken together, running over, will be put into **your** lap. For with the measure you use it will be **measured back to you**." (Emphasis added)).

## CONCLUSION

For all the reasons set out above, injunctive relief should be denied.

Respectfully submitted,

*/s  William J. Olson*

Patrick M. McSweeney
 McSweeney, Cynkar
 & Kachouroff, PLLC
 3358 John Tree Hill Rd.
 Powhatan, VA  23139

Jeffrey C. Tuomala
 114 Creekside Ln.
 Winchester, VA 22602

Phillip L. Jauregui
 Judicial Action Group
 2700 Corporate Dr., Ste. 200
 Birmingham, AL  35242

William J. Olson (D.C. Bar No. 233833)
Jeremiah L. Morgan (D.C. Bar No. 1012943)
 William J. Olson, P.C.
 370 Maple Avenue West, Suite 4
 Vienna, Virginia  22180-5615
 (703) 356-5070
 wjo@mindspring.com
Counsel for *Amici Curiae*
Dated: February 26, 2025

James N. Clymer
408 West Chestnut St.
Lancaster, PA  17603

18

Rick Boyer
 Integrity Law Firm
 P.O. Box 10953
 Lynchburg, VA  24506

J. Mark Brewer
209 N. Nugent Ave.
Johnson City, TX  78636