## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, | |
| *Plaintiff,* | |
| *v.* | |
| UNITED STATES DEPARTMENT OF STATE; | Case No. 1:25-cv-465-TNM |
| MARCO RUBIO, in his official capacity as Secretary of State, Department of State; | **REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| BUREAU OF POPULATION, REFUGEES, AND MIGRATION, Department of State; | |
| JENNIFER DAVIS, in her official capacity as Principal Deputy Assistant Secretary, Bureau of Population, Refugees, and Migration, Department of State; | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; | |
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, Department of Health and Human Services; | |
| *Defendants.* | |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 2

    I.    The Recent Termination Of USCCB's Agreements Does Not Change the
        Suspension's Unlawfulness—And Itself Is Unlawful .................................................... 2

    II.    USCCB Is Likely To Succeed On The Merits ................................................................ 3

        A.    The Refugee Funding Suspension Is Reviewable, Final Agency Action .............. 3

        B.    USCCB's Case Belongs In District Court ............................................................. 6

        C.    The Suspension and Termination Violate The Refugee Act Of 1980 ................. 12

        D.    The Suspension and Termination Violate the Impoundment Control Act ........... 14

        E.    The Suspension and Termination Are Arbitrary and Capricious ......................... 16

        F.    The Suspension and Termination Required Notice and Comment ...................... 20

    III.    The Funding Suspension and Termination Are Causing Irreparable Harm ................. 20

    IV.    The Balance Of The Equities And Public Interest Favor Relief ................................... 23

    V.    USCCB Should Not Be Required To Post Security ..................................................... 24

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ...................................................................................................6

*AIDS Vaccine Advocacy Coalition v. United States*,
    2025 WL 485324 (D.D.C. Feb. 13, 2025) ...............................................................23

*In re Aiken County*,
    725 F.3d 255 (D.C. Cir. 2013) .................................................................................15

*Allied Local & Reg'l Mfrs. Caucus v. Env't Prot. Agency*,
    215 F.3d 61 (D.C. Cir. 2000) ...................................................................................18

*American Near East Refugee Aid v. USAID*,
    2023 WL 10669678 (D.D.C. Mar. 21, 2023) .............................................................9

*Ancient Coin Collectors Guild v. Customs & Border Prot.*,
    801 F. Supp. 2d 383 (D. Md. 2011) ...........................................................................5

*Beacon Assocs. v. Apprio, Inc.*,
    308 F. Supp. 3d 277 (D.D.C. 2018) .........................................................................22

*Bennett v. Ky. Dep't of Ed.*,
    470 U.S. 656 (1985) ...................................................................................................9

*Bennett v. Spear*,
    520 U.S. 154 (1997) ...................................................................................................6

*Biden v. Texas*,
    597 U.S. 785 (2022) ...................................................................................................5

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) ...........................................................................................6, 7, 11

*Chamber of Commerce v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ...............................................................................4, 5

*City of New Haven v. United States*,
    809 F.2d 900 (D.C. Cir. 1987) .................................................................................15

*Coggeshall Dev. Corp. v. Diamond*,
    884 F.2d 1 (1st Cir. 1989) .....................................................................................9, 10

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.,
   38 F.4th 1099 (D.C. Cir. 2022)...............................................................8, 9, 10, 11

*Department of Homeland Security v. Regents of the University of California,
   591 U.S. 1 (2020)...............................................................................6, 16, 17

Detroit International Bridge Co.v. Government of Canada,
   185 F. Supp. 3d 85 (D.D.C. 2016) ......................................................................5

Dickson v. Sec'y of Def.,
   68 F.3d 1396 (D.C. Cir. 1995) ........................................................................20

DSE, Inc. v. United States,
   169 F.3d 21 (D.C. Cir. 1999) ..........................................................................24

Fed. Commc'ns Comm'n v. Fox Television Stations,
   Inc., 556 U.S. 502 (2009)...............................................................................17

P.J.E.S. ex rel. Francisco v. Wolf,
   502 F. Supp. 3d 492 (D.D.C. 2020) ..............................................................24, 25

Friends for All Children, Inc. v. Lockheed Aircraft Corp.,
   746 F.2d 816 (D.C. Cir. 1984) ........................................................................21

Gomez v. Trump,
   485 F. Supp. 3d 145 (D.D.C. 2020) ....................................................................4

Holy Land Found. for Relief & Dev. v. Ashcroft,
   333 F.3d 156 (D.C. Cir. 2003) ..........................................................................4

*Kidwell v. Dep't of Army, Bd. for Corr. of Military Records,
   56 F.3d 279 (D.C. Cir. 1995) .....................................................................8, 9, 11

*League of Women Voters of U.S. v. Newby,
   838 F.3d 1 (D.C. Cir. 2016) ...........................................................................22

Megapulse, Inc. v. Lewis,
   672 F.2d 959 (D.C. Cir. 1982) ..........................................................................8

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
   463 U.S. 29 (1983).....................................................................................18

Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,
   417 F.3d 1272 (D.C. Cir. 2005) .......................................................................20

Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget,
   2025 WL 368852 (D.D.C. Feb. 3, 2025) ...............................................................6

Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget,
   2025 WL 597959 (D.D.C. Feb. 25, 2025) .............................................................25

Nebraska v. Su,
   121 F.4th 1 (9th Cir. 2024) ..............................................................................4

iv

*New York v. U.S. Dep't of Homeland Sec.*,
 969 F.3d 42 (2d Cir. 2020)............................................................................................22

*Norton v. Southern Utah Wilderness Alliance*,
 542 U.S. 55 (2004)..........................................................................................................7

*Open Cmtys. All. v. Carson*,
 286 F. Supp. 3d 148 (D.D.C. 2017)...............................................................................24

*Perry Capital LLC v. Mnuchin*,
 864 F.3d 591 (D.C. Cir. 2017)......................................................................................10

*PPG Industries, Inc. v. United States*,
 52 F.3d 363 (D.C. Cir. 1995)..........................................................................................7

*Pub. Citizen v. U.S. Trade Rep.*,
 5 F.3d 549 (D.C.Cir. 1993).............................................................................................4

*Sec. & Exchange Comm'n v. Chenery Corp.*,
 318 U.S. 80 (1943)..........................................................................................................2

*St. Bernard Parish Gov't v. United States*, 134 Fed. Cl. 730 (2017)............................................10

*TikTok Inc. v. Trump*,
 507 F. Supp. 3d 92 (D.D.C. 2020) ..................................................................................4

*Tootle v. Sec'y of Navy*,
 446 F.3d 167 (D.C. Cir. 2006) ..................................................................................8, 11

*\*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
 967 F.2d 598 (D.C. Cir. 1992)....................................................................................8, 9

*Valle del Sol Inc. v. Whiting*,
 732 F.3d 1006 (9th Cir. 2013) ......................................................................................22

*Winter v. NRDC*, 555 U.S. 9, 20 (2008) ........................................................................24

*Yakima Valley Cablevision, Inc .v. Fed. Commc'ns Comm'n*,
 794 F.2d 737 (D.C. Cir. 1986) ......................................................................................18

*Yorktown Sys. Grp. v. Threat Tec LLC*,
 108 F.4th 1287 (11th Cir. 2024) ...................................................................................22

*Youngstown Sheet & Tube Co. v. Sawyer*,
 343 U.S. 579 (1952).......................................................................................................16

## Statutes

2 U.S.C.
 § 682(1)..........................................................................................................................14
 § 684(b).....................................................................................................................14, 15

8 U.S.C. § 1522 ..................................................................................................... *passim*

33 U.S.C. § 535b ...................................................................................................5

Department of State, Foreign Operations, and Related Programs Appropriations
      Act Title III ...............................................................................................19

Refugee Act of 1980, 94 Stat. 102 ...................................................1, 7, 9, 12, 25

**Rules**

Federal Rule of Civil Procedure 65(c) ..................................................................24

**Regulations**

2 C.F.R. § 200.305 ..........................................................................................17, 20

2 C.F.R. § 200.339 ................................................................................................20

**Other Authorities**

133 Cong. Rec. 24655 (1987) ...............................................................................15

Memorandum from Secretary of State to All Diplomatic and Consular Posts,
      Dep't of State (Jan. 24, 2025), https://perma.cc/J26TVCJR ......................4

Presidential Authority to Impound Funds Appropriated for Assistance to
      Federally Impacted Schools, 1 Supp. Op. O.L.C. 303 (1969) ..................16

## INTRODUCTION

The government's response doubles down on its unlawful refusal to comply with its statutory and regulatory obligations in suspending funding for initial-refugee resettlement. Perhaps recognizing the infirmity of that suspension, the government has pivoted. Late yesterday, just hours after it filed its response, the government issued cursory notifications to USCCB purporting to terminate its cooperative agreements.

The government's termination only confirms the need for preliminary injunctive relief. The suspension continues to inflict irreparable harm on USCCB because, as the termination notices make clear, the suspension is the reason that the government will continue to deny reimbursement requests for costs USCCB and its partners incurred between January 24 and February 27—preventing USCCB from receiving the funds necessary to carry out its mission to assist the refugees the government already placed in its care. And the government's purported termination of USCCB's awards while refugees remain in their initial 90-day resettlement period violates the Refugee Act, the Impoundment Control Act, and the APA for many of the same reasons the suspension did. It also causes irreparable harm, including frustration of USCCB's mission to assist refugees already in its programs. While the government asserts the termination renders USCCB's claim exclusively one for money damages, ECF No. 27, that assumes the lawfulness of the termination, which itself should be set aside. Moreover, regardless of the termination, this Court can still set aside the Jan. 24–Feb. 27 suspension and order the government to continue processing reimbursements for statutorily mandated services to already-arrived refugees during that period.

The government cannot escape review of its unlawful suspension by effecting an unlawful termination. This Court should preliminarily enjoin enforcement of the funding suspension and the termination.

1

## ARGUMENT

**I.    The Recent Termination Of USCCB's Agreements Does Not Change the Suspension's Unlawfulness—And Itself Is Unlawful**

Late yesterday, USCCB received two notifications from the State Department indicating that its cooperative agreements have been "immediately terminated as of February 27, 2025" because they "no longer effectuate[] agency priorities." Ex. A; Ex. B ("Termination Notice"). The Termination Notice provided no explanation for how USCCB's awards no longer effectuate agency priorities. And it reaffirmed the government's view that costs USCCB incurred after the January 24 Refugee Funding Suspension are not reimbursable. It states that if the "award is already in suspended status, payment requests for legitimate costs incurred *prior to the effective date of the Notice of Suspension* are allowable." *Id.* (emphasis added). In other words, the Termination Notice treats *the suspension* as what renders post-January 24 expenses non-reimbursable. Thus, far from mooting this case, the Termination Notice confirms the need for this Court's prompt relief from both the suspension and the termination of funding with respect to already-arrived refugees.

*First*, the Termination Notice does not eliminate the adverse effects of the Refugee Funding Suspension or retroactively render it any less unlawful. In the Termination Notice, the government continues to maintain that it properly suspended USCCB's cooperative agreements between January 24 and February 27, as evidenced by its suggestion that the government will continue rejecting expenses for USCCB's assistance to admitted refugees incurred during that 33-day period. The Termination Notice does not itself purport to impose those consequences or provide any additional justification for them. Any attempt to use the Termination Notice to justify the Refugee Funding Suspension would be an *ex-post* rationale that cannot succeed given fundamental administrative-law principles. *See Sec. & Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 94–95 (1943). The government's continued enforcement of the Jan. 24–Feb. 27 suspension still violates

2

8 U.S.C. § 1522(a)'s requirements to fund certain services for recently arrived refugees, flouts the Impoundment Control Act, and is arbitrary and capricious for multiple reasons.

*Second*, the Termination Notice is itself unlawful for many of the same reasons as the suspension. It also purports to end funding for thousands of refugees who have already arrived and been placed in USCCB's programs. And in doing so, it likewise violates the Refugee Act's requirement that the government provide, to the extent of available appropriations, essential services to those refugees. Like the suspension, the termination effects a government-wide refusal to spend funds that Congress appropriated for a statutorily mandated purpose based on a policy disagreement; it too violates the Impoundment Control Act. It is also arbitrary and capricious because the government (1) failed to consider the serious negative consequences it will have on USCCB and the refugees it is currently assisting; (2) failed to consider or explain its rejection of an obvious, superior alternative—*i.e.*, terminating the program *prospectively* while allowing already-arrived refugees to receive services until the end of their 90 days; and (3) failed to adequately explain itself—namely, how or why USCCB's awards are inconsistent with agency policy. And just like the suspension, the termination will cause irreparable harm to USCCB by preventing it from fulfilling its core mission by assisting refugees whom the government already has placed in its care.

Thus, as explained in more detail below, the Court should preliminarily enjoin the government from continuing to enforce both the suspension of USCCB's cooperative agreements between January 24 and February 27, 2025, and the termination of USCCB's cooperative agreement, until all refugees assigned to USCCB have graduated from the 90-day initial-resettlement program.

## II.    USCCB Is Likely To Succeed On The Merits

### A.    The Refugee Funding Suspension Is Reviewable, Final Agency Action

The government's alleged barriers to review under the APA are meritless.

The government first argues that the suspension is unreviewable because it effectuates the Foreign Aid Executive Order. Opp. 17. But the suspension does not implement that order because the awards involve "domestic assistance." 8 U.S.C. § 1522(a)(3). In any event, the suspension would be reviewable under the APA: USCCB has not asked this Court to set aside the Executive Order. Rather, it challenges the State Department's *implementation* of that order by suspending funding for all refugee-resettlement services. Memorandum from Secretary of State to All Diplomatic and Consular Posts, Dep't of State (Jan. 24, 2025), https://perma.cc/J26TVCJR ("Rubio Memo") (claiming the suspension is "[c]onsistent with" the Foreign Aid Executive Order).

"The D.C. Circuit has already held that the decision-making process an agency employs to effectuate an executive order . . . is subject to arbitrary and capricious review." *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 110 (D.D.C. 2020) (citing *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003)). "[A]cting at the behest of the President" does "not leave the courts without power to review the [action's] legality"; "courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996); *see also Pub. Citizen v. U.S. Trade Rep.*, 5 F.3d 549, 552 (D.C.Cir. 1993) ("*Franklin*['s denial of judicial review of presidential action] is limited to those cases in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties."); *Gomez v. Trump*, 485 F. Supp. 3d 145, 177 (D.D.C. 2020) ("APA review of an Executive Branch official's actions is thus not precluded merely because the official is carrying out an executive order."). Were the law otherwise, it would swallow the APA's presumption of judicial review of agency action, "allow[ing] Presidents to insulate any desired rulemaking from judicial review with the single stroke of an executive pen." *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024). The D.C. Circuit therefore

has rightly rejected that view.  *See Chamber of Commerce*, 74 F.3d at 1328.

The government's cases do not support its sweeping assertion that "actions taken by an executive agency to implement an executive order" are "unreviewable."  Opp. 17.  Those cases generally involved agency officials carrying out duties statutorily vested in the President himself. In *Detroit International Bridge Co. v. Government of Canada*, for example, the provision at issue commanded that "[n]o bridge may be constructed" under the statute "unless *the President has given his approval* thereto."  185 F. Supp. 3d 85, 95 (D.D.C. 2016) (quoting 33 U.S.C. § 535b) (emphasis added); *see also, e.g.*, *Ancient Coin Collectors Guild v. Customs & Border Prot.*, 801 F. Supp. 2d 383, 389 (D. Md. 2011) ("President 'determines'" whether statute is satisfied).

Here, however, the Secretary has been vested with the relevant statutory authority under 8 U.S.C. § 1522, as the government acknowledges.  Opp. 4–5.  The statutory provisions the government cites that *do* vest authority in the President are inapplicable.  *Id.* at 19.  The government thus must rely on the President's "lead role" in "foreign policy."  *Id.* at 18–19.  But the President's foreign-affairs powers have little to do with a program involving funding for already-admitted refugees in the United States.  And the government's position, taken to its logical conclusion, would mean that all agency action with any relation to foreign affairs is unreviewable under the APA.  That, however, is not the law.  *See Biden v. Texas*, 597 U.S. 785, 814 (2022) (holding that the district court should consider APA challenge to agency program requiring return to Mexico of non-Mexican aliens).  Thus, the agency's discretionary decisions to implement the Foreign Aid Executive Order by suspending all refugee-assistance funding are reviewable under the APA.

Equally meritless is the argument that USCCB is seeking impermissible programmatic relief because it does not challenge a "discrete, identifiable 'agency action.'"  Opp. 19.  USCCB challenges the State Department's suspension (and now termination) of reimbursements owed to

it under specific refugee-resettlement programs.  That action is at least as "discrete" and "identifi-

able" as that challenged in cases like *Bowen v. Massachusetts*, 487 U.S. 879, 886 (1988) (HHS

Secretary's determination that certain educational services were not covered by Medicaid), and

*Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 9 (2020)

(Homeland Security Secretary's termination of DACA program).

      The government also argues that the suspension is not "final agency action."  Opp. 20.  But

the government was not considering *whether* to suspend funding; it decided finally to suspend that

funding.  An agency's order to stop the "obligation or disbursement of . . . financial assistance" is

not "merely a guidance," but a "directive" that immediately purports to abrogate funding recipi-

ents' right to timely reimbursement.  *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 2025

WL 368852, at *10 (D.D.C. Feb. 3, 2025).  That is the "consummation" of agency decisionmaking.

*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  The suspension also had the "direct and apprecia-

ble legal effect" of leaving USCCB responsible for thousands of refugees without the ability to

obtain reimbursements from the government for their care.  *Id.* at 178.  If a purportedly temporary

suspension of funding were not final agency action, then the government could forever insulate its

funding decisions from review by classifying every suspension as temporary or continually imple-

menting a series of nominally time-limited suspensions.  That would make a mockery of the APA's

"basic presumption of judicial review."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967).

### B.    USCCB's Case Belongs In District Court

      The government's principal jurisdictional argument rests on the Tucker Act.  The govern-

ment claims that the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over this

case, displacing the APA's cause of action.  Opp. 10–17.  That is wrong.

      This case is on all fours with *Bowen*.  In *Bowen*, Massachussetts sought the same remedy

as USCCB—"declaratory and injunctive relief" and an order to "set aside" agency action that withheld funds from disbursement through a statutorily created grant program. *Id.* at 879. The Court held that the APA conferred jurisdiction on district courts over that "equitable action for specific relief" and concluded the Tucker Act does not displace the APA's cause of action in such cases because: (1) the Act grants the Court of Claims non-exclusive jurisdiction, *id.* at 910 n.48, and (2) the Claims Court often is not an adequate alternative forum because it "does not have the general equitable powers of a district court to grant prospective relief," *id.* at 892–893, 903, 905. The Court also emphasized the importance of prospective injunctive relief where, as here, the statutory scheme creates "rather complex ongoing relationships" between the parties. *Id.* at 905.

The government's contention that "the APA generally prohibits 'specific relief'" thus flatly contradicts *Bowen*. Opp. 14. The case it relies on, *PPG Industries, Inc. v. United States*, 52 F.3d 363 (D.C. Cir. 1995), says no such thing. It speaks, instead, about the need to remand to an agency when the agency has applied an incorrect legal standard. *Id.* at 365. And, contrary to the government's invocation of *Norton v. Southern Utah Wilderness Alliance*, the specific relief USCCB seeks does not require the Court to direct "how [an agency] shall act." 542 U.S. 55, 64 (2004). Rather, it would only "compel an agency 'to perform a ministerial or non-discretionary act,'" namely the use of appropriated funds as mandated by the Refugee Act. *Id.* (citation omitted).

The government's only response to *Bowen* is that USCCB is "not seeking funds to which a statute entitles it." Opp. 13 (quotations omitted). That is wrong because, as explained below, 8 U.S.C. § 1522(a) requires the government to reimburse USCCB's allowable costs for refugees the government assigned it. Even if that were not the case, *Bowen* recognizes district court jurisdiction over APA suits where a party "is seeking funds to which a statute *allegedly* entitles it." 487 U.S. at 901 (emphasis added). The government, in conflating jurisdiction with the merits,

disregards *Bowen*'s clear direction that the district courts must remain open to claims for equitable relief to redress alleged statutory violations, which the Court of Federal Claims cannot grant.

Instead of dealing with *Bowen*, the government relies on a line of D.C. Circuit cases holding that the Tucker Act grants the Court of Claims exclusive jurisdiction over "in essence" contract claims. Opp. 10–17. As the D.C. Circuit itself has recognized, that line of cases is on thin ice after *Bowen*. *See Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 612–13 (D.C. Cir. 1992) (noting the "strong case that, after *Bowen*, the Tucker Act should not be read to 'impliedly forbid' under the APA the bringing in district court of contract actions for specific relief" but ultimately concluding that *Bowen* "does not compel" overruling its prior holdings). Regardless, those cases don't apply here because USCCB's claims are not "in essence" contract claims.

To decide whether a claim is essentially contractual in nature, the D.C. Circuit looks to "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). In evaluating the nature of the relief, the Court inquires whether the claim "explicitly or 'in essence' seeks . . . monetary relief from the federal government." *Kidwell v. Dep't of Army, Bd. for Corr. of Military Records*, 56 F.3d 279, 284 (D.C. Cir. 1995). It also considers whether "jurisdiction lies in the Court of Federal Claims" before closing the door to the district court. *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006). A claim "must satisfy" each element of these tests "to fall within the Claims Court's exclusive Tucker Act jurisdiction." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 n.6 (D.C. Cir. 2022); *see also Kidwell*, 56 F.3d at 285–86 (holding the Court of Claims did not have exclusive jurisdiction, based solely on the nature of the relief). Here, neither the rights USCCB seeks to vindicate nor the relief it requests are based in contract.

*First*, the rights USCCB seeks to vindicate derive from federal law, not the cooperative

agreements.  The government argues that "the terms of Agreements will determine whether the State Department had the authority to suspend" them.  Opp. 15.  That mischaracterizes USCCB's claim.  USCCB is alleging violations of the Refugee Act, Impoundment Control Act, State Department regulations, APA, and the separation of powers; it is *not* alleging breaches of the agreements.  So "determining whether [the government] infringed" the rights USCCB is asserting "requires primarily an examination of the statutes" and regulations the government "has purportedly violated, not" the agreements.  *Crowley*, 38 F.4th at 1108–09; *see Bennett v. Ky. Dep't of Ed.*, 470 U.S. 656, 669 (1985) ("Unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy.").  For this reason, *American Near East Refugee Aid v. USAID*—a case where the court did not even rule on the Tucker Act issue, 2023 WL 10669678, at *6 (D.D.C. Mar. 21, 2023)—is inapposite.  It noted that "there appears to be no statute that creates the right [plaintiff] seeks to enforce."  *Id.*  The opposite is true here.

It is irrelevant that USCCB's federal-law claims, if successful, will have the effect of reinstating the government's obligations under the agreements by eliminating an unlawful barrier the government has erected to complying with those agreements.  As the D.C. Circuit has explained, a "federal district court may accept jurisdiction over a statutory or constitutional claim for injunctive relief" under the APA "even where the relief sought is an order forcing the government to obey the terms of a contract."  *Transohio Sav. Bank*, 967 F.2d at 610; *accord Kidwell*, 56 F.3d at 285– 86 ("[A]ny monetary benefits that may flow from [plaintiff's] victory would not come from the district court's exercise of jurisdiction, but from the structure of statutory and regulatory requirements.").  The government's reliance on contrary out-of-circuit precedent is therefore unavailing.  *See* Opp. 12 (citing *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989)).  Besides,

9

*Coggeshall* was a mandamus suit to compel specific performance under a deed. 884 F.2d at 4. It says nothing about suits for specific relief from violations of federal statutory or regulatory law.

Nor does it matter if the cooperative agreements give rise to some (but not all) of the government's statutory and regulatory obligations, or that the government is a party to the cooperative agreements. Opp. 16. In *Perry Capital LLC v. Mnuchin*, the D.C. Circuit held that a plaintiff's suit for breach of fiduciary duties (a non-contractual claim) was not "in essence" contractual even though the alleged fiduciary duties arose from the contractual relationship between the plaintiff and the government. 864 F.3d 591, 619 (D.C. Cir. 2017). That was because there, as here, the plaintiff did "not contend [the government] breached the terms of the [agreement] nor otherwise invoke them except to establish" the existence of the non-contractual rights. *Id.* Nor does the government establish that the cooperative agreement here is in fact a contract cognizable in the court of claims. *See St. Bernard Parish Gov't v. United States*, 134 Fed. Cl. 730, 735 (2017) (no jurisdiction because cooperative agreement did not constitute a contract for consideration).

*Second*, the relief USCCB seeks is also not contractual. USCCB is not asking the Court for damages—the "prototypical contract remedy." *Crowley*, 38 F.4th at 1107. USCCB seeks to enjoin the government from enforcing the unlawful impediments (the suspension and termination) that the government has erected to avoid its obligations under a statutorily mandated program. That equitable relief would not guarantee USCCB reimbursements in any specific amount; it would just require the government to process reimbursement requests in the ordinary course.

To be sure, the equitable relief USCCB is seeking would result in the government making payments to USCCB in the ordinary course; ordering the government to process reimbursements would ensure that it does not simply ignore an order setting aside the funding suspension. *See* ECF No. 1, Prayer for Relief. But that doesn't transform this case into a Tucker Act case. The

D.C. Circuit has held that a plaintiff "does not 'in essence' seek monetary relief . . . merely because . . . success on the merits may obligate the United States to pay" the plaintiff, "as long as the plaintiff's complaint requests only non-monetary relief that has 'considerable value' independent of any future potential for monetary relief." *Kidwell*, 56 F.3d at 284; *Crowley*, 38 F.4th at 1107.

That is precisely the case here. The equitable relief USCCB is seeking would eliminate the crisis caused by the government's unlawful suspension by restoring the ordinary processing of reimbursements on which program participants have come to rely. In doing so, it would provide "non-monetary relief to [USCCB's] business operations and professional reputation" as well as eliminate USCCB's "performance difficulties" resulting from the suspension. *Crowley*, 38 F.4th at 1111; *cf. Kidwell*, 56 F.3d at 285 (when requested relief would reduce stigma, the non-monetary value of the relief takes the claim outside of the Claims Court's exclusive jurisdiction). Thus, "any monetary recovery [USCCB] might be entitled to in the future would be entirely separate from the District Court's decision regarding whether the Government acted arbitrarily and capriciously or neglected to follow" statutes or regulations. *Tootle*, 446 F.3d at 175.

*Third*, the Court of Claims does not have jurisdiction to grant the relief USCCB is seeking. The government acknowledges that "the D.C. Circuit has categorically rejected the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." Opp. 16 (cleaned up); *Tootle*, 446 F.3d at 176–77. But that is exactly where its position in this case would lead. *Bowen* was explicit that "[t]he Claims Court does not have the general equitable powers of a district court to grant prospective relief." 487 U.S. at 905. Because "a naked money judgment against the United States" will not be "an adequate substitute for prospective relief" given the ongoing irreparable harm, the Claims Court cannot give USCCB the relief it needs. *Id.* So even if USCCB's claims were contractual, this Court would

need to exercise jurisdiction to avoid creating the jurisdictional gap the D.C. Circuit has rejected.

### C.    The Suspension and Termination Violate The Refugee Act Of 1980

The Refugee Funding Suspension (and subsequent Termination Notice) violate the Refugee Act's command that the Secretary of State promptly provide initial resettlement services to refugees admitted to the United States.  8 U.S.C. § 1522(a)(1).  The government's arguments to the contrary ignore the Act's mandatory language and the fact that the government has left eligible, already-arrived refugees without the services Congress required the government to provide.

The Refugee Act commands the government to provide initial-resettlement services to admitted refugees.  Once the government has begun "providing assistance" to refugees by resettling them in the United States and placing them in the care of a non-profit like USCCB, it must fund certain services "to the extent of available appropriations." 8 U.S.C. § 1522(a)(1)(A).  The agency must make available "sufficient resources" for "employment training and placement," "English language training," and other services to help refugees "achieve economic self-sufficiency" and "become effectively resettled." *Id.*  These services, the provision says twice, must be provided to help refugees resettle "*as quickly as possible*." *Id.* (emphasis added).

The government does not dispute the substance of its payment obligations under Section 1522(a).  Instead, the government argues that those obligations do not apply to the initial-resettlement program under Section 1522(b).  Opp. 21.  But Section 1522(a) imposes those obligations on the government's "providing assistance *under this section*."  8 U.S.C. § 1522(a)(1)(A) (emphasis added).  The statute does not carve out initial resettlement under Section 1522(b), and the government does not explain why Congress would have wanted to relieve the government of its payment obligations only during a refugee's first 90 days in the country—the most important part of a refugee's transition to the United States.

12

The government tries to manufacture an exception by pointing out that Section 1522(a) "addresses the provision of resettlement services to refugees by the Director of the Office of Refugee Resettlement," whereas the initial-resettlement program is "administered by the Secretary of State." Opp. 21. But the statute originally envisioned that the Director of the Office of Refugee Resettlement, starting in fiscal year 1982, *would* administer the initial-resettlement program, subject to the President's selection of a different official. 8 U.S.C. § 1522(b)(1)(A)(ii). Had the Director assumed that role, he clearly would have been bound to make payments in accordance with Section 1522(a). The President's designation of the Secretary of State in 1981 to assume the Director's role did not vitiate those statutory obligations; the Secretary simply stepped into the Director's shoes. Were there any doubt, Section 1522(b) makes clear that the Secretary's "[g]rants to, or contracts with, private nonprofit voluntary agencies under this paragraph shall be made *consistent with the objectives of this subchapter*"—which includes Section 1522(a). 8 U.S.C. § 1522(b)(1)(A) (emphasis added). The Secretary thus also must abide Section 1522(a)'s command to "make available sufficient resources" for essential services "as quickly as possible."

The government also argues that Section 1522(b)'s initial-resettlement program is discretionary in that the statute does not require the Secretary to enter into cooperative agreements with private non-profits like USCCB. Opp. 21. Maybe so. But once the government elected to "provid[e] assistance" by entering into those agreements and placing refugees with USCCB, Section 1522(a) required it to fund certain services for those refugees "to the extent of available appropriations." § 1522(a)(1)(A). The government is now shirking that obligation by refusing to reimburse USCCB for providing statutorily mandated services to the very refugees the government itself admitted and placed with USCCB. *See* Fuller Decl. ¶ 12 (as of February 24, 2025, "more than 5,000" refugees remain in USCCB programs).

13

Finally, the government's argument that the statute does not "mandate[] the timing of any payment under a cooperative agreement" misses the point.  TRO Opp. 10, ECF No. 14.  A funding shutdown, temporary or permanent, violates the Act if refugees within the 90-day eligibility window are denied access to services that the statute requires the government to provide "as quickly as possible" because the government refused to spend "available" funds. § 1522(a)(1)(A).  Refugees currently in the United States are being denied these services, and more will soon follow.  *See, e.g.*, Brown Decl. ¶ 7; Main Decl. ¶ 5; Colbert Decl. ¶ 6.  The funding suspension and termination thus cut off thousands of refugees from essential services required by law.

### D.    The Suspension and Termination Violate the Impoundment Control Act

The government fails to demonstrate that the suspension and termination have complied with the Impoundment Control Act.  It is undisputed that the government has not complied with the Impoundment Control Act's procedures for deferrals.  It instead insists that "[t]here has been no deferral."  Opp. 22.  Rather than engage with the broad statutory definition of the term, the government suggests that so long as it is putting appropriated funds to *other* uses authorized by the relevant appropriation (*e.g.*, "paying for the salaries of personnel in the Migration Bureau"), it is not deferring expenditures in violation of the Impoundment Control Act.  *Id.*  That ignores the obligations under Section 1522(a) that the State Department triggered when it placed refugees into USCCB's care.  Having taken that critical step, any "withholding or delaying" of funds thus devoted to resettling assigned refugees is a "deferral."  2 U.S.C. § 682(1).

The government also flouts the Impoundment Control Act's substantive limitations.  The Act limits the purposes for which the government may permissibly defer the use of appropriated funds to ensure "[c]onsistency with legislative policy."  2 U.S.C. § 684(b).  Those purposes are (1) "to provide for contingencies;" (2) "to achieve savings made possible by or through changes

14

in requirements or greater efficiency of operations;" or (3) "as specifically provided by law." *Id.* The Refugee Funding Suspension and the Termination Notice do not fit into any of the three enumerated purposes, and the government does not argue otherwise.

Instead, the government contends that the suspension is a permissible "[t]emporary pause[]." Opp. 22. But there is no "temporary pause" exception to the Impoundment Control Act. The government claims that *City of New Haven v. United States* stands for the proposition that the Act does not apply to "'trivial' impoundments relating to the 'normal and orderly operation of the government.'" 809 F.2d 900, 908 (D.C. Cir. 1987). But the *City of New Haven* decision pre-dated the 1987 amendment of the Impoundment Control Act, which prohibited all deferrals except for the three specifically enumerated categories described above. Indeed, Congress was aware of *City of New Haven* and intended to codify it "by prohibiting policy deferrals and providing that deferrals will be permissible only" for the purposes listed in the statute. 133 Cong. Rec. 24655 (1987).

In any event, the Termination Notice makes clear that the government's refusal to fund refugee-resettlement assistance is not temporary programmatic delay but a permanent and impermissible policy-based deferral. In *City of New Haven*, the D.C. Circuit distinguished "policy" deferrals—which the court held were prohibited—from "programmatic" deferrals. 809 F.2d at 901. Before the 1987 amendment, programmatic deferrals were permissible because they were "ordinarily intended to *advance* congressional budgetary policies by ensuring that congressional programs are administered efficiently." *Id.* Policy deferrals, on the other hand, "are ordinarily intended to *negate* the will of Congress by substituting the fiscal policies of the Executive Branch for those established by the enactment of budget legislation." *Id.* As the D.C. Circuit more recently affirmed, "the President does not have unilateral authority to refuse to spend" appropriated funds when it is "policy reasons" motivating the decision. *In re Aiken County*, 725 F.3d 255, 261

15

n.1 (D.C. Cir. 2013). This persistent bar against policy deferrals notwithstanding, the government insists that the Executive Branch has authority to use "short-term delays to determine how best to implement programs consistent with the President's policy objectives." Opp. 23. That position expands programmatic delay further than any court or government actor has ever conceived of it, and it is inconsistent with *City of New Haven* and *Aiken*. Deferrals cannot be justified by policy objections or potential policy objections, so the suspension and termination both violated the ICA.

As a last gasp, the government intimates that the Impoundment Control Act might not apply to foreign-affairs spending. Opp. 23. But nothing in the Act draws that distinction, and the OLC opinion the government cites assessed the President's residual power under the Constitution to impound federal funds *before* Congress enacted the Act. *See* Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools, 1 Supp. Op. O.L.C. 303 (1969) (predating the ICA by five years); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) (the Executive's power is at its "lowest ebb" when it defies Congress). In any event, as already discussed, these funds are not related to the President's foreign-affairs powers but are domestic assistance for individuals already present in the United States.

### E.     The Suspension and Termination Are Arbitrary and Capricious

The government's suspension and termination of funding for already-arrived refugees are arbitrary and capricious under the APA. At the outset, the government seeks to water down the APA by arguing that USCCB's claims should not be considered "'standard administrative fare'" because they relate to foreign policy. Opp. 9. But USCCB's awards exclusively provide "*domestic* assistance" to refugees admitted to the United States. 8 U.S.C. § 1522(a)(3) (emphasis added). Even if agency actions related to immigration or refugees implicated foreign policy, the Supreme Court has made clear that typical APA standards apply. *See, e.g., Dep't of Homeland Sec. v.*

*Regents of the Univ. of Cal.*, 591 U.S. 1, 8, 20 (2020) ("*Regents*") (applying arbitrary-or-capricious standard to the recission of the Deferred Action for Childhood Arrivals program). Under those well-settled standards, the government has little to say.

*Failure to Consider Disruption and Reliance.* Both the suspension and termination entirely fail to consider the disruption they have caused and continue to cause to the "serious reliance interests" of USCCB, its subrecipients, and their assigned refugees. *Regents*, 591 U.S. at 30. In the four decades USCCB has received funding, reimbursements were *never* suspended mid-award. *See Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) ("An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."). Moreover, USCCB was entitled to reimbursements under 2 C.F.R. § 200.305(b)(6), which provides that allowable costs may not be "withheld at any time," and USCCB's agreements allow suspension of funding only for noncompliance. So it was reasonable for USCCB to rely on continued funding for refugees already placed in USCCB's programs.

The government asserts that the suspension was only temporary, as though that exempts the government from the APA's requirement to consider the consequences of its actions. Opp. 25. But the Termination Notice makes clear that the suspension is *not* temporary. And in any event, the government identifies no case creating a temporary-action exception to *State Farm* and *Regents*. Nor would such an exception make sense, because "temporary" actions often have predictably serious and disruptive consequences. Here, for example, the government's decision to stop millions in funding midstream after four decades of continuity predictably forced USCCB to lay off employees and stop reimbursing its subrecipients, who in turn have laid off their staff and stopped providing services to refugees. Under bedrock APA principles, the government was required to consider and weigh those "important aspect[s] of the problem." *Motor Vehicle Mfrs.*

17

*Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The government alternatively claims that it *did* consider reliance interests by "providing a means for reimbursement of costs incurred prior to" January 24.  Op. 25.  But the government's purported assurance of reimbursements for *pre*-January 24 expenses does not absolve the government of its obligation to consider and address the far more serious disruption caused by its refusal to reimburse *post*-January 24 expenses.  And even as to pre-January 24 expenses, the government's assurance has proved illusory.  USCCB still has not been reimbursed for services provided to the thousands of refugees that have been assigned to it and has received no guidance (despite repeated requests) as to the applicability of any waiver or the already-incurred "legitimate expenses."  The government's conduct with respect to pre-January 24 expenses therefore has compounded, rather than diminished, the disruption to USCCB's reliance interests.  That is an important aspect of the problem that the government needed to (but did not) address.

***Failure to Consider Reasonable Alternatives***.  In effecting the suspension and the termination, the government entirely failed to consider an obvious alternative—namely, suspending or terminating the program *prospectively* while allowing already-arrived refugees to receive services until the end of their first 90 days.  The government does not claim that it did consider alternatives. Instead, the government argues it had no need to do so and claims that USCCB's proffered alternative is a mere "policy disagreement."  Opp. 26.  But it is blackletter law that to comply with the APA, an agency *must* consider obvious reasonable alternatives and explain why it chose the path it did, regardless of the agency's ultimate policy decision.  *See State Farm*, 463 U.S. at 48; *Allied Local & Reg'l Mfrs. Caucus v. Env't Prot. Agency*, 215 F.3d 61, 80 (D.C. Cir. 2000); *Yakima Valley Cablevision, Inc .v. Fed. Commc'ns Comm'n*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986). The government indisputably did not do so here.

*Inadequate Explanation*.  The suspension and termination are also arbitrary and capricious because the government offered no rational explanation for them.  The government's sole defense of the suspension is that it is purportedly "[c]onsistent with" the Foreign Aid Executive Order's suspension of funding for "foreign assistance."  Opp. 24–25.  According to the government, even though the initial-resettlement program is statutorily designated as "domestic assistance," it was rational for the State Department (through the Rubio Memo) to include that program within the foreign-assistance funding suspension because funding for the program is appropriated under the "Migration and Refugee Assistance" heading of Title III of the Department of State, Foreign Operations, and Related Programs Appropriations Act.  *Id.* at 24.

That explanation does not pass muster under the APA.  To begin, it appears nowhere in the suspension letter, which makes no reference to the Rubio Memo.  Under *Chenery*, therefore, the government cannot rely on it now.  More fundamentally, though, the government still has never explained why it unthinkingly swept in *domestic*-assistance programs funded through that appropriation, which cannot plausibly be considered "foreign assistance."  Nothing in the relevant appropriations act suggests that it covers exclusively foreign assistance.  And at least the very statute under which the government funds USCCB describes awards for refugee resettlement as "domestic assistance."  8 U.S.C. § 1522(a)(3).  The government provided no rationale for suspending domestic assistance in order to comply with an executive order targeting foreign assistance.

The Termination Notice likewise contains no adequate explanation.  It simply says that the "award no longer effectuates agency priorities"—without explaining what those priorities are or why the awards, which have been uninterrupted for decades, no longer effectuate those priorities.  "[C]onclusory statements" like these "do not meet the requirement that 'the agency adequately explain its result.'" *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1407 (D.C. Cir. 1995).

***Violation of Regulation***.  The government's continued refusal to process reimbursements for expenses incurred under the agreements also constitutes an impermissible withholding of payments for allowable costs under 2 C.F.R. § 200.305(b)(6).  The government contends that it did not impermissibly "with[hold]" payments because it was only required to "make payment within thirty calendar days" under 2 C.F.R. § 200.305(b)(3).  Opp. 26.  But the government's Termination Notice makes clear that it does not *ever* intend to make reimbursements for allowable expenses— regardless of when incurred.  And the expenses USCCB incurred are "allowable costs" under 2 C.F.R. § 200.305(b)(6) because the government had no authority to suspend its agreements on January 24, as 2 C.F.R. § 200.339 authorizes suspension of an award only as a remedy for non-compliance.  The government thus is indisputably unlawfully withholding those payments.

### F.    The Suspension and Termination Required Notice and Comment

The government argues that the APA's notice-and-comment procedures do not apply here. Opp. 27.  But the government's actions with respect to USCCB flow directly from a policy shutting down an entire program of refugee support—one that qualifies as a substantive rule.  *See, e.g.*, *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1285 (D.C. Cir. 2005) (holding that a nationwide dredge and fill permit was a rule because these permits "'grant rights, impose obligations, or produce other significant effects on private interests'").  The government thus needed to engage in the notice-and-comment process before shuttering the program.

### III.    The Funding Suspension and Termination Are Causing Irreparable Harm

USCCB continues to suffer irreparable harm as a result of the suspension and termination. Each action continues to prevent USCCB and its subrecipients from receiving reimbursements to which they would be entitled—the suspension for millions of dollars in pre-February 27 expenses and the termination for the rapidly accruing post-February 27 expenses.  If this Court were to set

aside either the suspension or the termination, USCCB would begin receiving reimbursements for expenses that would diminish the irreparable injuries by allowing USCCB to: (1) avoid hasty layoffs and better preserve its institutional expertise by ensuring accumulated knowledge is orderly transferred to remaining staff; (2) ensure that its partners are paid for work they performed, preserving USCCB's relationships in case refugee-resettlement programs resume in the future; and (3) continue to fulfill its mission of providing for already-arrived refugees for crucial additional weeks—enabling it to see thousands more of the refugees in its care receive essential services through the end of their 90-day resettlement period

The government's opposition does not undermine USCCB's showing of irreparable injury. At the threshold, the government attempts to increase USCCB's burden by characterizing its requested relief as changing the status quo.  But the D.C. Circuit has not adopted any heightened standard based on the relationship between the relief requested and the status quo.  *See Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 834 n.31 (D.C. Cir. 1984) (expressing "no view as to whether a heightened showing should in fact be required" for a "mandatory preliminary injunction" as opposed to "a prohibitory injunction").  Regardless, USCCB has established irreparable harm to its institutional knowledge, reputation, and mission under any standard.

The government's attempt (at 29–30) to cast USCCB's loss of employees and institutional knowledge as a typical "contracti[on]" of the program ignores USCCB's declaration explaining how the government's sudden suspension (and now termination) is categorically different—and imposes dramatically greater harm—than the typical ebb and flow of refugee assistance support. 2d Canny Decl. ¶ 5.  The government also offers no support for its vague suggestion that USCCB might be able to retain institutional knowledge "through other means" besides its employees.  Opp. 30.  And USCCB's refugee program director declared otherwise.  2d Canny Decl. ¶ 5.

As for USCCB's reputational injuries, the government suggests that there can be no cognizable reputational harm when the relationships at issue are "based on work with government sponsored programs." Opp. 29. But the government does not cite any case or provide any explanation for that proposition. In fact, courts routinely find irreparable harm in the context of government-sponsored programs. *See, e.g.*, *Yorktown Sys. Grp. v. Threat Tec LLC*, 108 F.4th 1287, 1296 (11th Cir. 2024); *Beacon Assocs. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 289 (D.D.C. 2018).

On the harm to USCCB's mission, the government offers only a weak assertion that USCCB's "overall operations" have not been affected. *Id.* at 30. But again, that is factually incorrect—the resettlement staff is nearly one third of the total USCCB staff, and the Migration & Refugee Services office is the largest USCCB subcomponent in terms of staff and operations. Fuller Decl. ¶ 6. And the USCCB's "operational and investment reserves cannot sustain a drain" at the rate of millions per week "without jeopardizing the entire operation of the USCCB." *Id.* ¶ 10. The government also ignores the cases holding that the frustration of even *one* of an organization's core missions is irreparable harm because the lost opportunity to fulfill one's mission for a period of time can never be regained. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 61, 86 (2d Cir. 2020). And here, as the government does not dispute, the suspension and termination both prevent USCCB from fulfilling its core mission with respect to helping refugees already placed in its care.

Lacking any persuasive response to USCCB's authorities on irreparable harm, the government tries to downplay the harm by characterizing it as purely "monetary." Opp. 28. That is inaccurate. Although USCCB's irreparable harm flows from its mounting expenses, the harm is not itself monetary. Rather, USCCB and its partners' substantial financial outlays to keep helping

refugees are simply part of the causal chain between the government's unlawful actions and USCCB's ultimate injuries to its mission, human capital, and relationships.

The government also argues that USCCB's "reimbursement practices undercut" its irreparable harm. Opp. 29. But there is nothing legally or practically significant in the time between the expense and USCCB's reimbursement request. USCCB and its partners incur expenses on a rolling basis. It does not pay until it receives a request from a subrecipient, and it submits its own reimbursements shortly thereafter. USCCB thus never (until now) goes long without recouping funds. As the government's declaration shows, the requests submitted to PRM since January 22 have been for overlapping periods in September 2024 through January 2025. ECF No. 25-1 at 6.

Nor does the issuance of an injunctive order by another judge in this District undermine USCCB's showing of irreparable harm. Opp. 30 (citing *AIDS Vaccine Advocacy Coalition v. United States*, 2025 WL 485324 (D.D.C. Feb. 13, 2025)). The government has been subject to that injunction for two weeks, yet it has made no payments to USCCB. Instead, the government has sought to evade its obligations under federal law and that order by unlawfully terminating USCCB's cooperative agreements. That order thus does nothing to ease the ongoing and irreparable harm USCCB is facing due to the government's unlawful suspension-turned-termination.

## IV. The Balance Of The Equities And Public Interest Favor Relief

The balance of the equities and the public interest strongly favor USCCB. The government offers no answer to the glaring inequity of its assigning USCCB nearly 7,000 refugees and imposing obligations on USCCB to provide essential services to those refugees only to suddenly suspend or terminate the millions of dollars in funding needed to provide those services. Refugees currently in the program are losing essential services like food, medical, and housing assistance *now*. No rational "balance of equities" justifies that result. *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

The government instead claims that a preliminary injunction would "effectively disable the President from effectuating the President's agenda consistent with his constitutional and statutory authorities," and would cause the government "irreparable injury" by preventing it from effectuating statutes enacted by representatives of its people.  Opp. 32.  But USCCB's argument is that the government's actions are *not* "consistent" with and do *not* "effectuate" the statutes enacted by Congress (not to mention the State Department's own regulations).  If the Court concludes that USCCB is likely to succeed on the merits of those claims, the government's argument collapses. *See Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) ("There is generally no public interest in the perpetuation of unlawful agency action.").

## V.    USCCB Should Not Be Required To Post Security

Finally, should the Court grant USCCB's motion for a preliminary injunction, the Court should reject the government's half-hearted request for a bond under Federal Rule of Civil Procedure 65(c).  Rule 65(c) "vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999)—including to refuse a bond or set a bond "in a nominal amount," *P.J.E.S. ex rel. Francisco v. Wolf*, 502 F. Supp. 3d 492, 550 (D.D.C. 2020) (quotation marks omitted)).

Courts generally exercise their discretion to waive the bond requirement when private parties seek to vindicate "important federal rights or public interests" against the government, including cases concerning rights granted "under immigration laws."  *Francisco*, 502 F. Supp. 3d at 550 (collecting cases).  Courts also waive bonds (or impose nominal bonds) when requiring more than a nominal bond would "have the effect of denying the plaintiffs their right to judicial review of administrative action."  *Id.* at 550; *see also Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 2025 WL 597959, at *18 (D.D.C. Feb. 25, 2025).

Under that framework, USCCB should not be required to post security because it seeks to vindicate important public rights and requiring security would undermine its right to judicial review.  USCCB is a nonprofit, religious organization seeking to protect the refugees allocated to it under the refugee-resettlement program, a program granting rights "under immigration laws" and determined by Congress to be within the public interest of the United States.  *Id.*; *see* Refugee Act of 1980, 94 Stat. 102.  The government argues that a bond is appropriate because it claims this case is "ultimately about money."  Opp. 32.  Putting aside that USCCB disagrees with that characterization of this case, as already discussed, the government again offers no caselaw or argument explaining for why a bond would be required simply because money is at issue.

The equities, moreover, cut strongly against imposing a bond.  The government's unlawful withholding of funds has already imposed a "drain" on USCCB's operational and investment reserves, risking "jeopardizing" the organization's "entire operation."  Fuller Decl. ¶ 10.  And holding USCCB "hostage" with a large bond would impose significant barriers to judicial review, especially because USCCB's financial resources have been slashed, its staff has been cut, and its religious mission has been undermined because of the government's unlawful conduct.  *Nat'l Council of Nonprofits*, 2025 WL 597959, at *18 (it "would defy logic" to "hold Plaintiffs hostage for the resulting harm" when the "government is alleged to have unlawfully withheld" funds, "especially" when the defendants "will personally face no monetary injury from the injunction").  The Court therefore should impose no bond (or at most a nominal bond).

## CONCLUSION

This Court should grant USCCB's motion for a preliminary injunction.

February 27, 2025                                          Respectfully submitted,

                                                                        */s/ David W. Casazza*

25

William Quinn (D.C. Bar No. 1601853)
Shannon Eckman (D.C. Bar No. 90024504)**

UNITED STATES CONFERENCE OF CATHOLIC
BISHOPS
3211 Fourth Street, NE
Washington, DC 20017
(202) 541-3300
WQuinn@usccb.org


*pro hac vice
**pro hac vice forthcoming

Dhananjay Manthripragada*
  (D.C. Bar No. 990448)
Nick Harper (D.C. Bar No. 144707)
David W. Casazza (D.C. Bar No. 1046918)
Connor P. Mui* (D.C. Bar No. 90009004)
Aly Cox (D.C. Bar No. 1780473)
Laura Stanley* (D.C. Bar No. 90008623)
Hunter Mason* (D.C. Bar No. 90021049)
Audrey Payne* (D.C. Bar No. 90028352)

GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500
DManthripragada@gibsondunn.com
NHarper@gibsondunn.com
DCasazza@gibsondunn.com
CMui@gibsondunn.com
ACox@gibsondunn.com
LStanley@gibsondunn.com
HMason@gibsondunn.com
APayne@gibsondunn.com