## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, 3211 Fourth Street, NE Washington, DC 20017 | |
| *Plaintiff,* | |
| *v.* | |
| UNITED STATES DEPARTMENT OF STATE, 2201 C Street, NW Washington, D.C. 20520; | Case No. 1:25-cv-465-TNM |
| MARCO A. RUBIO, in his official capacity as Secretary of State, Department of State, 2201 C Street, NW Washington, D.C. 20520; | **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| BUREAU OF POPULATION, REFUGEES, AND MIGRATION, Department of State, 2201 C Street, NW Washington, D.C. 20520; | |
| ADAM ZERBINOPOULOS, in his official capacity as Senior Bureau Official, Bureau of Population, Refugees, and Migration, Department of State, 2201 C Street, NW Washington, D.C. 20520; | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, 200 Independence Ave, SW Washington, D.C. 20201; | |
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, Department of Health and Human Services, 200 Independence Ave, SW Washington, D.C. 20201; | |
| MELLISSA HARPER, in her official capacity as Acting Director, Office of Refugee Resettlement, Department of Health and Human Services, 200 Independence Ave, SW Washington, D.C. 20201; | |
| *Defendants.* | |

## INTRODUCTION

1.      For nearly 80 years, the Catholic Church has been caring for refugees within the United States.  Refugees face significant challenges upon entering the country, including locating housing, learning English, and finding employment.  The Church has long helped to ease those burdens and integrate refugees into American society by providing shelter, clothing, food, and training.  This work is an expression of charity taken in fulfillment of Christ's commandment to serve those in need, regardless of their race, creed, or color.

2.      Since 1980, the United States Conference of Catholic Bishops and its predecessor organization, the U.S. Catholic Conference, ("USCCB" or the "Conference") have expanded that mission in partnership with the federal government through the U.S. Refugee Admissions Program.  It "is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands" by providing "transitional assistance to refugees in the United States."  Refugee Act of 1980, Pub. L. No. 96-212, § 101, 94 Stat. 102, 102.  The federal government carries out this transitional assistance through the Bureau of Population, Refugees, and Migration ("PRM"), which is a component of the Department of State.  USCCB has partnered with the federal government in this work for nearly half a century, under administrations of both parties and with the support of repeated and ongoing congressional appropriations.

3.      The beneficiaries of this cooperative partnership are refugees who are fleeing persecution, instability, and oppression and have come to the United States as a place of refuge and hope.  These refugees are vetted and approved by the federal government before entering the country and now are in the United States legally.  Once here, they are entitled by statute to receive federal funds for their initial period of resettlement—transitional support for no more than their first 90 days in the United States, which is essential to helping them establish a new

home.  This transitional assistance promotes the successful settlement of refugees in their communities, including by promoting gainful employment or connections to educational opportunities, thereby diminishing the likelihood that newly arriving refugees will be dependent on ongoing public support.

4.     PRM funds these refugee resettlement programs through annual cooperative agreements with organizations like USCCB.  Under USCCB's current cooperative agreements, PRM committed to provide around $65 million in federal funding for the immediate physical needs and integration of refugees into their new communities.  In coordination with local Catholic Charities and other subrecipients, USCCB uses these funds to care for thousands of refugees in the United States.  USCCB and its subrecipients provide food, shelter, job training, and English-language education in order to help refugees integrate and become self-sufficient as quickly as possible.  USCCB spends more on refugee resettlement each year than it receives in funding from the federal government, but it cannot sustain its programs without the millions in federal funding that provide the foundation of this private-public partnership.  For decades, the U.S. government has chosen to admit refugees and outsourced its statutory responsibility to provide those refugees with resettlement assistance to non-profit organizations like USCCB.  But now, after refugees have already arrived and been placed in USCCB's care, the government is attempting to pull the rug out from under USCCB's programs by halting funding.

5.     On January 24, 2025, without prior notice, the State Department suspended funding for refugee resettlement nationwide by issuing suspension letters to its resettlement partners (the "Refugee Funding Suspension").  USCCB received a cursory, two-page letter from PRM notifying the organization that its cooperative agreements were immediately suspended.  The suspension letter's only justifications were a reference to a recent Executive Order directing the

suspension of funding for foreign aid and a vague suggestion that the awards may not be consistent with the State Department's priorities. Since the suspension, the State Department has not made any payments to USCCB. Although the suspension letter purported to allow reimbursement for refugee-assistance work already completed before January 24, the State Department has refused to reimburse USCCB for those expenses as well.

6.      After litigation commenced, the State Department pivoted toward complete termination of the initial-resettlement program by canceling cooperative agreements with its resettlement partners (the "Refugee Funding Termination" or "Termination"). On February 26, 2025, USCCB received two one-page letters from the State Department notifying it that its cooperative agreements were terminated as of February 27, 2025. The letters stated that the awards no longer effectuate agency priorities without explaining why. The Department also asserted that it is not obligated to pay for the costs USCCB and its subrecipients incurred while the suspension was in effect. Still, the State Department reiterated that it would reimburse USCCB for refugee-assistance work completed before January 24th. But the Department to date has refused to reimburse USCCB for any of its expenses.

7.      The consequences of the Refugee Funding Suspension and Termination have been predictably devastating for USCCB and the refugees it supports. At the time of the suspension, there were more than 6,700 refugees assigned to USCCB by the government that were still within their 90-day transition period. As of February 24, 2025, two days before the Termination issued, more than 5,000 refugees assigned to USCCB remained eligible for initial-resettlement services. As a direct result of the suspension and termination, USCCB has millions of dollars in pending, unpaid reimbursements for services already rendered to refugees and is accruing millions more each week—with no indication that any future reimbursements will be

paid.  USCCB has already been forced to initiate layoffs for fifty employees.  It faces irreparable damage to its longstanding refugee resettlement programs and its reputation and relationship with its subrecipients and the refugee populations it serves.  USCCB's inability to reimburse its partner organizations, in turn, has required some of those organizations to lay off staff and stop providing aid for housing, food, and resettlement support to refugees.  Refugees who have already entered the United States have been or may soon be cut off from support, contravening the statutorily expressed will of Congress and making it more difficult for them to establish themselves as productive members of society.

8.    The government's sudden Refugee Funding Suspension and subsequent Termination are unlawful.  They violate multiple statutes, including the Administrative Procedure Act ("APA"), and undermine the Constitution's separation of powers.

9.    *First*, the Refugee Funding Suspension and Termination contravene appropriations-related statutes and flout the Constitution's vesting of the power of the purse in Congress. Congress has appropriated specific sums of money for refugee assistance and resettlement to remain available until expended, and it has mandated that the government provide prompt and adequate funding for the initial resettlement of refugees that the government has admitted and assigned to agencies like USCCB.  *See* 8 U.S.C. § 1522(a)–(b).  Given the continuing availability of appropriations, the Executive Branch cannot unilaterally and indefinitely refuse to fund those statutorily mandated services.  *See Train v. City of New York*, 420 U.S. 35, 41–44 (1975). In addition, the Impoundment Control Act sets forth specific procedural and substantive requirements for Executive Branch attempts to delay or rescind spending of appropriated funds—requirements that were not satisfied by the Refugee Funding Suspension and Termination. 2 U.S.C. § 684.  The suspension and termination therefore exceed the government's statutory

authority.  By ignoring Congress's appropriations decisions, moreover, the suspension and termination undermine the Constitution's separation of powers, which provides that Congress, not the Executive Branch, decides how public funds shall be spent.

10.    *Second*, the Refugee Funding Suspension and Termination are arbitrary and capricious.  For the first time in forty-five years, and without warning, the government has cut off funding to USCCB for the essential services USCCB provides to government-approved refugees, including refugees already placed with USCCB and its subrecipients.  In doing so, the government entirely failed to consider and address the obvious and catastrophic consequences that an immediate funding suspension or termination would impose on USCCB, its subrecipients, and individual refugees—let alone those parties' significant, reasonable reliance interests in continued funding.  Nor did it consider the obvious, less-disruptive alternatives of either reviewing its outstanding agreements *before* halting funds to active awardees or continuing funding for refugees already present in the United States while winding down the program.

11.    The reasons the government *did* provide for its actions only heighten the suspension's and termination's arbitrariness.  Although the suspension letter mentioned in passing an Executive Order pausing *foreign* aid, that Executive Order on its face does not apply to USCCB's cooperative agreements, which exclusively provide "*domestic* assistance" to government-vetted refugees located in the United States.  8 U.S.C. § 1522(a)(3) (emphasis added).  And the suspension letter's nebulous reference to the State Department's policy priorities did nothing to explain *why* USCCB's agreements—suddenly after decades of continuity—might be inconsistent with those priorities.  The termination letters' one-sentence "conclusion" that the

awards are inconsistent with agency priorities did nothing to remedy that defect.  The government also has given *no* explanation for its tacit refusal to reimburse pre-January 24 expenses under USCCB's cooperative agreements.

12.    *Third*, the Refugee Funding Suspension and Termination are unlawful because they were implemented without public notice and opportunity to comment.  5 U.S.C. § 553.  The suspension and termination are legislative or substantive rules because they prospectively alter the legal rights or interests of USCCB and thousands of refugees already present in the United States.  Yet the government did not provide notice to or solicit input from affected parties and the public at large, as the APA requires.

13.    The government's suspension and termination of funds that USCCB spends on initial refugee-resettlement services under its cooperative agreements with the State Department are unlawful.  This Court should declare Defendants' actions unlawful and set them aside and enjoin Defendants from implementing, enforcing, or otherwise giving effect to the Refugee Funding Suspension, Termination, or similar actions so that USCCB's vital work assisting lawfully admitted refugees may continue.

## PARTIES

14.    The United States Conference of Catholic Bishops is an American nonprofit corporation whose members are the active Cardinals, Archbishops, and Bishops of the Catholic Church in the United States and the U.S. Virgin Islands.  USCCB is incorporated as a non-profit and headquartered in the District of Columbia.  USCCB provides refugee-resettlement services to government-vetted refugees and special immigrant visa holders from Afghanistan within the United States.

15.    Defendant the Department of State is a department of the federal government.  It receives appropriations from Congress to administer refugee-resettlement programs authorized

under the Migration and Refugee Assistance Act of 1962, Pub. L. No. 87-510, 76 Stat. 112 (1962), and the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980).

16.     Defendant Marco Rubio is the Secretary of State.  In that role, he is responsible for oversight of the Bureau of Population, Refugees, and Migration, which is responsible for providing the cooperative-agreement awards to USCCB.  Secretary Rubio is sued in his official capacity.

17.     Defendant Bureau of Population, Refugees, and Migration is a bureau within the State Department.  PRM has been delegated responsibility for entering into cooperative agreements with private resettlement agencies, including USCCB, to implement the programs of initial resettlement for refugees and special immigrant visa holders.  *See* 8 U.S.C. § 1522(b).

18.     Defendant Adam Zerbinopoulos is the Senior Bureau Official of the Bureau of Population, Refugees, and Migration.  Upon information and belief, Mr. Zerbinopoulos is the highest-ranking official at PRM with supervisory authority over the Bureau.  Mr. Zerbinopoulos is sued in his official capacity.

19.     Defendant U.S. Department of Health and Human Services ("HHS") is a department of the federal government.  HHS processes the government's payments to USCCB pursuant to the terms of its cooperative agreements.

20.     Defendant Robert F. Kennedy, Jr., is the Secretary of HHS.  Secretary Kennedy is sued in his official capacity.

21.     Defendant Mellissa Harper is the Acting Director of the Office of Refugee Resettlement, Department of Health and Human Services.  Ms. Harper is sued in her official capacity.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the claims alleged in this complaint under 28 U.S.C. § 1331, because they arise under federal law, including the Administrative Procedure Act, 5 U.S.C. § 702.

23.     Sovereign immunity has been waived under 5 U.S.C. § 702.

24.     Venue lies in the District of Columbia because USCCB is incorporated and headquartered in the District.    28 U.S.C. § 1391(e)(1)(C).  Venue is also proper in this District because the State Department and HHS are also headquartered in Washington, D.C., and Secretary Rubio, Secretary Kennedy, Senior Bureau Official Zerbinopoulos, and Acting Director Harper maintain their principal offices in Washington, D.C.  *Id.* § 1391(e)(1)(A).  On information and belief, Defendants' decisions regarding PRM programming and USCCB funding have been made in the District of Columbia.  *Id.* § 1391(e)(1)(B).

## STATEMENT OF FACTS

**I.    USCCB Cared For Refugees In The United States For Decades Before It Partnered With The Government**

25.     The Catholic Church has cared for refugees since the earliest days of Christianity. *See The U.S. Refugee Admissions Program and the Catholic Church*, USCCB Off. of Pol'y & Advoc. (Jan. 26, 2025), https://perma.cc/D7FC-WKKL; Pope Pius XII, Apostolic Constitution, *Exsul Familia Nazarethana* (1952) (the Catholic Church is devoted to caring for refugees because the Holy Family's emigration to Egypt serves as "the archetype of every refugee family"). The "duty of giving foreigners a hospitable reception" is "imposed by human solidarity and by Christian charity."   Pope Paul VI, *Populorum Progressio* (Mar. 26, 1967), https://perma.cc/N36H-3FSX.  "Jesus Christ, loving everyone with a universal love, educates us in the permanent recognition of the dignity of every human being, without exception." *Letter*

*of the Holy Father Francis to the Bishops of the United States of America* (Feb. 10, 2025),

https://perma.cc/38MM-RR4Z.

26.    In the United States specifically, the Church's refugee-resettlement efforts long

predate its partnership with the federal government.  The Church first coordinated large-scale

efforts to receive and integrate those displaced by World War II in dioceses across the United

States, and later welcomed hundreds of thousands of refugees fleeing communist persecution in

the Soviet Union, Hungary, Vietnam, and Cuba.  *See Catholic Ministries Serving Migrants and*

*Refugees*, USCCB (last visited Feb. 14, 2025), https://perma.cc/ZSD8-879C.

27.    Since 1965, USCCB has carried out this institutional mission in the United

States.  USCCB does so not because the refugees are Catholic (many are not), "but because we

are Catholic."  Cardinal Blase J. Cupich, *Setting the record straight*, Chicago Catholic (Feb. 5,

2025), https://perma.cc/TZM6-VBZ4.  In this way, USCCB discharges the mandate of the Gos-

pel:  "I was hungry and you gave me food, I was thirsty and you gave me drink, a stranger and

you welcomed me."  *Id.* (quoting Matthew 25:35).

## II.    Congress Has Required Funding For Resettlement Of Admitted Refugees For Decades

28.    For more than sixty years, Congress likewise has recognized that refugee assis-

tance and resettlement is not just a moral imperative, but also is essential to this country's inter-

ests.  In 1962, in response to the increase of refugees fleeing communist countries, Congress

passed the Migration and Refugee Assistance Act, which authorized the appropriation of funds

to address "urgent refugee and migration needs."  Pub. L. No. 87-510, 76 Stat. 121, 122 (1962)

(codified as amended at 22 U.S.C. § 2601(c)); *see also Refugee Timeline*, USCIS (last updated Jan. 24, 2025), https://perma.cc/F8PM-H27V.

29.     In 1980, Congress enacted the Refugee Act, Pub. L. No. 96-212, 94 Stat. 102 (1980) (codified at 8 U.S.C. § 1521 *et seq.*).  That Act declared that "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their home-lands," including through "efforts to promote opportunities for resettlement."  Refugee Act of 1980, § 101, 94 Stat. at 102.  Consistent with that purpose, the Refugee Act of 1980 created a statutory framework for the admission and resettlement of refugees known as the U.S. Refugee Admissions Program.

30.     Under the U.S. Refugee Admissions Program, individuals outside the United States who have been persecuted or fear persecution on account of race, religion, nationality, or certain other grounds can seek legal admission into the United States.  *See* 8 U.S.C. §§ 1101(a)(42), 1157(c).  Refugees are screened abroad for eligibility and admissibility—a rigorous process that involves security and biometric checks, interviews, and medical screening, among other things.  *Refugee Processing and Security Screening*, USCIS (last visited Feb. 14, 2025), https://perma.cc/4A8C-EQRZ.  If approved as refugees, the individuals are admitted into the United States.  8 U.S.C. §§ 1157(c)(1), 1181(c).  The President determines the maximum number of refugees to be admitted each fiscal year.  *Id.* § 1157(a)(2), (3).  Since 1990, around 65,000 refugees have been admitted per year on average.  Off. of Homeland Sec. Stat., Dep't of Homeland Sec., *Refugees: 20*23, at 4 (Nov. 2024), https://perma.cc/8NAF-ST46.

31.     A core component of the U.S. Refugee Admissions Program is federal funding for "domestic assistance" for the resettlement of newly arrived refugees, in partnership with private non-profit organizations.  8 U.S.C. § 1522.  Rather than rely entirely on private charitable

organizations to provide resettlement assistance, Congress made it the "policy of the United States" to commit federal funds in order to "promote opportunities for [refugee] resettlement." Refugee Act of 1980, § 101, 94 Stat. at 102.

32.     Although refugee resettlement is multifaceted, the resettlement program at issue here is the "[p]rogram of initial resettlement."  8 U.S.C. § 1522(b).  Under that program, the Secretary of State has been designated by the President to "make grants to, and contracts with, public or private nonprofit agencies for initial resettlement . . . of refugees in the United States." *Id.* § 1522(b)(1)(A), (B); *see also HIAS, Inc. v. Trump*, 985 F.3d 309, 319 n.5 (4th Cir. 2021) ("Since 1981, the Department of State has overseen the program.").  Congress has made the same funding available for special immigrant visa holders from Afghanistan—*i.e.*, those who assisted the U.S. Mission in Afghanistan and fear reprisals as a result.[1]  *See* Afghan Allies Protection Act, § 602(b)(8), Pub. L. No. 111-8, 123 Stat. 807, 809 (2009) (codified in the notes of 8 U.S.C. § 1101).

33.     The Secretary of State has charged PRM with administering the initial-resettlement program.  PRM discharges that responsibility by entering into annual cooperative agreements with resettlement agencies.  As of February 25, 2025, there were ten resettlement agencies, including USCCB.  *United States Refugee Admissions Program Flowchart*, USCIS & Bureau of Population, Refugees, and Migration (Sept. 18, 2024), https://perma.cc/F5PJ-ZV3X. Under the cooperative agreements, PRM awards specific sums to each resettlement agency to reimburse expenses the agency incurs supporting refugees for up to the first 90 days they are in the United States.  This funding covers critical services, such as housing, food, clothing, and

---

[1] For simplicity, this complaint refers to special immigrant visa holders and refugees collectively as "refugees."

assistance with access to social, medical, educational, and employment services. The State Department's payments to USCCB under the cooperative agreements are made through the Department of Health and Human Services' Payment Management System.

34.    The government has a statutory obligation to provide adequate initial-resettlement funding for admitted refugees "to the extent of available appropriations." 8 U.S.C. § 1522(a)(1)(A).[2] In particular, and among other things, the agency "*shall*, to the extent of available appropriations": (1) "make available sufficient resources for employment training and placement in order to achieve economic self-sufficiency among refugees as quickly as possible"; and (2) "provide refugees with the opportunity to acquire sufficient English language training to enable them to become effectively resettled as quickly as possible." *Id.* (emphasis added).

35.    Consistent with those statutory commands, State Department regulations provide that "[p]ayments for allowable costs" incurred by resettlement agencies "must not be withheld . . . unless required by Federal statute, regulations, or" if the "recipient or subrecipient has failed to comply with the terms and conditions of the Federal award" or is "delinquent in a debt." 2 C.F.R. § 200.305(b)(6) (OMB regulations incorporated by reference into the State Department's federal award regulations at 2 C.F.R. § 600.101). The State Department must reimburse

---

[2] Although Section 1522(a) names the Director of the Office of Refugee Resettlement at the Department of Health and Human Services, the Director's statutory obligations with respect to initial resettlement have been transferred by presidential designation to the Secretary of State (and delegated to PRM) under Section 1522(b). *See* Letter from President Jimmy Carter to Speaker of the House of Representatives, 3 Public Papers of President Carter 2879 (Jan. 13, 1981) ("In accordance with Section 412(b)(1)(B) of the Refugee Act of 1980 . . . I have determined that the administration of the Reception and Placement grants, awarded to resettlement agencies for the performance of certain initial services for refugees coming to the United States, should be retained by the Department of State."). The Department of Health and Human Services and Secretary Kennedy are named as defendants out of an abundance of caution, because HHS's Payment Management System is used to make payments to USCCB. So too with Acting Director Harper, to the extent that the government argues that she, not the Secretary of State, is responsible for providing initial resettlement assistance to refugees in USCCB's care.

its resettlement agencies for expenses incurred "within 30 calendar days after receipt of the payment request[s]." *Id.* § 200.305(b)(3).

36.    Similarly, the State Department must abide by certain regulations if it wishes to end its relationship with a refugee-resettlement agency. *See* 2 C.F.R. § 200.340. For example, the Department may terminate a cooperative agreement if it concludes that the "award no longer effectuates the program goals or agency priorities," but only if it does so "pursuant to the terms and conditions" of the award and "to the extent authorized by law." *Id.* § 200.340(a)(4).

37.    For decades, on a bipartisan basis, Congress has consistently appropriated funds for refugee resettlement. In 1985, for example, Congress appropriated $344,730,000 annually to the State Department for "Migration and Refugee Assistance." Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub. L. No. 99-93, § 101, 99 Stat. 405, 407 (1985); *see also* Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No. 103-236, § 104, 108 Stat. 382, 390 (1994) (appropriating about $590,000,000 for the same); Department of State, Foreign Operations, and Related Programs Appropriations Act, 2015, Pub. L. No. 113-235, 128 Stat. 2573, 2589 (2014) (appropriating $931,886,000 for the same); Additional Afghanistan Supplemental Appropriations Act, 2022, Pub. L. No. 117-43, 135 Stat. 372, 375 (2021) (appropriating $415,000,000 for fiscal year 2022 to "address humanitarian needs in, and to assist refugees from, Afghanistan").

38.    Congress's most recent appropriations have been no different. In 2024, Congress appropriated $3,928,000,000 to implement, among other things, "the Migration and Refugee Assistance Act of 1962 . . . and other activities to meet refugee and migration needs." Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, Pub. L.

No. 118-47, 138 Stat. 729, 744 (2024); *see also, e.g.*, Additional Afghanistan Supplemental Appropriations Act, 2022, 135 Stat. at 374–75 (appropriating $976,100,000 for special immigrant visa holders from Afghanistan, among other things).

39.     Independent of the statutory scheme requiring the government to adequately fund initial resettlement for admitted refugees, Congress also has enacted the Impoundment Control Act. *See* 2 U.S.C. § 681 *et seq*. That Act regulates the Executive Branch's authority to "defer" the spending of appropriated funds by imposing substantive limitations and procedural requirements. *Id.* § 684. Before the Executive Branch can defer the use of appropriated funds, the Act requires the President to transmit a "special message" to both houses of Congress with specific details about the proposed deferral, including the amount to be deferred, the deferral's duration, "the reasons for the proposed deferral," and "the estimated fiscal, economic, and budgetary effect" it will have. *Id.* § 684(a). The Act also denies the Executive Branch any authority to defer spending except for three specified reasons; it forbids deferrals based on policy disagreements with Congress. *Id.* § 684(b). Moreover, the Act forbids the Executive Branch from "rescind[ing]" spending that Congress has authorized unless the President transmits a message to Congress and Congress enacts a rescission bill. *Id.* § 683.

**III.     USCCB's Refugee-Resettlement Program And Cooperative Agreements**

40.     Each year since the enactment of the Refugee Act of 1980, USCCB has entered into agreements with the federal government to provide initial-resettlement services for refugees. USCCB receives and coordinates the distribution of PRM awards for initial resettlement through its Migration & Refugee Service. USCCB partners with subrecipients, most of whom are local Catholic Charities, across the United States to accomplish this work. These partners are strategically chosen in concert with the State Department and state refugee coordinators to

achieve goals such as partnering with subrecipients in locations that will facilitate family reunification efforts.

41.    Today, USCCB runs the largest non-governmental refugee-resettlement program in the United States. *Resettlement Services*, USCCB (last visited Feb. 14, 2025), https://perma.cc/2DPN-M47N.  USCCB currently serves approximately 17% of refugees being resettled in the United States.  And since 1980, USCCB has provided refugee-resettlement services to more than 930,000 refugees.

42.    In providing this assistance, USCCB has consistently devoted more resources than it receives in related federal funding.  In 2023, for example, USCCB paid $4 million more on its refugee-resettlement and related programs than it received from the federal government. KPMG, *United States Conference of Catholic Bishops and Affiliates: Consolidated Financial Statements with Supplemental Schedules, December 31, 2023 and 2022*, at 30 (Aug. 16, 2024), https://perma.cc/59YQ-TH5L.  And those numbers do not account for the additional cash, in-kind contributions, or volunteer services provided by local Catholic Charities and other subrecipients.

43.    For Fiscal Year 2025, USCCB entered into two cooperative agreements with PRM awarding USCCB around $65 million for initial refugee resettlement.  One of the agreements covers refugees; the other covers refugees and special immigrant visa holders from Afghanistan, who are treated like refugees for initial-resettlement purposes.  In all other relevant respects, the terms of the cooperative agreements are materially identical.  Both cooperative agreements run from October 1, 2024 to September 30, 2025.

44.    Both cooperative agreements require USCCB to "[a]ssume responsibility for sponsorship of the refugees assigned to" it "under this agreement."  On the day a refugee is

admitted, USCCB must ensure that each refugee is met at the airport, transported to their home, and provided a first meal as well as food and clothing for their immediate needs.  USCCB also must ensure that "refugees assigned to it" are provided the required home visits within 72 hours of arrival, and that the housing provided to the refugees is safe, sanitary, and adequately furnished.  USCCB must then assist refugees with, among other things, applications for social security cards, health insurance and medical care, English-language programs, cultural orientation, and employment services during the first 90 days they are in the United States.

## IV.    The President And Secretary Of State Issued Orders Suspending Foreign Aid and Refugee Admissions

45.    Starting on January 20, 2025, both the President and the Secretary of State issued orders suspending foreign aid and refugee admissions into the United States.  But none of those orders expressly suspends funding for the resettlement of admitted refugees.

46.    On January 20, President Trump signed an executive order titled "Reevaluating and Realigning United States Foreign Aid."  Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025) ("Foreign Aid Executive Order").  The Foreign Aid Executive Order directs relevant Executive Branch officials to institute a "90-day pause in United States foreign development assistance" pending review for programmatic efficiency and policy alignment, subject to waivers authorized by the Secretary of State for specific programs.  *Id.* § 3(a).  On the same day, President Trump signed an executive order titled "Realigning the United States Refugee Admissions Program."  Exec. Order No. 14,163, 90 Fed. Reg. 8459 (Jan. 20, 2025) ("Refugee Executive Order").  The Refugee Executive Order suspends the entry of new refugees into the United States with narrow exceptions.

47.    On January 24, Secretary of State Rubio issued an order to all State Department diplomatic and consular posts stating that "[c]onsistent with" the Foreign Aid Executive Order,

"all new obligations of funding . . . for foreign assistance programs funded by or through the Department and USAID" would be paused "pending a review." Memorandum from Secretary of State to All Diplomatic and Consular Posts, Dep't of State (Jan. 24, 2025), https://perma.cc/J26T-VCJR ("Rubio Memo"). The Rubio Memo instructed that for "existing foreign assistance awards, contracting officers and grant officers shall immediately issue stop-work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review." *Id.* The Rubio Memo also provided for waivers for limited circumstances. *Id.*

## V.    The Government Abruptly Suspended Funding For Refugee Resettlement

48.    Although none of the President's or Secretary of State's orders mentions (let alone pauses) funding for the resettlement of refugees already admitted into the United States, the State Department decided suddenly to suspend refugee-resettlement funding as well (the "Refugee Funding Suspension").

49.    On January 24, on information and belief, PRM sent materially identical suspension letters to its resettlement agencies, including USCCB. *See, e.g.*, Complaint ¶¶ 196–97, *Pacito v. Trump*, No. 2:25-cv-255 (W.D. Wash. Feb. 10, 2025).

50.    The two-page suspension letter USCCB received stated that "consistent with" the Foreign Aid Executive Order, awards pursuant to USCCB's cooperative agreements with the State Department were "immediately suspended as of January 24, 2025" "pending a Department-wide review of foreign assistance programs." Ex. A ("Suspension Letter"). The suspension letter instructed that immediately upon receipt, USCCB "must stop all work under the award(s) and not incur any new costs after" January 24 and "cancel as many outstanding obligations as possible." *Id.*

51.    The suspension letter provided only two perfunctory reasons for the sudden suspension.  First, the order stated that the suspension was "[c]onsistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid," without addressing how domestic refugee resettlement constitutes foreign aid.  *Id.*  Second, the letter stated that the award to USCCB "may no longer effectuate agency priorities," without addressing what the agency's priorities are or why the awards may no longer effectuate those priorities.  *Id.*  The letter did not explain why the government had elected to suspend funding pending its reevaluation of priorities rather than conduct that review before cutting off funding midstream.

52.    The suspension letter also stated that USCCB could "submit payment requests for legitimate expenses incurred prior to the date of" the letter "or legitimate expenses associated with the" funding suspension.  *Id.*  But the government has thus far refused to reimburse USCCB for more than $13 million in reimbursement funds for initial-resettlement services rendered before January 24.

53.    On January 28, USCCB responded to PRM.  USCCB explained that its resettlement program services "includ[e] the provision of housing support, emergency food assistance, and emergency medical care to newly arrived refugees and Special Immigrant Visa ("SIV") holders who have been processed and approved for resettlement in the United States by the federal government."  Ex. B.  USCCB urged that its programs were consistent with the "Administration's goals to make the United States safer and stronger, as it operates domestically to ensure that newly arrived refugees and SIV holders are able to integrate successfully into local communities."  *Id.*  USCCB also explained that it did not understand their awards to represent

"new costs" and that the organization is entitled to reimbursement for all costs for serving "refugees and SIV holders in their initial 90-day . . . service periods." *Id.* USCCB also inquired about "legitimate expenses" it incurred before January 24, 2025. *Id.*

54.    On January 31, 2025, in providing an update about payment requests, PRM stated that the suspension was issued in order to "compl[y] with the [Foreign Aid] Executive Order." Ex. C. PRM also directed USCCB to "abide by the notice of suspension issued to [the] organization." *Id.*

## VI.    The Government Terminated Its Partnerships For Refugee Resettlement

55.    USCCB filed suit against the Defendants on February 18, 2024 and sought a temporary restraining order and a preliminary injunction. *See* Complaint, ECF No. 1; Motion for Temporary Restraining and Preliminary Injunction, ECF No. 5. This Court denied USCCB's motion for a temporary restraining order and scheduled a hearing to adjudicate USCCB's motion for a preliminary injunction. ECF No. 15.

56.    While the litigation was ongoing, the State Department purported to terminate the initial-resettlement program. On February 26, 2025, two days before the preliminary injunction hearing, the State Department issued two notices of termination to USCCB, cancelling its cooperative agreements to provide initial-resettlement services to the refugees the government assigned to USCCB.

57.    On information and belief, the State Department sent materially identical termination notices to its other resettlement agencies. *See, e.g.*, Plaintiffs' Motion for Emergency Conference or Show Cause Hearing at 1–2, *Pacito v. Trump*, No. 2:25-cv-255 (W.D. Wash. Feb. 27, 2025) (describing HIAS, Inc.'s and Church World Service, Inc.'s termination letters).

58.    The one-page letters USCCB received stated that the awards were "immediately terminated as of February 27, 2025." Ex. D; Ex. E ("Termination Letters"). Like the suspension

letter, the termination letters instructed that immediately upon receipt, USCCB "must stop all work on the program and not incur any new costs" after February 27 and "cancel as many outstanding obligations as possible." Ex. D; Ex. E.

59.    The termination letters provided a single reason for the termination—that the cooperative agreements "no longer effectuate[] agency priorities." Ex. D; Ex. E. The letters did not address what the State Department's priorities are or why the awards no longer effectuate those priorities. Ex. D; Ex. E. The letters did not explain why the government elected to cut off its relationship with USCCB "immediately" rather than giving USCCB a 90-day notice of impending termination to allow the refugees assigned to USCCB's care to graduate from the program. Ex. D; Ex. E.

60.    The termination letters also revealed that the State Department views any initial-resettlement services USCCB provided to refugees between January 24 and February 27 as "new costs." The termination letters stated that if USCCB's awards were "already in suspended status," only "payment requests for legitimate costs incurred prior to the effective date of the Notice of Suspension are allowable." Ex. D; Ex. E. The termination letters thereby assumed that the suspension letter operated to render post-January 24 expenses non-reimbursable.

61.    The termination letters repeated the State Department's promise that "[p]ayment requests for legitimate costs incurred prior to this notification are allowable." Ex. D; Ex. E. But the government has thus far refused to reimburse USCCB for more than $13 million in reimbursement funds for initial-resettlement services rendered before January 24.

## VII.    The Refugee Funding Suspension Has Inflicted Swift And Irreparable Harm

62.    On January 25, 2025, the day after USCCB received the suspension letter, there were 6,758 refugees that had been assigned by the federal government to USCCB's care and who had been in the United States for 90 days or less. As of February 24, 2025, two days before

USCCB received the termination letters, more than 5,000 refugees assigned to USCCB's care remained eligible for initial-resettlement services.

63.     In the ordinary course, USCCB receives subrecipient reimbursement requests for refugee-resettlement services rendered.  USCCB then pays its subrecipients for the refugee-resettlement services provided pursuant to the cooperative agreements and pays its own administrative costs, operating costs, and the salaries of resettlement staff provided for in the agreements.  Then, USCCB submits reimbursement requests for those costs to PRM's grants office. Those funds are typically available to USCCB within 24 to 48 hours.

64.     As a result of the Refugee Funding Suspension and Termination, however, USCCB has not been reimbursed for services provided to the thousands of refugees that have been assigned to it.  USCCB has not been paid for services provided as far back as November 2024, or for services rendered after January 24 to the refugees already allocated to USCCB's care for their initial-resettlement period.  USCCB is currently awaiting approximately $13 million of unpaid reimbursements and currently owes an additional $11.4 million to its subrecipients that it is unable to reimburse.  These numbers will continue to rise by millions of dollars every week that the Refugee Funding Suspension and Termination remain in effect.

65.     The consequences of that funding shortfall have been predictably devastating. As a result of that shortfall, on February 7, USCCB was forced to give four-weeks' notice of planned termination to 50 staff members in its Migration & Refugee Services office, more than half of its refugee-resettlement staff.  Those staff members have accumulated expertise with USCCB's programs, partners, and the refugees USCCB serves; losing them will negatively affect USCCB's ability to provide refugee resettlement services in the future.

66.     Likewise, USCCB cannot sustain the current scale of its refugee resettlement services without federal funding.  The fact that federal funding is integral to USCCB's resettlement services is a direct result of congressional decisions about the design of the program and the appropriations directed to it.  And the termination of USCCB's partnership with the government, the first termination in USCCB's decades-long relationship with the State Department, will cause long-term, potentially catastrophic consequences to USCCB's programs.  Even if the State Department later decides to reinstate the program, the substantial financial risk of partnering with the government to provide these services is too high if reimbursements can be arbitrarily and unlawfully suspended or terminated; USCCB's local partners will be unwilling to work with USCCB on such programs.  As a result, USCCB faces irreparable harm to its mission to care for vulnerable refugee populations in the United States.

67.     USCCB also faces reputational harm as an employer and as a provider of refugee resettlement services.  The Refugee Funding Suspension and Termination have caused irreparable harm to USCCB's reputation and relationships with its subrecipients, who have stopped receiving payments from USCCB despite expecting their ordinary-course reimbursements.  USCCB's inability to meet its subrecipients' expectations will harm those relationships and make it less likely that subrecipients will be willing to rely on and partner with USCCB in fulfilling refugee-assistance cooperative agreements—or other programs—in the future.  The reputational harm and staff reductions suffered by USCCB's subrecipients will also make it more difficult to partner with those organizations going forward.

68.     The Refugee Funding Suspension and Termination also have caused irreparable harm to the refugees in USCCB's care, who rely on the resettlement program's material assistance, language education, and job training in their first 90 days in this country.  Several of

23

USCCB's subrecipients have been forced to stop providing resettlement services for the refugees in their care. With each day that passes while the suspension and termination are in effect, more refugees are at risk of losing their new homes and losing access to the vital cash assistance, English-language programs, and employment assistance they need to successfully integrate into their newfound communities.

69.    The Refugee Funding Suspension and Termination also harm the public interest. USCCB and its subgrantees provide essential services to vulnerable, new members of American society who have entered this country legally after being thoroughly vetted by multiple federal agencies. The services provided by USCCB and its subrecipients successfully integrate refugees into communities and enable refugees to be self-sufficient, consistent with congressional directives. *See, e.g.*, 8 U.S.C. § 1522(a)–(b). And the results bear out Congress's judgment. When so integrated, refugees have a significant, positive impact on society and the U.S. economy: From 2005 to 2019, for example, refugees served by the Department of Health and Human Service's Office of Refugee Resettlement yielded a net positive fiscal impact of $123.8 billion and generated $581 billion in revenue for state and federal governments. *See* Off. of Assistant Sec'y for Plan. & Evaluation, U.S. Dep't of Health & Hum. Servs., *The Fiscal Impact of Refugees and Asylees at the Federal, State, and Local Levels from 2005 to 2019*, at 4 (Feb. 2024), https://perma.cc/Y95E-QLWS. And Congress's passage of the Migration and Refugee Assistance Act of 1962, the Refugee Act of 1980, and the decades-worth of consistent and meaningful appropriations for refugee resettlement express the wise judgment of multiple Congresses and Presidents that providing refugee resettlement services is in the public interest.

**COUNT I**
**Administrative Procedure Act and Equitable Cause of Action**
**(Violations of Appropriations Statutes)**

70.    Plaintiff incorporates the preceding paragraphs by reference.

71.    The APA authorizes this Court to hold unlawful and set aside agency action that is "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(B)–(D).

72.    The Refugee Funding Suspension and Termination undermine the Constitution's separation of powers, contravene statutes requiring the government to provide certain forms of refugee assistance to the extent of available appropriations, and violate the Impoundment Control Act's substantive and procedural requirements.

73.    The Constitution vests the power of the purse in Congress.  The Appropriations Clause and Article I ensure "that public funds will be spent according to the letter of the difficult judgments reached *by Congress* as to the common good and not according to the individual favor of Government agents."  *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990) (emphasis added).  "If it were otherwise, the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure."  *Id.* at 427 (quoting Joseph Story, 2 Commentaries on the Constitution of the United States § 1348 (3d ed. 1858)).

74.    Those principles apply with equal force when the Executive Branch *refuses* to spend money that Congress has appropriated for specific purposes.  In those circumstances, the "practical effect" of Executive impoundments is to unilaterally negate appropriations statutes, contravening the "'finely wrought' procedure that the Framers designed" for the enactment or

repeal of a law. *Clinton v. City of New York*, 524 U.S. 417, 438–40 (1998). That is why "where previously appropriated money is available for an agency to perform a statutorily mandated activity," there is "no basis for a court to excuse the agency from that statutory mandate." *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013).

75.    When the Executive Branch ignores Congress's instructions with respect to appropriations, it arrogates to itself Congress's power of the purse. That threatens to concentrate "power in the hands of a single branch" at grave risk to individual liberty, which is "always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton*, 524 U.S. at 450 (Kennedy, J., concurring). The Executive's power therefore is at its "lowest ebb" when it defies Congress's appropriations laws. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

76.    Here, Congress has imposed (with the President's assent) two independent restrictions on the Executive Branch's ability to suspend or terminate funding for refugee resettlement:  First, it has enacted a statute mandating that the State Department spend available appropriations on certain forms of assistance for refugees it has admitted; and, second, it has enacted the Impoundment Control Act, which permits the Executive Branch to defer spending appropriated funds only for particular reasons and after complying with specific procedures. The government has defied both of those congressional commands.

77.    *First*, the Refugee Funding Suspension and Termination contravene Congress's command that in administering the initial-resettlement program, the government must promptly provide certain services to admitted refugees. The Immigration and Nationality Act, as amended by the Refugee Act of 1980, provides that once the government chooses to admit refugees into

the United States, the Secretary must provide funding to those refugees "*to the extent of available appropriations.*" 8 U.S.C. § 1522(a)(1)(A) (emphasis added). Among other things, the Secretary "*shall*" make available "as quickly as possible" "sufficient resources for employment training" and for "sufficient English language training." *Id.* (emphasis added).

78.    Here, the government has chosen to admit refugees into the United States. 8 U.S.C. § 1522(a)(1)(A). At the time of the Refugee Funding Suspension, it had assigned nearly 7,000 refugees to USCCB who had been in the United States for 90 days or less. The government therefore has an obligation to make available funding for resettling those refugees "as quickly as possible" and "to the extent of available appropriations." *Id.*

79.    The government has made no suggestion that the funds Congress appropriated to support this program have been exhausted. Last year alone, Congress appropriated $3.9 billion to the State Department for, among other things, "migration and refugee assistance." Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, 138 Stat. at 744; *see also* Additional Afghanistan Supplemental Appropriations Act, 2022, 135 Stat. at 375 (appropriating an additional $976,100,000 for special immigrant visa holders from Afghanistan, among other things). Nor has it suggested that it is providing the statutorily mandated initial-resettlement services to the refugees in USCCB's care through other means. Yet the government, through the Refugee Funding Suspension and Termination, is indefinitely refusing to spend that money, even though Congress has commanded that it do so for statutorily mandated purposes—including providing employment and English training to refugees already placed with USCCB. *See* 8 U.S.C. § 1522(a)(1)(A). The government instead has left USCCB and its assigned refugees to fend for themselves. The Refugee Act of 1980 simply does not give

the government "discretionary control over the outlay of funds" that Congress not only has ap-propriated for these specific purposes but also mandated that the government spend for those same purposes. *Train*, 420 U.S. at 45.

80.    *Second*, the Refugee Funding Suspension and Termination are independently un-lawful because they violate the Impoundment Control Act.  That Act limits the authority of the Executive Branch "to defer any budget authority provided for a specific purpose or project."  2 U.S.C. § 684(a).  It defines a "deferral of budget authority" broadly to include "*withholding or delaying* the *obligation or expenditure* of budget authority . . . provided for projects or activi-ties," or "any other type of Executive action or inaction which *effectively precludes the obliga-tion or expenditure* of budget authority."  *Id.* § 682(1) (emphasis added); *see Matter of Henry M. Jackson, U.S. Senate*, B-200685, 1980 WL 14499, at *1 (Comp. Gen. Dec. 23, 1980) ("[A]ny executive branch action or inaction whether based on programmatic, budgetary, or other factors, is potentially subject to the Impoundment Control Act if it precludes or delays, the use of budget authority.").

81.    The Impoundment Control Act establishes procedural requirements for deferring or rescinding budget activities required by Congress.  If an agency intends to temporarily or permanently defer spending money that it has been appropriated, "the President shall transmit" a special message to Congress specifying, among other things, how much budget authority he wishes to defer and for how long, the specific projects or governmental functions involved, his reasons and legal authority for doing so, and the "fiscal, economic, and budgetary effect of the proposed deferral."  2 U.S.C. § 684(a).  Similarly, if the President wishes to "rescind[]" budg-

etary authority—"terminat[ing] . . . authorized projects or activities for which budgetary authority has been provided"—he must submit a special message to Congress explaining and justifying his proposal.  *Id.* § 683(a).

82.    The Impoundment Control Act also imposes substantive limits on the Executive Branch's authority to defer or rescind budget authority.  "Deferrals shall be permissible *only*" to "(1) provide for contingencies; (2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law."  *Id.* § 684(b) (emphasis added).  "No officer or employee of the United States may defer any budget authority for any other purpose"—including based on policy disagreements.  *Id.*  As the D.C. Circuit has explained, a "President sometimes has policy reasons (as distinct from constitutional reasons) . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program."  *In re Aiken County*, 725 F.3d at 261 n.1.  "But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds."  *Id.*  "Instead, the President must propose the rescission of funds" under the Impoundment Control Act, "and Congress then may decide whether to approve a rescission bill."  *Id.*  If Congress does *not* enact a rescission bill, the funds must be "made available."  2 U.S.C. § 683(b).

83.    Here, the Refugee Funding Suspension and Termination effect a "deferral of budget authority" within the meaning of the Impoundment Control Act.  The suspension indefinitely halts—and the termination defers or rescinds—the disbursement of millions in funds that Congress appropriated to the government for refugee assistance and the government committed to expending through cooperative agreements with USCCB.  Despite Congress's specific appropriation of funds for refugee assistance, the government seeks categorically not to spend those funds.  That is unquestionably a "delay[]" in the "expenditure of budget authority" or an

"action" that "effectively precludes the . . . expenditure of budget authority" under the Impound-ment Control Act.  2 U.S.C. § 682(1); *see also New York v. Trump*, 2025 WL 357368, at *2 (D.R.I. Jan. 31, 2025) (Executive Branch's indefinite pause of all federal financial assistance likely violates the Impoundment Control Act).  It also constitutes the "termination of authorized projects or activities for which budget authority has been provided."  2 U.S.C. § 683(a).

84.    The Refugee Funding Suspension's and Termination's deferral and rescission of budget authority violates the Impoundment Control Act's procedural requirements by ignoring them altogether.  There is no indication that the President has transmitted to Congress any spe-cial message explaining and justifying the deferral or rescission of budgetary authority effected by the Refugee Funding Suspension and Termination, as the Act requires.  *See* 2 U.S.C. §§ 683(a), 684(a).  The Act's procedural requirements would have forced the government to consider and explain the consequences of its sudden funding suspension or termination before acting.  The government's failure to do so violates the Act.

85.    The Refugee Funding Suspension and Termination also run afoul of the substan-tive limitations imposed by the Act.  USCCB's suspension letter states that the government is deferring spending because the awards "may no longer effectuate agency priorities."  Ex. A, Suspension Letter, *supra.*  USCCB's termination letters purport to make a definitive conclusion to that effect.  Ex. D, Ex. E, Termination Letters, *supra*.  To the extent that rationale has any discernable meaning at all, it expresses nothing more than a pure policy disagreement.  As the D.C. Circuit has recognized, such policy disagreements fall outside the Act's three enumerated categories of permissible deferrals.  2 U.S.C. § 684(b)(1)–(3); *In re Aiken County*, 725 F.3d at

261 n.1 ("[I]n those circumstances, even the President does not have unilateral authority to re-fuse to spend the funds").  And because Congress has not enacted a rescission bill, the Impound-ment Control Act forbids the termination.  2 U.S.C. § 683(b).

86.    The Refugee Funding Suspension and Termination thus violate both the Refugee Act of 1980 and its related appropriations statutes, and the Impoundment Control Act—all in contravention of the Constitution's separation of powers.  To the extent that the government might argue that the Foreign Aid Executive Order or the Rubio Memo independently justify or require the Refugee Funding Suspension or Termination, those actions are unlawful for the same reasons.

87.    The Refugee Funding Suspension and Termination, including the suspension of reimbursements for pre-January 24 expenses and for ongoing expenses that USCCB incurs in implementing the refugee-resettlement program under Section 1522, should be declared unlaw-ful and set aside, as should the Rubio Memo to the extent it applies to USCCB.  *See* 5 U.S.C. §§ 702, 706.  Defendants and all persons acting in concert with them should be enjoined from enforcing, implementing, or in any manner giving effect to the Refugee Funding Suspension and Termination—and, to the extent they apply to USCCB, the Foreign Aid Executive Order and Rubio Memo.  *See* 5 U.S.C. § 705; *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (recognizing equitable cause of action to enjoin "violations of federal law by federal officials"); *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902).

## COUNT II
### Administrative Procedure Act
### (Arbitrary and Capricious Agency Action)

88.    Plaintiff incorporates the preceding paragraphs by reference.

89.     The Administrative Procedure Act authorizes this Court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

90.     The APA requires agency action to be "reasonable and reasonably explained." *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (quotation marks omitted).  Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

91.     Among the most important factors that an agency must consider are "serious reliance interests" engendered by its prior policies and significant alternatives to its chosen course of action. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,* 591 U.S. 1, 30 (2020) (reliance interests); *Allied Local & Reg'l Mfrs. Caucus v. Env't Prot. Agency*, 215 F.3d 61, 80 (D.C. Cir. 2000) (alternatives).

92.     The Refugee Funding Suspension and Termination are textbook arbitrary-and-capricious agency actions.  The government utterly failed to consider the dire consequences of its actions and obvious, superior alternatives; it gave no reasoned explanation for its decisions; and it ignored its own regulations.

93.     *First*, the government "entirely failed to consider . . . important aspect[s] of the problem." *State Farm*, 463 U.S. at 43.  Most glaringly, the government did not account for the obvious and serious consequences that an immediate funding suspension or termination would have on award recipients like USCCB, its subrecipients, and individual refugees—including

irreparable damage to USCCB's reputation, relationships, and mission, and to refugees who lose essential services and training during the critical first months of their resettlement periods. The government made no effort whatsoever to identify (let alone weigh) the costs and benefits of its blunderbuss Refugee Funding Suspension and Termination—and tellingly could provide no explanation even after USCCB raised these issues with PRM post suspension.

94.     In so failing, the government also ignored the substantial, reasonable reliance interests imperiled by a sudden suspension or termination of refugee-assistance awards. *Regents,* 591 U.S. at 30 ("When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." (quotation marks omitted)); *see also Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).

95.     For decades, USCCB has reasonably relied on awards from the government under the terms of its cooperative agreements. USCCB has entered into cooperative agreements with and received reimbursement from the government every year since 1980, and *never*—not until the Refugee Funding Suspension—has the government halted funding mid-agreement. USCCB fulfills its obligations under the agreements to provide high-quality, essential resettlement assistance to thousands of refugees; and it reasonably expects in return, based on past experience and the terms of the agreements, that the government will meet its statutory funding obligations.

96.     By abruptly cutting off funding without notice, the government predictably eviscerated USCCB's serious reliance interests. USCCB has about $13 million (and growing) of unreimbursed costs that it incurred prior to the Refugee Funding Suspension in reliance on its cooperative agreements and owes an additional $11.4 million to its subrecipients for services

rendered, $9.8 million of which is for services rendered prior to the Suspension. Because of the Refugee Funding Suspension, USCCB on February 7 had no choice but to notify 50 employees—more than half of its refugee resettlement staff—of impending termination. All of those employees relied on continued funding under USCCB's cooperative agreements. Moreover, USCCB already has had to stop reimbursing its subrecipients providing direct services to refugees, causing those organizations to go unpaid despite *their* reliance on the State Department's compliance with its funding obligations. And most disheartening, lawfully admitted refugees who resettled in this country relying on the Department's promise to aid their integration have lost—and more will soon lose—the essential services provided to them by USCCB and its subrecipients. The Termination has cemented that these harms are going to continue.

97.    The APA "required" the government—*before* taking action—"to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33.

98.    The government also failed to consider several obvious, less disruptive "alternative way[s] of achieving [its] objectives." *State Farm*, 463 U.S. at 48. First, before issuing the Suspension, the State Department could have conducted a review of its outstanding cooperative agreements to ensure their compliance with agency priorities *before* halting funds to active awardees. The government has "not offered any explanation for why a blanket suspension of all congressionally appropriated foreign aid, which set off a shockwave and upended reliance interests for thousands of businesses, nonprofits, and organizations around the country, was a rational precursor to reviewing the programs." *AIDS Vaccine Advoc. Coal. v. Dep't of State*, 2025 WL 485324, at *5 (D.D.C. Feb. 13, 2025). Indeed, there is no indication that the government considered this alternative, and it certainly did not explain itself. That glaring failure also

dooms the Refugee Funding Suspension. *Yakima Valley Cablevision, Inc. v. Fed. Commc'ns Comm'n*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986) ("The failure of an agency to consider obvious alternatives has led uniformly to reversal.").

99.    The government also failed to consider an obvious, less disruptive alternative to the Refugee Funding Termination—namely, terminating USCCB's awards prospectively only while allowing USCCB to provide services to the refugees already in its care until the end of their initial 90-day periods and to conduct an orderly wind down of their resettlement programs. As with the suspension, the government has "not offered any explanation" for why the terminations needed to occur immediately. *AIDS Vaccine Advoc. Coal.*, 2025 WL 485324, at *5. The government's failure to consider the devastation the abrupt terminations would cause was arbitrary and capricious. *See Yakima Valley Cablevision, Inc.*, 794 F.2d at 746 n.36.

100.    *Second*, the Refugee Funding Suspension and Termination are arbitrary and capricious because the reasons the government *did* provide are manifestly inadequate.

101.    The government's first rationale for the Refugee Funding Suspension was that it is "[c]onsistent with" the President's Foreign Aid Executive Order. Ex. A, Suspension Letter, *supra*. But that Executive Order applies only to "foreign assistance." "Foreign assistance," whatever its meaning, cannot plausibly include awards to an *American* non-profit for refugees *in the United States*. *Cf.* 22 U.S.C. § 2394(b) ("foreign assistance" means aid provided "to a foreign country or international organization"). That is particularly so because the statute under which the government provides funding to USCCB refers to awards for refugee resettlement as "*domestic* assistance." 8 U.S.C. § 1522(a)(3) (emphasis added). At a minimum, the government made no effort to explain how USCCB's activities constitute "foreign assistance" or how the

Refugee Funding Suspension otherwise would be "consistent with" the Foreign Aid Executive Order.

102.    The government's second rationale for the Refugee Funding Suspension fares no better.  The government stated that USCCB's cooperative agreements "may no longer effectuate agency priorities," but it did not explain what those priorities are.  Ex. A, Suspension Letter, *supra*.  More problematic, the government did not explain *why* its agreements with USCCB may no longer effectuate those priorities—a particularly glaring omission given that the government has continuously funded USCCB's refugee programs for decades.  It is a basic precept of administrative law that "conclusory statements" like these "do not meet the requirement that 'the agency adequately explain its result.'"  *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1407 (D.C. Cir. 1995).

103.    The Refugee Funding Termination only contained a single rationale.  The State Department announced its conclusion that USCCB's cooperative agreements "no longer effectuate[] agency priorities" but provided zero explanation as to what priorities the State Department considered or how its longstanding relationship with USCCB violated those objectives.  Ex. D, Ex. E, Termination Letters, *supra*.  Nothing in the termination letters adequately explains how the State Department reached its decision to terminate its partnership with USCCB.

104.    To the extent that the Refugee Funding Suspension and Termination include an unwritten refusal to reimburse pre-January 24 expenses incurred pursuant to USCCB's cooperative agreements, the government gave *no* rationale for this action.  It simply stopped reimbursing these expenses even though the written suspension letter and termination letters that USCCB received explicitly contemplate their reimbursement.

105.    *Third*, in issuing the Refugee Funding Suspension and Termination, the government also ignored its own regulations.  "[A]n agency action may [also] be set aside as arbitrary and capricious if the agency fails to comply with its own regulations."  *Nat'l Env't Dev. Ass'n's Clean Air Project v. Env't Prot. Agency*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (citation and quotation marks omitted).

106.    The State Department has a regulation providing that "[p]ayments for allowable costs [incurred under a Federal award] must not be withheld . . . unless required by Federal statute, regulations, or" if the "recipient or subrecipient has failed to comply with the terms and conditions of the Federal award" or is "delinquent in a debt."  2 C.F.R. § 200.305(b)(6) (incorporated by reference into the State Department's federal award regulations at 2 C.F.R. § 600.101).  Another regulation states that reimbursements for services rendered under a federal award must be paid "within 30 calendar days after receipt of the payment request" unless the State Department "reasonably believes the request to be improper."  *Id.* § 200.305(b)(3).

107.    Here, no statute or regulation requires the payments to USCCB to be withheld, and the government has not asserted that USCCB has failed to comply with the terms of the award or is delinquent in a debt.  And even if the suspension letter theoretically allows reimbursements for "legitimate expenses" incurred prior to January 24, Ex. A, Suspension Letter, *supra*, the Department's Refugee Funding Suspension in fact includes an unwritten policy of refusing to reimburse even those "allowable costs," 2 C.F.R. § 200.305(b)(6).  And more than thirty days have passed without reimbursement with respect to at least two of the requests USCCB submitted to the State Department, with more requests that will become past due in the coming days.

108.    The government also violated its own regulations with respect to the Refugee Funding Termination.  The State Department's regulations permit it to terminate a cooperative agreement if it concludes that the "award no longer effectuates the program goals or agency priorities," but the Department may only effectuate such terminations "pursuant to the terms and conditions" of the award and "to the extent authorized by law."  *Id.* § 200.340(a)(4).

109.    The Refugee Funding Termination violates that regulation.  Even if the State Department made a reasoned decision that USCCB's cooperative agreements "no longer effec-tuate[]" its priorities, Ex. D, Ex. E, Termination Letters, *supra*, the terminations still violate the agency's regulations because they are not "authorized by law," for the reasons already dis-cussed, 2 C.F.R. § 200.340(a)(4).  Terminating the cooperative agreements for initial-resettle-ment services *without establishing an alternative means* to fulfill the State Department's obli-gations under the Refugee Act of 1980 violates that statute—not to mention the Impoundment Control Act and the APA.

110.    The government's departure from its own regulations, without explanation, in-dependently violates the APA.

111.    For each of these reasons, the Refugee Funding Suspension and Termination are arbitrary and capricious in violation of the APA.  To the extent the government might argue that the Rubio Memo or Foreign Aid Executive Order independently justify or require the Refugee Funding Suspension, those actions are arbitrary and capricious for the same reasons.

112.    The Refugee Funding Suspension and Termination, including the suspension of reimbursements for pre-January 24 expenses and for ongoing expenses that USCCB incurs in implementing the refugee-resettlement program under Section 1522, should be declared unlaw-ful and set aside, as should the Rubio Memo to the extent it applies to USCCB.  *See* 5 U.S.C. §§ 702, 706.  Defendants and all persons acting in concert with them should be enjoined from

enforcing, implementing, or in any manner giving effect to the Refugee Funding Suspension and Termination—and, to the extent they apply to USCCB, the Foreign Aid Executive Order and Rubio Memo. *See* 5 U.S.C. § 705; *Armstrong*, 575 U.S. at 327.

## COUNT III
**Administrative Procedure Act**
**(Failure To Conduct Notice-And-Comment Rulemaking)**

113.    Plaintiff incorporates the preceding paragraphs by reference.

114.    The Refugee Funding Suspension and Termination are also substantive rules issued without the notice-and-comment procedures required by the APA. Before issuing a "substantive rule," the Administrative Procedure Act commands agencies to publish a "[g]eneral notice of proposed rule making" and "give interested persons an opportunity to participate in the rule making." 5 U.S.C. § 553. An agency's failure to do so requires setting aside the agency's resulting action. *See Kooritzky v. Reich*, 17 F.3d 1509, 1514 (D.C. Cir. 1994).

115.    The Refugee Funding Suspension and Termination are substantive rules because they "alter the rights or interests of parties." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014). Far from merely putting the public "on notice of *pre-existing* legal obligations or rights" or adjudicating an individual's rights "case-by-case" under pre-existing law, the Refugee Funding Suspension and Termination have the legal effect of prospectively altering the rights of refugees and resettlement organizations like USCCB to receive funding. *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83, 85 (D.C. Cir. 2020). The government therefore was required to provide public notice and opportunity for comment before implementing this significant, prospective change.

116.    The Refugee Funding Suspension and Termination thus violated the procedural requirements of the APA. To the extent the government might argue that the Rubio Memo or Foreign Aid Executive Order independently justify or require the Refugee Funding Suspension

39

or Termination, the Rubio Memo and agency actions implementing the Foreign Aid Executive Order are unlawful for the same reasons and should be set aside.

117.    The Refugee Funding Suspension and Termination, including the suspension of reimbursements for pre-January 24 expenses and for ongoing expenses that USCCB incurs in implementing the refugee-resettlement program under Section 1522, should be declared unlawful and set aside, as should the Rubio Memo to the extent it applies to USCCB. *See* 5 U.S.C. §§ 702, 706. Defendants and all persons acting in concert with them should be enjoined from enforcing, implementing, or in any manner giving effect to the Refugee Funding Suspension and Termination—and, to the extent they apply to USCCB, the Rubio Memo and Foreign Aid Executive Order. *See* 5 U.S.C. § 705; *Armstrong*, 575 U.S. at 327.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

1.    Declare that the Refugee Funding Suspension and Refugee Funding Termination (and, to the extent they apply to USCCB, the Rubio Memo and actions implementing the Foreign Aid Executive Order) violate the Refugee Act of 1980, the Impoundment Control Act, and the separation of powers; are arbitrary and capricious under the APA; and are substantive rules that did not comply with the procedural requirements of the APA;

2.    Hold unlawful and set aside the Refugee Funding Suspension and Refugee Funding Termination (and, to the extent it applies to USCCB, the Rubio Memo);

3.    Enjoin—temporarily, preliminarily, and permanently—Defendants from taking any action enforcing or implementing against USCCB the Refugee Funding Suspension, Refugee Funding Termination, Rubio Memo, or Foreign Aid Executive Order;

4.    Enjoin—temporarily, preliminarily, and permanently—Defendants from issuing or reissuing other letters or taking any other actions that have a materially similar effect;

5.    Enjoin Defendants to comply with their statutory and regulatory obligations, including those under the Refugee Act of 1980 to provide initial-resettlement services to the refugees in USCCB's programs;

6.   Award Plaintiff's counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

7.   Award such other relief as this Court may deem just and proper.

March 3, 2025                                     Respectfully submitted,


                                                 /s/ David W. Casazza

William Quinn (D.C. Bar No. 1601853)             Dhananjay Manthripragada
Shannon Eckman (D.C. Bar No. 90024504)**           (D.C. Bar No. 990448)*
UNITED STATES CONFERENCE OF CATHOLIC             Nick Harper (D.C. Bar No. 144707)
BISHOPS                                          David W. Casazza (D.C. Bar No. 1046918)
3211 Fourth Street, N.E.                         Connor P. Mui (D.C. Bar No. 90009004)*
Washington, DC 20017                             Aly Cox (D.C. Bar No. 1780473)
(202) 541-3300                                   Laura Stanley (D.C. Bar No. 90008623)*
WQuinn@usccb.org                                 Hunter Mason (D.C. Bar No. 90021049)*
                                                 Audrey Payne (D.C. Bar No. 90028352)*

                                                 GIBSON, DUNN & CRUTCHER LLP
*pro hac vice                                    1700 M Street, N.W.
**pro hac vice forthcoming                       Washington, D.C. 20036-4504
                                                 (202) 955-8500
                                                 DManthripragada@gibsondunn.com
                                                 NHarper@gibsondunn.com
                                                 DCasazza@gibsondunn.com
                                                 CMui@gibsondunn.com
                                                 ACox@gibsondunn.com
                                                 LStanley@gibsondunn.com
                                                 HMason@gibsondunn.com
                                                 APayne@gibsondunn.com