# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, <br><br> *Plaintiff,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE; <br><br> MARCO RUBIO, in his official capacity as Secretary of State, Department of State; <br><br> BUREAU OF POPULATION, REFUGEES, AND MIGRATION, Department of State; <br><br> ADAM ZERBINOPOULOS, in his official capacity as Senior Bureau Official, Bureau of Population, Refugees, and Migration, Department of State; <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; <br><br> ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, Department of Health and Human Services; <br><br> MELLISSA HARPER, in her official capacity as Acting Director, Office of Refugee Resettlement, Department of Health and Human Services; <br><br> *Defendants.* | Case No. 1:25-cv-465-TNM <br><br> **MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ................................................................................................................................ 1

    I.    This Court Has Jurisdiction to Set Aside and Enjoin The Termination ......................... 1

    II.   USCCB Is Likely To Succeed On The Merits ................................................................ 4

        A.    The Termination Violates the Refugee Act of 1980 ................................................ 4

        B.    The Termination Violates the Impoundment Control Act ...................................... 8

        C.    The Termination Is Arbitrary and Capricious ......................................................... 8

    III.  The Termination Is Causing Irreparable Harm ............................................................... 9

    IV.  The Balance Of The Equities And Public Interest Favor Relief ................................. 10

CONCLUSION ........................................................................................................................... 10

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Albrecht v. Comm. on Emp. Benefits*,
  357 F.3d 62 (D.C. Cir. 2004)...................................................................................................3

*Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*,
  2023 WL 10669678 (D.D.C. Mar. 21, 2023)............................................................................3

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015)..................................................................................................................1

*\*Bowen v. Massachusetts*,
  487 U.S. 879 (1988)...............................................................................................................1, 4

*City of New Haven v. United States*,
  809 F.2d 900 (D.C. Cir. 1987)..................................................................................................8

*Cobell v. Norton*,
  240 F.3d 1081 (D.C. Cir. 2001)................................................................................................1

*\*Crowley Gov. Servs., Inc. v. Gen. Servs. Admin.*,
  38 F.4th 1099 (D.C. Cir. 2022)..............................................................................................2, 3

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020)......................................................................................................................8

*Dickson v. Sec'y of Def.*,
  68 F.3d 1396 (D.C. Cir. 1995)..................................................................................................9

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)..................................................................................................................7

*HIAS, Inc. v. Trump*,
  985 F.3d 309 (4th Cir. 2021) ....................................................................................................7

*Katz v. Cisneros*,
  16 F.3d 1204 (Fed. Cir. 1994)...................................................................................................4

*Kidwell v. Dep't of Army*,
  56 F.3d 279 (D.C. Cir. 1995)....................................................................................................3

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)....................................................................................................10

*Md. Dep't of Human Res. v. Dep't of Health and Human Servs.*,
  763 F.2d 1441 (D.C. Cir. 1985)................................................................................................1

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982)..................................................................................................3

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................................................ 8

*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. Envtl. Prot. Agency*,
  752 F.3d 999 (D.C. Cir. 2014) .............................................................................................. 9

*New York v. U.S. Dep't of Homeland Sec.*,
  969 F.3d 42 (2d Cir. 2020) .................................................................................................. 10

*Pacito v. Trump*,
  No. 2:25-cv-255-JNW (W.D. Wash.) ................................................................................. 10

*\*Sharp v. Weinberger*,
  798 F.2d 1521 (D.C. Cir. 1986) ............................................................................................. 2

*\*Tootle v. Sec'y of the Navy*,
  446 F.3d 167 (D.C. Cir. 2006) ........................................................................................... 2, 3

*\*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
  967 F.2d 598 (D.C. Cir. 1992) ................................................................................... 1, 2, 3, 4

*Uzuegbunam v. Preczewski*,
  592 U.S. 279 (2021) ............................................................................................................... 8

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ............................................................................................. 10

**STATUTES**

2 U.S.C. § 681 .................................................................................................................................. 2

2 U.S.C. § 682 .................................................................................................................................. 8

2 U.S.C. § 683 .................................................................................................................................. 8

2 U.S.C. § 684 .................................................................................................................................. 8

5 U.S.C. § 702 .................................................................................................................................. 1

5 U.S.C. § 703 .................................................................................................................................. 1

5 U.S.C. § 704 .................................................................................................................................. 1

5 U.S.C. § 705 .................................................................................................................................. 1

5 U.S.C. § 706 ............................................................................................................................. 1, 3

8 U.S.C. § 1157 ................................................................................................................................ 5

8 U.S.C. § 1522 ............................................................................................................... 2, 4, 5, 6, 7

Pub. L. No. 96-212, 94 Stat. 102 (1980) ..................................................................................... 4, 6

**REGULATIONS**

2 C.F.R. § 200.305 .................................................................................................................. 2

2 C.F.R. § 200.340 ............................................................................................................... 2, 9

**OTHER AUTHORITIES**

Letter from President Carter to Speaker of the House, 3 Public Papers of President
    Carter 2879 (Jan. 13, 1981) ............................................................................................. 7

**INTRODUCTION**

The government's termination of USCCB's cooperative agreements ("Termination") is unlawful for many of the same reasons as its Refugee Funding Suspension. The Termination also is causing irreparable injury to USCCB, frustrating the Conference's mission to assist refugees assigned to it. And the balance of equities and public interest weigh in favor of allowing USCCB's resettlement programs to continue as long as refugees remain in their 90-day resettlement windows. For these reasons, and those in USCCB's earlier briefing, which USCCB adopts, this Court should preliminarily enjoin enforcement of the Refugee Funding Suspension and Termination.

**ARGUMENT**

**I.    This Court Has Jurisdiction to Set Aside and Enjoin The Termination**

This Court has jurisdiction to set aside the unlawful Termination and enjoin the government. *See* 5 U.S.C. §§ 703, 705, 706; *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (court may enjoin "violations of federal law by federal officials"); *Cobell v. Norton*, 240 F.3d 1081, 1108 (D.C. Cir. 2001) (similar). That jurisdiction is not limited by the APA. Requests for "specific relief, albeit monetary, are for relief other than money damages and therefore within the waiver of sovereign immunity in section 702." *Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988) (quoting *Md. Dep't of Human Res. v. Dep't of Health and Human Servs.*, 763 F.2d 1441, 1447–48 (D.C. Cir. 1985)). Thus, the APA waives the United States' sovereign immunity.

The Tucker Act neither provides an "adequate remedy," 5 U.S.C. § 704, nor "expressly or impliedly forbids the relief which is sought," 5 U.S.C. § 702. Jurisdiction "depends not simply on whether a case involves contract issues, but on whether, despite the presence of a contract, plaintiffs' claims are founded *only* on a contract, or whether they stem from a statute or the Constitution." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992)

(emphasis added).  The D.C. Circuit looks to three considerations—on a claim-by-claim basis—to determine if a claim in district court is barred by the Tucker Act.  A claim is barred only if *both* the nature of the claim is contractual, *and* the relief sought is contractual.  *Crowley Gov. Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106–07 & n.6 (D.C. Cir. 2022).  And, the D.C. Circuit has "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims."  *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006).  Here, each favors district court jurisdiction.

*First*, USCCB's claims are grounded in regulatory and statutory duties—not contracts.  Litigants "may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract."  *Transohio*, 967 F.2d at 610.  To resolve those claims, the Court must interpret the Refugee Act, 8 U.S.C. § 1522, the Impoundment Control Act, 2 U.S.C. § 681 *et seq.*, and the Uniform Administrative Requirements, 2 C.F.R. § 200.305 *et seq*.  Determining whether the government "exceeded its authority" or "violated" these various federal laws "requires primarily an examination of the statutes" and regulations the government "has purportedly violated"; these are "not questions the district court can answer by examining a contractual promise."  *Crowley*, 38 F.4th at 1108–09.[1]  USCCB's claims thus resemble those repeatedly held cognizable in district court.  *See, e.g.*, *Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986) ("federal regulations, statutes and the Constitution"); *Transohio*, 967 F.2d at 611 ("statutory and due process claims"); *Crowley*, 38 F.4th at 1108 ("Transportation Act" and "Contract Disputes Act's finality clause").  Here, USCCB does not assert breach of obligations grounded solely in the

---

[1] The Court's analysis of whether the termination is "authorized by law" would be identical with or without the cooperative agreements' adoption of it.  2 C.F.R. § 200.340(a)(4).  If adoption of a regulation by reference rendered its violation a Tucker Act action, the government could evade the APA simply by adopting statutory and regulatory regimes into its contracts.

2

cooperative agreements. *Contra Albrecht v. Comm. on Emp. Benefits*, 357 F.3d 62, 66–69 (D.C. Cir. 2004) (breach of "section 7.1," "section 10.2," and "section 8.1(b) of the Board Plan"); *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 2023 WL 10669678, at *6 (D.D.C. Mar. 21, 2023) (contesting "USAID's execution or interpretation of the Cooperative Agreement").

*Second*, USCCB seeks classic equitable remedies available in an administrative law action: an order "hold[ing] unlawful and set[ting] aside agency action"—the suspension letter, termination letters, and policy suspending support for initial refugee resettlement—because those actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and exceed "statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706. To be sure, USCCB's suit may result in an order compelling the government to provide payments as provided for in the agreements, but "a federal district court may accept jurisdiction over a statutory or constitutional claim for injunctive relief even where the relief sought is an order forcing the government to obey the terms of a contract." *Transohio*, 967 F.2d at 610; *see also Megapulse, Inc. v. Lewis*, 672 F.2d 959, 971 (D.C. Cir. 1982) (rejecting view "that an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action might also amount to a breach of contract"). USCCB's requested order also would confer "non-monetary relief" that has "'considerable value' independent of any future potential for monetary relief." *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995). It would enable USCCB to continue its deeply-held mission to assist refugees—one of a "host of non-monetary benefits" including "perhaps most significantly, the ability to provide services to [refugees] and perform its contractual obligations free of the" government's "alleged interference." *Crowley*, 38 F.4th at 1111. Any monetary consequences "will not come from the District Court's exercise of jurisdiction, 'but from the structure of statutory and regulatory requirements'" in the operation of the program. *Tootle*, 446 F.3d at 175.

3

*Third*, this case must remain in district court because the Court of Federal Claims cannot provide the relief most important for USCCB. The "Claims Court cannot . . . order specific performance," *Transohio*, 967 F.2d at 608, and cannot "grant prospective relief," *Bowen*, 487 U.S. at 905. That is why the Federal Circuit has also agreed that a complaint that "unmistakably asks for prospective relief"—including "payments to which [the plaintiff] is entitled pursuant to federal statute and regulations"—and turns on "the interpretation of a law that controls payment" is properly in the district court's jurisdiction. *Katz v. Cisneros*, 16 F.3d 1204, 1208 (Fed. Cir. 1994). Without prompt equitable relief, any future award of money damages would not repair the ongoing and irreparable harm to USCCB's mission as it is unable to care for the refugees already placed under its care. The suggestion that USCCB "could reframe its claim as one for damages and bring it in the Claims Court" is "no response" because it is "precisely the 'restrictive and unprecedented interpretation of § 704' that the Supreme Court rejected" in *Bowen*. *Transohio*, 967 F.2d at 608.

## II.    USCCB Is Likely To Succeed On The Merits

### A.    The Termination Violates the Refugee Act of 1980

The Refugee Act of 1980 requires the government to provide resettlement services for refugees that the government chooses to admit into the United States. Through the Refugee Funding Suspension and Termination, the government has violated that statutory command by cutting off funding of initial-resettlement services for already-admitted refugees.

In the Refugee Act, Congress sought "to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." Pub. L. No. 96-212 § 101(b), 94 Stat. 102, 102 (1980). To accomplish that objective, Congress *required* the government to provide resettlement services to admitted refugees. *See* 8 U.S.C. § 1522(a). Congress mandated that the government "shall" provide funding "to the extent of available appropriations"

4

for services like employment and English training such that refugees become self-sufficient "as quickly as possible." *Id.* § 1522(a)(1)(A). Congress likewise directed that the government "shall develop and implement . . . policies and strategies for the placement and resettlement of refugees within the United States," *id.* § 1522(a)(2)(B), and expressed its "intent" that "employable refugees should be placed on jobs as soon as possible after their arrival," *id.* § 1522(a)(1)(B)(i).

Although Congress has made funding mandatory for refugee-resettlement programs, it has given the government discretion over how to fund the programs. For the resettlement program at issue here—the "program of initial resettlement"—the government can provide funding through one or more resettlement agencies, as it has done every year since the statute was enacted in 1980. 8 U.S.C. § 1522(b)(1). Alternatively, the government has authority to carry out the program itself. *Id.* § 1522(b)(2) (the government is "authorized to develop" and "implement" training and education programs for resettling refugees). And of course, the government also retains discretion whether to admit refugees into the United States in the first place. *See* 8 U.S.C. § 1157(c)(1). But Congress nowhere gave the government discretion to decline to spend available appropriations for initial resettlement of refugees that the government has elected to admit into the United States.

Yet that is exactly what the government has done through the Refugee Funding Suspension and the Termination. The government has ceased providing USCCB funding for the thousands of refugees in USCCB's care who are still within their period of initial resettlement. And the government has offered no evidence (nor is USCCB aware of any) that the government is providing that funding directly to refugees. That funding cessation violates the Refugee Act.

The government has not denied that Section 1522(a) imposes mandatory resettlement-funding obligations. Instead, the government has suggested that those obligations do not apply to the initial-resettlement program. The government points out that Section 1522(b)(1)(A) gives the

5

government discretion whether to enter into cooperative agreements with agencies like USCCB. Opp. 21. But as discussed, that discretion is limited to deciding *how* to fund the initial-resettlement program—either directly or through private agencies. The Refugee Act does not grant the government discretion to decide *whether* to provide funding at all. To the contrary, the statute makes clear that Section 1522(a)'s funding obligations apply throughout Section 1522, including Section 1522(b). Section 1522(a)'s first sentence provides that "*under this section*"—which includes Section 1522(b)—the government "shall" fund the specified resettlement services "to the extent of available appropriations." *Id.* § 1522(a)(1)(A) (emphasis added); *accord id.* § 1522(a)(1)(B) ("It is the intent of Congress that in providing refugee assistance *under this section . . . .*" (emphasis added)). Section 1522(b) further instructs that "[g]rants to, or contracts with, private nonprofit voluntary agencies under this paragraph *shall be made consistent with the objectives of this subchapter*"—which includes Section 1522(a)'s commands. *Id.* § 1522(b)(1)(A) (emphasis added). Section 1522(a)'s requirements thus flow down to the initial-resettlement program.

Contextual cues point to the same conclusion. In the Refugee Act, Congress directed that the President "shall provide for a study of which agency is best able to administer the program under this paragraph [§ 1522(b)(1)] and shall report . . . to the Congress on such study." § 412(b)(1)(B), 94 Stat. at 113. It would make no sense for that report to be mandatory if the program itself were not. In addition, the government still has not explained why Congress would have wanted to give the government unfettered discretion to decide whether to fund resettlement payment obligations *only* during a refugee's first 90 days in the country—the most important part of a refugee's transition to the United States.

The government also contends that Section 1522(a)'s obligations do not carry through to the initial-resettlement program because Section 1522(a) by its terms imposes obligations on the

6

Director of the Office of Refugee Resettlement, not the Secretary of State who currently carries out the initial-resettlement program. Opp. 21. But the Secretary of State stands in the Director's shoes when implementing that program. Under the Refugee Act, the Director would have administered the initial-resettlement program starting in fiscal year 1982. *See* 8 U.S.C. § 1522(b)(1)(A)(ii). Had that happened, the Director would have been subject to Section 1522(a)'s requirements for the reasons already discussed. The President's designation of the Secretary of State to assume the Director's role in 1981 did not vitiate those statutory obligations. Instead, the Refugee Act makes clear that the Secretary stepped into the Director's shoes: "[T]he authority of the Director under the first sentence of [§ 1522(b)(1)(A)] shall be exercised by such officer as the President shall from time to time specify." 8 U.S.C. § 1522(b)(1)(B); *see* Letter from President Carter to Speaker of the House, 3 Public Papers of President Carter 2879 (Jan. 13, 1981); *HIAS, Inc. v. Trump*, 985 F.3d 309, 319 n.5 (4th Cir. 2021). Moreover, even if the Director somehow retained Section 1522(a)'s funding obligations, that would be immaterial in this case because the Director and the Secretary of State are both defendants here. If either of those parties has funding obligations under Section 1522(a), this Court can order them to comply with the statute.

Finally, USCCB has standing to enforce Section 1522(a). USCCB is injured by the suspension and termination of its programs. That injury likely would be redressed by an order setting aside the government's actions and requiring the government to comply with its statutory obligations. Although the government might comply by providing services directly to refugees, it has never done that and could not practically do so within the initial-resettlement period for the thousands of refugees in USCCB's care. Thus, the government almost certainly would respond to this Court's order by providing funding for the initial resettlement of these refugees to USCCB. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (sufficient

7

that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision").  And even if the government *did* provide services directly to refugees in USCCB's care, that would at least "effectuate a partial remedy" by reducing some of USCCB's mission-based and financial harms—"satisf[ying] the redressability requirement."  *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (quotation marks omitted).

### B. The Termination Violates the Impoundment Control Act

The Termination is an even clearer violation of the Impoundment Control Act than the suspension.  While the suspension at least purported to be a temporary pause to evaluate USCCB's agreements, the termination is a *permanent* refusal to spend funds on refugee assistance, based on "agency priorities."  This permanent refusal to spend appropriated funds for resettlement assistance mandated by law is either a "withholding or delaying [of] the obligation or expenditure of budget authority," 2 U.S.C. § 682(1)(A) (a "deferral"), or "the termination of authorized projects or activities for which budget authority has been provided, 2 U.S.C. § 683(a) (a "rescission").  In either event, the termination violates the ICA:  It is either an unlawful policy-based deferral, *see* 2 U.S.C. § 684(b); *City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987), or an unauthorized rescission for which no special message has been sent to Congress, 2 U.S.C. § 683.

### C. The Termination Is Arbitrary and Capricious

*First*, the government did not account for the serious consequences that it will have on grantees like USCCB, subrecipients, and refugees—including irreparable damage to USCCB's mission and to refugees who are losing essential services during the critical first months of their resettlement.  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020).

*Second*, the government's lone rationale was inadequate.  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Termination rested on

8

the bare assertion that the "award no longer effectuates agency priorities." But the government did not explain *why* USCCB's awards no longer effectuate its priorities—a glaring omission given that it has continuously funded USCCB's refugee programs for decades. "[C]onclusory statements" like these "do not meet the requirement that 'the agency adequately explain its result.'" *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1407 (D.C. Cir. 1995). By merely "parrot[ing] the language of" 2 C.F.R. 200.340(a) "without providing an account of how [the government] reached its results," the government "has not adequately explained the basis for its decision." *Id.* at 1405.

*Third*, the government violated its own regulations, rendering the Termination arbitrary and capricious. *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. Envtl. Prot. Agency*, 752 F.3d 999, 1009 (D.C. Cir. 2014). Even if USCCB's awards no longer effectuate "agency priorities," they could only be terminated "to the extent authorized by law." 2 C.F.R. § 200.340(a)(4). But as explained above, the Termination independently violates the Refugee Act, ICA, and the APA's reasoned-decisionmaking requirement. So it also violates 2 C.F.R. § 200.340(a).

### III.  The Termination Is Causing Irreparable Harm

Like the Refugee Funding Suspension, the Termination is causing irreparable injury to USCCB. The most obvious injury is to USCCB's mission. No longer temporary, the Termination ends the government funding that enables USCCB to fulfill one of its core missions. There is no dispute that without the funds the government promised when it assigned refugees to USCCB, USCCB will be unable to continue providing essential food, housing, and training to the thousands of recently arrived refugees in its care. Every day that passes with the unlawful termination in effect is another day that USCCB is unable to fulfill its mission to follow the model of Jesus Christ and serve these poor and vulnerable neighbors. Bishop Seitz Decl. ¶ 6. As the D.C. Circuit and others have recognized, a mission-driven organization's inability to fulfill its mission for a period

of time cannot be retroactively remedied with money damages. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 61, 86 (2d Cir. 2020).

The recent preliminary injunction issued in *Pacito* does not obviate USCCB's need for relief. That order enjoined the government from halting refugee admissions and withholding reimbursements from refugee-resettlement organizations, finding plaintiffs likely to succeed on their claims under 8 U.S.C. § 1522 and the APA. *See Pacito v. Trump*, No. 2:25-cv-255-JNW, ECF No. 45 (W.D. Wash. Feb. 28, 2025). But there is no indication that the government has begun to process USCCB's reimbursement requests as a result of that order. And USCCB is entitled to its own, narrow remedy in case the *Pacito* court's order—which granted universal relief against both the suspension of refugee admissions and resettlement funding—is stayed or narrowed.

## IV.   The Balance Of The Equities And Public Interest Favor Relief

The equities and public interest favor enabling USCCB to keep helping the refugees the government assigned to it. No equities or public interest justifies depriving recently arrived refugees of essential services like food, medical, and housing assistance. The President has no legitimate interest in implementing policies that contravene statutes. Regardless, any frustration of the President's policies would be trivial because the relief USCCB requests would continue its programs only until its remaining refugees finish their 90-day resettlement periods. But make no mistake: No one else is helping these thousands of recently arrived refugees, and the public interest is better served if those refugees, rather than going hungry and homeless, instead receive the English-language and job training that would enable them to integrate into American society.

## CONCLUSION

This Court should grant USCCB's motion for a preliminary injunction.

| | |
|---|---|
| March 3, 2025 | Respectfully submitted, |
| | /s/ David W. Casazza |
| William Quinn (D.C. Bar No. 1601853)<br>Shannon Eckman (D.C. Bar No. 90024504)**<br>UNITED STATES CONFERENCE OF CATHOLIC BISHOPS<br>3211 Fourth Street, N.E.<br>Washington, DC 20017<br>(202) 541-3300<br>WQuinn@usccb.org<br><br>*pro hac vice<br>**pro hac vice forthcoming | Dhananjay Manthripragada*<br>   (D.C. Bar No. 990448)<br>Nick Harper (D.C. Bar No. 144707)<br>David W. Casazza (D.C. Bar No. 1046918)<br>Connor P. Mui* (D.C. Bar No. 90009004)<br>Aly Cox (D.C. Bar No. 1780473)<br>Laura Stanley* (D.C. Bar No. 90008623)<br>Hunter Mason* (D.C. Bar No. 90021049)<br>Audrey Payne* (D.C. Bar No. 90028352)<br>GIBSON, DUNN & CRUTCHER LLP<br>1700 M Street, N.W.<br>Washington, D.C. 20036-4504<br>(202) 955-8500<br>DManthripragada@gibsondunn.com<br>NHarper@gibsondunn.com<br>DCasazza@gibsondunn.com<br>CMui@gibsondunn.com<br>ACox@gibsondunn.com<br>LStanley@gibsondunn.com<br>HMason@gibsondunn.com<br>APayne@gibsondunn.com |

11