UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| U.S. CONFERENCE OF CATHOLIC BISHOPS, | |
| Plaintiff, | |
| v. | Civil Action No. 25-0465 (TNM) |
| DEPARTMENT OF STATE, et al., | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
<u>IN SUPPORT OF MOTION TO DISMISS</u>**

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ............................................................................................................ 1

STATUTORY BACKGROUND ...................................................................................... 1

    I.      Refugee Admission ............................................................................... 1

    II.     Refugee Resettlement .......................................................................... 3

FACTUAL AND PROCEDURAL BACKGROUND.......................................................... 5

    I.      The Cooperative Agreements ............................................................. 5

    II.     The Executive Orders .......................................................................... 5

    III.    Implementation of the Executive Orders ......................................... 6

STANDARD OF REVIEW .............................................................................................. 8

ARGUMENT ................................................................................................................... 9

    I.      The Government Has Not Waived Sovereign Immunity...................... 9

          A.     Plaintiff Seeks in Essence More than $10,000 in Monetary Relief .......... 10

          B.     Plaintiff's Claim Is Essentially a Contract Action ................................... 12

    II.     Plaintiff's Claims Are Moot................................................................ 15

    III.    Implementation of an Executive Order Is Not Subject to Notice and Comment.. 16

CONCLUSION................................................................................................................ 16

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A & S Council Oil Co. v. Lader,*
56 F.3d 234 (D.C. Cir. 1995) ................................................................................................. 14

*Am. Near E. Refugee Aid v. Agency for Int'l Dev.,*
Civ. A. No. 21-3184 (CRC), 2023 WL 10669678 (D.D.C. Mar. 21, 2023) .............. 10, 12, 13, 14

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................................................. 9

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ............................................................................................................. 9

*Busby v. Capital One, N.A.,*
932 F. Supp. 2d 114 (D.D.C. 2013) ....................................................................................... 9

*City of Erie v. Pap's A.M.,*
529 U.S. 277 (2000) ............................................................................................................. 15

*Clarke v. United States,*
915 F.2d 699 (D.C. Cir. 1990) ............................................................................................. 15

*Coggeshall Dev. Corp. v. Diamond,*
884 F.2d 1 (1st Cir. 1989) .................................................................................................... 11

*COMED v. HHS,*
671 F.3d 1275 (D.C. Cir. 2010) ........................................................................................... 16

*Commodity Futures Trading Comm'n v. Nahas,*
738 F.2d 487 (D.C. Cir. 1984) ............................................................................................. 8

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.,*
38 F.4th 1099 (D.C. Cir. 2022) ....................................................................................... 12, 13

*Curran v. Holder,*
626 F. Supp. 2d 30 (D.D.C. 2009) ........................................................................................ 8

*Fateh v. Blinken,*
Civ. A. No. 23-1277 (RCL), 2024 WL 864378 (D.D.C. Feb. 29, 2024) .................................... 15

*Genesis Healthcare Corp. v. Symczyk,*
569 U.S. 66 (2013) ............................................................................................................... 15

*Herbert v. National Academy of Science,*
974 F.2d 192 (D.C. Cir. 1992) ............................................................................................. 8

*Jerome Stevens Pharmacy, Inc. v. FDA*,
402 F.3d 1249 (D.C. Cir. 2005) ................................................................... 8

*Jones v. Horne*,
634 F.3d 588 (D.C. Cir. 2011) ..................................................................... 9

*Kidwell v. Dep't of Army*,
56 F.3d 279 (D.C. Cir. 1995) ..................................................................... 10

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) ..................................................................................... 8

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ................................................................................... 16

*Long Term Care Pharm. All. v. UnitedHealth Grp., Inc.*,
498 F. Supp. 2d 187 (D.D.C. 2007) .......................................................... 12

*Mertens v. Hewitt Assocs.*,
508 U.S. 248 (1993) ................................................................................... 12

*Moore v. United States*,
48 Fed. Cl. 394 (2000) ............................................................................... 14

*Nat'l Wildlife Fed'n v. Snow*,
561 F.2d 227 (D.C. Cir. 1976) ................................................................... 16

*Pa. Dep't of Pub. Welfare v. United States*,
48 Fed. Cl. 785 (2001) ............................................................................... 14

*Perry Cap. LLC v. Mnuchin*,
864 F.3d 591 (D.C. Cir. 2017) ................................................................... 14

*Reid v. Inch*,
920 F.3d 828 (D.C. Cir. 2019) ................................................................... 15

*San Antonio Hous. Auth. v. United States*,
143 Fed. Cl. 425 (2019)

*Spectrum Leasing Corp. v. United States*,
764 F.2d 891 (D.C. Cir. 1985) ................................................................... 13

*Strumsky v. Wash. Post Co.*,
842 F. Supp. 2d 215 (D.D.C. 2012) ............................................................ 9

*Tootle v. Sec'y of Navy*,
446 F.3d 167 (D.C. Cir. 2006) ................................................................... 10

*Trauma Serv. Grp. v. United States*,
104 F.3d 1321 (Fed. Cir. 1997).................................................................................. 12

*Trudeau v. Fed. Trade Comm'n*,
456 F.3d 178 (D.C. Cir. 2006) ...................................................................................... 9

*United States v. President & Fellows of Harvard Coll.*,
323 F. Supp. 2d 151 (D. Mass. 2004) ......................................................................... 12

*United States v. Winstar Corp.*,
518 U.S. 839 (1996) ...................................................................................................... 11

*Watkins v. Westinghouse Hanford Co.*,
12 F.3d 1517 (9th Cir.1993) ........................................................................................ 12

*Yee v. Jewell*,
228 F. Supp. 3d 48 (D.D.C. 2017) ......................................................................... 10, 14

**Statutes**

5 U.S.C. § 553(a)(2) ...................................................................................................... 16

8 U.S.C. § 1101(a)(42) .................................................................................................... 2

8 U.S.C. § 1157(a)(2) ...................................................................................................... 2

8 U.S.C. § 1157(c)(1) ...................................................................................................... 2

8 U.S.C. § 1157(c)(2)(A) .............................................................................................. 2, 3

8 U.S.C. § 1157(c)(3) ...................................................................................................... 2

8 U.S.C. § 1182(a) .......................................................................................................... 2

8 U.S.C. § 1522(a)(1)(A) ................................................................................................. 4

28 U.S.C. § 1491(a)(1) ................................................................................................... 10

Pub. L. No. 96-212 .......................................................................................................... 1

**Regulations**

2 C.F.R. § 200.305(b)(6) ................................................................................................ 11

8 C.F.R. § 207.7(a) ....................................................................................................... 2, 3

Defendants, by and through the undersigned counsel, respectfully submit this memorandum in support of their motion to dismiss.

## INTRODUCTION

On January 20, 2025, the President issued a ninety-day pause in foreign development assistance to assess programmatic efficiencies, and to ensure that all foreign aid is consistent with foreign policy. *See* Exec. Order No. 14,169, Reevaluating & Realigning United States Foreign Aid, 90 Fed. Reg. 8,610 (Jan. 20, 2025) ("Foreign Aid Order") §§ 2, 3. As a result, the Department of State ("Department") paused all foreign aid related to the U.S. Refugee Admissions Program ("USRAP" or the "Program"), to include payments to refugee resettlement agencies.

Plaintiff U.S. Conference for Catholic Bishops, a national refugee resettlement agency, brings claims under the Administrative Procedure Act ("APA") to enjoin the Program from continuing the pause in payments and to direct the Program to promptly reimburse Plaintiff for any expenses. Plaintiff's motion fails because the government has not waived sovereign immunity, or in the alternative, Plaintiff's claims are moot. Further, the Department's implementation of the Foreign Aid Order is not subject to notice and comment rulemaking procedures.

Accordingly, for the reasons discussed below, the Court should dismiss Plaintiff's claims for lack of jurisdiction or failure to state a claim. *See* Fed. R. Civ. P. 12(b)(1), (6).

## STATUTORY BACKGROUND

### I.    <u>Refugee Admission</u>

The Refugee Act of 1980 amended the Immigration and Nationality Act ("INA") to establish "a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for [their] effective resettlement." Pub. L. No. 96-212, 94 Stat. 102, § 101(b). The Refugee Act provides that the maximum number of refugees that may be admitted annually "shall

be such number as the President determines, before the beginning of the fiscal year and after appropriate consultation [with Congress], is justified by humanitarian concerns or is otherwise in the national interest." 8 U.S.C. § 1157(a)(2).

Subject to numerical limits set annually by the President, the Secretary of Homeland Security has discretion to admit "any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible (except as otherwise provided under [8 U.S.C. § 1157(c)(3)]) as an immigrant" under the INA. 8 U.S.C. § 1157(c)(1); *see also* 8 U.S.C. §§ 1101(a)(42) (defining "refugee"), 1182(a) (general inadmissibility grounds). Which refugees are determined to be "of special humanitarian concern" to the United States for the purpose of refugee resettlement is determined in the Report to Congress on Proposed Refugee Admissions prior to the beginning of the fiscal year. Zerbinopoulos Decl. (ECF No. 14-1) ¶ 9. Refugees admitted in accordance with this provision are sometimes referred to as "principal" applicants or refugees.

In addition, certain individuals who do not meet the statutory definition of a refugee under 8 U.S.C. § 1101(a)(42) may nonetheless be entitled to refugee status if they are accompanying or "following-to-join" a principal refugee. *See* 8 U.S.C. § 1157(c)(2)(A); 8 C.F.R. § 207.7(a). To obtain "derivative refugee" status, an applicant must be the spouse or unmarried child under the age of 21 of a principal refugee and must also be admissible (except as otherwise provided under 8 U.S.C. § 1157(c)(3)) as an immigrant under the INA. 8 U.S.C. § 1157(c)(2)(A). Derivative refugees who are either in the physical company of the principal refugee when admitted to the United States or admitted within four months of the principal refugee's admission are called "accompanying" refugees. 8 C.F.R. § 207.7(a). Derivative refugees who seek admission more than four months after the principal refugee are called "following-to-join" refugees. *Id*.

The INA provides only that such derivative refugees are entitled to refugee status if the appropriate application or petition is processed and their relationship as the spouse or child of a principal refugee and their admissibility are established.[1]  *See* 8 U.S.C. § 1157(c)(2)(A).  The INA does not, however, entitle derivative refugees to be admitted to the United States without qualification.  The admission of a derivative who has obtained refugee status is contingent on there being room under the subsection allocation under which the principal refugee's admission is charged, as well as, by implication, the annual refugee limit, set by the President, and that individual establishing their eligibility for admission.  *Id*.

## II.    <u>Refugee Resettlement</u>

Following admission, the United States, through public and private organizations, provides resettlement services to assist refugees in achieving self-sufficiency.  To administer the services, Congress established the Office of Refugee Resettlement (or "ORR") in the Department of Health and Human Services, which is headed by a Director.  8 U.S.C. § 1521(a).  "The function of the Office and its Director is to fund and administer (directly or through arrangements with other Federal agencies), in consultation with the Secretary of State, programs" to provide resettlement services.  8 U.S.C. § 1521(b).  The Director

> shall, to the extent of available appropriations, (i) make available sufficient resources for employment training and placement in order to achieve economic self-sufficiency among refugees as quickly as possible, (ii) provide refugees with the opportunity to acquire sufficient English language training to enable them to become effectively resettled as quickly as possible, (iii) insure that cash assistance is made available to refugees in such a manner as not to discourage their economic

---

[1]      Accompanying derivatives are processed via Form I-590, Registration for Classification as Refugee, which is filed in conjunction with the Form I-590 by the principal refugee overseas. Following-to-join derivatives are processed via Form I-730, Refugee/Asylee Relative Petition, which the admitted principal refugee files on behalf of the derivative, who may be overseas or in the United States.

self-sufficiency, in accordance with subsection (e)(2), and (iv) insure that women
have the same opportunities as men to participate in training and instruction.

8 U.S.C. § 1522(a)(1)(A); *see also* 45 C.F.R. § 400.11(a). Accordingly, the Office of Refugee

Resettlement provides a majority of the services for resettlement, *e.g.*, cash assistance and medical

services for up to twelve months, child welfare services for unaccompanied refugee children, and

employment assistance and English language learning for up to five years. 8 U.S.C. 1522(c)-(e),

45 CFR Part 400, Subparts E, G and I.

In addition to the services required under section 1522(a)(1)(A), the Secretary of State "is

authorized, to make grants to, and contracts with, public or private nonprofit agencies for initial

resettlement (including initial reception and placement with sponsors) of refugees in the United

States." 8 U.S.C. §§ 1522(b)(1)(A)(ii), (b)(1)(B); 3 Pub. Papers. 2879 (Jan. 13, 1981) (Exec. Off.

Of the Pres.) (authorizing the Secretary of State under section 1522(b)(1)(B) to exercise the

authority). Accordingly, the Secretary of State through cooperative agreements, provides initial

resettlement services, which last between thirty and ninety days and include:

- Agreement to accept refugees for management by local resettlement affiliates;

- Pre-arrival resettlement planning, including placement and arrangement for health care requirements, as needed;

- Reception on arrival, including transportation from the airport to living quarters;

- Basic needs support (including identification and securing of housing, as well as provision of furnishings, food, and clothing);

- Cultural orientation;

- Assistance with access to healthcare, employment, education, and other services, as needed;

- Assistance with applying for and/or enrolling in other benefits and services, as appropriate and as eligible

- Development and implementation of an initial service plan for each refugee.

4

2d Zerbinopoulos Decl. (ECF No. 25-1) ¶¶ 10, 11.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    <u>The Cooperative Agreements</u>

State Department's Bureau of Population and Migration ("PRM" or "Migration Bureau")
awarded Plaintiff two cooperative agreements to provide initial resettlement services for fiscal
year 2025 (collectively, the "Agreements").  Cooperative Agmt. SPRMCO24CA0342 (ECF No. 5-
4), Cooperative Agmt. SPRMCO24CA0336 (ECF No. 5-5).  Pursuant to the Agreements, Plaintiff
received 6,259 refugees, 1,796 Afghan or Iraqi special immigrants, and four Amerasians special
immigrants for provision of initial services.  2d Zerbinopoulos Decl. (ECF No. 25-1) ¶ 14.  As of
April 24, 2025, all of the individuals will be past the initial ninety-day resettlement services
period.  *Id.*

The Agreements require Plaintiff to provide core services for the individuals, *e.g.*,
reception services to apprise the refugee of the availability of initial housing. *See*, *e.g.*, Cooperative
Agmt. SPRMCO24CA0342 (ECF No. 5-4) § 16.2 ¶ vii (describing core services).  The applicable
administrative requirements for the Agreements are at 2 C.F.R. Part 200 Subparts A through F and
2 C.F.R. Parts 600 and 601.  *Id.*, Std. Terms & Conds. for Fed. Awards.

As of February 24, 2025, Plaintiff has submitted six requests for payment of expenses to
the Migration Bureau, totaling $13,015,130.49.  2d Zerbinopoulos Decl. (ECF No. 25-1) ¶ 15.

### II.    <u>The Executive Orders</u>

On January 20, 2025, the President signed Executive Order No. 14,163, Realigning the
United States Refugee Admissions Program, 90 Fed. Reg. 8,459 (Jan. 20, 2025) ("Refugee
Order"), which suspended admission of refugees under the Program, pursuant to the President's
authority under 8 U.S.C. §§ 1182(f) and 1185(a) and based on the President's finding that "[t]he
United States lacks the ability to absorb large numbers of migrants, and in particular, refugees,

into its communities in a manner that does not compromise the availability of resources for Americans, that protects their safety and security, and that ensures the appropriate assimilation of refugees." Refugee Order §§ 1, 3(a)  The Refugee Order also suspended "decisions on applications for refugee status." *Id.* § 3(b).  Notwithstanding the suspension, the Refugee Order allows for admission of refugees on a case-by-case basis should the Secretaries of Homeland Security and State jointly determine such admission is in the national interest and would not threaten national security or welfare, and sets a process for resuming refugee admissions in the future. *Id.* §§ 3(c), 4.

That same day, the President also signed the Foreign Aid Order, i.e., Executive Order No. 14,169, which required agency heads to "immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors pending reviews of such programs . . . to be conducted within 90 days." Foreign Aid Order § 3(a).  The Foreign Aid Order also required agency heads to review each foreign assistance program under guidelines provided by the Secretary of State to determine "whether to continue, modify, or cease each foreign assistance program." *Id.* § 3(b)–(c).  Notwithstanding the pause, the Foreign Aid Order allows the Secretary of State to waive the ninety-day pause on incurring new development assistance funds and allows for the resumption of programs prior to the end of the ninety-day period with the Secretary of State's approval. *Id.* § 3(d)–(e).

## III.    **Implementation of the Executive Orders**

In the days before the administration change, the incoming administration informed senior officials in the State Department's Migration Bureau that President Trump intended to suspend refugee admissions under the Program through executive order.  Zerbinopoulos Decl. (ECF No. 14-1) ¶ 18.  In anticipation of the Refugee Order, the State Department, upon learning that the suspension would go into effect on January 27, 2025, cancelled all travel after 12:00 p.m. on

January 20, 2025. *Id*. ¶ 20. The State Department did so out of an abundance of caution because most refugees travel to the United States from around the world, a trip that involves multiple layovers and can take multiple days. *Id*. Consequently, the State Department cancelled travel scheduled between January 20 and 27, 2025 to avoid the not insignificant risk that refugees would not arrive in the United States before the suspension went into effect at 12:01 a.m. on January 27, 2025, and to avoid the possibility that some refugees would be stranded at a U.S. port of entry or at an airport in a foreign country. *Id*.

In response to the Refugee Order's directive to suspend any decisions on refugee applications, the State Department also suspended the Program's processing activities. *Id*. ¶ 21. The suspension was intended to prevent inefficiencies, as it would be illogical for the Government and resettlement partners to move refugees to transit centers or conduct pre-departure activities when refugee admissions were suspended. *Id*. ¶¶ 21–22. And some processing activities, such as medical exams and security checks, expire after a certain amount of time. *Id*. ¶ 22. Further, the State Department could not be sure when and which classes of refugees the President would find to be in the United States' interest upon resumption of refugee admissions. *Id*.

Following the Foreign Aid Order's directive to immediately cease foreign aid payments, the State Department, on January 24, 2025, issued 25 STATE 6828, an "All Diplomatic and Consular Posts" (or "ALDAC") cable "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID." *Id*. ¶ 26. This pause applied to assistance funded from accounts in title III of the Department of State, Foreign Operations, and Related Programs Appropriations Act, to include the Migration and Refugee Assistance account, from which funding for initial reception and placement services is provided

to resettlement agencies.  *Id.* ¶¶ 23–26.  Thus, the Order's halt on foreign aid necessarily included payments to resettlement agencies in the United States.  *Id.* ¶¶ 24–26.

## STANDARD OF REVIEW

Rule 12(b)(1) requires dismissal of claims where a court "lack[s] jurisdiction over the subject matter."  Fed. R. Civ. P. 12(b)(1).  "Rule 12(b)(1) presents a threshold challenge to the Court's jurisdiction . . . [and] the Court is obligated to determine whether it has subject-matter jurisdiction in the first instance."  *Curran v. Holder*, 626 F. Supp. 2d 30, 32 (D.D.C. 2009) (internal citation and quotation marks omitted).  "A federal court presumptively lacks jurisdiction in a proceeding until a party demonstrates that jurisdiction exists."  *Commodity Futures Trading Comm'n v. Nahas,* 738 F.2d 487, 492 n.9 (D.C. Cir. 1984); *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("[I]t is presumed that a cause lies outside [the federal courts'] limited jurisdiction.").  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).

A court may resolve a motion to dismiss brought pursuant to Rule 12(b)(1) in two ways: a facial challenge or a factual challenge.  In a facial challenge, the court may decide the motion based solely on the factual allegations in the Complaint.  *See Herbert v. Nat'l Acad. of Sci.*, 974 F.2d 192, 197 (D.C. Cir. 1992).  In contrast, to determine the existence of jurisdiction in a factual challenge, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence.  *See Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (noting that, with respect to a factual challenge, the district court may consider materials outside of the pleadings to determine whether it has subject matter jurisdiction over the claims); *Herbert*, 974 F.2d at 197 (same).

Rule 12(b)(6) provides for the dismissal of an action where a complaint fails to "state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss,

"a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. *Trudeau v. Fed. Trade Comm'n,* 456 F.3d 178, 193 (D.C. Cir. 2006). Mere "labels and conclusions" and "formulaic recitation[s] of the elements of a cause of action" are insufficient to defeat a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, the complaint must "suggest a plausible scenario that shows that the pleader is entitled to relief," *Jones v. Horne*, 634 F.3d 588, 595–96 (D.C. Cir. 2011), and must set forth "enough [facts] to raise a right to relief above the speculative level," *Twombly,* 550 U.S. at 555. "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

"In evaluating a Rule 12(b)(6) motion to dismiss, a court may consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the parties." *Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 133–34 (D.D.C. 2013) (internal citations and quotation marks omitted). "[A] document need not be mentioned by name to be considered 'referred to' or 'incorporated by reference' into the complaint." *Strumsky v. Wash. Post Co.*, 842 F. Supp. 2d 215, 218 (D.D.C. 2012) (internal citation omitted).

## ARGUMENT

### I.    The Government Has Not Waived Sovereign Immunity

Congress's waiver of sovereign immunity in the APA excludes "authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Here, the Tucker Act impliedly forbids the application of APA Section 702 to Plaintiff's complaint.

"The Tucker Act waives sovereign immunity for actions 'founded . . . [upon] any express or implied contract with the United States' . . . for suits brought in the U.S. Court of Federal Claims." *Yee v. Jewell*, 228 F. Supp. 3d 48, 55 (D.D.C. 2017) (citing 28 U.S.C. § 1491(a)(1)).[2] "[T]he D.C. Circuit has instructed that a claim must be brought in the Claims Court, as opposed to the District Court, if it meets three requirements: (1) 'it explicitly or 'in essence' seeks more than $10,000 in monetary relief from the federal government,' *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995), (2) it 'is essentially a contract action,' *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004), and (3) the [Claims Court] would have jurisdiction over the matter[.]" *Am. Near E. Refugee Aid v. Agency for Int'l Dev.*, Civ. A. No. 21-3184 (CRC), 2023 WL 10669678, at *5 (D.D.C. Mar. 21, 2023) (citing *Yee*, 228 F. Supp. 3d at 56, and *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176–77 (D.C. Cir. 2006)). Plaintiff's claim meets all these requirements.

### A.     Plaintiff Seeks in Essence More than $10,000 in Monetary Relief

To be sure, Plaintiff avers that it is not seeking any money damages. The Complaint says otherwise. Plaintiff demands the Court, "[e]njoin—temporarily, preliminarily, and permanently—Defendants to reimburse USCCB for all expenses it has incurred or will incur pursuant to the terms of its cooperative agreements." *See* Compl. (ECF No. 1) at Prayer for Relief § 4. "Stripped of its equitable flair, the requested relief seeks one thing: The Conference wants the Court to order the Government to stop withholding the money due under the Cooperative Agreements." *United States Conf. of Cath. Bishops v. Dep't of State*, Civ. A. No. 25-0465 (TNM), 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025).

---

[2]     Because Plaintiff seeks "in essence" more than $10,000 in monetary relief—about $24 million, the District Court would not have concurrent jurisdiction under the "Little Tucker Act." 28 U.S.C. § 1346(a)(2).

Moreover, Plaintiff further defines the point of this suit: money. *E.g.* Pl.'s Supp. Mem. (ECF No. 22) at 10 ("The government's refusal to reimburse [Plaintiff's] expenses pursuant to its cooperative agreements is arbitrary and capricious because it violates 2 C.F.R. § 200.305(b)(6)— an [Office of Management and Budget] regulation governing federal grants that the State Department has incorporated into its own regulations[.]"). Further, Plaintiff explains:

> Nor is there any dispute that the reimbursement requests [Plaintiff] has submitted are for "allowable costs" under the terms of its agreements, or that [Plaintiff] remains within the agreements' "period[s] of performance"—which run until September 30, 2025.

> Yet the government nevertheless has impermissibly "withheld" payment for allowable costs by refusing—through its Refugee Funding Suspension—to process [Plaintiff's] reimbursement requests in the ordinary course.

*Id*. at 11. The "ordinary course" Plaintiff alludes to is the course of the Agreements. Indeed, Plaintiff acknowledges that "it has asked the government to comply with federal law and the terms of its cooperative agreements by resuming the processing of reimbursement requests in the same way and on a similar timeline as it always has." Pl.'s Mem. (ECF No. 5-2) at 15. But where claimants "simply seek to receive the amount [agency] promised," the "true nature of" the claim was for compensatory money damages and not equitable relief." *Boaz*, 995 F.3d at 1368. Importantly, "damages are always the remedy for breach of contract." *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996). "Federal courts do not have the power to order specific performance by the United States of its alleged contractual obligations." *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989).

Plaintiff's insistence that there is not a contract claim in the face of evidence to the contrary is just the sort of argument the D.C. Circuit has cautioned against, explaining that "plaintiffs may circumvent Tucker Act jurisdiction by disguising claims for monetary relief as ones for injunctive relief," *Am. Near E.*, 2023 WL 10669678, at *5, and has "cautioned plaintiffs that [the Circuit]

'prohibit[s] . . . the creative drafting of complaints,' for example, by 'disguis[ing]' a claim for money damages as one for equitable relief, to avoid the jurisdictional consequences of the Tucker Act," *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting *Kidwell*, 56 F.3d at 284; and citing *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969 (D.C. Cir. 1982)).  The D.C. Circuit has therefore instructed that the "plain language of a complaint . . . does not necessarily settle the question of Tucker Act jurisdiction," *Kidwell*, 56 F.3d at 284 (cleaned up), and that courts should look to the complaint's "substance, not merely its form." *Id.*; *see also Long Term Care Pharm. All. v. UnitedHealth Grp., Inc.*, 498 F. Supp. 2d 187, 194 (D.D.C. 2007) ("court must look to the 'substance of the remedy sought . . . rather than the label placed on that remedy." (quoting *Watkins v. Westinghouse Hanford Co.*, 12 F.3d 1517, 1528 n.5 (9th Cir.1993))); *see also Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993)).

### B.    Plaintiff's Claim Is Essentially a Contract Action

To determine if this is essentially a contract action, the Court must consider, "whether the Cooperative Agreement is indeed a contract," and "it is the source of [Plaintiff's claim." *Am. Near E.*, 2023 WL 10669678, at *6.

#### 1.    The Cooperative Agreement is a Contract

The Agreements "appear[] to satisfy the requirements of a contract with the government— 'mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government.'"  *Id.* (citing *United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 164 (D. Mass. 2004) (citing *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997), and holding that cooperative agreements between USAID and Harvard University "constitute[d] contracts to assist Russia in developing capital markets and foreign investments")).  Consideration exists because the Department intended to "benefit economically and otherwise from" the initial resettlement services

through the Cooperative Agreements. *See President & Fellows of Harvard Coll.*, 323 F.2d at 165. Indeed, the benefits to the Department are explicitly acknowledged in the agreement itself, which provides that the objectives of the agreement is to provide initial refugee settlement services. *See*, *e.g.*, Cooperative Agmt. SPRMCO24CA0342 (ECF No. 5-4) §3.2.

### 2.    Plaintiff's Claim Arises out of the Cooperative Agreement

"When deciding if a claim sounds in contract, courts consider 'the source of the rights upon which the plaintiff bases its claims' and 'the type of relief sought.'" *Am. Near E.*, 2023 WL 10669678, at *6 (quoting *Albrecht*, 357 F.3d at 68).

Clearly, "[t]he source of the right sought here arises from" the Agreements. *Id.* (citing *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (rejecting argument that the Debt Collection Act created the substantive right to the remedy sought by plaintiffs and noting that the right to payments were "created in the first instance by the contract")). The action that Plaintiff challenges is the State Department's suspension of the Agreements. As such, the terms of Agreements will determine whether the Department had the authority to suspend the Agreements to assess its priorities.

Moreover, all other factors that courts have traditionally looked to in determining whether the contract is the source of a claimed right similarly led to the conclusion that the Agreements are the source of Plaintiff's claimed right in this case. For example, courts look to whether the government is a party to the contract. *Crowley*, 38 F.4th at 1110 (distinguishing *Spectrum*, where the government had been part of the agreement, which "squarely indicate[ed] that the claims against" the government "arose under the contract."). Here the government—the State Department—is a party. Moreover, for the reasons discussed above, Plaintiff seeks "in essence" more than $10,000 in monetary damages, *see supra*, a "'prototypical contract remedy'" that is "'specific to actions that sound in contract.'" *Crowley*, 38 F.4th at 1107 (citing *Perry Cap. LLC*

*v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *A & S Council Oil Co. v. Lader*, 56 F.3d

234, 240 (D.C. Cir. 1995))).  Thus, Plaintiff's claim arises out of the Agreements.

3.    <u>Plaintiff's Action Could Have Properly been Brought in the Claims Court</u>

The District Court "can only be deprived of jurisdiction if the action can properly be

brought in the Court of Federal Claims."  *Am. Near E.*, 2023 WL 10669678, at *6 (citing *Yee*,

228 F. Supp. 3d at 56 (noting that the D.C. Circuit has "categorically reject[ed] the suggestion that

a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies

in the Court of Federal Claims" (citing *Tootle*, 446 F.3d at 176-77))).  There is little doubt that a

Tucker Act claim, alleging the breach of a money-mandating contract, may be brought in the

Claims Court, as long as it is brought within the six-year statute of limitations, 28 U.S.C. § 2501.

Jurisdiction exists in the Federal Circuit over "money-mandating" contracts, and cooperative

agreements "have been held to be contracts within Tucker Act jurisdiction when all the requisite

elements of a contract were present."  *Pa. Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785,

790 (2001) (further noting that it "is not this Court's position that grants can never be contracts

within Tucker Act jurisdiction"); *see also San Antonio Hous. Auth. v. United States*, 143 Fed. Cl.

425, 462 (2019); *Moore v. United States*, 48 Fed. Cl. 394, 397 (2000) (noting that "this court and

its predecessor have also concluded that jurisdiction lies under the Tucker Act to consider alleged

breaches of grants or cooperative agreements").  As such, Plaintiff could have brought his claims

in the Claims Court.

*    *    *

In short, Plaintiff cannot meet its burden to establish that the claims fall within an

applicable waiver of sovereign immunity and that this Court has subject-matter jurisdiction.

Although Plaintiff superficially invokes the APA, which waives sovereign immunity as to

nonmonetary claims, Plaintiff's own request for relief show that its claims seek payment of money

14

and turn on the terms of the Agreements.  As such, Plaintiff has not established that sovereign immunity is waived in this Court.  Therefore, the Court should dismiss the complaint for lack of subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).

## II.    Plaintiff's Claims Are Moot

A "situation in which a court lacks subject-matter jurisdiction is if the case becomes moot—that is, when 'the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Fateh v. Blinken*, Civ. A. No. 23-1277 (RCL), 2024 WL 864378, at *4 (D.D.C. Feb. 29, 2024) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)).  "Under the mootness doctrine, we cannot decide a case if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *Reid v. Inch*, 920 F.3d 828, 832 (D.C. Cir. 2019) (quoting *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc)).  "If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (internal quotation marks and citation omitted).

Here, Plaintiff seeks for the Court to "[e]njoin—temporarily, preliminarily, and permanently—Defendants from taking any action enforcing or implementing against USCCB the Refugee Funding Suspension, Rubio Memo, or Foreign Aid Executive Order."  *See* Compl. (ECF No. 1) at Prayer for Relief § 3.  Yet, a decision from this Court to enjoin any purported policy would be forward-facing, even were it justified, and, thus, would fail to redress Plaintiff's asserted injury, which is the Department's past suspension of the Agreements.  *See COMED v. HHS*, 671 F.3d 1275, 1279–80 (D.C. Cir. 2010) (affirming dismissal, for lack of standing, of a claim seeking to enjoin certain vaccines, because past injuries are not redressable by prospective injunctive

relief).  Importantly, while the Agreements "require USCCB to assume responsibility for sponsorship of the refugees assigned to it under [the Agreements]," "USCCB must then assist refugees . . . during the first 90 days they are in the United States."  Compl. (ECF No. 1) ¶ 41.  Yet, as of April 24, 2025, any refugees assigned to Plaintiff would no longer be in the first 90 days that they are in the United States.  2d Zerbinopoulos Decl. (ECF No. 25-1), Ex. 1 (listing the dates of admission).  As such, Plaintiff's obligations under the Agreements would expire on April 24, 2025.

Accordingly, Plaintiff's claim would be moot.  Therefore, the Court should dismiss the complaint for lack of subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).

## III.    Implementation of an Executive Order Is Not Subject to Notice and Comment

5 U.S.C. § 553(a)(2) exempts, "a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts" from notice-and-comment rule making.  5 U.S.C. § 553(a)(2); *see also Lincoln v. Vigil*, 508 U.S. 182, 196 (1993) ("Section 553 has no application, for example, to 'a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.'" (quoting section 553(a)(2)).  The Department's implementation of the executive orders, pausing payments under the agreement with Plaintiff clearly involves "loans, grants, benefits, or contracts."  5 U.S.C. § 553(a)(1).  As such, the State Department was exempt from the requirement of section 553(b).  *See Nat'l Wildlife Fed'n v. Snow*, 561 F.2d 227, 232 (D.C. Cir. 1976) (exempting from notice and comment rulemaking procedure regulations governing the Federal Aid Highway grant program).

Therefore, the Court should dismiss Plaintiff's notice and comment claim for failure to state a claim.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court dismiss Plaintiff's complaint.

Dated:  April 21, 2025                    Respectfully submitted,
        Washington, DC

                                          EDWARD R. MARTIN, JR., D.C. Bar #481866
                                          United States Attorney

                                          BRIAN P. HUDAK
                                          Chief, Civil Division

                                          By:        /s/ Joseph F. Carilli, Jr.
                                              JOSEPH F. CARILLI, JR.
                                              Assistant United States Attorney
                                              601 D Street, NW
                                              Washington, DC 20530
                                              (202) 252-2525

                                          *Attorneys for the United States of America*

17