## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES CONFERENCE OF CATHOLIC BISHOPS;<br><br>*Plaintiff,*<br><br>*v.*<br><br>UNITED STATES DEPARTMENT OF STATE, et al.;<br><br>*Defendants.* | Case No. 1:25-cv-465-TNM |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

    I.    The Government Partnered With USCCB To Fulfill The Government's
        Statutory Mandate To Provide Refugee Resettlement Assistance. ................................. 3

    II.   The Government Unlawfully Suspended And Terminated Resettlement
        Assistance. ......................................................................................................................... 4

    III.  Courts Reinstated Cooperative Agreements That Fulfill The Government's
        Resettlement Obligations. ............................................................................................... 5

    IV.  The Refugee Funding Suspension And Termination Have Harmed USCCB, Its
        Partners, And Refugees. ................................................................................................... 5

STANDARD OF REVIEW .................................................................................................... 6

ARGUMENT ........................................................................................................................... 7

    I.    This Court Has Jurisdiction Over USCCB's Claims. ................................................... 8

        A.   The APA waives sovereign immunity for USCCB's claims. ................................. 8

        B.   The federal-official Defendants do not have sovereign immunity from
            USCCB's claims seeking equitable relief for violations of statutes and the
            Constitution. ............................................................................................................... 30

    II.   USCCB's Claims Are Not Moot. .................................................................................... 34

    III.  The Government Was Required To Engage In Notice-and-Comment
        Rulemaking .......................................................................................................................... 38

CONCLUSION ........................................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Lab'ys v. Gardner*,
    387 U.S. 136 (1967)..................................................................................................30

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013).................................................................................33

*Albrecht v. Comm. on Emp. Benefits*,
    357 F.3d 62 (D.C. Cir. 2004)...................................................................................14

*Alcaraz v. Block*,
    746 F.2d 593 (D.C. Cir. 1984).................................................................................39

*Alvarado Hosp., LLC v. Price*,
    868 F.3d 983 (Fed. Cir. 2017)..................................................................................24

*Am. Hosp. Ass'n v. Bowen*,
    834 F.2d 1037 (D.C. Cir. 1987)...............................................................................39

*Am. Near E. Refugee Aid v. Agency for Int'l Dev.*,
    2023 WL 10669678 (D.D.C. Mar. 21, 2023).........................................................12

*Am. Sch. of Magnetic Healing v. McAnnulty*,
    187 U.S. 94 (1902)...................................................................................................31

*Armstrong v. Exceptional Child Ctr., Inc.*
    575 U.S. at 320 (2015)..................................................................................10, 18, 31

*Bank of Wash. v. Tobriner*,
    405 F.2d 1321 (D.C. Cir. 1968)..................................................................................8

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988)..............................................................9, 10, 22, 24, 28, 29, 33

*Bowen v. Mich. Acad. of Fam. Physicians*,
    476 U.S. 667 (1986)...................................................................................................7

*California v. U.S. Dep't of Educ.*,
    2025 WL 760825 (D. Mass. Mar. 10, 2025)...........................................................27

*Chamber of Com. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996)...................................................................8, 30, 31, 34

*Coggeshall Dev. Corp. v. Diamond*,
    884 F.2d 1 (1st Cir. 1989)........................................................................................20

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
    603 U.S. 799 (2024).................................................................................................38

iii

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.,
    38 F.4th 1099 (D.C. Cir. 2022).......................12, 13, 14, 15, 16, 17, 19, 20, 28, 36

Ctr. for Arms Control & Non-Proliferation v. Pray,
    531 F.3d 836 (D.C. Cir. 2008)..................................................................................37

Dart v. United States,
    848 F.2d 217 (D.C. Cir. 1988)..................................................................................34

Does 1-3 v. Mills,
    142 S. Ct. 17 (2021)..................................................................................................26

DSE, Inc. v. United States,
    169 F.3d 21 (D.C. Cir. 1999)....................................................................................17

Eastport Steamship Corp. v. United States,
    372 F.2d 1002 (Ct. Cl. 1967)....................................................................................23

Fed. Express Corp. v. U.S. Dep't of Com.,
    486 F. Supp. 3d 69 (D.D.C. 2020)............................................................................34

Fed. Trade Comm'n v. Weyerhaeuser Co.,
    665 F.2d 1072 (D.C. Cir. 1981)..................................................................................8

Great-West Life & Annuity Ins. Co. v. Knudson,
    534 U.S. 204 (2002)..............................................................................9, 10, 22, 23, 26

IAP Worldwide Servs., Inc. v. United States,
    160 Fed. Cl. 57 (2022)..............................................................................................25

Ingersoll-Rand Co. v. United States,
    780 F.2d 74 (D.C. Cir. 1985)....................................................................................21

Katz v. Cisneros,
    16 F.3d 1204 (Fed. Cir. 1994)..................................................................................25

*Kidwell v. Dep't of Army,
    56 F.3d 279 (D.C. Cir. 1995)..................................................................17, 18, 20, 36

Knox v. Serv. Emps. Int'l Union, Loc. 1000,
    567 U.S. 298 (2012)..................................................................................................35

*Larson v. Domestic & Foreign Com. Corp.,
    337 U.S. 682 (1949)......................................................................................31, 32, 33

League of Women Voters of U.S. v. Newby,
    838 F.3d 1 (D.C. Cir. 2016)......................................................................................19

Lion Raisins, Inc. v. United States,
    416 F.3d 1356 (Fed. Cir. 2005)................................................................................24

Louie v. Dickson,
    964 F.3d 50 (D.C. Cir. 2020)....................................................................................35

iv

*Me. Cmty. Health Options v. United States*,
    590 U.S. 296 (2020) ................................................................................................23, 25

*Maldonado v. Dist. of Columbia.*,
    61 F.4th 1004 (D.C. Cir. 2023) ........................................................................................35

*Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*,
    763 F.2d 1441 (D.C. Cir. 1985) ...............................................................................9, 10, 23

*Megapulse, Inc. v. Lewis,
    672 F.2d 959 (D.C. Cir. 1982) .........................................................................11, 12, 16, 20, 29

*Merrill v. Milligan*,
    142 S. Ct. 879 (2022) ......................................................................................................26

*Middle East Broad. Networks, Inc. v. United States*,
    No. 25-5150 (D.C. Cir. May 3, 2025) ...............................................................................27

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    417 F.3d 1272 (D.C. Cir. 2005) ........................................................................................39

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ..........................................................................................39

*Nat'l Helium Corp. v. Morton*,
    455 F.2d 650 (10th Cir. 1971) ..........................................................................................16

*Perry Cap. LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ....................................................................................14, 15

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*,
    313 F. Supp. 3d 62 (D.D.C. 2018) ....................................................................................38

*Pollack v. Hogan*,
    703 F.3d 117 (D.C. Cir. 2012) ..........................................................................................32

*Preiser v. Newkirk*,
    422 U.S. 395 (1975) .........................................................................................................37

*Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*,
    2021 WL 1198047 (D.D.C. Mar. 30, 2021) ......................................................................37

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
    758 F.3d 296 (D.C. Cir. 2014) ..........................................................................................36

*Ritter v. Migliori*,
    142 S. Ct. 1824 (2022) .....................................................................................................26

*San Antonio Hous. Auth. v. United States*,
    143 Fed. Cl. 425 (2019) ...................................................................................................25

*Sharp v. Weinberger,
    798 F.2d 1521 (D.C. Cir. 1986) ...............................................................................11, 13, 17

*Spectrum Leasing Corp. v. United States,*
    764 F.2d 891 (D.C. Cir. 1985) ...................................................................14, 15, 16

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) .................................................................................................6

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ..............................................................................32

*Tarzana Providence Health Sys. v. Becerra,*
    749 F. Supp. 3d 1 (D.D.C. 2024) ............................................................................6

*Tootle v. Sec'y of the Navy,*
    446 F.3d 167 (D.C. Cir. 2006) ......................................................12, 20, 26, 28

*Transohio Sav. Bank v. Director, OTS,*
    967 F.2d 598 (D.C. Cir. 1992) ................... 7, 11-14, 16, 20, 21, 29, 33

*U.S. Conf. of Catholic Bishops v. U.S. Dep't of State,*
    No. 25-5066, slip op. (D.C. Cir. Mar. 28, 2025) ....................................14, 16, 20

*United States v. California,*
    145 S. Ct. 966 (2025) .....................................................................10, 26, 28

*United States v. Testan,*
    424 U.S. 392 (1976) ...............................................................................................23

*Univ. of Texas v. Camenisch,*
    451 U.S. 390 (1981) .................................................................................................8

*Van Drasek v. Lehman,*
    762 F.2d 1065 (D.C. Cir. 1985) ............................................................................16

STATUTES

2 U.S.C. § 682 .......................................................................................................30, 32

2 U.S.C. § 683 .......................................................................................................30, 32

2 U.S.C. § 684 .......................................................................................................30, 32

5 U.S.C. § 553(a)(2) ....................................................................................................39

5 U.S.C. § 702 ..............................................................................................7, 8, 10, 27

5 U.S.C. § 703 .......................................................................................................10, 18

5 U.S.C. § 706 .......................................................................................................10, 18

8 U.S.C. § 1522 ..............................................................................................3, 13, 30, 32

28 U.S.C. § 1491 ...................................................................................................10, 24

vi

**REGULATIONS**

2 C.F.R. § 200.305(b)(6)..................................................................................................13

2 C.F.R. § 200.340 ........................................................................................................13

**INTRODUCTION**

For more than four decades, the United States has partnered with resettlement agencies, including the United States Conference of Catholic Bishops, to carry out Congress's mandate to provide domestic resettlement assistance to newly admitted refugees.  In January of this year, the government suddenly and unilaterally halted this assistance program, cutting off vital services to newly admitted refugees and stranding long-time partners, including the Conference.  The government's actions abandon the statutory obligations imposed in the Refugee Act and ongoing appropriations, offend the separation of powers, and violate multiple provisions of the Administrative Procedure Act.

The government's primary defense is not to defend the lawfulness of its action but to attack this Court's jurisdiction, arguing that this litigation is foreclosed by the possibility that the Conference may be able to obtain some form of relief in an action for breach of contract under the Tucker Act.  This jurisdictional argument is mistaken.  Two independent avenues allow the Conference to press this litigation.  First, the Conference has a right to seek injunctive relief against federal officials for actions taken in violation of their statutory obligations.  Claims against federal officers to restrain *ultra vires* action do not require a waiver of the United States' sovereign immunity, and therefore the limitations in Section 702 of the Administrative Procedure Act are simply irrelevant.  Second, even under the terms of Section 702, the Conference may press its claims because it does not seek "money damages" and because the Tucker Act neither expressly nor impliedly forecloses the relief sought.  The Tucker Act is no bar here because (i) the Conference's claims sound in statutory and constitutional rights, not in the breach of the terms of its contract, (ii) the forms of relief the Conference seeks are not contractual, and (iii) the Court of Federal Claims lacks authority to grant the relief sought by the Conference.

As this Court recognized in denying the preliminary injunction, the relief sought in the complaint differs in important ways from the Conference's request for preliminary relief. The denial of preliminary relief, therefore, does not predetermine the government's motion. Here, the Conference seeks classic forms of equitable relief: (1) a declaratory judgment that the government's actions violate federal law, (2) vacatur and a permanent injunction against implementation of the government's purported suspension and termination, and (3) a permanent injunction requiring the government to comply with its obligations under federal law, including the Refugee Act. USCCB does *not* seek an order requiring the government to disburse funds to USCCB or obey the terms of its agreements.

The government's contention that the Conference's claims are moot is also wrong. All three categories of relief that USCCB requests—the declaratory judgment, vacatur of and injunction against the suspension and termination, and the injunction to enforce the statutory mandate— remain valuable to USCCB even though its assigned refugees have graduated from the initial resettlement program. This relief would restore the Conference's status as an available resettlement agency as the government admits new refugees, including for any admissions pursuant to court orders in other proceedings. A declaratory judgment or vacatur also would establish that the suspension and termination of USCCB's cooperative agreements violated federal laws that the Court of Federal Claims cannot adjudicate. This case would, therefore, be the only opportunity to adjudicate the Conference's argument that the government's suspension and termination violate the APA and Refugee Act. Moreover, a declaratory judgment and an injunction for the government prospectively to fulfill its obligations under the Refugee Act would, in part, alleviate the damage to USCCB's goodwill by reducing the stigma and reputational harm that resulted from the government's unlawful conduct toward the Conference.

**BACKGROUND**

**I.    The Government Partnered With USCCB To Fulfill The Government's Statutory Mandate To Provide Refugee Resettlement Assistance.**

Caring for refugees has been a core aspect of the Catholic Church's mission since its inception.  The Church has a long history of assisting refugees fleeing persecution abroad to resettle in the United States, stretching back well before the historic partnership between USCCB and the State Department.

Since passage of the Refugee Act of 1980, the federal government has partnered with USCCB, among other nonprofit resettlement agencies, to fulfill the statutory mandate to "make available sufficient resources"—"to the extent of available appropriations"—to enable refugees to "become effectively resettled" and "economic[ally] self-sufficien[t]" as "quickly as possible." 8 U.S.C. § 1522(a).  Under the initial-resettlement program, the State Department enters annual agreements with nonprofits like USCCB to provide essential assistance—like housing, food, and clothing, as well as social, medical, educational, and employment services—during refugees' first few months in the United States.  *Id.* § 1522(b).

Under USCCB's cooperative agreements for 2025, the government committed $65 million for initial resettlement.  Dkt. 29 (Am. Compl.) ¶ 4.  Between entering into the agreements and purportedly suspending them, the government placed over 8,000 refugees or Special Immigrant Visa holders into USCCB's resettlement program, triggering USCCB's obligations under the cooperative agreements to provide funds and assistance during these individuals' initial resettlement periods for up to 90 days.  Dkt. 25-1 (2d Zerbinopoulos Decl.) ¶ 14.  USCCB provides the required services in coordination with local Catholic Charities across the country.  Dkt. 5-3 (1st Canny Decl.) ¶ 7.

## II.     The Government Unlawfully Suspended And Terminated Resettlement Assistance.

On January 24, 2025, without notice, the State Department suspended funding for refugee resettlement nationwide by issuing suspension letters to its resettlement partners.  It claimed that the suspension was "[c]onsistent with" President Trump's Executive Order "Reevaluating and Realigning United States Foreign Aid," and that the agreements "may no longer effectuate agency priorities." Dkt. 29 (Am. Compl.) ¶ 51.  The notices did not explain how the agreements conflicted with agency priorities; they did not even identify those priorities.  As of the date of the suspension, more than 6,700 refugees who had been assigned to USCCB were still within their 90-day resettlement period.  Dkt. 25-1 (2d Zerbinopoulos Decl.) ¶ 14.  Since the suspension, and despite ongoing conversations with USCCB, the government has not made any payments to USCCB—even to reimburse pre-January 24 services, which the suspension letter purported to allow.  Dkt. 29 (Am. Compl.) ¶ 52.  USCCB filed this lawsuit on February 18, 2025, seeking (1) a declaratory judgment that the suspension violated the Constitution and multiple federal statutes, (2) vacatur of the suspension based on violations of the APA, and (3) various forms of injunctive relief.  Dkt. 1 (Compl.) at 34.

On February 26, 2025, as the parties litigated USCCB's request for a preliminary injunction, the State Department doubled down:  USCCB received two one-page letters purporting to terminate the cooperative agreements.  Dkt. 29 (Am. Compl.) ¶ 56.  They stated that the awards "no longer effectuate[] agency priorities"—again, without explaining the Department's priorities, why the awards no longer effectuate them, or why USCCB must immediately "stop all work" and abandon the thousands of refugees still in their critical 90-day period.  *Id.* ¶¶ 58-59.  USCCB amended its complaint to extend its requested relief to the purported termination.  *Id.* at 40.  Its amended complaint also added a prayer for this Court to "[e]njoin Defendants to comply with their

4

statutory and regulatory obligations, including those under the Refugee Act of 1980 to provide

initial-resettlement services to the refugees in USCCB's programs." *Id.*

## III.    Courts Reinstated Cooperative Agreements That Fulfill The Government's Resettlement Obligations.

While the parties in this case continued to litigate the preliminary injunction, the United

States District Court for the Western District of Washington was adjudicating a similar suit.  In

that case, two of the State Department's other partner resettlement agencies likewise challenged

the lawfulness of the suspension and eventual termination of their cooperative agreements.  On

March 24, 2025, the district court concluded that the termination was unlawful and consequently

issued a preliminary injunction ordering the government "to reinstate all cooperative agreements

terminated pursuant to the Termination Notices to their status as they existed immediately before

February 26, 2025." *Pacito v. Trump*, No. 2:25-cv-255, Dkt. 79 at 36 (W.D. Wash. Mar. 24, 2025).

Pursuant to that order, the State Department sent USCCB letters on April 2, 2025, stating

its intent to reinstate the terminated cooperative agreements "in accordance with the March 24

preliminary injunction . . . issued in *Pacito v. Trump*."  Exs. A, B.  But the letter also notified

USCCB that the Department would immediately resuspend the agreements.  Two days later, on

April 4, USCCB received a letter purporting to suspend both of the reinstated agreements.  Ex. C.[1]

## IV.    The Refugee Funding Suspension And Termination Have Harmed USCCB, Its Partners, And Refugees.

The consequences of the government's recalcitrance throughout the litigation have been

devastating for USCCB and the refugees it serves.  When the promised funds stopped flowing with

---

[1] The content of these letters is not essential to the determination of the government's motion to dismiss.  The Conference is providing these letters to the Court to keep the Court fully informed about the current status of its cooperative agreements.

the initial suspension, USCCB and its local partners could only serve the 6,700 refugees still as-signed to them by drawing on their own resources. Dkt. 29 (Am. Compl.) ¶¶ 62-64. As a result, USCCB is short millions of dollars in unpaid reimbursements for services already rendered—with no indication the government will fund any additional services. *Id.* USCCB was forced to lay off fifty employees to conserve funds for refugee assistance. *Id.* ¶ 65. Its refugee-resettlement pro-gram has been irreparably damaged, as have its relationships with its partners, and its mission to care for refugees. *Id.* ¶¶ 66-67. USCCB's inability to reimburse its partners required those part-ners to also lay off mission-critical staff and forced them to stop providing critical services to refugees. *See* Dkt. 22-2 (Brown Decl.); Dkt. 22-3 (Colbert Decl.); Dkt. 22-5 (Main Decl.). Refu-gees who had already entered the United States were cut off from support before receiving the promised assistance during their resettlement period, *id.*, which made it more difficult for refugees to establish themselves as productive members of society.

Now, after this Court's denial of USCCB's motion for a preliminary injunction, the gov-ernment moves to dismiss the complaint based primarily on purported defects in this Court's ju-risdiction.

## STANDARD OF REVIEW

In deciding a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court "assumes the truth of the allegations in the Complaint," but it "is not limited to allegations contained" therein. *Tarzana Providence Health Sys. v. Becerra*, 749 F. Supp. 3d 1, 5 (D.D.C. 2024). The Court asks "whether the facts, as alleged, give rise to a plausible inference that the Court has jurisdiction over the case." *Id.* (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

Courts determining whether they have jurisdiction over a plaintiff's claims or if the Tucker Act impliedly precludes their jurisdiction "must consider [the plaintiff's] claims individually"—

engaging in a claim-by-claim analysis and dismissing only those claims for which jurisdiction is lacking. *Transohio Sav. Bank v. Director, OTS*, 967 F.2d 598, 609, 614-24 (D.C. Cir. 1992).

## ARGUMENT

The government is wrong that this Court lacks jurisdiction over USCCB's claims. The APA waives sovereign immunity for claims "seeking relief other than money damages." 5 U.S.C. § 702. The Tucker Act does not impliedly preclude the APA's sovereign-immunity waiver with respect to USCCB's claims, which are not essentially contractual because they are based on federal law rather than contractual provisions, do not seek contractual forms of relief, and could not be heard by the Court of Federal Claims. Given the "strong presumption that Congress intends judicial review of administrative action,'" *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986), and the acknowledged tension between the government's jurisdictional argument and "the language of the Tucker Act," *Transohio Sav. Bank v. Director, OTS*, 967 F.2d 598, 609 (D.C. Cir. 1992), this Court should be cautious before barring the Conference from litigating in an Article III tribunal. Moreover, the scope of the APA's waiver of sovereign immunity and any effect the Tucker Act may have on it are irrelevant to this Court's ability to hear USCCB's claims against federal officials acting beyond their lawful authority—claims that do not implicate sovereign immunity in the first place.

The government's contention that USCCB's claims are moot is likewise unavailing. This Court has power to grant USCCB meaningful relief. A declaration that the suspension and termination were unlawful, vacatur of those actions, and injunctions to obey federal law and to not implement the unlawful acts would restore USCCB's eligibility to perform its mission by assisting

any newly admitted refugees, repair harm to USCCB's goodwill, and provide USCCB with a judgment as to the unlawfulness of the suspension and termination of its agreements that it can rely on in future adjudications.  Each potential form of relief confirms that USCCB's claims are live.

## I.    This Court Has Jurisdiction Over USCCB's Claims.

The government's primary argument (at 9) is that this Court lacks jurisdiction because the government has not waived sovereign immunity.  Although this Court concluded that the government's jurisdictional argument was likely to succeed at the preliminary-injunction stage, Dkt. 37 (PI Order) at 15, that prediction was "only a forecast," *Fed. Trade Comm'n v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981); it is "not binding," *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *accord Indus. Bank of Wash. v. Tobriner*, 405 F.2d 1321, 1324 (D.C. Cir. 1968). Indeed, as this Court anticipated, its analysis at the preliminary-relief stage does "not flow to the Complaint itself."  Dkt. 37 (PI Order) at 15.

The Court should reject the government's jurisdictional argument for two independent reasons.  *First*, to the extent that a waiver of sovereign immunity is required for some of USCCB's claims—*i.e.*, those against government agencies based on the suspension and termination—the APA waives sovereign immunity, and the Tucker Act does not "impliedly forbid[] the relief which is sought."  5 U.S.C. § 702.  *Second*, as to USCCB's claims seeking equitable relief for federal officials' violation of federal statutes and the Constitution, "there is no sovereign immunity to waive—it never attached in the first place."  *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996).

### A.  The APA waives sovereign immunity for USCCB's claims.

The APA waives sovereign immunity for suits "seeking relief other than money damages" against a federal "agency or an officer or employee thereof," except that it does not "confer[] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids

the relief which is sought." 5 U.S.C. § 702. USCCB's claims do not seek money damages, and no other statute forbids the relief sought.

### 1.    USCCB has not requested "money damages."

None of USCCB's requested relief constitutes "money damages"—a point the government does not directly contest. In *Bowen v. Massachusetts*, the Supreme Court held that a district court had jurisdiction over a claim seeking to set aside an HHS order "refusing to reimburse a State for a category of expenditures under its Medicaid program." 487 U.S. 879, 882 (1988). Under *Bowen*, complaints that seek "declaratory and injunctive relief" are "certainly not actions for money damages," and even when the action may require *specific* relief, such relief is "not 'money damages' as that term is used in" the APA's sovereign-immunity waiver. *Id.* at 893.

*Bowen* recognized the long-standing "distinction between an action at law for damages— which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—*which may include an order providing for … the recovery of specific property or monies,* ejectment from land, or injunction either directing or restraining the defendant officer's actions." *Id.* (quotation marks omitted; emphasis added). "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* The *Bowen* Court referenced and adopted the reasoning of Judge Bork in distinguishing between "money damages," which "*substitute* for a suffered loss," and "specific remedies," which "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Id.* at 895 (quoting *Md. Dep't of Hum. Res. vs. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985)). Under *Bowen*, even a suit seeking a specific remedy of payment of a sum of money owed is not a suit for "money damages" excluded from the APA's sovereign-immunity waiver.

The Supreme Court's later decision in *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002), does not change *Bowen*'s rule. *Knudson* addressed whether an order of specific performance was unavailable between private parties under a statute, ERISA, that authorized "equitable relief." *Id.* at 209-10. *Knudson* was not a case under the APA and interpreted neither the Tucker Act nor Section 702. *See U.S. Dep't of Educ. v. California*, 145 S. Ct. 966, 969 (2025) (Kagan, J., dissenting). To the contrary, *Knudson* expressly distinguished *Bowen* by explaining that "*Bowen* did not turn on distinctions between 'equitable' actions and other actions … but rather [on] what Congress meant by 'other than money damages' in the Administrative Procedure Act." 534 U.S. at 212 (quotation marks omitted) (alteration in original). It did not overrule *Bowen*'s (and the D.C. Circuit's) rule that requests for specific relief are *not* "money damages" excluded from the APA's sovereign-immunity waiver. *See Md. Dep't of Hum. Res.*, 763 F.2d at 1446-48.

Here, USCCB does not seek *any* monetary relief. It seeks a declaratory judgment establishing that the suspension and termination violate statutes and the Constitution, an injunction preventing the Defendants from enforcing those actions, vacatur under the APA, and an injunction requiring Defendants to comply with the Refugee Act and other federal statutes and regulations. *Bowen* squarely held that such relief is not "money damages"—even if it may ultimately "require one party to pay money to another." 487 U.S. at 893. And *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015), and the APA, 5 U.S.C. §§ 703, 706, make clear that such forms of relief are expressly available when the government has violated its statutory and constitutional obligations.

### 2.     The Tucker Act does not divest this Court's jurisdiction.

The government argues that this Court lacks jurisdiction because the Tucker Act "expressly or impliedly forbids the relief" that USCCB seeks. 5 U.S.C. § 702. That is incorrect.

The Tucker Act grants the Court of Federal Claims "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. 1491(a)(1).  While nothing in the text of the Tucker Act precludes seeking equitable remedies for contract violations in district court, *see infra* Section I.A.4, the D.C. Circuit has held that the Tucker Act renders the APA's sovereign-immunity waiver ineffective with respect to claims that are "essentially contractual."  *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982).

The D.C. Circuit requires courts to conduct a claim-by-claim analysis to determine whether the Tucker Act impliedly forecloses jurisdiction over each "claim" and "prayer" for relief.  *Sharp v. Weinberger*, 798 F.2d 1521, 1523-24 (D.C. Cir. 1986).  Thus, in *Sharp*, the Court separately analyzed and distinguished between the claims asserting a violation of "federal regulations, statutes and the Constitution," which were cognizable in district court, and claims asserting "the United States was in material breach of its contractual obligations."  *Id.* at 1524-45; *see also Transohio*, 967 F.2d at 609 (courts "must consider [the plaintiff's] claims individually").  The government therefore errs in treating USCCB's complaint as a single undifferentiated "contract claim."  Instead, the Court must assess whether each of USCCB's claims is essentially contractual under the *Megapulse* standard.

The Conference asserts claims for violations of (1) the Refugee Act, the Impoundment Control Act and the constitutional separation of powers; (2) the APA's prohibition on arbitrary and capricious agency action, and action that violates federal regulations (including regulations governing the withholding or termination of payments); and (3) the APA's procedural require-

ments. As relief, USCCB seeks distinct prospective, equitable and declaratory remedies: a declaration that the suspension and termination are unlawful, vacatur of those actions, an injunction against their enforcement, and an injunction ordering compliance with the government's statutory and regulatory obligations.

The Conference and the government agree that under D.C. Circuit precedent, the Tucker Act limits the APA's waiver of sovereign immunity (to the extent that waiver is necessary here) only when a particular claim "meets three requirements." Mot. 10 (citing *Am. Near E. Refugee Aid v. Agency for Int'l Dev.*, 2023 WL 10669678, at *5 (D.D.C. Mar. 21, 2023)). A claim falls "within the Claims Court's exclusive Tucker Act jurisdiction" only if "*both*" (1) the "source" of the right asserted is contractual, "*and*" (2) the relief sought is contractual. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106-07 & n.6 (D.C. Cir. 2022) (emphasis added); *see also Megapulse*, 672 F.2d at 968 ("The classification of a particular action as one which is or is not 'at its essence' a contract action depends *both* on the source of the rights upon which the plaintiff bases its claims, *and* upon the type of relief sought (or appropriate)." (emphasis added)). Thus, the district court is not deprived of jurisdiction, and a plaintiff is not forced to litigate in a non-Article III tribunal, if only the source of the right or the type of relief sought is contractual. A "federal district court may accept jurisdiction over a statutory or constitutional claim for injunctive relief even where the relief sought is an order forcing the government to obey the terms of a contract—that is, specific performance." *Transohio*, 967 F.2d at 610. In addition, this Court (3) has "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006). The government's motion to dismiss cannot be granted

unless all three of these requirements are satisfied, for every one of USCCB's claims for relief. In fact, *none* of these requirements is satisfied for *any* of USCCB's claims.

### (a)    Source of the right

The Conference's claims are grounded in statutory and regulatory duties and the Constitution—not contracts. The government baldly asserts (at 13) that because USCCB challenges "the State Department's suspension of the Agreements," the "terms of [the] Agreements will determine whether the Department had the authority to suspend the Agreements to assess its priorities." That is wrong. The Conference alleges that the suspension and termination violate *independent* statutory, regulatory, and constitutional constraints on government power; it does *not* assert any breach-of-contract claim. Claims founded in regulation or statute are cognizable "even when the claims depend on the existence and terms of a contract with the government." *Transohio*, 967 F.2d at 610.

USCCB's core claim is that the government has a statutory obligation to provide refugee resettlement assistance because the Refugee Act demands that it "shall, to the extent of available appropriations," provide certain enumerated services, including language training, job training, and other transitional assistance to newly admitted refugees. 8 U.S.C. § 1522(a). The government violated that duty when it suspended and later terminated its resettlement assistance to refugees. The Conference also argues the government has violated (1) the Impoundment Control Act, by deferring and rescinding budget authority appropriated for resettlement assistance on impermissible grounds and without observing the procedures Congress required; (2) the APA, by suspending resettlement assistance arbitrarily and capriciously; (3) the Uniform Administrative Requirements, *see* 2 C.F.R. §§ 200.305(b)(6), 200.340, by improperly withholding payments and unlawfully terminating the cooperative agreements; and (4) the Constitution's separation of powers, by flouting Congress's constraints on the Executive Branch's spending discretion. Determining whether the

13

government "exceeded its authority" or "violated" these laws "requires primarily an examination of the statutes" and regulations it "has purportedly violated"; these are "not questions the district court can answer by examining a contractual promise." *Crowley*, 38 F.4th at 1108-09.

The source of the rights asserted in USCCB's claims thus resemble those that the D.C. Circuit has repeatedly held cognizable in district court. *See, e.g.*, *Sharp*, 798 F.2d at 1524 ("federal regulations, statutes and the Constitution"); *Transohio*, 967 F.2d at 611 ("statutory and due process claims"); *Crowley*, 38 F.4th at 1108 ("statutes"). USCCB's claims do not depend on breaches of its agreements; "any relief would not be determined by reference to the terms of" the agreements. *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017). These claims do not resemble those the D.C. Circuit has held were based in contract because, for example, they asserted breach of specific sections of the agreement between the plaintiff and the government. *See, e.g.*, *Albrecht v. Comm. on Emp. Benefits*, 357 F.3d 62, 66-69 (D.C. Cir. 2004) (contract would "determine whether the relief sought … is available" because plaintiff asserted breaches of "section 7.1," "section 10.2," and "section 8.1(b) of the Board Plan"). "To decide this case, the court will have to interpret those federal laws and review the State Department's administrative record. The court will have little, if any, need to analyze or interpret the Conference's contracts with the State Department." *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, No. 25-5066, slip op. at 2 (D.C. Cir. Mar. 28, 2025) (Millett, J., dissenting).

The government's reliance (at 13) on *Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985), is misplaced. *See also* Dkt. 37 (PI Order) at 11. In *Spectrum*, the Debt Collection Act "*in no way create[d]* the substantive right" the plaintiff invoked; it had no legal effect separate from the pre-existing contract. 764 F.2d at 894 (emphasis added). Here, by contrast, the government's statutory duties under the Refugee Act, Impoundment Control Act, and

APA exist independently of its agreements with USCCB; they are non-contractual bases for USCCB's claims. While the government quotes *Spectrum*'s explanation that the right to payments was "created in the first instance by the contract," *id.*, that is plainly incorrect here. At a minimum, the Conference's claim that the government should be enjoined to fulfill its duty under the Refugee Act does not rest on the cooperative agreements. The government's obligation to pay for refugee services "is created in the first instance" by the Refugee Act, 8 U.S.C. § 1522(a); the government's obligation and the corresponding right come from the Act, *not* "the contract." *Spectrum*, 764 F.2d at 894. In fact, the government could fulfill this statutory obligation (and satisfy a mandatory injunction) by partnering with other resettlement agencies, working directly with the Conference's sub-grantees, or offering services directly to refugees. The government need not partner with the Conference under the cooperative agreements to fulfill this obligation, and whether the government has fulfilled that obligation does not depend on the cooperative agreements.

The government seems to read *Spectrum* for the proposition that if the plaintiff's original right to payment arose from a contract, then the source of the plaintiff's asserted right must be the contract—regardless of whether the plaintiff asserts the violation of regulatory, statutory, or constitutional constraints. To begin, only USCCB's claims seeking to vacate and enjoin the suspension and termination (based on the APA, Impoundment Control Act, federal regulations, and the separation of powers) could even conceivably be construed as vindicating *USCCB*'s right to payments; USCCB's request to enjoin the government to comply with the Refugee Act seeks to vindicate refugees' right to receive services and would not require any payments to USCCB under its agreements. More fundamentally, however, the D.C. Circuit has squarely "reject[ed]" the proposition that the source of an asserted right is contractual just because the claim would not exist but for the existence of a contract. *Crowley*, 38 F.4th at 1110. Rather, litigants "may bring statutory

15

and constitutional claims in federal district court *even when the claims depend on the existence and terms of a contract*." *Transohio*, 967 F.2d at 610 (emphasis added) (finding jurisdiction because the government's "breach" of plaintiffs' "contracts" was "inconsistent with federal law"); *see Perry Cap.*, 864 F.3d at 619 (same, even where fiduciary duties "arose from" contractual relationship). If it were otherwise, district courts would lack jurisdiction to enjoin the government from withholding payments under government contracts based on political, racial, or religious animus. That cannot be the law.

USCCB's claims more closely resemble a case that *Spectrum* accepted and distinguished: *National Helium Corp. v. Morton*, 455 F.2d 650 (10th Cir. 1971). In that case, as *Spectrum* explained, the Tenth Circuit ordered an agency "to comply with … the National Environmental Policy Act" before "cancelling a helium conservation contract"—resulting in the "reinstatement of the helium contract" and "obligat[ing] the government to perform under it." *Spectrum*, 764 F.2d at 894 n.4. Like the *Morton* plaintiff, USCCB is "not asserting a private right in [its] capacity as government contractor[], but [is] instead … enforcing" federal law. *Id*. And like the *Morton* plaintiff, USCCB can press statutory claims that would not have arisen but for the prior existence of its government contracts. *See Crowley*, 38 F.4th at 1110; *Morton*, 455 F.2d at 653-54 (finding jurisdiction over claim that contract termination violated the APA and National Environmental Policy Act). Even though USCCB's claims require "some reference to … a contract," they are not "on the contract" but instead are "validly based on grounds other than a contractual relationship with the government." *Megapulse*, 672 F.2d at 968.

### (b)    Relief sought

USCCB seeks "traditional equitable and declaratory relief" available under the APA and this Court's equitable powers to enjoin violations of federal law by federal officials: a declaratory judgment, injunctions, and vacatur. *U.S. Conf. of Catholic Bishops*, No. 25-5066, slip op. at 3

(Millett, J., dissenting). "[T]he Tucker Act is not implicated when the plaintiff seeks only declaratory and injunctive relief." *Van Drasek v. Lehman*, 762 F.2d 1065, 1068 (D.C. Cir. 1985). The Conference seeks "neither the prototypical contractual remedy of damages" nor the "classic contractual remedy of specific performance." *Crowley*, 38 F.4th at 1110 (quotation marks omitted). Thus, even if the Court lacked power to grant the Conference's preliminary relief request, the differences between the preliminary relief sought and the relief sought in the amended complaint "matter for jurisdictional purposes." Dkt. 37 (PI Order) at 15.

*First*, USCCB seeks a declaration that the suspension and termination "violate the Refugee Act of 1980, the Impoundment Control Act, and the separation of powers; are arbitrary and capricious under the APA; and are substantive rules that did not comply with the procedural requirements of the APA." Dkt. 29 (Am. Compl.) at 40. A declaratory judgment, of course, does not require payment of any money or specific performance under a contract. Moreover, USCCB's requested declaration would speak only to the government's obligations under federal statutes, regulations, and the Constitution; it would not "in any way constitute[] an adjudication of [USCCB's] rights under its [agreements]"—so the "Tucker Act does not speak to [its] propriety." *DSE, Inc. v. United States*, 169 F.3d 21, 34 (D.C. Cir. 1999). The declaration would not say that USCCB "ha[s] a valid contract," *Sharp*, 798 F.2d at 1523, or that the government breached the contract, but that the government's actions violate the law.

USCCB's requested declaration has "'considerable value' apart from and is not 'negligible in comparison' to any potential monetary recovery that [USCCB] might obtain in other proceedings." *Crowley*, 38 F.4th at 1111 (quoting *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995)). Namely, a declaration that the government acted unlawfully in suspending and terminating its partnership with USCCB would have salutary effects on USCCB's reputation and goodwill

independent of any potential recovery of funds. It would vindicate USCCB's resettlement program as being consistent with law and public policy, and it would improve USCCB's relationship with its past and future local-charity partners by signaling that the sudden suspension and termination of refugee-funding agreements are unlawful and therefore less likely to be repeated. Thus, like the change-of-discharge status sought in *Kidwell* and its predecessors, which "would lift some of the shame associated with" the government's unlawful conduct, this relief would reduce the stain on the Conference's reputation caused by the government. 56 F.3d at 285. That is sufficient grounds for the district court to exercise jurisdiction even if that non-monetary relief will have a "direct, automatic, and unavoidable consequence" of causing money to flow from the government to the plaintiff. *Id.* (quotation marks omitted). Because the requested declaration has considerable non-monetary value and "the plaintiff here has not explicitly requested monetary relief," a district court "may hear the claim and grant the proper equitable relief." *Id.* at 284-85.

*Second*, USCCB seeks an injunction ordering "Defendants to comply with their statutory and regulatory obligations, including those under the Refugee Act of 1980 to provide initial-resettlement services to the refugees in USCCB's programs." Dkt. 29 (Am. Compl.) at 40. Federal courts indisputably have the equitable power to order federal officials to comply with federal law, *see, e.g.*, *Armstrong*, 575 U.S. at 327, and power under the APA to issue injunctions to compel agency action "unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1); *id.* § 703. And this requested injunction cannot be equated to an order for specific performance because the government could comply with the injunction *without performing under USCCB's agreements*: While the government likely would comply with such an injunction by adhering to USCCB's agreements, it *could* provide services or funding directly to refugees or to local charities that have provided refugee services—charities that are not even parties to USCCB's agreements. The government all

but admits that "a refugee *could* bring an APA claim challenging the failure to provide assistance" under the Refugee Act.  Doc. 2106955 (Response) at 15, No. 25-5066 (D.C. Cir. Mar. 21, 2025) (emphasis added).  This relief would be valuable to USCCB independent of the disbursement of any funds under the cooperative agreements, and it does not constitute a request ordering "the obligation or disbursement of appropriated funds" to USCCB—the relief in USCCB's preliminary-injunction request that this Court found jurisdictionally suspect.  *See* Dkt. 37 (PI Order) at 9-10.  At a minimum, this Court can issue this injunction to require the government to comply with federal law by making provision for refugees to receive resettlement assistance.

*Third*, USCCB requests vacatur—that this Court "[h]old unlawful and set aside"—the suspension and termination and an injunction restraining Defendants from enforcing or implementing them.  Setting aside and enjoining the suspension and termination are not contractual remedies because this relief is not "in essence … monetary."  *Crowley*, 38 F.4th at 1111 (quotation marks omitted).  Rather, this relief would confer a "host of non-monetary benefits" that are "not negligible in comparison to any potential monetary recovery."  *Id.* at 1111-13 (quotation marks omitted).  Namely, USCCB's refugee-assistance program and relationship with government could continue—preserving USCCB's eligibility to receive and serve refugees and SIV holders that may be admitted in the future, signaling to local charities that USCCB remains a viable partner, and preventing additional harm to USCCB's mission.  *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016).  Vacatur and the injunction would remove legal barriers (the suspension and termination) that would otherwise preclude the government from partnering with the Conference.  The non-monetary benefits of this relief mean that it is not contractual, even if its practical effect is to "reverse … the Government's decision to cease a financial relationship with the Conference."  Dkt. 37 (PI Order) at 13.

To be sure, this relief would have the effect of requiring the government to continue performing its obligations under USCCB's cooperative agreements—including reimbursing USCCB for expenses incurred to provide refugee services and continuing USCCB's resettlement programs for newly admitted refugees and SIV holders on an ongoing basis. But this relief would remove an unlawful impediment to contract performance; it would not order specific performance. *See Crowley*, 38 F.4th at 1111. Moreover, the D.C. Circuit has repeatedly held that a form of relief is not barred as impermissibly contractual *even if it requires specific performance of a contract*, if the basis for that relief is federal law: A "federal district court may accept jurisdiction over a statutory or constitutional claim for injunctive relief even where the relief sought is an order forcing the government to obey the terms of a contract." *Transohio*, 967 F.2d at 610. District courts are not "forbidden from granting injunctive relief merely because that relief might be the equivalent of ordering specific performance." *Id.* at 611. The D.C. Circuit has rejected the proposition that the government "may not be enjoined, even if in clear violation of a statute, simply because that same action might also amount to a breach of contract," lest the government be able to "avoid injunctions against activities violative of a statutory duty simply by contracting not to engage in those activities." *Megapulse*, 672 F.2d at 971. The "mere fact that an injunction would require the same governmental restraint that specific []performance might require in a contract setting" does not "deny a district court … jurisdiction." *Id.*; *see also, e.g.*, *Kidwell*, 56 F.3d at 284 (relief is not contractual even if it "may obligate the United States to pay the complainant"); *Tootle*, 446 F.3d at 176 (similar); *U.S. Conf. of Catholic Bishops*, No. 25-5066, slip op. at 3 (Millett, J., dissenting) (the fact that "one effect of [the] equitable relief may be that payments required by law flow to the Conference" "is not enough to turn the complaint into one for contract damages").

The government argues to the contrary (at 10-11) by citing a First Circuit case for the proposition that federal courts "do not have the power to order specific performance by the United States of its alleged contractual obligations." *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989). But that out-of-circuit statement says nothing about whether a district court can issue an injunction or vacatur *based on federal law* that would have the *same effect as* specific performance. And the government does nothing to square that argument with the D.C. Circuit's holding that "a federal district court may accept jurisdiction over a statutory or constitutional claim for injunctive relief even where the relief sought is an order forcing the government to obey the terms of a contract—that is, specific performance." *Transohio*, 967 F.2d at 610. Tellingly, the government has nothing to say about this precedent.[2]

Nor does *Ingersoll-Rand Co. v. United States* render USCCB's requested relief contractual. *See* Dkt. 37 (PI Order) at 11-12. In that case, the plaintiff sought "an order reinstating the original award of the contract" with the government. 780 F.2d 74, 79-80 (D.C. Cir. 1985). USCCB seeks no such thing. Although vacatur of the suspension and termination may have the effect of (at least temporary) reinstatement, USCCB's amended complaint does not "amount[] to a request for specific performance" because the relief sought would not "mean that the government must perform." *Id.* at 80. In the future, the government might lawfully terminate its agreements with USCCB yet still observe the statutory and regulatory duties USCCB seeks to vindicate here, including the Refugee Act's requirement to provide resettlement assistance. And here it is not "possible to conceive

---

[2] The government also quotes (at 10) a request in USCCB's original complaint for an injunction to reimburse expenses pursuant to the terms of its cooperative agreements. But no such request appears in the operative amended complaint. *See* Dkt. 29 (Am. Compl.) at 40. Even if such a request remained live, it would (1) still be permissible under *Megapulse* and *Transohio* because payment under the agreements is the necessary result of vacating and enjoining the independently unlawful suspension and termination, and (2) need to be considered separately from USCCB's other claims for relief.

of this dispute as entirely contained within the terms of the contract." *Id.* at 78. Moreover, USCCB's claims are distinct from those at issue in *Ingersoll-Rand* because (1) the statutory violations USCCB alleges cannot be reframed as violations of any clause of its agreements, and (2) the "issues raised by [USCCB's] complaint are" *not* "within the unique expertise of the Court of Claims"—which has no special expertise in interpreting these statutes. *Id.*

Neither does the *Bowen* dissent's claim that "sovereign immunity bars a suit against the United States for specific performance of a contract" preclude the relief the Conference seeks. 487 U.S. at 921 (Scalia, J., dissenting); Dkt. 37 (PI Order) at 10. This statement rested on precedent that pre-dated the enactment of the APA's waiver of sovereign immunity in 1976, and was implicitly rejected by the *Bowen* majority, which explained that "specific performance of [a] contract" is not a request for "money damages" under Section 702, necessarily indicating that Section 702's sovereign immunity waiver encompasses specific performance. 487 U.S. at 895 (quotation marks omitted). In any event, the dissent said nothing about courts' jurisdiction to order, based on statutes, regulations, or the Constitution, equitable relief that would effectively require contractual performance.

Finally, *Knudson* does not alter the analysis of relief under *Megapulse* and *Kidwell*. *Knudson* addressed neither the APA nor the Tucker Act, but the different language and context of the Employee Retirement Income Security Act. 534 U.S. at 206. And the question it answered was not whether a particular form of relief was uniquely *contractual*, but rather whether an ERISA provision allowing a court to grant "equitable relief" contemplated an order of specific performance demanding that one private party follow the express terms of a plan contract formed with another private party. *Id.* at 210. Critically, the substance of the order in *Knudson* was grounded on the breach of the terms of the contract between the parties, and the relief expressly sought would

have been an order to comply with the express terms of the contract, *id.* at 208 (attempt to enforce reimbursement provisions of plan)—not an order to comply with statutory, regulatory, or constitutional requirements.

### (c)        Jurisdiction in the Court of Federal Claims

The government cursorily concludes (at 14) that USCCB "could have brought [its] claims in the Claims Court." But that conclusion erroneously assumes that USCCB's claims sound entirely and exclusively in contract. The government ignores settled legal principles that preclude the Court of Federal Claims from granting the relief USCCB currently seeks, both because of its basis in statutes, regulations, and the Constitution, and the nature of the relief sought.

*First*, the Claims Court lacks jurisdiction to grant relief based on USCCB's statutory and constitutional claims because "the historical boundaries of [its] competence have excluded those instances in which the basis of the federal claim—be it the Constitution, a statute, or a regulation—cannot be held to command … the payment of money to the claimant." *Eastport Steamship Corp. v. United States*, 372 F.2d 1002, 1008 (Ct. Cl. 1967). Thus, that court's jurisdiction "depends upon whether any federal statute 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *United States v. Testan*, 424 U.S. 392, 400 (1976). "[M]oney-mandating provisions are uncommon." *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 324 (2020).

The federal-law bases for USCCB's claims—the Refugee Act, the Impoundment Control Act, the APA, and the separation of powers—do not fit the bill. None of these provisions or principles creates a cause of action for damages caused by their breach, nor do they imply that the government has a fiduciary duty to compensate USCCB specifically for their breach. *Cf. Md. Dep't of Hum. Res.*, 763 F.2d at 1450-51 (Title XX is not money-mandating because it does "not expressly provide a cause of action … in favor of participating states" and there was no fiduciary

23

duty owed by the government).[3]  They do not "attempt to compensate a particular class of persons for past injuries or labors."  *Bowen*, 487 U.S. at 905 n.42.  At most, they prohibit unilaterally with-holding congressionally appropriated funds; forbid acting unlawfully, arbitrarily, or capriciously; or "direct[] the Secretary to pay money … not as compensation for a past wrong, but to subsidize future … expenditures."  *Id.*  *Bowen* forecloses claims based on the Refugee Act in the Court of Federal Claims.  *See id.* (a statute creating "a federal grant-in-aid program" is not money mandat-ing).  And USCCB cannot ask the Claims Court to ignore the suspension and the termination based on their arbitrariness or capriciousness because "no APA review is available in the Court of Federal Claims."  *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1370 n.11 (Fed. Cir. 2005).  Because USCCB's claims do not involve money-mandating federal law, the Claims Court lacks jurisdiction to order damages based on the government's violation of its statutory and regulatory duties.

*Second*, the Court of Federal Claims has no power to grant the kinds of relief that USCCB requests from this Court.  As relevant here, the Tucker Act grants jurisdiction only to render judg-ments in claims for money damages and to grant limited equitable relief "as an incident of and collateral to any such judgment."  28 U.S.C. § 1491(a)(2).  That limitation places all of the Con-ference's requested relief beyond the power of the Claims Court.  That court cannot enter a declara-tory judgment as to the lawfulness of the government's actions.  *Alvarado Hosp., LLC v. Price*, 868 F.3d 983, 999 (Fed. Cir. 2017) ("The Tucker Act does not generally confer jurisdiction for actions seeking declaratory or injunctive relief.").  It cannot set aside the government's suspension

---

[3] For similar reasons, the Court's holding in *Maine Community Health Options v. United States* is likewise inapposite because that case involved "a rare money-mandating obligation" under statute. 590 U.S. at 328.  Distinguishing that statute from *Bowen*, the Court held that the plaintiff was "seek[ing] specific sums already calculated, past due, and designed to compensate for completed labors." *Id.* at 327.  Meanwhile, in *Bowen*—as here—Massachusetts sought "prospective declara-tory and injunctive relief to clarify the extent of the Government's ongoing obligations under" a federal "grant-in-aid program," which relief was not available in the Claims Court. *Id.* at 326-27.

and termination of USCCB's agreements.  *See IAP Worldwide Servs., Inc. v. United States*, 160 Fed. Cl. 57, 70 (2022) (Claims Court only has APA jurisdiction to set aside government contract awards).  Nor can it enter a permanent injunction to ensure the government's prospective compliance with its statutory obligations; it cannot order the government to provide essential services to admitted refugees.  *Me. Cmty. Health Options*, 590 U.S. at 327 (holding that "the Court of Federal Claims 'does not have the general equitable powers of a district court to grant prospective relief'").  Indeed, the Federal Circuit agrees that the appropriate forum in which to seek "prospective relief" of the kind USCCB is after—including "an adjudication of the lawfulness" of the government's actions and an order "compel[ling] [the government] to perform" its statutory and regulatory duties—is an Article III district court.  *Katz v. Cisneros*, 16 F.3d 1204, 1208-09 (Fed. Cir. 1994).  That decision makes clear that if USCCB were to bring the claims currently before this Court to the Court of Federal Claims, it would be turned away, leaving it with no avenue for redress.

The government overlooks these limits on the Claims Court's equitable powers and the substantive law it can adjudicate and simply asserts that the Conference's claims "could have properly been brought in the Claims Court."  Mot. 14.  Tellingly, the government does not concede either that the Claims Court could offer comparable relief, or that the Claims Court could adjudicate each of the legal infirmities the Conference alleges in the government's conduct.  The government does not even concede that the Conference's cooperative agreement is an enforceable contract with the government or that the cooperative agreement is a money-mandating agreement that could give rise to a claim for Tucker Act damages.  *See San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 461-62 (2019) (noting standards for determining whether grant agreements qualify as enforceable contracts giving rise to Tucker Act damages).

Because "the Court of Federal Claims can have exclusive jurisdiction *only* with respect to matters that Congress has proclaimed are within its jurisdictional compass," this Court is not deprived of jurisdiction unless the Court of Federal Claims can adjudicate the Conference's claims and provide appropriate relief. *Tootle*, 446 F.3d at 176-77. The Claims Court can neither resolve the substance of the claims the Conference asserts, nor can it provide the declaratory and injunctive relief the Conference seeks. In this context, the D.C. Circuit "categorically reject[s] the suggestion that a federal court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Id.* at 176.

*     *     *

USCCB's claims therefore implicate none of the D.C. Circuit's three requirements for Tucker Act exclusivity. But if this Court disagrees and concludes that any of USCCB's claims belong in the Court of Federal Claims, it should retain jurisdiction over USCCB's other claims.

### 3.    *Department of Education v. California* **is inapposite.**

The Supreme Court's recent stay opinion in *Department of Education v. California*, 145 S. Ct. 966, does not compel a contrary conclusion. The Court stayed a district court's order requiring the government to "pay out past-due grant obligations and to continue paying obligations as they accrued" because the government was likely to succeed in showing that "the APA's waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *Id.* at 968 (quoting *Knudson*, 534 U.S. at 212). The opinion was "not a decision on the merits" and therefore did not receive the benefit of "full briefing, oral argument, and [the Supreme Court's] usual extensive internal deliberations." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring); *accord Does 1-3 v. Mills*, 142 S. Ct. 17, 18 (2021) (Barrett, J., concurring). *California*'s precedential effect is therefore limited. *Cf. Ritter v. Migliori*, 142 S. Ct. 1824, 1824 (2022) (Alito, J., dissenting) ("I do not rule out the

26

possibility that further briefing and argument might convince me that my current view is un-founded.").

In any event, *California* is distinguishable because none of USCCB's requested relief asks this Court to enforce a contractual obligation to pay money. The district court order stayed by the interim order in *California* focused expressly on contract enforcement. It purported to "restore" plaintiffs "to the pre-existing status quo … under all previously awarded … grants." *California v. U.S. Dep't of Educ.*, 2025 WL 760825, at *5 (D. Mass. Mar. 10, 2025). And it enjoined the government from "withholding … any funds approved and obligated for the grants." *Id.* By contrast, USCCB seeks a *declaration* that the government's actions *violate federal law* and an injunction requiring Defendants "to comply with their statutory and regulatory obligations" under, among other things, the Refugee Act, Dkt. 29 (Am. Compl.) at 40—which Defendants may fulfill by directly providing services to admitted refugees or by funding third parties who provide those services *instead of paying USCCB pursuant to its cooperative agreements*. At a minimum, *these* forms of relief would not be controlled by *California* and do not count as "money damages." 5 U.S.C. § 702.[4]

---

[4] For the same reasons, the D.C. Circuit's recent per curiam order in *Middle East Broadcasting Networks, Inc. v. United States*, No. 25-5150 (D.C. Cir. May 3, 2025)—which relied on *California*—does not control here. The D.C. Circuit stayed a district court's injunction that "ordered restoration of the FY 2025 grants and disbursement to [plaintiffs] of the funds Congress appropriated." *Id.*, slip op. at 6 (cleaned up). Again, USCCB's requested relief is unlike these orders because it focuses on the cessation of legal violations that have only an ancillary impact on its contractual relationship with the government. USCCB thus does not ask the Court "in substance [to] order[] specific enforcement" of the cooperative agreements. *Id.* And, in any event, the en banc D.C. Circuit has reinstated the preliminary injunction while it considers whether to reverse the motions panel's vacatur. *Middle East Broad. Networks, Inc. v. United States*, No. 25-5150 (D.C. Cir. May 7, 2025) (administratively staying panel order that had stayed preliminary injunction).

Nor does USCCB's request for vacatur of the suspension and termination of its cooperative agreements run afoul of *California*. While vacatur might result in payments flowing to USCCB, vacatur is not a contractual remedy, but judicial implementation (via the APA's cause of action) of the "*statutory and regulatory requirements* governing" refugee assistance, which make ending USCCB's programs unlawful independently of the terms of any agreement. *Tootle*, 446 F.3d at 175 (emphasis added). Vacatur would not "enforce [any] contractual obligation to pay money," *California*, 145 S. Ct. at 968, but would remove an *unlawful impediment* to USCCB's continued "ability to provide services to" refugees, *Crowley*, 38 F.4th at 1111. Moreover, vacatur would have the non-monetary prospective effect of requiring the government to treat USCCB as eligible to receive newly admitted refugees and SIV holders. Thus, all of USCCB's requested relief is distinguishable from the order to "pay out past-due grant obligations and to continue paying obligations as they accrue" that the *California* Court stayed. 145 S. Ct. at 968.

### 4.    Tucker Act exclusivity defies statutory text and Supreme Court precedent.

Under the D.C. Circuit's precedent, the Tucker Act does not divest this Court of jurisdiction over USCCB's claims for declaratory and equitable relief from the government's violations of federal law. That conclusion is compelled by a straightforward reading of circuit precedent. This Court should reject the government's overly expansive interpretation of that precedent because the fundamental premise of the government's argument—that the Tucker Act impliedly forecloses the APA's sovereign-immunity waiver for contract claims—is contrary to the statutory text and context.

While it is "often assumed that the Claims Court has exclusive jurisdiction of Tucker Act claims for more than $10,000," that "assumption is not based on any language in the Tucker Act granting such exclusive jurisdiction to the Claims Court." *Bowen*, 487 U.S. at 910 n.48. To the

contrary, the Act's text makes no distinction between constitutional, statutory, regulatory, and contractual claims: "[N]othing in the language of the Tucker Act suggests that a claim founded 'upon an express or implied contract with the United States' should be treated differently than a claim 'founded either upon the Constitution, or any Act of Congress or any regulation of an executive department.'" *Transohio*, 967 F.2d at 609.

In *Bowen*, the Supreme Court observed that the Tucker Act does *not* grant exclusive jurisdiction to the Claims Court for constitutional and statutory claims. 487 U.S. at 910 n.48. And the Court likewise cast doubt on Tucker Act exclusivity with respect to contractual claims: If "§ 702 of the APA is construed to authorize a district court to grant monetary relief—other than traditional 'money damages'—as an incident to the complete relief that is appropriate in the review of agency action, the fact that the purely monetary aspects of the case could have been decided in the Claims Court is not a sufficient reason to bar that aspect of the relief available in a district court." *Id.* "The policies of the APA take precedence over the Tucker Act and plaintiff's action should properly be treated as a final agency action reviewable in District Court." *Id.* at 908 n.46.

In *Transohio*, the D.C. Circuit recognized the "strong case that, after *Bowen*, the Tucker Act should not be read to 'impliedly forbid' under the APA the bringing in district court of contract actions for specific relief"; "such a result would be faithful to the text of the Tucker Act and the APA, and sensible" because "[n]othing in the language of either the Tucker Act or the APA requires special treatment for contract claims." *Transohio*, 967 F.2d at 612. To be sure, *Transohio* declined to overrule the D.C. Circuit's pre-*Bowen* precedent creating Tucker Act exclusivity for contract claims "[w]ithout more certain direction from the Supreme Court." *Id.* at 613; *see Megapulse*, 672 F.2d at 967 (foreclosing APA "claims against the United States" that "are essentially contractual" out of "concern for preserving the integrity of the Tucker Act" and preventing "the

29

demise of the Court of Claims"). But the sound reasoning of *Transohio* cautions against expanding the preclusive effect of the Tucker Act, as the government requests here. Given the APA's "basic presumption of judicial review" of agency action, the Tucker Act should not be stretched to foreclose more review than Congress clearly intended. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967).

### B. The federal-official Defendants do not have sovereign immunity from USCCB's claims seeking equitable relief for violations of statutes and the Constitution.

Sovereign immunity is not implicated by USCCB's claims attacking—and requesting an injunction against—*ultra vires* actions by the federal-official defendants. These are claims that this Court did not address at the preliminary-injunction stage. Because those officials acted beyond their legal authority, sovereign immunity "never attached in the first place," *Reich*, 74 F.3d at 1329, and USCCB's *ultra vires* claims against them can proceed regardless of whether the APA's sovereign-immunity waiver or the Tucker Act's would apply. Because the Conference need not rely on Section 702's sovereign immunity waiver to pursue relief on its *ultra vires* claims, it is irrelevant whether that sovereign immunity waiver is limited by the Tucker Act.

The Conference pled claims asserting that individual federal officials—including Secretary of State Marco Rubio, Senior Bureau Official Adam Zerbinopoulos, Secretary of Health and Human Services Robert F. Kennedy, Jr., and Acting ORR Director Mellissa Harper—acted beyond their statutory authority by violating statutory mandates. Count I of USCCB's amended complaint alleges that Defendants' suspension and termination of USCCB's refugee assistance programs violated the Refugee Act of 1980, 8 U.S.C. § 1522(a)(1)(A), which requires the government to promptly provide certain services to admitted refugees, and the Impoundment Control Act, 2 U.S.C. §§ 682-84, which denies the Executive Branch power to unilaterally defer or rescind the obligation or expenditure of budget authority. *See* Dkt. 29 (Am. Compl.) ¶¶ 77-87. The amended

complaint also alleges that Defendants' actions violated "the Constitution's separation of powers" and "vest[ing of] the power of the purse in Congress." *Id.* ¶¶ 72-73. The Conference presses these statutory and constitutional claims through two causes of action—an APA cause of action, and an "equitable cause of action to enjoin 'violations of federal law by federal officials.'" *Id.* ¶ 87 (quoting *Armstrong*, 575 U.S. at 327, and citing *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)). As relief, USCCB seeks a declaration that the suspension and termination issued by Defendants "violate the Refugee Act of 1980, the Impoundment Control Act, and the separation of powers," an injunction against enforcing or implementing those actions, and an injunction for Defendants to "comply with their statutory and regulatory obligations, including those under the Refugee Act of 1980." *Id.* at 40.

Thus, at least some of USCCB's claims sought equitable relief against federal officials who transgressed the bounds of their lawful authority by violating federal statutes and the Constitution. As the Supreme Court held in *McAnnulty* more than a century ago, if a federal "official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief" because the official's action is "unauthorized by the statute under which he assumes to act." 187 U.S. at 108; *see Armstrong*, 575 U.S. at 326-27 (citing *McAnnulty* for the proposition that an equitable cause of action exists to enjoin "violations of federal law" and "unconstitutional actions" by "federal officials").

If "the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit," because "there is no sovereign immunity to waive—it never attached in the first place." *Reich*, 74 F.3d at 1329 (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690-91 (1949)). Where an "officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign

actions"; "[h]is actions are *ultra vires* his authority and therefore may be made the object of specific relief." *Larson*, 337 U.S. at 689. "[N]o waiver of sovereign immunity is required"—"sovereign immunity does not act as a bar to … exercising jurisdiction"—where the official's action allegedly "violate[s]" a federal "statute" and is therefore "beyond statutory authority." *Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996). The same is true when the exercise of the officer's statutory powers "in the particular case[] are constitutionally void." *Larson*, 337 U.S. at 702; *see also, e.g.*, *Pollack v. Hogan*, 703 F.3d 117, 119-20 (D.C. Cir. 2012) (per curiam) ("[S]uits for specific relief against officers of the sovereign allegedly acting beyond statutory authority or unconstitutionally are not barred by sovereign immunity." (quotation marks omitted)).

While "jurisdiction of the court to hear the case may depend … on the merits," this is not a case where the "alleged claim under the Constitution or federal statutes clearly appears to be … made solely for the purpose of obtaining jurisdiction or … is wholly insubstantial and frivolous." *Larson*, 337 U.S. at 690 & n.10. Rather, the Conference has made a strong showing that the federal-official Defendants exceeded the scope of their authority by halting services and funding for refugee assistance, violating limits imposed by the Refugee Act, Impoundment Control Act, and constitutional separation of powers. For example: The Refugee Act provides that government officials "shall" provide funding for services like employment and English training "to the extent of available appropriations" "as quickly as possible," 8 U.S.C. § 1522(a), and those obligations apply to the program of initial resettlement, which must be administered "consistent with the objectives of this subchapter," *id.* § 1522(b)(1)(A). The Impoundment Control Act forbids the government from rescinding budget authority without a rescission bill from Congress, and from "withholding or delaying the obligation or expenditure of budget authority" except for three specified purposes that do *not* include policy disagreements. 2 U.S.C. §§ 682-84. And the Constitution's

vesting of the power of the purse in Congress prevents Executive-Branch officials from unilaterally refusing to expend appropriated funds or defying Congress's restrictions on impoundment. *See In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

Moreover, sovereign immunity does not protect the federal-official Defendants from USCCB's claims for equitable relief regardless of whether that relief is construed as specific performance of a contract, because federal officials may be enjoined from committing *ultra vires* acts even if an injunction would have the effect of mandating specific performance. To be sure, the *Bowen* dissent read *Larson* to suggest that "sovereign immunity bars a suit against the United States for specific performance of a contract." *Bowen*, 487 U.S. at 921 (Scalia, J., dissenting). But *Larson* did not speak so broadly—it held only that sovereign immunity barred a claim seeking specific performance where "[t]here was no claim made that the [officials] were acting unconstitutionally" or in violation of a statutory "limitation on [their] delegated power." 337 U.S. at 691. *Larson* expressly contemplated situations in which "the action of an officer of the sovereign" in breach of contract could "be regarded as so 'illegal' as to permit a suit for specific relief against the officer as an individual," if the action exceeds "the officer's statutory powers" or is "constitutionally void." *Id.* at 701-02. Thus, if an officer's breach of contract is *ultra vires* because it exceeds the officer's statutory or constitutional authority, sovereign immunity poses no barrier to his being enjoined from acting *ultra vires*, even if that means he must specifically perform. *Cf. Transohio*, 967 F.2d at 610 (district court has "jurisdiction over a statutory or constitutional claim for injunctive relief even where the relief sought is an order forcing the government to obey the terms of a contract"). The injunction would not order *the sovereign* to do anything; far from it, the injunction would require the offending official to come into compliance with his obligations to the sovereign by carrying out his statutory and constitutional duties.

Finally, because no sovereign immunity attaches in the first place, the APA's waiver of sovereign immunity *does not matter* for these claims: "[N]othing in the subsequent enactment of the APA altered the *McAnnulty* doctrine of review." *Reich*, 74 F.3d at 1328 (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)). The APA "does not repeal the review of *ultra vires* actions recognized long before, in *McAnnulty*." *Id.* "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Id.* Thus, the "availability of ultra vires review is not dependent on the APA review process or on § 702's waiver of sovereign immunity." *Fed. Express Corp. v. U.S. Dep't of Com.*, 486 F. Supp. 3d 69, 80 (D.D.C. 2020). This Court has jurisdiction to enter injunctive relief on the Conference's statutory and constitutional claims against federal officers.

## II.    USCCB's Claims Are Not Moot

The government argues that "a decision from this Court to enjoin any purported policy would be forward-facing" and therefore would "fail to redress Plaintiff's asserted injury, which is the Department's past suspension of the Agreements." Mot. 15. That is mistaken several times over. The Conference's claims are not moot because it requests relief that would restore its legal relationship with the government, removing a legal impediment that would preclude it from receiving newly admitted refugees; because it would obtain a declaratory judgment establishing that the government's action violated statutory, regulatory, and constitutional obligations; and because it would lessen the reputational harm imposed on the Conference by the government's unlawful acts. The government's mootness discussion addresses none of these considerations and addresses only the Conference's right to payment for refugees admitted prior to the suspension. While those refugees are an acute indication of the Conference's injury, they are not the sole basis of its claims.

The government's narrow focus is misplaced. It has failed to meet its "heavy burden" of proving mootness. *Maldonado v. Dist. of Columbia.*, 61 F.4th 1004, 1006 (D.C. Cir. 2023).

Mootness "applies to each form of relief requested." *Louie v. Dickson*, 964 F.3d 50, 54 (D.C. Cir. 2020). Courts must therefore "proceed claim by claim" before dismissing a case on mootness grounds. *Id.* A claim "becomes moot only when it is *impossible* for a court to grant *any effectual relief whatever* to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (emphasis added; quotation marks omitted).

To begin, the government has voluntarily continued to admit a limited number of SIV holders and is currently under court order to continue processing admissions for certain refugees. *See Pacito v. Trump*, No. 2:25-cv-00255-JNW, Dkt. 112 at 1 (W.D. Wash. Apr. 18, 2025) (government has decided to "admit a group of 65 'high value' Afghan refugees"); Dkt. 45 at 61 (W.D. Wash. Feb. 28, 2025) (enjoining "the suspension of refugee processing, decisions, and admissions"). But, because the government has purportedly suspended and terminated its relationship with the Conference, it will not consider placing new refugees with the Conference. The unlawful suspension and termination thus pose an absolute barrier to the Conference's ability to partner with the government to care for new refugees. Vacating the suspension and termination or enjoining the government from relying on the suspension or termination would remove that bar and redress that injury. Independently, this case would not be moot even if the government were to totally stop admitting new refugees and no other meaningful relief were possible, because the suspension and

termination would be "capable of repetition yet evading review": The government could strategically halt refugee admissions to moot cases like this one before restarting admissions at will. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 321 (D.C. Cir. 2014).[5]

In any event, USCCB's requested relief would meaningfully redress its injuries.

*First*, USCCB's request for a judicial declaration "that the Refugee Funding Suspension and Refugee Funding Termination … violate" federal statutes and the constitutional separation of powers is not moot. Dkt. 29 (Am. Compl.) at 40. That relief would be valuable to USCCB even now after its recent class of refugees has graduated from the initial resettlement program. For one, the declaration would establish USCCB's continued eligibility to receive and assist newly admitted refugees and SIV holders into its resettlement programs, thereby redressing the injury to its religious mission. The declaration also would partially restore USCCB's reputation and goodwill with the refugees it could not fully serve, the partners it could not fully compensate, and the community writ large: A judgment that the government acted unlawfully in suspending and terminating its partnership with USCCB would "lift some of the shame associated with" losing a public award, *Kidwell*, 56 F.3d at 285, thus rehabilitating in part USCCB's "professional reputation," *Crowley*, 38 F.4th at 1111.

Moreover, a declaration that the suspension and termination were unlawful would make clear the government's legal obligation to reimburse the millions of dollars USCCB has expended for refugee services since January 24, 2025. The government has shown that it will rely on the

---

[5] The government's purported "reinstatement" of the cooperative agreements does not affect the Conference's claims. The government reinstated the agreements only because it was under court order to do so in a related proceeding. The government immediately purported to suspend the agreements and has never conceded that the initial suspension or termination were ineffective or unlawful. The government cannot, by repeatedly purporting to revoke or reinstate the program, effectively prevent any reviewing court from rendering a judgment as to the lawfulness of its suspension.

purported validity of the suspension and termination to deny reimbursement for post-January 24 expenses. *See, e.g.*, Dkt. 29-8 (Notice of Termination) ("[P]ayment requests for legitimate costs *incurred prior to the effective date of the Notice of Suspension* are allowable." (emphasis added)). But if the suspension and termination were unlawful, then USCCB's agreements remained in force while USCCB continued assisting refugees. Even though USCCB has not requested from this Court any order directing the government to pay it under the terms of its agreements, the requested "declaration of [USCCB's] legal right to" seek reimbursement "could form the basis of" an action in the Court of Federal Claims. *Ctr. for Arms Control & Non-Proliferation v. Pray*, 531 F.3d 836, 839 n.* (D.C. Cir. 2008); *see also Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, 2021 WL 1198047, at *17 (D.D.C. Mar. 30, 2021) (a request for declaratory judgment is not moot when the judgment "can then be used by plaintiffs as ammunition for their attack on" government action in a separate forum (cleaned up)). In other words, this Court (and *only* this Court) can grant a declaration that the suspension and termination violated federal statutes, regulations, and the Constitution. Because the implication of such a declaration would be that USCCB's agreements have remained effective, USCCB could rely on it in a future lawsuit in the Court of Federal Claims to seek money owed under those agreements. Thus, the lawfulness of the suspension and termination clearly remains "a substantial controversy … of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975) (quotation marks and emphasis omitted).

*Second*, the Conference's prayer that the Court "[h]old unlawful and set aside" and enjoin enforcement of the suspension and termination, Dkt. 29 (Am. Compl.) at 40, would likewise have "real-world consequences" for the Conference, *Pub. Emps. for Env't Resp.*, 2021 WL 1198047, at *12 (case not moot where setting aside agency action would provide "effectual relief"). Vacatur

would restore the *status quo ante*, "as if the agency had never [suspended or] terminated" USCCB's cooperative agreements. *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 68 (D.D.C. 2018); *accord Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 829 (2024) (Kavanaugh, J., concurring) ("[T]he phrase 'set aside' meant 'cancel, annul, or revoke.'").  Restoring the *status quo* would include restoring the Conference's eligibility to receive newly admitted refugees into its programs.  As with the declaratory judgment, this relief would partially remedy the missional and reputational harms the Conference experienced from the government's unlawful actions.  Moreover, vacatur of the suspension and termination (on statutory or constitutional grounds) would also restore the State Department's obligations for the duration of the cooperative agreements' period of performance—obligations USCCB could seek to enforce in a separate proceeding in the Court of Federal Claims.

*Finally*, USCCB's request for an injunction ordering the government to comply with its statutory and regulatory obligations, including its obligation under the Refugee Act to provide initial-resettlement services, would provide meaningful relief.  It would require the government to provide resettlement services to any new refugees or SIV holders it admits, including those it may place in USCCB's programs.  This relief would be meaningful because it would require the government to fulfill the obligation Congress imposed in the Refugee Act and it would ensure that newly admitted refugees receive the services they are entitled to, whether through the Conference or otherwise.

The Conference's claims are not moot.

## III.    The Government Was Required To Engage In Notice-and-Comment Rulemaking

The government asks the Court to dismiss the Conference's Section 553 claim based on the erroneous suggestion that notice-and-comment procedures do not apply to the government's

decision to end the program of initial resettlement assistance for newly admitted refugees. Mot. 16. The D.C. Circuit has "consistently declined to allow the exceptions itemized in § 553 to swallow the APA's well-intentioned directive." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987); *accord Alcaraz v. Block*, 746 F.2d 593, 612 (D.C. Cir. 1984) ("The exceptions to [S]ection 553 will be 'narrowly construed and only reluctantly countenanced.'").

The government characterizes its actions as a matter "relating to ... loans, grants, benefits, or contracts," Mot. 16 (quoting 5 U.S.C. § 553(a)(2)), but the challenged conduct extends far beyond a grant determination. The government has unilaterally discontinued a program that gives resettlement assistance to thousands of refugees on their entry into the United States. In so doing, it has contravened Congress's command in the Refugee Act and in repeated and ongoing appropriations statutes. To be sure, the government's unlawful closure of this program has impacts on grant partners, including the Conference. But it also has much broader impacts, on refugees, on those members of the public who house, employ, educate, or work with refugees, and on the United States' policy to be a welcome home to those fleeing oppression. The closure of the program "alter[s] the rights or interests of parties" beside those flowing from grants or contracts. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (quotation marks omitted). Such a drastic measure qualifies as a substantive rule. *See, e.g.*, *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1285 (D.C. Cir. 2005) (holding that a nationwide dredge and fill permit was a legislative rule because such permits "'grant rights, impose obligations, or produce other significant effects on private interests'"). Just as the D.C. Circuit has "struck down as nonprocedural an agency rule foreclosing home health agencies from the right to deal with the Secretary of HHS in order to gain reimbursement for Medicare," *Am. Hosp. Ass'n*, 834 F.2d at

1048, the government's decision here to absolutely preclude USCCB and its other former resettlement partners from "deal[ing]" with the government was a substantive rule that altered and affected the rights of private parties.  The government thus needed to engage in the notice-and-comment process before shuttering the program, and the Court should not dismiss USCCB's claim to that effect.

## CONCLUSION

The Court should deny the government's motion to dismiss.

May 12, 2025

Respectfully submitted,

/s/ David W. Casazza

William Quinn (D.C. Bar No. 1601853)*
Shannon Eckman (D.C. Bar No. 90024504)*
UNITED STATES CONFERENCE OF CATHOLIC
BISHOPS
3211 Fourth Street, NE
Washington, DC 20017
(202) 541-3300
WQuinn@usccb.org

Dhananjay Manthripragada
  (D.C. Bar No. 990448)*
Nick Harper (D.C. Bar No. 144707)
David W. Casazza (D.C. Bar No. 1046918)
Connor P. Mui (D.C. Bar No. 90009004)*
Aly Cox (D.C. Bar No. 1780473)
Laura Stanley (D.C. Bar No. 90008623)*
Hunter Mason (D.C. Bar No. 90021049)*
Audrey Payne (D.C. Bar No. 90028352)*

GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500
Dmanthripragada@gibsondunn.com
Nharper@gibsondunn.com
Dcasazza@gibsondunn.com
Cmui@gibsondunn.com
Acox@gibsondunn.com
Lstanley@gibsondunn.com
Hmason@gibsondunn.com
Apayne@gibsondunn.com

*pro hac vice

Counsel for the United States Conference of Catholic Bishops

40