UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| U.S. CONFERENCE OF CATHOLIC BISHOPS,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>DEPARTMENT OF STATE, et al.,<br><br>　　　　Defendants. | Civil Action No. 25-0465 (TNM) |

### REPLY IN FURTHER SUPPORT OF MOTION TO DISMISS

Defendants, through undersigned counsel, respectfully reply in further support of their motion to dismiss.

### I.　　The Tucker Act Bars Jurisdiction in this Court

Defendants largely rely on the arguments advanced in their opening brief. "An action against the United States which is *at its essence* a contract claim lies within the Tucker Act and a district court has no power to grant injunctive relief in such a case." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)) (cleaned up). "Whether a claim is 'at its essence' contractual for the Tucker Act 'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'" *Id.* As explained in Defendants' opening brief, the source of Plaintiff's rights in this case stem from its cooperative agreements, and even if Plaintiff tries, again, to convince the Court otherwise, ultimately, Plaintiff seeks money it believes it is due under those agreements. Under these circumstances, the Tucker Act bars jurisdiction in this Court. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 892-95 (D.C. Cir. 1985); *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 76-80 (D.C. Cir. 1985).

Seeking to avoid this fate, Plaintiff, again, argues that the source of its right does not stem from its cooperative agreements; instead, it stems from the APA, various statutes, the Constitution, and regulations. And while Plaintiff concedes that it would obtain money it believes that it is due under the agreements if the Court were to provide the relief it seeks, Plaintiff insists that the primary reason for bringing this suit is not for money; instead, it is to vindicate the perceived rights of others. *See, e.g.*, Pl.'s Opp'n at 20 ("USCCB's core claim is that the government has a statutory obligation to provide refugee resettlement assistance because the Refugee Act demands that it 'shall, to the extent of available appropriations,' provide certain enumerated services, including language training, job training, and other transitional assistance *to newly admitted refugees*."); *id.* at 22 ("USCCB's request to enjoin the government to comply with the Refugee Act seeks to vindicate *refugees' right* to receive services and would not require any payments to USCCB under its agreements.").

The problem with Plaintiff's position, however, is that it conflates Plaintiff's rights and legally protected interests with the perceived[1] rights and interests of others. Generally, to establish standing,[2] a plaintiff must have suffered an injury in fact, or an invasion of a legally protected interest. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The "injury in fact" test "requires that the party seeking review be himself among the injured." *Id.* at 563. The requirement serves an important purpose: it "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Food & Drug Admin. v. All.*

---

[1] To be clear, while Defendants frame this argument as "the rights of others," Defendants do not concede that any of the statutes to which Plaintiff cites create a private cause of action for others, namely, refugees. As will be explained in more detail, Defendants merely stress that, if any such right exists, Plaintiff does not possess it.

[2] It does not appear that standing was addressed in Defendants' opening motion, but since the issue goes to the Court's jurisdiction, Defendants address it here.

*for Hippocratic Med.*, 602 U.S. 367, 381 (2024). "For example, a citizen does not have standing to challenge a government regulation simply because the plaintiff believes that the government is acting illegally." *Id.* (citing *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982)). A citizen may not sue based only on an "asserted right to have the Government act in accordance with law." *Id.* (citations omitted). "Nor may citizens sue merely because their legal objection is accompanied by a strong moral, ideological, or policy objection to a government action." *Id.* (citing *Valley Forge*, 454 U.S. at 473). As the Supreme Court recently explained:

> The injury in fact requirement prevents the federal courts from becoming a "vehicle for the vindication of the value interests of concerned bystanders." An Article III court is not a legislative assembly, a town square, or a faculty lounge. Article III does not contemplate a system where 330 million citizens can come to federal court whenever they believe that the government is acting contrary to the Constitution or other federal law. Vindicating "the public interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive."

*All. for Hippocratic Med.*, 602 U.S. at 382 (citations omitted).

Here, Plaintiff repeatedly argues that it is not filing suit to vindicate its own contract rights. *See, e.g.*, Pl.'s Opp'n at 9 ("USCCB does *not* seek an order requiring the government to disburse funds to USCCB or obey the terms of its agreements."); *id.* at 22 ("[The Conference] does *not* assert any breach-of-contract claim."). But if the cooperative agreements are not the source of Plaintiff's right here, Plaintiff would have no basis to vindicate the rights of others under any of the statutes it references, assuming without conceding that those statutes create private rights of action. *Lujan*, 504 U.S. at 562 ("Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." (citation omitted)). Said differently, whether a refugee receives assistance under the Refugee Act is not an injury that Plaintiff experienced. Plaintiff may

be upset or have strong feelings about whether refugees receive assistance, but that is not enough of a legally cognizable injury to Plaintiff itself.

At times, Plaintiff also complains about the ability of other resettlement agencies to be able to provide services for refugees and be reimbursed for those services. *See, e.g.*, Pl.'s Opp'n at 22 ("In fact, the government could fulfill this statutory obligation (and satisfy a mandatory injunction) by partnering with other resettlement agencies, working directly with the Conference's sub-grantees, or offering services directly to refugees. The government need not partner with the Conference under the cooperative agreements to fulfill this obligation, and whether the government has fulfilled that obligation does not depend on the cooperative agreements."). But again, Plaintiff does not have the right to sue for any alleged injury to other resettlement agencies either.

Without the cooperative agreements in this case, Plaintiff would be no differently situated than the public at large, upset about the decision to suspend the U.S. Refugee Admissions Program, but the public at large would not have a right to sue for any purported injuries to the refugees or other resettlement agencies. *Lujan*, 504 U.S. 573-74 ("We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.").

Thus, if Plaintiff has any right of its own in this case, it stems from the injury of not being paid under the cooperative agreements. It does not stem from the injury to the refugees who did not get assistance or services under any of the statutes referenced, again, assuming they had a private right of action. The source of Plaintiff's right here is based on its cooperative agreements.

The rest of Plaintiff's arguments have already been addressed by the Court before or are erroneous. For example, although Plaintiff continues to argue that it does not seek money damages—instead, it seeks declaratory and injunctive relief—Plaintiff must concede, as it does, that declaratory and injunctive relief would result in money damages under the cooperation agreements. Pl.'s Opp'n at 27 ("To be sure, this relief would have the effect of requiring the government to continue performing its obligations under USCCB's cooperative agreements—including reimbursing USCCB for expenses incurred to provide refugee services and continuing USCCB's resettlement programs for newly admitted refugees and SIV holders on an ongoing basis."). As the Court found before, "accepting such an argument would be to distort the obvious. Sure, the Conference seeks to set aside agency action. But the agency action that it asks the Court to reverse is the Government's decision to cease a financial relationship with the Conference. This is not standard injunctive fare." *U.S. Conf. of Cath. Bishops v. Dep't of State*, Civ. A. No. 25-0465 (TNM), 2025 WL 763738, at *7 (D.D.C. Mar. 11, 2025).

Plaintiff also argues that the Court of Federal Claims cannot vindicate the rights it purports to have under the statutes to which it cites. Pl.'s Opp'n at 30-33. As stated above though, Plaintiff's right, if any, is sourced from its cooperative agreements, and the Court of Federal Claims likely has jurisdiction over any claim related to the agreements. 28 U.S.C. §§ 1346(a)(2); 1491(a)(1). For example, in *Columbus Regional Hospital v. United States*, 990 F.3d 1330, 1338-40 (Fed. Cir. 2021), the Federal Emergency Management Agency entered a written disaster relief agreement with the State of Indiana. The Federal Circuit ruled that the agreement was a binding contract, citing its prior precedent which held that federal grant agreements constitute contracts "when the standard conditions for a contract are satisfied, including that the federal entity agrees to be

5

bound." *Id.* at 1338. If the Federal Circuit found jurisdiction there, it is hard to see why the Court of Federal Claims would not do so here.

Plaintiff then argues that Tucker Act exclusivity "defies statutory text and Supreme Court precedent," and tries to distinguish this case from *Department of Education v. California*, 145 S. Ct. 966 (2025), but the argument is unavailing. In *California*, the district court issued a temporary restraining order enjoining the government from terminating various education-related grants and requiring the government to pay out past-due grant obligations and to continue paying obligations as they accrue. *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025). But the Supreme Court stayed the order after reaffirming the longstanding notion that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money'" and explaining that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.*

Plaintiff also tries to make a distinction between the APA and other statutes referenced. Pl.'s Opp'n at 37-41. Plaintiff continues, regardless of whether Defendants have waived sovereign immunity under the APA, the Court has jurisdiction under the *ultra vires* doctrine and equitable considerations for the other statutes referenced. *Id.* At the outset, it bears mentioning that, although Plaintiff may certainly plead inconsistent claims, Fed. R. Civ. P. 8(d)(3), that Plaintiff is arguing it has an APA claim does not help its *ultra vires* theory. *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 842 n.7 (D.C. Cir. 2024) ("Because we hold that Congress has provided for APA review of [Digital Millennium Copyright Act] rules, the *ultra vires* claim is no longer available[.]").

That is because "[t]ime and again, courts have stressed that *ultra vires* review has 'extremely limited scope.'" *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721-22 (D.C.

Cir. 2022) (citation omitted). The D.C. Circuit has described an *ultra vires* claim as "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Id.* at 722. "Only error that is patently a misconstruction of the Act, that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *Id.* "That demanding standard is necessary because *ultra vires* review seeks the intervention of an equity court where Congress has not authorized statutory judicial review, on the assumption that Congress has not 'barred judicial comparison of agency action with plain statutory commands[.]'" *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (citation omitted).

Regardless, any distinction between the APA and the other statutes cited makes little difference. Again, assuming without conceding that Plaintiff had a right under any of the statutes to which it cited, a "plaintiff may not avoid the jurisdictional bar . . . merely by alleging violations of regulatory or statutory provisions rather than breach of contract," whatever the statutes and regulations are. *Info. Sys. & Networks Corp. v. Dep't of Health & Hum. Servs.*, 970 F. Supp. 1, 4–5 (D.D.C. 1997); *see also Ingersoll-Rand*, 780 F.2d at 77 ("We begin with the well-accepted proposition that a plaintiff may not avoid the jurisdictional bar of the [Contract Disputes Act] merely by alleging violations of regulatory or statutory provisions rather than breach of contract.").

For the reasons above, and those explained in the opening brief, the Tucker Act bars Plaintiff's claims.

## II.     Regardless of Whether There is a Currently Ongoing Case or Controversy, it is for the Court of Federal Claims to Decide

Defendants argued in their opening motion that Plaintiffs' claims are moot. Defendants wish to clarify that if a case or controversy exists, it belongs in the Court of Federal Claims. At best, Plaintiff may have suffered an injury by rendering services under the agreements totaling $13 million, for which it states it has yet to be paid for. Am. Compl. ¶ 7 ("As a direct result of the

suspension and termination, USCCB has millions of dollars in pending, unpaid reimbursements for services already rendered to refugees and is accruing millions more each week—with no indication that any future reimbursements will be paid."); *id.* ¶ 52 ("But the government has thus far refused to reimburse USCCB for more than $13 million in reimbursement funds for initial-resettlement services rendered before January 24."). The merits of that claim, however, is for another day in another court.

That said, as argued in Defendants' opening brief, as of April 24, 2025, any refugees assigned to Plaintiff would no longer be in the first 90 days that they are in the United States. 2d Zerbinopoulos Decl. (ECF No. 25-1), Ex. 1 (listing the dates of admission). A decision from this Court to enjoin any purported policy would be forward-facing, even were it justified, and, thus, would fail to redress Plaintiff's asserted injury, which is the Department's past suspension of the agreements. *See COMED v. HHS*, 671 F.3d 1275, 1279–80 (D.C. Cir. 2010) (affirming dismissal, for lack of standing, of a claim seeking to enjoin certain vaccines, because past injuries are not redressable by prospective injunctive relief).

Plaintiff insists that this case is not moot because declaratory and injunctive relief would redress speculative injuries like goodwill, stigma, and reputation harm. Pl.'s Opp'n at 9, 43-45. Plaintiff also continues that an injunction "would require the government to fulfill the obligation Congress imposed in the Refugee Act and it would ensure that newly admitted refugees receive the services they are entitled to, whether through the Conference or otherwise." *Id.* at 45. But Plaintiff cannot use an Article III court to contest the policy decisions of the other branches of government with which it disagrees. *All. for Hippocratic Med.*, 602 U.S. at 382 ("Vindicating the public interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive." (quoting *Lujan*, 504 U.S. at 576)

8

(cleaned up)). While Plaintiff may have "a strong moral, ideological, or policy objection to" Defendants' decision to suspend the U.S. Refugee Admissions Program, as explained above, "Article III does not contemplate a system where 330 million citizens can come to federal court whenever they believe that the government is acting contrary to the Constitution or other federal law."[3] *All. for Hippocratic Med.*, 602 U.S. at 381-82 (citations omitted). If Plaintiff is upset with the decision to suspend the U.S. Refugee Admissions Program, which obviates the need for future services, the more appropriate avenue to contest the disagreement is at the ballot box, not in an Article III court.

### III. Implementation of an Executive Order Is Not Subject to Notice and Comment

Defendants rely on the arguments made in their opening brief from this section. 5 U.S.C. § 553(a)(2) exempts, "a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts" from notice-and-comment rule making. 5 U.S.C. § 553(a)(2); *see also Lincoln v. Vigil*, 508 U.S. 182, 196 (1993) ("Section 553 has no application, for example, to 'a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.'" (quoting section 553(a)(2)). The Department's implementation of the executive orders, pausing payments under the agreement with Plaintiff clearly involves "loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(1). As such, the State Department was exempt from the requirement of section 553(b). *See Nat'l Wildlife Fed'n v. Snow*, 561 F.2d 227, 232 (D.C.

---

[3] It bears mentioning that federal law—specifically sections 212(f) and 215(a) of the Immigration and Nationality Act—provide, "[w]henever the President finds that the entry of any [noncitizens] or of any class of [noncitizens] into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all [noncitizens] or any class of [noncitizens] as immigrants or nonimmigrants, or impose on the entry of [noncitizens] any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f).

9

Cir. 1976) (exempting from notice and comment rulemaking procedure regulations governing the Federal Aid Highway grant program).

## CONCLUSION

For the reasons above, and those in Defendants' opening motion, the Court should dismiss this case.

Date: May 19, 2025
Washington, DC

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:   */s/ Sam Escher*
SAM ESCHER, D.C. Bar #1655538
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-2531
Sam.Escher@usdoj.gov

*Attorneys for the United States of America*